1        UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF OHIO

3            EASTERN DIVISION

4

5          DEPOSITION OF PAUL MONROE

6

7    NIKI FRENCHKO,                  )
                                     )
8                                    )        Case No.
                  Plaintiff,         )
9                                    )      4:23 CV 00781
     VS.                             )
10                                   )
                                     )
11   PAUL MONROE, ET AL.             )
                                     )
12                                   )
                  Defendants.        )
13

14

15      Deposition taken in the above-entitled cause, pursuant

16   to Agreement before Jodie L. Algarin, a Notary Public for

17   the State of Ohio, on September 14, 2023, to be used

18   pursuant to the Rules of Civil Procedure or by agreement

19   of counsel in the aforesaid cause of action, pending in

20   the United States District Court for the Northern District

21   of Ohio, Eastern Division.

22

23

24

25

```
 1    APPEARANCES OF COUNSEL

 2

 3

 4    On Behalf of Plaintiff:

 5        Matt Miller-Novak, Esquire
          Barron, Peck, Bennie & Schlemmer Co., LPA
 6        3074 Madison Road
          Cincinnati, Ohio  45209
 7        (513) 721-1350
          mmn@bpbslaw.com
 8

 9        David J. Betras, Esquire
          Betras, Kopp & Markota
10        6630 Seville Drive
          Youngstown, Ohio  44406
11        (330) 746-8484
          dbetras@bkmlaws.com
12

13

14    On Behalf of Defendants Harold Wix and Robert Ross:

15        Andrew N. Yosowitz, Esquire
          Teetor Westfall
16        200 E. Campus View Boulevard, Suite 200
          Columbus, Ohio  43235
17        (614) 412-4000
          ayosowitz@tettorlaw.com
18

19

20    On Behalf of Defendants Sheriff Paul Monroe, Trumbull
      County, Trumbull County Board of Commissioners, Trumbull
21    County Sheriff's Office, Mauro Cantalamessa and Frank
      Fuda:
22
          Helen K. Sudhoff, Esquire
23        Fishel Downey Albrecht & Riepenhoff, LLP
          7775 Walton Parkway, Suite 200
24        New Albany, Ohio  43054
          (614) 221-1216
25        hsudhoff@fisheldowney.com
```

1                          STIPULATIONS

2

3

4          It is stipulated and agreed by and between counsel

5     for the parties hereto that this deposition may be taken

6     at this time, 1:10 p.m., September 14, 2023, at the

7     offices of Atty. David Betras, 6630 Seville Drive,

8     Canfield, Ohio.

9          It is further stipulated and agreed by and between

10    counsel that the deposition may be taken in shorthand by

11    Jodie L. Algarin, a Notary Public within and for the State

12    of Ohio, and may be by her transcribed with the use of

13    computer-assisted transcription; that the witness's

14    signature to the finished transcript of his deposition is

15    not waived; and that the deposition will be available for

16    the witness to read and sign the finished transcript of

17    his deposition.

18

19

20

21

22

23

24

25

```
 1                        INDEX

 2

 3   CROSS EXAMINATION BY MR. MILLER-NOVAK -  PAGE 5

 4

 5

 6   OBJECTIONS:

 7   BY MR. YOSOWITZ - PAGE(S) 15, 16, 39, 40, 55, 84, 99, 108,

 8   109

 9   BY MS. SUDHOFF - PAGE(S) 16, 26, 28, 29, 31, 40, 41, 54,

10   57, 58, 73, 77, 78, 86, 95, 99, 108, 109, 110, 114, 118

11

12

13   DEFENDANT'S EXHIBITS:

14   EXHIBIT 1 - PAGE 33

15   EXHIBIT 2 - PAGE 81

16   EXHIBIT 5 - PAGE 10

17   EXHIBIT 9 - PAGE 64

18   EXHIBIT 10 - PAGE 72

19   EXHIBIT 11 - PAGE 75

20   EXHIBIT 12 - PAGE 80

21   EXHIBIT 13 - PAGE 112

22

23

24

25
```

```
 1                    WHEREUPON,

 2                    PAUL MONROE,

 3                    Called as a witness, having been first

 4                    duly sworn by the Notary Public to testify

 5                    the truth, the whole truth and nothing but

 6                    the truth, was examined and testified as

 7                    follows:

 8   CROSS EXAMINATION

 9   BY MR. MILLER-NOVAK:

10   Q.               Okay.  Can you state and spell your name for

11   the record, please?

12   A.               Paul Monroe, P-A-U-L, M-O-N-R-O-E.

13   Q.               Mr. Monroe, my name's Matt Miller-Novak.  I

14   represent Ms. Frenchko in this case.  I know we have not

15   met before today.  What would you prefer I refer to you

16   as?

17   A.               Paul's fine.

18   Q.               Paul.  Okay.  If you have any questions for

19   me, you want to get my attention, Matt --

20   A.               Okay.

21   Q.               -- is fine.  We'll do first names today

22   then.  So have you ever been deposed before?

23   A.               Yes.

24   Q.               Okay.  I rarely come across officers who

25   haven't.  So when's the last time you were deposed?
```

1    A.          It's been a few years.

2    Q.          Okay.  Do you know what case that was?

3    A.          It was a civil suit with Charter Oaks

4    Development.

5    Q.          Were you the sheriff at the time?

6    A.          I was.

7    Q.          Okay.  What was the nature of that case?

8    A.          Dispute over poor workmanship.

9    Q.          So it was contractual?

10   A.          Yes.

11   Q.          Okay.  Well, it's been a few years, so I

12   just want to kind of maybe refresh you a little bit.  So,

13   you know, you're under oath, as you understand, correct?

14   A.          Yes.

15   Q.          And you understand that she's taking a

16   written record of --

17   A.          Yes.

18   Q.          Okay.  And because of that -- and you're

19   already doing it -- we want to make sure we use the words

20   yes or no.  We don't want to use uh-huhs or huh-uhs, so

21   the record's clear.  Do you understand?

22   A.          Yes.

23   Q.          In addition, because it does happen

24   sometimes, we tend to interrupt each other when we're

25   talking in normal human behavior, but because this is a

1   written record, we want to do the best we can to allow

2   each other to finish speaking before we speak.  Do you

3   understand?

4   A.          Yes.

5   Q.          And if for any reason my questions are

6   unclear to you and you want me to clarify the question

7   because you don't understand it, please feel free to ask

8   me.

9   A.          Okay.

10  Q.          If you need to take a break today for any

11  reason, please feel free to ask me.

12  A.          Okay.

13  Q.          Okay.  The only thing I ask if you take a

14  break is that you finish the question that's on the table.

15  Does that make sense?

16  A.          Yes.

17  Q.          I guess the next question is, and you don't

18  have to tell me what the medication is, are you on any

19  medication or --

20  A.          I don't take any medications.  I'm not on

21  any medications.

22  Q.          Okay.  Are you able to clearly testify and

23  recall things today?

24  A.          Yes.

25  Q.          Okay.  So I'm going to ask you some

1    questions about your work history first.  So when did you

2    first get into law enforcement?

3    A.          1985.

4    Q.          That was a few years ago.  And where was

5    that?

6    A.          Howland Township Police Department.

7    Q.          Okay.  Howland Tigers?

8    A.          Yes.

9    Q.          And what was your initial position at

10   Howland Township?

11   A.          Reserve patrol officer.

12   Q.          And how long were you reserve patrol

13   officer?

14   A.          About a year and a half.

15   Q.          Then what?

16   A.          Patrol officer.

17   Q.          Full time?

18   A.          Yes.

19   Q.          Okay.  And how long did you do that?

20   A.          I'm not -- actually, probably only about

21   seven, eight months, then I was moved into the detective

22   bureau to work on homicide.

23   Q.          Seems fast to me.  Is that fast?

24   A.          That was fast.

25   Q.          Okay.  How long were you a detective at

```
1    Howland?

2    A.          Long time.

3    Q.          Your entire tenure there?

4    A.          No.  I was promoted to sergeant, went back

5    to the road, and then went back to the detective bureau

6    after that.  Not sure on the exact dates or years.

7    Q.          At what time did you -- did you finish back

8    on the road?  Because you said you were on the road, you

9    were a detective, then you went back to sergeant on the

10   road, correct?

11   A.          Yes.  Then I went to police chief.

12   Q.          You were the chief of Howland.  How long

13   were you the chief at Howland?

14   A.          Thirteen years.

15   Q.          What was your next step?

16   A.          Sheriff.

17   Q.          Sheriff.  And what year was that?

18   A.          2017.

19   Q.          And you've been sheriff ever since in

20   consecutive terms?

21   A.          Yes.

22   Q.          And what party were you endorsed by?

23   A.          Democratic party.

24   Q.          Do you know Mauro Cantalamessa?

25   A.          Yes.
```

```
 1   Q.            How do you know him?

 2   A.            County commissioner where I work.

 3   Q.            When did you first meet Mauro?

 4   A.            My best recollection would be about 2015,

 5   2016.

 6   Q.            He was the precinct chair at the time?

 7   A.            I believe he was -- he was a commissioner

 8   at the time, and I was beginning to run for office.

 9   Q.            Okay.  Did he help you in your campaign?

10   A.            No, no.

11   Q.            Did he have any kind of headquarters or

12   anything like that you would use?

13   A.            I didn't participate in any politics with

14   Mauro Cant- --

15   Q.            It's a tough one.

16   A.            Yeah.  Cantalamessa.

17   Q.            You can just say Mauro.  So the record's

18   clear, when we say Mauro, we're referring to Mauro

19   Cantalamessa.

20   A.            Yes.

21   Q.            Is that okay with you?

22   A.            Yes.

23   Q.            He has a lot of syllables.

24   A.            Yes, it does.

25   Q.            That way we'll just shorten it to two.
```

```
 1   A.           Okay.

 2   Q.           It's easier for both of us.  So you're

 3   saying that you never received any financial or in kind

 4   help from Mauro?

 5   A.           No, I have not.

 6   Q.           What about any of his family members?

 7   A.           Yes.

 8   Q.           Okay.  Which one?

 9   A.           Bart DiVieste.

10   Q.           Okay.  That's a lot syllables, too.

11   A.           Yes, it is.

12   Q.           Okay.  And what did Bart do for you?

13   A.           Bart allowed me to use some of his

14   property for signage and a storage area that I was able

15   to keep signs in and have meetings in with people that

16   were helping me get elected.

17   Q.           Okay.  And what is his relation to Mauro?

18   A.           I think it's his uncle.

19   Q.           Okay.  Did you receive any other help from

20   any of Mauro's family members?

21   A.           As far as what?

22   Q.           Campaigning, running for office.

23   A.           Mostly just providing properties I was

24   able to put political signs on.  I don't know if any of

25   them provided me any financial support.
```

1    Q.          You mean some of the other family members

2    said bring a sign by, I'll put it in my yard kind of

3    thing?

4    A.          Yes.  Some had commercial properties.

5    Mostly Bart DiVieste had a lot of properties in Trumbull

6    County.

7    Q.          Would you have considered Bart's location

8    kind of a campaign headquarters at the time?

9    A.          Yes.

10   Q.          Okay.  What about Mr. Fuda?  How do you know

11   Mr. Fuda?

12   A.          Just as a commissioner and interacting

13   with him in the workplace.

14   Q.          So did Mr. Fuda assist you at all?

15   A.          Not at all.

16   Q.          Okay.  What about any of his family members?

17   A.          I don't know any of his family.

18   Q.          Okay.  So in your history as a law

19   enforcement official, I'm assuming that you received

20   training, correct?

21   A.          Yes.

22   Q.          Okay.  Did you attend some type of academy

23   at some point, I would imagine?

24   A.          Yes.

25   Q.          Okay.  What academy was that?

```
1    A.            Ohio Peace Officer's Training Academy.

2    Q.            Would that have been kind of like prior to

3    1985?

4    A.            It would have been in '85.

5    Q.            Okay.  How long does the academy take?

6    A.            Back then, probably three or four months.

7    Q.            Little longer now probably?

8    A.            Yes.

9    Q.            When you were in the academy, did you

10   receive any training on laws?

11   A.            Yes.

12   Q.            Were you taught the difference between the

13   mental state of the crime and the act of the crime or

14   anything like that?

15   A.            Exactly what's your question?  Are you

16   talking about elements of the crime?

17   Q.            Yes.

18   A.            Yes.

19   Q.            So you did receive -- and I don't know how

20   it was worded to you, but I'll just represent, in law

21   school you kind of learn there's a mens rea and actus reus

22   and then kind of causation and a harm, correct?

23   A.            Okay.

24   Q.            Do you agree with that or is that the word

25   they use?
```

1    A.              I don't know that that was a question.

2    What is the question?

3    Q.              Fair enough.  In my head there was a

4    question mark after it.  So you talked about elements of a

5    crime.  Are you referring to elements of criminal

6    statutes, correct?

7    A.          Yes.

8    Q.              Do you understand that one of those is the

9    actus reus?

10   A.          Yes.

11   Q.              And one is the mens rea?

12   A.          Okay.

13   Q.              Which is the mental state required to

14   prosecute that crime, correct?

15   A.          Yes.

16   Q.              Okay.  To just give an example, sometimes

17   that's easier.  So the difference between involuntary

18   manslaughter and voluntary manslaughter is the purpose of

19   the criminal, correct?

20   A.          Yes.

21   Q.              So when you were a detective, there were

22   times where you knew you needed to accumulate evidence

23   that showed the mental state of the defendant, correct?

24   A.          As far as what?

25   Q.              Well, if you want to establish the

1    particular defendant -- because you said you were in

2    homicide, correct?

3    A.              I'm saying -- you're asking me am I

4    proving the mental state without the cooperation of the

5    defendant.  I don't have that ability.

6    Q.              Well, let me go back.  So you were a

7    homicide detective, correct?

8    A.              Yes.

9    Q.              Okay.  So you were in homicide.  You would

10   agree that there's a difference between, let's say, a

11   negligent homicide and an intentional homicide, correct?

12   A.              Yes.

13   Q.              And that would require different amounts of

14   evidence to show that a murder was -- or a homicide was

15   intentional as opposed to negligent, correct?

16   A.              Yes.

17   Q.              Okay.  And when you were investigating those

18   crimes, are you familiar with obstruction of justice?

19   A.              Yes.

20   Q.              And obstruction of justice would involve a

21   criminal defendant -- one example would be a criminal

22   defendant destroying evidence that related to that crime,

23   correct?

24                   MR. YOSOWITZ:  Objection.  Go on.

25   A.              Could be.

1    Q.          And another example would be potentially

2    lying during questioning, correct?

3                   MS. SUDHOFF:  Objection.

4                   MR. YOSOWITZ:  Objection, but go on.

5    A.          Yes.

6                   MR. BETRAS:  You represent the sheriff,

7    right, or you?

8                   MR. YOSOWITZ:  No, but I can still object.

9                   MR. BETRAS:  Okay.  I just got confused

10   for a moment, that's all.  I was like, wait.  That's

11   Helen's client.  But you said go ahead and answer.

12   That's what made me confused.

13                  MR. YOSOWITZ:  Well, sure.

14                  MR. MILLER-NOVAK:  Reflex.  That's all

15   right.

16   Q.          So when you're investigating certain

17   crimes -- like, I imagine when you were working in

18   homicide that you received probably a fair amount of

19   training on the differences between the different statutes

20   of which you were investigating, correct?

21   A.          I don't know that, other than reading the

22   revised code, that there really is ever any training

23   directed towards it.  We would present the facts to the

24   prosecutor's office and to a grand jury, and those

25   charges would be determined.

```
 1    Q.          As a sheriff, do you provide trainings to

 2    your deputies?

 3    A.          Yes.

 4    Q.          What kind of trainings do you provide?

 5    A.          There's a variety of training that's

 6    mandated by the State of Ohio, anywhere from domestic

 7    violence, search and seizure, criminal law updates.

 8    Q.          Do you provide different trainings to the

 9    different subdivisions of your department?

10    A.          Yes.

11    Q.          Okay.  So I guess somebody that's a

12    patrolman -- and I don't know.  Is that a good term?  Did

13    I butcher that?

14    A.          A road deputy training would be different

15    than, let's say, a detective that deals with sexual

16    assaults.

17    Q.          Okay.  Thanks.  You answered my question

18    better than I asked it.

19    A.          Okay.

20    Q.          In your career, do you know how many

21    homicides -- do you know how many arrests you've made

22    during your stint as a homicide detective?

23    A.          No.

24    Q.          Okay.

25    A.          When you refer to homicide detective --
```

```
 1    Q.            Yeah.

 2    A.            I guess in our area nobody's strictly a

 3    homicide detective.

 4    Q.            Okay.

 5    A.            We investigate everything from a smashed

 6    mailbox to an aggravated murder.

 7    Q.            Okay.

 8    A.            So it's what comes down your lane.

 9    Q.            Okay.

10    A.            I was assigned to a homicide task force

11    for a number of years.

12    Q.            But you still did detective work --

13    A.            Yes.

14    Q.            -- regarding other crimes?

15    A.            Absolutely.

16    Q.            Okay.  So you weren't limited to just

17    homicides?

18    A.            No.

19    Q.            You would also maybe have drug offenses and

20    other things?

21    A.            Yes.

22    Q.            Okay.  I guess -- Howland's roughly the size

23    of maybe like Austintown or Boardman.  Little smaller?

24    A.            Probably about half the size, I would

25    estimate, of Austintown.
```

```
 1   Q.              Okay.  In any of your arrests did you ever
 2   arrest somebody for obstruction of justice?
 3   A.              Nothing -- nothing really stands out, but
 4   I wouldn't be surprised if there was an arrest in there
 5   somewhere.
 6   Q.              Sometimes it's kind of like a companion
 7   crime, correct?
 8   A.              Yes.
 9   Q.              Tends to not usually be the only crime.  It
10   tends to be someone covering up another crime, correct?
11   A.              Only thing that really comes to mind is,
12   as an example, is a traffic stop where you tell me your
13   name's Dave Betras and we write you the ticket and
14   process it, and then we find out your name's Matt Novak.
15   Q.              Yeah.  If Dave ever tries to pretend to be
16   me, please throw the book at him, all right?  That was a
17   helpful example, though.  I guess it would probably be
18   maybe someone throwing their drugs out the window of the
19   car, too, correct?
20   A.              Could be.
21   Q.              Yeah.  And I'm going to be a little ignorant
22   for a second, but I watched a show Cops.  Did you ever
23   watch a show Cops?
24                   MR. BETRAS:  He hates it.  Go ahead.
25   A.              I don't watch law enforcement shows.
```

```
 1              MR. BETRAS:  I don't watch attorney shows

 2    either.

 3    Q.            On that show -- you know what, I never even

 4    did the research, but a lot of times when cops are

 5    searching somebody and they say do you have drugs in your

 6    pocket, and then they'll say if you lie to me that's

 7    obstruction of justice, would you agree with that?

 8    A.            No.

 9    Q.            Okay.  Thanks.  You just made that show less

10    enjoyable.  That's helpful.  All right.  In all your time

11    in law enforcement, do you have any personal experience

12    like working public meetings of boards?

13    A.            Working them in what aspect?

14    Q.            I guess, you know, being a security detail

15    like say in a school board meeting or something like that.

16    A.            No.

17    Q.            Have you ever received any training on

18    public meetings?

19    A.            No.

20    Q.            Have you ever worked in a commissioners'

21    meeting?

22    A.            No.

23    Q.            Have you ever attended a commissioners'

24    meeting?

25    A.            Yes.
```

```
 1    Q.          How many commissioner meetings have you

 2    attended?

 3    A.          I'm not sure.

 4    Q.          Do you attend them frequently?

 5    A.          No.

 6    Q.          Okay.  Have you ever been invited to attend

 7    commissioners' meetings?

 8    A.          Yes.

 9    Q.          Have you ever attended a commissioners'

10    meeting without being invited?

11    A.          Yes.

12    Q.          When you've attended a commissioners'

13    meeting without being invited, why would you do that?

14    A.          May have been something on the agenda that

15    dealt specifically with the sheriff's office or

16    something going on in the county that I wanted to see

17    where it was headed towards.

18    Q.          You felt in the past if you wanted to attend

19    a commissioners' meeting to discuss something that you

20    could do so?

21    A.          I've always felt that way.

22    Q.          Do you know Commissioner Frenchko?

23    A.          I know who she is.

24    Q.          Okay.  When did you first meet her?

25    A.          Probably first week of January two
```

1    thousand -- I'm going to guess '20 or '21 when she took

2    office.

3    Q.          What's your opinion of Commissioner

4    Frenchko?

5    A.          Not good.

6    Q.          Why is it not good?

7    A.          Found that she plays the victim a lot.

8    She tried to use my office to do investigations for her,

9    and every single investigation that she came in and

10   spoke with our detectives, took up their time, was

11   either fabricated, unfounded or exaggerated.

12   Q.          Has Commissioner Frenchko ever, to your

13   knowledge, criticized you?

14   A.          Often, yes.

15   Q.          Have you ever publicly made critical

16   statements about Commissioner Frenchko in the past?

17   A.          As far as what, sir?

18   Q.          Any critical statement.  Any negative

19   statements about -- what you would consider to be a

20   negative statement about Commissioner Frenchko in the

21   public?

22   A.          Maybe once.

23   Q.          Okay.  When was that?

24   A.          It was during a meeting on March 9th.

25   Q.          What did you say in that meeting?

```
1    A.            I told her that I didn't want to

2    participate in her lunacy on social media.

3    Q.            Change the subject here a little bit.

4    During July of 2022, what model cell phone did you have?

5    A.            I had an iPhone 12 Pro, I believe.

6    Q.            Do you still have that phone?

7    A.            I do.

8    Q.            So if your counsel told me that you no

9    longer had that phone or traded it in, would that not be

10   accurate?

11   A.            Yes, that would be correct.

12   Q.            So you traded that phone in?

13   A.            No.  I still have the same phone.

14   Q.            You still have the same phone?  Okay.  Does

15   the county pay for your phone?

16   A.            No.

17   Q.            Do you use that cell phone to call other

18   deputies or -- I guess not other deputies.  They're your

19   deputies.  Do you use that cell phone to call deputies?

20   A.            Yes.

21   Q.            Do you use that cell phone to text message

22   other deputies?

23   A.            Yes.

24   Q.            Do you use that cell phone to conduct your

25   business?
```

```
 1    A.          Sometimes.

 2    Q.          Okay.  Some of those text messages involve

 3    your activities as sheriff, correct?

 4    A.          Yes.

 5    Q.          Have you ever received any kind of public

 6    records training?

 7    A.          Yes.

 8    Q.          When did you receive public records

 9    training?

10    A.          Every four years I have a class on it.

11    Q.          You say you have a class.  Do you teach a

12    class?

13    A.          No.

14    Q.          Okay.

15    A.          Attend it through the state.

16    Q.          All right.  So like the attorney general's

17    office?

18    A.          Yes.

19    Q.          And you attend that in person?

20    A.          Yes.

21    Q.          The sheriff's department has a records

22    retention policy, correct?

23    A.          Yes.

24    Q.          Was the record retentions policy approved by

25    the records commission?
```

```
1    A.          I'm sure it is.

2    Q.          Do you know the most recent year that

3    occurred?

4    A.          No, I don't.

5    Q.          Do you know what the records retention

6    policy says regarding the retention of text messages?

7    A.          No, I don't.

8    Q.          So if I were to ask you right now at what

9    time it's okay to delete text messages, you wouldn't know?

10   A.          My understanding is when it is no longer

11   of value or it hasn't been put in some other media.

12   Q.          And who makes the determination whether a

13   text message is no longer of value?

14   A.          I would think that would be up to the

15   person that has that phone what the value is.

16   Q.          So you don't have anybody submit their text

17   messages to the record retentions commission?

18   A.          No, we don't.

19   Q.          You're not aware of any procedure that

20   requires approval of one-time deletion of records to be

21   approved by the records commission?

22   A.          On personal phones or on other records?

23   Q.          Well, on personal cell phones.

24   A.          Yes, I'm not familiar with that.

25   Q.          So why did you say -- why do you think
```

```
 1    there's a distinction between personal cell phones as

 2    opposed to other records?

 3    A.          Well, a police report is different than a

 4    personal cell phone.  I possess and own that cell phone.

 5    Q.          So is it your belief that because you own

 6    your own cell phone that your text messages are not public

 7    records?

 8    A.          No, that is not.

 9    Q.          So do you understand or think that when you

10    use your personal cell phone to send official text

11    messages that those are public records?

12                MS. SUDHOFF:  Objection.

13    A.          What -- could you restate the question?

14    Q.          It wasn't great, so I'll just maybe

15    rephrase.  So earlier you testified that you use your

16    personal cell phone and one's not provided to you,

17    correct?

18    A.          Yes.

19    Q.          And that you sometimes send text messages

20    to -- related to the activities of your office, correct?

21    A.          Yes.

22    Q.          Aren't those text messages public records

23    then?

24    A.          Yes.

25    Q.          Okay.  So before you delete those text
```

1  messages, do you send those to the records commission for

2  approval --

3  A.          No.

4  Q.          -- of deletion?  So you unilaterally decide

5  whether or not you think your text messages that are

6  public records should be retained?

7  A.          I'm unaware where you're headed here.

8  Q.          Me too.  I just ask the question, though.

9  A.          If the text message has no value, if you

10  text me and tell me that there's a burglary in progress

11  at 123 Scott Street and I go there, based on what you

12  said, that's a public record.  It has no value.  It

13  would seem silly to go to the records commission to ask

14  to delete a text that has no value that you went there

15  to a call because there was an address there that --

16  Q.          So you manually delete text messages?

17  A.          Sometimes, yes.

18  Q.          Okay.  So let me go back to your example.

19  So you're talking about if you get a call and you go

20  somewhere, you think if -- so what you're saying is if it

21  turns out to be nothing, then those text messages no

22  longer have value?

23  A.          If the text message has no value to the

24  future of any investigation or any real purpose and you

25  have a list of 50 people who have sent you messages,

1    there may be something there that you want to look back

2    on.  An example would be Deputy X texted me and asked

3    me, hey, we're going to McDonald's for lunch, can we

4    pick something up for you?  I may delete that Deputy X's

5    text stream that has absolutely no value other than to

6    clog up my phone.

7    Q.          It has no value to you?

8    A.          No.

9    Q.          Wouldn't it show the location of deputies at

10   that precise time?

11   A.          No.

12   Q.          So if a text message says go pick up lunch,

13   let's say at 12:00 p.m., and a defendant wants to prove

14   deputy wasn't at a particular location, you're saying it

15   would have no value to the defendant?

16   A.          That doesn't make any sense at all.

17   Q.          So you're telling me in a text message

18   telling a deputy to go somewhere at a particular time

19   wouldn't document the location of that deputy potentially

20   at that particular time?

21              MS. SUDHOFF:  Objection.

22   A.          I think that's ridiculous.

23   Q.          So when you were a detective and you were

24   trying to locate people or establish their time or

25   location at a certain time, you never look at phone

```
 1   records to do that?

 2                    MS. SUDHOFF:  Objection.

 3   A.            Yes.

 4   Q.            Yeah.  Because phone records can be valuable

 5   to document someone's activities, correct?

 6   A.            Yes.  We would get subpoenas for those

 7   things.

 8   Q.            Right.  And you could document where they

 9   were located at a particular time by tracing it, I think,

10   on a satellite, correct?

11   A.            Not a text message.

12   Q.            Okay.  But if a text message said I'm at the

13   grocery store and you could see that the text message said

14   that at noon, then that text message would say that that

15   person was at a grocery store at noon.

16   A.            Often people lie to us and they're not

17   where they say they are.  So without having a ping off

18   that phone or a more extensive forensic analysis of that

19   phone from tower to tower, it wouldn't determine

20   anything.

21   Q.            Well, that wouldn't be a text message they

22   sent to you.  So, for example, let's just say --

23   A.            That's what somebody said.

24   Q.            Okay.

25   A.            Not what they're actually doing.
```

```
 1    Q.           But it still would be a piece of evidence
 2    that you could collect, correct?
 3    A.           Yes.
 4    Q.           Okay.  So, for instance, let's just say
 5    someone was robbing a bank at noon and the bank happened
 6    to be -- I don't know banks around here -- let's just
 7    Huntington Bank, correct?
 8    A.           Okay.
 9    Q.           And let's just say that one of the
10    defendants says I'm heading to the bank now and you could
11    see the text message, you're seeing 11:45, that would be a
12    piece of evidence you could use, correct?
13    A.           Yes.
14    Q.           Because sometimes text messages can show
15    locations of a person or the intentions of that person,
16    correct?
17    A.           If you believe what's written in that text
18    message.
19    Q.           Yes, but that could be something that a jury
20    decides.
21    A.           Very often when we deal with the public
22    they lie to us.
23    Q.           Well, and quite frankly, anybody can lie,
24    correct?
25    A.           Yes.
```

```
 1   Q.            And that would include one of your officers
 2   could lie in a certain circumstance, correct?
 3                 MS. SUDHOFF:  Objection.
 4   A.            I would say no.
 5   Q.            So it's your testimony today that no
 6   officer -- you don't think your officers are capable of
 7   lying like any other --
 8   A.            I didn't say that.  You said that.
 9   Q.            Okay.  I asked you, because we're talking
10   about possibilities.
11   A.            If they lie, then we will deal with it.
12   Q.            Okay.  Well, in criminal prosecutions
13   defendants are allowed to request records from a
14   government, correct?
15   A.            Yes.
16   Q.            And some of those records that they can
17   request would include text messages, correct?
18   A.            Yes.
19   Q.            So text messages can be relevant to a
20   defendant's rights, correct?
21   A.            If you can get them.
22   Q.            Okay.  What do you mean by if you can get
23   them?
24   A.            I can tell you other than dealing with
25   federal court in one case, I have never seen phone
```

1    providers be very cooperative with law enforcement.

2    Q.          I can request them from the government

3    itself, correct?

4    A.          Yes.

5    Q.          Because text messages are something that

6    falls underneath public records, correct?

7    A.          That's what you testified to, yes.

8    Q.          Okay.  What about surveillance videos?

9    What's the records retention policy say about surveillance

10   videos within the sheriff's department?

11   A.          I'm not certain, but I believe it's 30

12   days.

13   Q.          Do you still have all the surveillance

14   videos of inside all parts of the sheriff's department on

15   July 7th, 2022?

16   A.          I don't know.

17   Q.          Did you do anything to preserve those

18   videos?

19   A.          I did.

20   Q.          What did you do?

21   A.          I turned over -- I asked Chief Palmer to

22   put a memo out to our IT department to preserve those

23   records.

24            MR. MILLER-NOVAK:  Okay.  Could I get a

25   copy of that memo?

```
1                      MS. SUDHOFF:  Sure.

2                      MR. MILLER-NOVAK:  Can you hand him what's

3       been marked as Exhibit 1?

4       Q.             Have you seen this letter before?

5       A.             I have.

6       Q.             And it's a letter with your letterhead on

7       it, correct?

8       A.             Yes.

9       Q.             And it is dated July 5th, 2022, correct?

10      A.             Yes.

11      Q.             And it's a letter that you drafted on -- to

12      Commissioner Fuda, Commissioner Cantalamessa, and

13      Commissioner Frenchko, correct?

14      A.             Yes.

15      Q.             And it says inappropriate response to

16      citizen complaint in the subject line, correct?

17      A.             Yes, it does.

18      Q.             Okay.  And I'm going to represent to you

19      that the electronic copy I received -- and I'm not sure if

20      it was from public records request or whatever -- it said

21      final letter.

22      A.             I don't know what you're talking about.

23      Q.             I know you don't, but I'm going to ask a

24      question here in a second.  Were there multiple drafts to

25      this letter?
```

```
 1    A.              I sat down over multiple days and wrote

 2    the letter.

 3    Q.              Okay.

 4    A.              As far as drafts, you know, added and

 5    deleted parts of it.

 6    Q.              Do you know if you saved multiple versions

 7    of it in Word?

 8    A.              I did not.

 9    Q.              Okay.  That's what I was kind of asking.

10    A.              Okay.

11    Q.              So thanks.  Did anybody help you write this

12    letter?

13    A.              I had eyes put on this letter by other

14    administrative staff.

15    Q.              And who were those staff members?

16    A.              Jeff Palmer, Dan Mason, probably Dan

17    Lester.

18    Q.              Okay.  And who's Mr. Palmer?

19    A.              The chief deputy of the sheriff's office.

20    Q.              You mentioned two other names.  I was going

21    to ask who they were.

22    A.              Dan Mason's a major, and Dan Lester is a

23    captain.

24                    MR. BETRAS:  What was the second name?

25    I'm sorry.
```

```
 1                    MS. FRENCHKO:  Dan Mason.

 2                    MR. MILLER-NOVAK:  And Lester.

 3    Q.              Okay.  Anybody else who's not on your staff?

 4    A.              Not on my staff?

 5    Q.              Yes.

 6    A.              No.

 7    Q.              Did a Mr. Blair look at this letter at any

 8    time, Matt Blair?

 9    A.              Who's Mr. Blair?

10    Q.              Matt Blair.

11    A.              No.

12    Q.              What comments did Mason have about this

13    letter?

14    A.              I don't know.

15    Q.              Okay.  You don't recall?

16    A.              No, I do not.

17    Q.              Did you send any emails relating to this

18    letter?

19    A.              I don't believe I did.

20    Q.              So all these conversations happened via

21    telephone?

22    A.              Probably in person.

23    Q.              I want to go through the letter a little

24    bit, if you don't mind.  It begins, I am writing this

25    letter as a response to Commissioner Frenchko's reading at
```

1    the June 1st, 2022, commissioners' public meeting.  The

2    letter claimed to be written by the mother of a previously

3    incarcerated adult inmate at Trumbull County Jail.  Do you

4    see that?

5    A.          I do.

6    Q.          Okay.  And some of the -- when I read this

7    word for word, some of the comments in that letter

8    involves medical attention and medical care within jail,

9    correct?

10   A.          What is the question?

11   Q.          Well, I mean some of the comments in the

12   letter from a parent that Commissioner Frenchko read on

13   June 1st, 2022, involved allegations about medical care at

14   the jail, correct?

15   A.          Yeah.  Michele Frenchko alleged that there

16   were abuses and lack of care given to an inmate in our

17   custody.

18   Q.          And the medical doctor, his name is

19   Dr. Malvasi, correct?

20   A.          Yes.

21   Q.          Did you talk to Dr. Malvasi at all after

22   June 1st, 2022?

23   A.          Yes.

24   Q.          Did you talk to him about the letter that

25   Commissioner Frenchko had read?

```
1   A.          Yes.
2   Q.          And what was his comments about it?
3   A.          Just that this inmate never asked for any
4   medical care at all.  We checked our records, and that,
5   in fact, never happened.
6   Q.          I'm going to go down a bit in this -- and
7   did you share this letter at all with Dr. Malvasi?
8   A.          No.
9   Q.          I want to go down to -- it's in the middle.
10  It says such a public presentation -- it's in the middle
11  of that same page.  Helen's been a very valuable pointer
12  of things.
13  A.          Okay.
14  Q.          You see where it starts such a public
15  presentation prior to initiating an appropriate
16  investigation.  Do you see that?
17  A.          Yes, I do.
18  Q.          -- investigation through well-established,
19  existing investigatory protocol is contrary to sound
20  government and procedural justice safeguards.  Do you see
21  that?
22  A.          Yes.
23  Q.          Commissioner Frenchko's been advised on at
24  least two prior statements -- prior separate occasions,
25  sorry, of the proper procedure to initiate and/or file a
```

1    complaint.  Do you see that?

2    A.          Yes.

3    Q.          Regarding allegations of improper treatment

4    of inmates.  Do you see that?

5    A.          Yes.

6    Q.          Is it your opinion that Ms. Frenchko, as a

7    commissioner, needs to follow your procedures?

8    A.          Yes.

9    Q.          Why?

10    A.          Well, she damages without doing any due

11    diligence just because somebody told you something; her

12    lack of proper information as to what really is going on

13    damages Trumbull County.  And when you put stuff out in

14    a public meeting that is fabricated and untruthful and

15    exaggerated, it does nothing but damage the sheriff's

16    office and the county, in general.

17    Q.          Okay.  So that's your opinion why --

18    A.          That's the truth.  That's not an opinion.

19    Q.          Okay.

20    A.          When you show up at a public meeting and

21    you make statements that are not truthful and they're

22    flat-out lies that have not been investigated, and you

23    take a letter that somebody wrote you without looking

24    into it, you damage the county.  As a public official,

25    you should look into it, not just throw it out there

```
 1    this is what my constituent said.
 2    Q.          So you don't like it?
 3    A.          No, I don't like it.
 4    Q.          But the question is, do you believe that she
 5    must follow your procedures as a commissioner?
 6    A.          No.
 7    Q.          Okay.  So she doesn't have to follow your
 8    procedures?
 9    A.          No.
10    Q.          You would agree that you have -- that she as
11    a commissioner and you as a sheriff, you have, as the
12    sheriff, have no power to force her to follow your
13    procedures, correct?
14    A.          That's correct.
15    Q.          Okay.  So you were pretty upset that she
16    read that letter on June 1st, correct?
17    A.          Yes.
18    Q.          And I imagine that the other deputies found
19    out about it because news gets around, correct?
20                MR. YOSOWITZ:  Objection.
21    A.          I don't know what the other deputies know.
22    Q.          Well, you talked to at least three, because
23    they helped you draft this letter, correct?
24    A.          Correct.
25    Q.          It's possible they probably talked to other
```

1    deputies about her letter reading, correct?

2                    MR. YOSOWITZ:  Objection.

3                    MS. SUDHOFF:  Objection.

4    A.              I don't know what the other people I talk

5    to and who they talk to and what they talked about.

6    Q.              Did you talk to anybody besides those three

7    deputies about her reading the letter on June 1st, 2022?

8    A.              I don't know.

9    Q.              You don't know who else you spoke with about

10   her reading the letter?

11   A.              I don't know.

12   Q.              Did you talk to Mr. Timko about her reading

13   that letter?

14   A.              I don't know.  We're talking about

15   something a year ago.

16   Q.              Well, you remembered talking to Mr. Lester,

17   correct?

18   A.              I do remember that.

19   Q.              Okay.  So in the next page it says

20   commissioner -- it's the middle paragraph.  It's the first

21   full paragraph, technically, on that page.  It says,

22   Commissioner Frenchko's presentation not only

23   unnecessarily, inappropriately and inaccurately besmirched

24   the performance of the men and women operating the

25   Trumbull County Jail, but also negatively portrayed the

1   per- -- both the performance and the professional

2   reputation of the third-party vendor providing medical

3   care to inmates of the Trumbull County Jail, correct?

4   A.          That's exactly what it says.

5   Q.          Okay.  Are you referring to Dr. Malvasi

6   there?

7   A.          Dr. Malvasi and his staff.

8   Q.          There have been a number of lawsuits against

9   the county, correct, regarding medical care at the jail?

10  A.          There have been some lawsuits.

11  Q.          All right.  And there's been some

12  settlements that the county paid regarding those lawsuits,

13  correct?

14              MS. SUDHOFF:  Objection.

15  A.          I don't know.

16  Q.          You don't know whether or not the county's

17  settled a number of lawsuits for allegations --

18  A.          For medical?  I don't believe so.

19  Q.          Okay.

20  A.          I believe we've done pretty well.

21  Q.          So you don't think there's been one

22  settlement regarding allegations of poor medical care at

23  the jail?

24  A.          Since I've been in office?  I'm not

25  certain, but I don't believe so.

```
1    Q.          Has there been any lawsuits that have been
2    settled regarding medical care since Dr. Malvasi's been
3    the head of medical care at the jail?
4    A.          I don't know.
5    Q.          Okay.  If I told you there were, would you
6    have any reason to disagree with me?
7    A.          I would not.
8    Q.          Okay.  Do you know if there's been any
9    settlements regarding inmate treatment at the jail since
10   you've been in office?
11   A.          Inmate treatment?
12   Q.          Yeah.  I don't know, like excessive force or
13   any settlements paid to inmates' families regarding their
14   treatment at the jail?
15   A.          Yes.
16   Q.          Okay.  How many?
17   A.          I can only think of one.
18   Q.          Okay.  Since you've been in office?
19   A.          That didn't have -- that didn't have to do
20   with medical treatment.
21   Q.          Okay.  Do you believe that the public is
22   entitled to their opinions about settlements or medical
23   care at the jail?
24   A.          Yes.
25   Q.          Do you believe Commissioner Frenchko is
```

1    entitled to her opinions about medical care at the jail?

2    A.          Yes.

3    Q.          Do you believe that she's entitled to voice

4    her opinions about medical care at the jail?

5    A.          Yes.

6    Q.          Okay.  I want to go to the last paragraph.

7    It says, I am requesting a public apology from

8    Commissioner Frenchko as a first step to regaining public

9    trust.  Do you see that?

10   A.          Yes.

11   Q.          So you believe that you're speaking for the

12   entire public?

13   A.          Well, I believe that when you are elected

14   to a position such as a commissioner's job, you owe it

15   to the public to properly represent the truth and the

16   facts, not to just throw it against the wall and see

17   what happens; and these people that come in here and

18   work hard every day and do a good job, and you have no

19   idea what these people do in a jail, to try to protect

20   these inmates at the same time as an inmate is

21   manipulating their family to get them to reach out to

22   someone like Commissioner Frenchko and do irreparable

23   damage to these employees.  Yeah, I think that's

24   accurate.

25   Q.          Okay.  But this says the public trust.  It

```
1    doesn't say --

2    A.           Yeah.

3    Q.           -- the department's trust, correct?

4    A.           Yeah.  I mean, don't you think that you

5    should try to restore that trust -- well, in fact, this

6    commissioner read a letter without ever investigating

7    anything other than taking the word of an inmate's

8    mother.  She didn't go out and interview the inmate.

9    The inmate wasn't even in jail.  Provided no medical

10   records, no documentation, never spoke with us about it,

11   and to this day she's never filed a complaint with the

12   sheriff's office telling us there was a problem.

13   Q.           But she doesn't have to file a complaint.

14   A.           No, but as a public official, wouldn't you

15   think that you would try to work with the other public

16   officials and say, hey, there's a problem here; can you

17   do something with this and get back to me with what

18   you've done?  That never happened.

19   Q.           Okay.  It says, I expect an apology to be

20   delivered in the same public forum as was the publication

21   of the false accusation.  Do you see that?

22   A.           Yes.

23   Q.           Okay.  So the point of the letter was to

24   tell her that you believe that her allegations were false,

25   number one, correct?
```

```
 1    A.            Allegations were all false.

 2    Q.            Okay.  Number two, the point was to demand

 3    an apology, correct?

 4    A.            No.  I asked.  I did not demand anything.

 5    Q.            It says, I expect the apology to be

 6    delivered in the same public forum as was the publication

 7    of the false accusations.

 8    A.            Expectation and demands are two different

 9    words.

10    Q.            Okay.  So you expected it to be issued in

11    the same public forum?

12    A.            I would expect that one would act

13    professionally, but you can't demand that.

14    Q.            Okay.  You can give the letter back to her.

15    The process is she hands you your exhibit --

16    A.            I didn't know we were done with this yet.

17    Q.            We are.

18    A.            Okay.

19    Q.            I'm just telling you, though, because we got

20    to be careful so you don't walk away with it.  Thank you.

21    How did you deliver that letter to the commissioners?

22    A.            I walked it upstairs and gave it to one of

23    the clerks or Mr. Fuda -- I'm not certain which one --

24    and asked it be delivered to each commissioner.

25    Q.            Someone -- one of the commissioners asked --
```

1    you asked --

2    A.          I'm not certain who I gave it to.

3    Q.          Okay.

4    A.          I brought it up to the office and asked if

5    you could give this to each of the commissioners, and I

6    left.

7    Q.          Okay.  So you hand-delivered it, then?

8    A.          Yes.

9    Q.          And you gave -- you don't remember who?

10   A.          I do not.

11   Q.          Whoever it was, you said please give a copy

12   to each of the commissioners?

13   A.          Yeah.  There's been turnover.  I'm not

14   sure who was working the desk at that time.

15   Q.          Okay.  Did you talk to -- we agreed on

16   Mauro.  Did you talk to Mauro about the letter before the

17   July 7th, 2022, meeting?

18   A.          I did not.

19   Q.          Did you talk to Commissioner Fuda about it?

20   A.          Before the meeting?

21   Q.          Yes.

22   A.          Yes.

23   Q.          Okay.  And what did you two discuss?

24   A.          He called me in my office, asked me if I

25   wanted to come up to the commissioners' meeting and read

1    the letter.  I told him no, that was not my intent.  My

2    intent was just to provide it to the commissioners.

3    Q.          Did Fuda ask you if you wanted him to read

4    it into the meeting that day?

5    A.          Somewhere along the lines of how you

6    stated it, yes, he did.

7    Q.          Okay.  So it's your testimony right now that

8    it was his idea to read it into the record?

9    A.          He asked me if I wanted the letter read in

10   the meeting, and I said do whatever you want.  That was

11   not what my intent was.  It's just to make the

12   commissioners aware that we did investigate this and

13   what happened and it was inappropriate.

14   Q.          Did he tell you he was going to do it in

15   that conversation?

16   A.          I don't believe he did.

17   Q.          Okay.  So is it your testimony today that

18   you had no idea he was going to read it into the record

19   that day?

20   A.          Yes.

21   Q.          Did you know that Harold Wix would be

22   providing security at the meeting that day?

23   A.          No.  Should have been Brian Kaintz.

24   Q.          Did you know that Deputy Ross was going to

25   be attending the meeting that day?

```
 1    A.            Yes.

 2    Q.            Did you call Mr. Wix before the meeting

 3    began that day?

 4    A.            I don't recall calling before the meeting.

 5    Q.            Did you call Sergeant Ross before the

 6    meeting that day?

 7    A.            Well, from the phone records, I'm told

 8    that I did, but I don't recall talking to him that day.

 9    Q.            Okay.  Who told you that the phone records

10    said that?

11    A.            My attorney did.

12    Q.            Well --

13                  MR. MILLER-NOVAK:  Are you okay with that?

14                  MS. SUDHOFF:  I am.

15                  MR. BETRAS:  Sorry.

16                  THE WITNESS:  Does this make you a

17    witness?

18                  MR. MILLER-NOVAK:  No.

19                  MR. BETRAS:  We're not allowed to know.

20                  MR. MILLER-NOVAK:  Privilege.

21    A.            I looked at all these things.

22    Q.            I know.  I know.  But --

23    A.            Am I not allowed to look at them?

24    Q.            Absolutely.  It's just like the

25    conversations you have between you and your attorney are
```

```
 1   privileged.  That's all.
 2   A.          Okay.
 3               MS. SUDHOFF:  What he's saying, if he asks
 4   you a question and the answer is my attorney told me,
 5   just say I think that's a privileged answer or something
 6   along those lines.
 7               THE WITNESS:  Okay.
 8   Q.          And if you have a doubt whether or not
 9   something's privileged, let's take one of them break
10   things, all right?
11   A.          All right.
12               MS. SUDHOFF:  You're good.  I don't have
13   any concerns with that.
14   Q.          Okay.  So you don't remember calling either
15   Wix or Ross at 10:25 a.m. that day?
16   A.          I do not remember talking to either of
17   them.
18   Q.          Do you remember calling a Nadine that
19   morning?
20   A.          I do not.
21   Q.          Do you remember sending text messages to a
22   Nadine that morning?
23   A.          I do not.
24   Q.          Do you know who assigned Harold Wix to be at
25   that meeting that day?
```

1    A.          It would have either been Captain

2    Villanueva or Lieutenant Kaintz.

3    Q.          Have you ever ascertained why one of them

4    would do that?

5    A.          After the meeting I did ask.

6    Q.          Okay.  Who did you ask?

7    A.          I believe I asked Kaintz why he wasn't at

8    the meeting.

9    Q.          What did he tell you?

10   A.          I think his response is we had new

11   vehicles come in and they were doing something with the

12   modems for our computers.  And he is -- Lieutenant

13   Kaintz is assigned to deal with a lot of the inventory

14   regarding cruisers.

15   Q.          Are you familiar with the statute that

16   relates to disturbing a public meeting?

17   A.          I've read it.

18   Q.          When did you first read it?

19   A.          After the meeting.

20   Q.          Okay.  So you had never read that statute

21   before the meeting?

22   A.          I don't believe I had.

23   Q.          Had you ever held a training on that statute

24   at the sheriff's department before that meeting?

25   A.          No.

```
 1    Q.             In your time in the department, how many

 2    people have you arrested -- are you aware whether or not

 3    the deputies have removed any member of the public from a

 4    meeting while you've been a deputy -- I mean while you've

 5    been the sheriff?  Sorry.

 6    A.             Arrested or removed?

 7    Q.             Removed.

 8    A.             I know we have removed people from

 9    meetings in the past.

10    Q.             Okay.

11    A.             Not that many.

12    Q.             So you've removed more than one person from

13    a commissioners' meeting in the past?

14    A.             I believe they have.

15    Q.             Were any of those people charged with

16    disturbing a public meeting?

17    A.             No.

18    Q.             So you're saying that more than one public

19    member was removed from a meeting but not prosecuted?

20    A.             I believe we had a problem with a guy with

21    mental illness who had been to several of the

22    commissioners' meetings and had been removed.

23    Q.             Anybody else?

24    A.             Not that I know of.

25    Q.             And why was he not prosecuted?
```

```
 1    A.              I'm not familiar with the exact elements
 2    of the removal.
 3    Q.              I mean, apparently his conduct as a member
 4    of the public was bad enough he had to be removed then,
 5    correct?
 6    A.              I think I heard about it after the fact.
 7    I'm not privy to everything that happens with our guys
 8    that are working every single meeting.  There's a lot
 9    that goes on in the sheriff's office other than the
10    commissioners' meetings.
11    Q.              You would agree commissioners' meetings are
12    for the commissioners to conduct business, right?
13    A.              Yes.
14    Q.              So it's not for the public to interrupt or
15    participate in until they're given permission to, correct?
16    A.              Depends what part of the meeting you're
17    in.
18    Q.              Right.  I mean, typically speaking, let's
19    just say there was a member, like an audience
20    participation time or whatever you want to call it,
21    correct?
22    A.              Yeah.
23    Q.              When that's not occurring, then the public's
24    really not supposed to talk at all, correct?
25    A.              That's correct.
```

1   Q.          And when a member of the public's talking

2   during public participation, there's usually some kind of

3   rules that control however long they might talk or things

4   like that, correct?

5   A.          I don't know what those rules are, but in

6   the meeting since Michele Frenchko's got there doesn't

7   seem like there's any rules up there.

8   Q.          Okay.  Is it her job to create the rules?

9   A.          I think there are rules in place that --

10  not sure what it is under.

11  Q.          Uh-huh.  Well, she's not in charge -- she's

12  not the presiding officer, to your understanding, correct?

13  A.          She's not in charge.

14  Q.          Okay.  So she's not necessarily in charge of

15  handling audience participation, then, correct?

16  A.          No.

17  Q.          Okay.  So what I'm really asking is that you

18  would agree that whoever's enforcing the rules that,

19  typically speaking, the public has one particular time

20  that they're allowed to speak when invited to do so,

21  correct?

22  A.          I would say that sounds fair.

23  Q.          Okay.  And there might be a time limit

24  sometimes that can be placed on members of the public,

25  correct?

```
1    A.            I would think that would be up to the
2    board to provide the time limit.
3    Q.            Right.  It would be up to the board to
4    provide the rules for public participation, correct?
5    A.            Yes.
6    Q.            And if a member of the public didn't follow
7    them, they could be removed, correct?
8    A.            They could be asked to leave.
9    Q.            Okay.  They could or could not be prosecuted
10   potentially?
11   A.            Case by case.
12   Q.            Okay.  So you're talking about an individual
13   that had to be removed from more than one meeting?
14   A.            I'm not certain on that.
15   Q.            Okay.  I think your testimony earlier was
16   you believe this person was removed more than one --
17   A.            I believe after the fact I heard about
18   somebody who had problems and deputies were discussing
19   it, saying they had -- so-and-so was up there who has
20   some mental issues and was asked to leave.
21   Q.            Okay.  And he was not prosecuted?
22   A.            No, he wasn't.
23   Q.            Okay.  You looked at the statute.  What
24   conduct do you think justifies a criminal charge?
25                 MS. SUDHOFF:  Objection.
```

```
 1                    MR. YOSOWITZ:  Objection.
 2    A.              Well, the fact that Michele Frenchko put
 3    another employee in emotional distress to the point
 4    where she couldn't face the public and is visibly
 5    crying.  What she did to that employee publicly and
 6    disrupting the meeting -- if you show me the revised
 7    code here, let's look at it.
 8    Q.              Well, we'll -- we can look at it.
 9    A.              I'm sure that's one of your questions
10    that's coming.  Let's look at it.
11    Q.              It wasn't.
12    A.              Okay.
13    Q.              That's okay.
14    A.              I just -- I look to you.  If that was your
15    mother that was being emotionally crushed and put in
16    emotional distress, what do you do?  Just watch your mom
17    get beat up?
18    Q.              What's that?
19    A.              Just watch your mom get verbally abused?
20    Q.              Okay.  I think I understand the analogy that
21    you're trying to lay down.  So you think that -- so what
22    you're saying is like that emotional abuse becomes
23    disruptive?
24    A.              The totality of her actions were
25    disruptive.
```

```
 1   Q.           Okay.  So you did mention the -- you're
 2   talking about Paula Klotz, Vivoda-Klotz?
 3   A.           Yes.
 4   Q.           Everybody in Trumbull County has a more
 5   complex name than most other places it seems.  Just --
 6   except for yours.  Yours is great.  Paul Monroe is
 7   wonderful.  So, you know, you -- you're mentioning her --
 8   I guess -- I think I understood what you said, so I'm
 9   going to move on.  So after Niki was arrested, she -- when
10   did you first become aware of that?
11   A.           My guesstimate is probably ten minutes
12   afterwards.
13   Q.           And who contacted you?
14   A.           Dan Lester.
15   Q.           How did Dan Lester become aware of it?  Do
16   you know?
17   A.           No.
18   Q.           He wasn't at the meeting, was he?
19   A.           No.
20   Q.           Do you know if either Wix or Ross contacted
21   him?
22   A.           I don't know that.
23   Q.           So what would the process be in terms of Wix
24   and Ross's arrest of Niki?  Would they have immediately
25   called the office at that point in time?
```

```
 1   A.              No.  They would have -- after an arrest
 2   they would have taken her down to central booking just
 3   to process and issue a summons and release.
 4   Q.              Okay.  So you found out approximately ten
 5   minutes after Ms. Frenchko was arrested, correct?
 6   A.              Yeah.  Within five to ten minutes
 7   afterwards, I would say.
 8   Q.              And you text messaged Nadine at Channel 27
 9   three minutes after that, correct?
10                   MS. SUDHOFF:  Objection.
11   A.              I don't know.
12   Q.              You don't remember?
13   A.              I don't know.
14   Q.              Okay.  And you called her only several
15   minutes over that, correct?
16   A.              I don't know.
17   Q.              You don't recall whether or not you called
18   Nadine -- is it Masley (phonetic spelling)?  What's her
19   name?
20                   MS. FRENCHKO:  Grimley.
21   Q.              Nadine Grimley.  Did you call Nadine
22   Grimley?
23   A.              I don't know without seeing records who
24   was called, but typically when something happens, my
25   phone starts to blow up.
```

```
1   Q.            Okay.  But you called her.

2   A.            Okay.

3   Q.            Right?

4   A.            I didn't say that.  You did.

5   Q.            Okay.  Did you discuss her arrest, Niki

6   Frenchko's arrest, with Nadine?

7   A.            I'm going to need to see some cell phone

8   records to answer your questions.  This is a year ago.

9   I don't remember talking to Nadine seven minutes after

10  this arrest.

11  Q.            Do you remember text messaging her and text

12  messaging her about the arrest after it occurred?

13  A.            I do not.

14  Q.            Why do you not know?

15                MS. SUDHOFF:  Objection.

16  A.            This was over a year ago.  I don't know

17  who I texted yesterday.

18  Q.            Would it help you to see the text messages?

19  A.            Yes, it would.

20  Q.            I don't have them.

21  A.            Well --

22  Q.            Do you know why I don't have them?

23  A.            No, I don't know why you don't have them.

24  Q.            Did you produce them?

25  A.            I gave you -- you gave a subpoena to my
```

1   carrier, and they provided them to you.

2   Q.          Well, they sent me phone logs.  Do you still

3   have the text messages?

4   A.          If they're on my phone, I do.

5   Q.          Okay.  Are they still on your phone?

6   A.          No.

7   Q.          Why not?

8   A.          It's over a year ago.

9   Q.          Did you delete them?

10  A.          They never existed.

11  Q.          You're saying you never text Nadine?

12  A.          I have texted Nadine, but, I mean, I don't

13  know what's in that text message.

14  Q.          Okay.  So the text message did exist?

15  A.          I don't know.

16              MR. MILLER-NOVAK:  Okay.  I want to take a

17  break.

18                  (Off the record.)

19              MR. MILLER-NOVAK:  We'll go back on the

20  record.

21  Q.          So you said that you were aware that

22  Commissioner Frenchko was arrested ten minutes,

23  approximately, after her arrest, correct?

24  A.          I'm making an estimate.

25  Q.          Okay.  And it was Deputy Lester that

```
 1   contacted you?
 2   A.          Captain Lester contacted me.
 3   Q.          Captain Lester.  Okay.  And at that point in
 4   time, what did you find out?
 5   A.          Very little.  He knocked on my door and
 6   told me that they had arrested Michele Frenchko and
 7   started to walk out of the office.  I said, hang on a
 8   second.  I said, what for, and he said he didn't know.
 9   And I said find out.  Get ahold of the lieutenant and
10   fast track her and get her out of here as quick as
11   possible.  That's my only interaction with them.
12   Q.          Do you know that she was in there for an
13   hour and a half?
14   A.          No, I don't.
15   Q.          How long are people normally in booking like
16   that?
17   A.          Could be a long time.
18   Q.          Okay.  Did you talk to Wix or Ross before
19   charges were filed in municipal court?
20   A.          I'm sure I did.
21   Q.          Okay.  What did you discuss with them?
22   A.          What happened, what was she charged with,
23   and they knew the procedure for going down, you know, to
24   talk with the city prosecutor.
25   Q.          So did they inform you of the facts?
```

```
 1   A.            Yes.

 2   Q.            Did they inform you of the statute that they

 3   were going to charge her under?

 4   A.            Yes.

 5   Q.            Did you give them the okay to do that?

 6   A.            I don't okay any charges.

 7   Q.            Okay.  And did you tell them to not do that?

 8   A.            I did not.

 9   Q.            Okay.  Is it your policy -- so in other

10   words, could you, if you wanted to say, don't do it yet.

11   I want to investigate further?

12   A.            Probably could.

13   Q.            Okay.  So you have the opportunity to say

14   before we charge her, I'd like to -- I'd like to watch the

15   video?

16   A.            She had already been arrested.

17   Q.            Okay.  Well, she had been arrested, but

18   charges had not been filed in the municipal court yet,

19   correct?

20   A.            Yeah.

21   Q.            So if you wanted to, you could have put a

22   pause on that, correct?

23   A.            Could.

24   Q.            And you could have always charged her at a

25   later day, correct?
```

```
 1    A.            Yes.
 2    Q.            And you could have done further
 3    investigation before charges were filed against her,
 4    correct?
 5    A.            What further investigation?  It's an
 6    in-progress crime.
 7    Q.            Had you watched the video at that point in
 8    time?
 9    A.            I don't know.
10    Q.            Do you know if you listened to any sound
11    recordings at that point in time?
12    A.            I don't know.  If anything, I would have
13    seen video of it.
14    Q.            Okay.  Did you watch the video that day?
15    A.            I think I probably did.
16    Q.            And did you watch it before charges were
17    filed in municipal court?
18    A.            Yes.
19    Q.            Okay.  So after watching the charges, did
20    you call the prosecutor?
21    A.            No, I did not.
22    Q.            So you didn't call the prosecutor that day?
23    A.            I don't know.
24    Q.            Did you call the prosecutor before charges
25    were filed in municipal court?
```

1    A.          I don't know.

2    Q.          Did you call -- what's Mr. Timko's name?

3    A.          Nicholas.

4    Q.          Did you call Nicholas Timko's sister at

5    Warren?

6    A.          At some point I did.

7    Q.          Did you call her before the charges were

8    filed?

9    A.          I don't know.

10   Q.          What did you discuss with Timko's sister?

11   A.          I don't -- I mean, I assume we discussed

12   the charges, that there was probable cause for the

13   arrest.  I mean, I don't know what we discussed.  This

14   was a year and two months ago, three months ago.

15   Q.          But you talked to her before the charges

16   were filed in Warren Municipal Court, correct?

17   A.          I'm assuming that I did.  I would have to

18   see phone records, but I would think that I did.

19   Q.          Okay.  So you took at least the step of

20   contacting Warren's prosecutor before charges were filed,

21   correct?

22   A.          Well, I'm sure the deputies talked to her.

23   I'm not certain that I called her without looking at the

24   phone logs.

25   Q.          Okay.  Have you ever viewed phone logs from

1    AT&T before?

2    A.          Briefly.

3    Q.          Okay.

4    A.          One time.

5    Q.          Going to hand you what's marked as Exhibit

6    9.

7              (Whereupon Plaintiff's Exhibit 9 was marked.)

8    Q.          Okay.  I understand that as the sheriff of

9    Trumbull County your number is not something you

10   necessarily want to say out loud, so I'm just going to ask

11   you to confirm that that's your phone number in the top

12   left-hand corner.

13   A.          It is.

14   Q.          Okay.  I'm going to represent to you that I

15   subpoenaed these phone logs from AT&T after your attorneys

16   provided me your number and carrier in the course of this

17   case.  Do you have any reason to dispute that?

18   A.          That you subpoenaed them?  No, I know you

19   subpoenaed them.

20   Q.          Okay.  So I know you said you looked at them

21   once before, so I have to kind of -- I'm just going to run

22   you through how I understand this works.  On the left you

23   could see it says item number?

24   A.          Okay.

25   Q.          So you can see they just kind of go up one

```
1    at a time.  So that's just kind of a log of things in

2    progress.  Obviously you can see the second column is the

3    date that a text message was sent or received.  Do you see

4    that?

5    A.          Yes.

6    Q.          I'm also going to represent that this report

7    is just your text messages and a day range, okay?

8    A.          All these are text messages?

9    Q.          These are all text messages.  On the top it

10   says SMS usage for.  Do you see that?

11   A.          No.

12               MR. MILLER-NOVAK:  Helen, can you --

13               MS. SUDHOFF:  I'm also missing it.  Oh.

14   A.          Over here?

15   Q.          No.  Top left.

16               MS. SUDHOFF:  Look right here.  SMS usage.

17               THE WITNESS:  Okay.

18   Q.          So, unfortunately, the way AT&T does it,

19   your text reports are separate from your voice --

20   A.          Okay.

21   Q.          -- like the traditional phone call kind of

22   concept.  And can you see the third column is the time,

23   and then do you see that UTC at the top?

24   A.          Yes.

25   Q.          Okay.  We had a very nerdy conversation
```

```
 1    about this yesterday, but UTC --

 2                  MR. MILLER-NOVAK:  Go ahead.  What does it

 3    stand for?

 4                  MR. YOSOWITZ:  Universal Time Coordinated.

 5    Q.            Universal Time Coordinated.  Do you know

 6    what that is?

 7    A.            No idea.

 8    Q.            Darn.  So Universal Time Coordinated is --

 9                  MR. MILLER-NOVAK:  I mean, you explained

10    it so much better.  Do we mind?  So we all agree on it.

11    We can stipulate what it is, essentially.

12                  MR. YOSOWITZ:  It's the time in Greenwich,

13    England, that they use as a standard time for --

14                  MR. BETRAS:  Everything.

15                  MR. YOSOWITZ:  -- for various professions,

16    aviation, boating.  It's just so that they don't have --

17    then they would be -- if you didn't have that, AT&T

18    would have to be putting in Eastern Time and -- you

19    know, it would be difficult.

20    Q.            So essentially it is one time zone, and I'm

21    going to represent to you that in Eastern Time during

22    daylight savings time we are four hours behind; and when

23    we're not in daylight savings time we are five hours

24    behind.

25                  MR. MILLER-NOVAK:  Correct?
```

```
 1              MR. YOSOWITZ:  Yes, I believe that's
 2  correct.
 3  Q.          Okay.  So because this was in July of 2022,
 4  we would be four hours behind at that time.  Are you
 5  following me, Sheriff?
 6  A.          Yeah.  I follow you four hours behind
 7  and -- but the numbers mean absolutely nothing to me.
 8  Q.          Well, these are military time.
 9  A.          Okay.
10  Q.          So the connection time is in military time.
11  So every time you have to subtract four.  So if it said
12  1600 hours UTC, it would actually be noon in Eastern Time.
13  Does that make sense?
14  A.          I guess.
15  Q.          Okay.  It makes it a little bit miserable to
16  go through these, admittedly, so I'll do my best.  So the
17  next column says originating number, and that's the number
18  who sent the text message.  Do you understand that?
19  A.          Originating number sent the text message?
20  Q.          Yes.
21  A.          Okay.  So who would have sent me a text
22  message at 15:15 from -- is that one million or 100
23  million?
24  Q.          15:15?
25  A.          791, item 791.
```

1    Q.          You're on the second page.

2    A.          Just trying to come up with a time, so

3    15:15.

4    Q.          15:15:06?

5    A.          Yeah.  What is that?

6    Q.          I don't know.  But in the next one do you

7    see 792 -- it could have been an automated text message

8    saying your bill's due, for all I know.  You see the next

9    one, 792?

10   A.          Yes.

11   Q.          Where it's your number and you're texting

12   that other number to the right?

13   A.          Yes.

14   Q.          That ends in 9038?

15   A.          Yes.

16   Q.          Do you know that number?

17   A.          No.

18   Q.          Okay.  So what would have happened there is

19   you would have sent a text message to that phone number at

20   11:16:30 Eastern Time military; do you understand?

21   A.          So you're saying that's 11:16 a.m.?

22   Q.          Yes.  Because it's 15:16 hours minus four

23   equals 11:16 hours Eastern Time.

24               MS. SUDHOFF:  I will also verify the times

25   he gives you as he gives them.

1    Q.          She's a little ahead of the game here

2    because we've been doing this for a bit.

3              MR. MILLER-NOVAK:  You agree that that's

4    accurate?

5              MS. SUDHOFF:  I do.  As does Google.

6    Q.          Well, if you look in the production, the

7    phone companies also sent an explanation, too, because

8    they know nobody knows what it is.  So I'm going to have

9    you go to 7/7/22, which starts at 788 on page 23.

10   A.          Okay.

11   Q.          Are you there?

12   A.          Item 788?

13   Q.          Yes.

14   A.          Yes.

15   Q.          Okay.  If you look at 15:16:12, 792.  Do you

16   see that?

17   A.          Are we on 788 still?

18   Q.          No.  We're going to move down to 792.  I

19   just wanted to get you in the range.  Do you see item 792?

20   A.          Yes, sir.

21   Q.          Okay.  You sent that July 7th, 2022, at

22   15:16:12 UTC.

23   A.          Okay.

24   Q.          Which is 11:16 a.m. and 12 seconds.  Do you

25   agree with that?

```
 1   A.          That's what you're saying.

 2   Q.          Okay.

 3   A.          I'm not familiar with this UTC stuff.

 4               MR. MILLER-NOVAK:  Helen, do you agree?

 5               MS. SUDHOFF:  I agree.

 6   Q.          Okay.  The originating number is, it looks

 7   like, your phone number.  Do you agree with that?

 8   A.          Yes.

 9   Q.          The terminating number is 1(330) -- I'm

10   going to do this, because I don't --

11               MS. SUDHOFF:  Thank you.

12   Q.          -- want to list this either.  It ends in

13   9038.  Do you see that?

14   A.          Yes.

15   Q.          Do you agree that that is Nadine's phone

16   number?

17   A.          No.

18   Q.          Whose phone number is it?

19   A.          I have no idea.  I provided a list of the

20   numbers that I knew.  I would have to see the list that

21   I provided you and have some way to look up that number.

22               MS. SUDHOFF:  I think --

23   A.          I'm not going to blindly agree to

24   something because Matt testified to it.  I provided you

25   a list with numbers that I knew in this case.
```

```
1              MS. FRENCHKO:  Where's his phone?

2    A.            Matt, other than your attorney, is anybody

3    else allowed to participate in this?

4              MR. BETRAS:  I took care of it.

5              THE WITNESS:  Okay.

6              MR. MILLER-NOVAK:  Okay.  Well, on

7    Interrogatory number 2 that I sent, I think this is

8    my -- you did the first, second and third all in the

9    same, which is fine, so I'm pretty sure it was my

10   second.

11             MS. SUDHOFF:  I believe so.

12   Q.            Okay.  It looks like, through counsel, you

13   identified that phone number as Nadine Grimley?

14   A.            If that's what you're testifying to, yes.

15   Q.            I'm not testifying.

16   A.            I'm just asking -- I could speed things up

17   if you'll give me the list that I provided you.

18   Q.            Okay.

19   A.            I will say yes.

20   Q.            I'll hand it to you.

21   A.            Yeah.

22   Q.            Okay.  I understand that.  And --

23   A.            I'm just not going to blindly answer a

24   question.

25   Q.            That's fine.
```

```
 1    A.          Okay.
 2    Q.          I understand.  So I'm going to hand you --
 3    keep that exhibit out, though.
 4    A.          Okay.
 5    Q.          Sometimes we have to manage two exhibits.  I
 6    was trying to avoid that, honestly, because it is annoying
 7    for you, really.  I guess we're on 10.
 8            (Whereupon Plaintiff's Exhibit 10 was marked.)
 9    Q.          So you do recall these Interrogatories,
10    correct?
11    A.          Yes, I do.
12    Q.          And, obviously, we talked earlier and you
13    don't need to tell me conversations you had with your
14    attorney, but you did assist in answering these, correct?
15    A.          Yes, I did.
16    Q.          Okay.  So here it says, Sheriff Monroe
17    identifies the following individuals who upon information,
18    belief, own or otherwise use the phone numbers identified
19    by plaintiff above.  Do you see that?
20    A.          Yes.
21    Q.          Okay.  So on D, as in dog --
22    A.          Yes.  I recognize that.
23    Q.          -- the number ends in 9038 is Nadine.  I
24    don't know if is it Grimley or Grimley?
25    A.          Grimley.
```

1    Q.            Okay.  So if we go back to the Exhibit 9, it

2    says that on 11:16 Eastern Time you text messaged that

3    number, which is Nadine Grimley's at, 11:16 a.m., correct?

4    A.            Yes.

5    Q.            Okay.  Are you aware that that is

6    approximately four minutes before Commissioner Frenchko

7    was arrested?

8    A.            No.

9    Q.            Okay.  She texted you back, it looks like,

10   if you go to 793, at 15:16:30 seconds, so 18 seconds

11   later.  Do you see that?

12   A.            Yes.

13   Q.            Okay.  She texted you again 14 minutes later

14   at 11:30 a.m.  Do you see that?

15   A.            Yes.

16   Q.            Earlier you testified that Lester had told

17   you that Commissioner Frenchko was arrested at -- well,

18   she was arrested at 11:20, according to the police report,

19   either 11:20 or 11:22, I think, if you look at the

20   records, so this would have been approximately ten minutes

21   after Commissioner Frenchko was arrested.

22                MS. SUDHOFF:  Objection.

23   Q.            Correct?

24   A.            I don't have any of those records in front

25   of me.  I don't know what time Commissioner Frenchko was

1    arrested, and I don't know the exact time that I was

2    notified.

3    Q.            So is it your testimony today that you did

4    not text her about the arrest?

5    A.            My testimony is I don't know what these

6    texts are without going back and looking at a calendar.

7    I may have been texting her about an upcoming event or

8    something she was doing press on.  I was in the middle

9    of a meeting when the commissioner was arrested.  I

10   don't know what those text messages are about.

11   Q.            Okay.  And you no longer have those text

12   messages, correct?

13   A.            No, I don't.

14   Q.            Because you deleted them?

15   A.            Did you ask a question?

16   Q.            Yes.  Did you delete them?

17   A.            Did I delete what?

18   Q.            Your text messages from this day.

19   A.            I'm sure by now I have.

20   Q.            Okay.  Do you know when you deleted them?

21   A.            No, I don't.

22   Q.            Did you manually delete them?

23   A.            I don't know.

24   Q.            Okay.  So you don't know that if you go into

25   your phone -- do you delete your own text messages?

```
1    A.              I know how to manually delete text

2    messages, and I have done that in the past, but I can't

3    remember -- I don't know if it does it automatically

4    sometimes or manually.

5    Q.              Okay.

6    A.              I'm not a tech guy.

7    Q.              And you texted her again, if you look at

8    798, at 11:32 a.m., correct?

9    A.              Yes.

10   Q.              At 11:34, who's Brian Butcher?

11   A.              Brian Butcher is the president of Clemans

12   Nelson law firm.

13   Q.              And you texted him -- what capacity -- does

14   he represent you?

15   A.              At the time we were trying to get Clemans

16   Nelson to come in and negotiate our contracts for the

17   sheriff's office.

18   Q.              Okay.

19   A.              We had not retained them yet.

20   Q.              Who's Dave List?

21   A.              Dave List is a personal friend of mine.

22   Q.              All right.  Kind of keep those handy.  I'm

23   going to hand you what we're going to mark as Exhibit 11.

24           (Whereupon Plaintiff's Exhibit 11 was marked.)

25   A.              Are you done with this, sir?
```

1    Q.              Kind of keep it handy.  Plaintiff's

2    Exhibit 11.  If you look at the top left, this is the

3    voice usage.

4    A.              Okay.

5    Q.              Okay.  And the good news is it's not wildly

6    different than reading the text usage.  So it has the item

7    numbers on the left, and then it goes to the date, and it

8    has the connection time.  Do you see that on the third

9    column?

10   A.              Yes.

11   Q.              And then you have the originating number,

12   who's making the call, and the terminating number, who's

13   receiving it.  Do you see that?

14   A.              Yes.

15   Q.              Okay.  So I will find the range numbers for

16   you here, get you in the ballpark.  And this still follows

17   the UTC, so we have the annoying task of subtracting four

18   by everything.  We are going to approximately item number

19   2975.  Do you see that?

20   A.              Give me a minute here.  Yes.

21   Q.              Okay.  So we'll start -- 2975.  All right.

22   So it appears that this is Nadine Grimley's number again,

23   and she called you at 11:14 a.m.  Do you see that?

24   A.              Yes.

25   Q.              Okay.  And you go down a little bit.  It

```
 1    looks like you called her -- at 2977, it looks like you
 2    called her at 11:26 a.m.  Do you see that?
 3    A.          What number are you on?
 4    Q.          I am on -- 2977's the item number.
 5    A.          Yes.
 6    Q.          Okay.  And that phone call took place at
 7    11:26 Eastern Time, correct?
 8    A.          Correct.
 9    Q.          I'm sorry.  No.  Neither of us are correct.
10    So you called her at -- she called you at 11:14.
11    Actually, sorry.
12                MS. SUDHOFF:  Could we take a quick break?
13                MR. MILLER-NOVAK:  Sure.
14                     (Off the record.)
15    Q.          So it appears that you exchanged phone calls
16    and text messages with Nadine Grimley both before and
17    after Commissioner Frenchko's arrest on July 7th, 2022,
18    correct?
19                MS. SUDHOFF:  Objection.
20                THE WITNESS:  Do I answer?
21                MS. SUDHOFF:  To the extent you know.
22    A.          From looking at these records, that's what
23    it appears like.
24    Q.          Okay.  And earlier you said you did not call
25    Mr. Danso, correct?
```

```
1    A.              I never said that.

2                    MS. SUDHOFF:  Objection.

3    Q.              What did you say?

4    A.              You never asked me that question before.

5    Q.              Okay.  Did you call Mr. Danso after

6    Commissioner Frenchko's arrest?

7    A.              I don't know.

8    Q.              Okay.  Once again, I do not want to put

9    his -- you guys have so many friends in your business, so

10   let's just -- you know, I'm even going to shorten it here

11   because it's a little different than a reporter, but if

12   you look -- do you still have that list?

13   A.              Item 2977, is that the call you're

14   referring to?

15   Q.              Yes.

16   A.              Yes.  My answer is yes.

17   Q.              Thank you.  That was the best way to do

18   that.  And 2978?

19   A.              15:26 would be what time?

20   Q.              It would be 11:26 a.m.

21   A.              Okay.

22   Q.              I'm going to have you go to the next page,

23   2990.  Do you see that?

24   A.              Yes.

25   Q.              2991, 2992, 2993, 2994 and 2995, those are
```

1    calls back and forth between you and Bill Danso, correct?

2    A.          Those numbers were called, but based on

3    the time of the calls, I'd say it was probably a phone

4    message or less, or just a hang-up, because there's no

5    conversation there.  The longest call was 37 seconds.

6    Q.          Did you talk to William Danso at all that

7    day?

8    A.          Yes, I did.

9    Q.          Did you get any clearance from him to file

10   charges?

11   A.          No, I did not.

12   Q.          Did you ask him whether or not you should

13   file charges?

14   A.          I asked their office if they would review

15   the arrest of the deputies.  They said they were

16   conflicted, and they did not give any legal advice

17   whatsoever.

18   Q.          Did they say that it would be best to have a

19   special prosecutor?

20   A.          Not at that time.

21   Q.          Do you understand as a sheriff that it's

22   normal procedure when a prosecutor is conflicted to obtain

23   a special prosecutor?

24   A.          That prosecutor's office didn't have

25   jurisdiction over this case either, so they completely

1    were removed from the process, sir.

2    Q.          Okay.  Okay.  I tell you what we're going to

3    do.  We're going to try to orderly give her back all those

4    exhibits.  I'm going to hand you what we're going to mark

5    as Exhibit 12.

6          (Whereupon Plaintiff's Exhibit 12 was marked.)

7    Q.          I'm going to hold out that this is a news

8    report written by Nadine Grimley and posted online on

9    July 7th, 2022, at 11:52 a.m.  Do you see that?  And we'll

10   go to the second page.  And on that page it contains --

11   and I forgive you on the print.  Unfortunately with

12   interior screens and pop-ups when you print it out, it

13   does some wild and whacky things, but you can see that

14   that report had a copy of your letter posted in there.  Do

15   you see that?

16   A.          I see a partial portion of the letter I

17   wrote.

18   Q.          Correct.  And 11:52 a.m. would be

19   approximately a half hour, little north of a half hour

20   after Commissioner Frenchko's arrest, so -- if you go

21   down -- actually, if you go to the third page of this

22   printout, you see in the middle where it says report, man

23   led police on 105-mile-an-hour chase.  Do you see that?

24   A.          Yes.

25   Q.          Right below that that's your quote.  It says

1    Monroe said that isn't the case.  In quotations, our

2    deputies gave her more latitude than a normal person from

3    the public in a meeting.  We should have typically removed

4    someone from the meeting immediately for the disruptions

5    that she caused.  Do you see that?

6    A.          Yes.

7    Q.          Next quote is, what she did violated the law

8    and she forced our deputies to take official action.  Do

9    you see that?

10   A.          Yes.

11   Q.          So there's a quote from you in an article

12   posted about a half hour after her arrest.  Do you see

13   that?

14   A.          No.  I see the dates and times.  If you're

15   asking a question, yes, I see the dates and times that

16   are posted.

17   Q.          Okay.  You can set that down.  Or, actually,

18   do you deny that's a statement you made to Nadine?

19   A.          No.

20   Q.          Exhibit 2, do you recognize this as the

21   report regarding Commissioner Frenchko's arrest?

22   A.          Yes.

23   Q.          Okay.  And we talked about it earlier.

24   There's no page numbers on it, so we'll have to do the

25   best we can.  We have to kind of count.  Unfortunately,

```
1    it's not Bates stamped.  Well, if you look at the bottom,
2    it has the -- let's just start on the first page.  At the
3    bottom it says that the dispatch -- it says 11:24.  Do you
4    see that?
5    A.          Yes.
6    Q.          But in the top right-hand corner it says
7    that the incident date and time was at July 7th, 2020, at
8    11:20 a.m., correct?
9    A.          Yes.
10               MR. YOSOWITZ:  '22.  No.  You said
11   July 7th, 2020.
12   Q.          Okay.  So 2022 at 11:20 a.m.?
13   A.          Yes.
14   Q.          Takes a village.  All right.  So it appears
15   that that is what is reported the time of her offense,
16   correct?
17   A.          Yes.
18   Q.          And when it says dispatch, does that mean
19   the time of the arrest?
20   A.          No.
21   Q.          Okay.  What does that mean?
22   A.          Are you asking me to speculate?
23   Q.          I mean, I don't know --
24   A.          Based on what I see, if they listed day of
25   the incident 11:20, they probably made the arrest
```

1   at 11:20, and once they were out of the meeting room

2   probably out on their portable radio and when they

3   started moving the prisoner, let the dispatcher know

4   that somebody was in custody.

5   Q.          Okay.

6   A.          That's -- that would be a better question

7   for Wix and Ross.

8   Q.          Okay.  So if you go to the third page --

9   A.          Still trying to go over your first page

10  which -- it's showing at 11:55 female is being

11  transported to the -- to jail at 11:55.

12  Q.          Okay.  It says transport.  Isn't that

13  different than incident?

14  A.          That would sound to me like they were

15  moving the prisoner at that time.

16  Q.          Okay.  Well, I'll represent to you that Wix

17  had testified that the incident date was the time of the

18  incident.

19  A.          Okay.

20              MS. SUDHOFF:  Can we go off the record for

21  a moment?

22              MR. MILLER-NOVAK:  Sure.

23                  (Off the record.)

24              MR. MILLER-NOVAK:  Can we go back on the

25  record, please?

```
 1    Q.            Do you know, is there a way to look on this
 2    report and see what time it was completed?  So I want to
 3    go to page 3.  You see on the top left-hand corner?
 4    A.            Yes.
 5    Q.            Where it says TOC.  Does that mean time of
 6    completion regarding this form?
 7    A.            I'm not certain.  I would have thought
 8    that was time of call.
 9    Q.            Well, but TOD, it would be time of dispatch,
10    because on the front it had the dispatch --
11    A.            Sometimes a call will come in and there
12    will be things going on.  I'm not certain of the answer.
13    Q.            Okay.
14    A.            But I would think that's time of call.
15    Q.            How long does it typically take to fill out
16    a police report properly?
17                  MR. YOSOWITZ:  Objection.
18    A.            Depends on what the report -- what the
19    incident is and what all they have to do to gather
20    information.  It could take anywhere from ten minutes to
21    days.
22    Q.            Okay.  Well, if you go to the narrative
23    supplements -- I think they start on page 5 or 6.  And the
24    first one is two pages, and it looks like it's Robert
25    Ross's narrative, correct?
```

```
 1    A.              Yes.

 2    Q.              The second one is by Harold Wix.  Do you see

 3    that?

 4    A.              Yes.

 5    Q.              The third one is by Detective Jolene

 6    Marcello.  Do you see that?

 7    A.              Yes.

 8    Q.              Okay.  So it looks like her and Wayne Mackey

 9    interviewed two witnesses, correct?

10    A.              Yes.

11    Q.              Okay.  So before this police report was

12    completed, they interviewed at least two witnesses,

13    correct?

14    A.              Yes.

15    Q.              Okay.  And those -- both Detective Mackey

16    and Marcello wrote about a one-and-a-quarter page report

17    on those interviews, correct?

18    A.              I don't see a supplement here for Mackey.

19    Q.              Well --

20    A.              I just have Marcello.

21    Q.              -- I guess Marcello wrote it.

22    A.              Okay.

23    Q.              But it refers to interviews that she

24    conducted with --

25    A.              With him.
```

```
 1    Q.             -- Detective Mackey, correct?

 2    A.             Yes.

 3    Q.             Okay.  So I want to go back to Wix's

 4    narrative, which was the second one.  Sort of in -- in the

 5    middle of the page it says Frenchko was given ample

 6    opportunity to stop her disruptive behavior, even more

 7    opportunity than the general public who attends would be

 8    afforded.  Do you see that?

 9    A.             Yes, sir.

10    Q.             Okay.  Earlier when we looked at the news

11    report, you had told Nadine Grimley that day that the

12    deputies gave Ms. Frenchko more latitude than they would a

13    member of the general public, correct?

14    A.             Yes.

15    Q.             Earlier today you talked about an individual

16    that was removed from multiple meetings but wasn't

17    arrested, correct?

18                   MS. SUDHOFF:  Objection.

19    Q.             Correct?

20    A.             Yes.

21    Q.             Okay.  So that individual had to be removed

22    from multiple meetings, but he wasn't charged with any

23    crimes, correct?

24                   MS. SUDHOFF:  Objection.

25    A.             Not exactly sure of the identity of that
```

1    person.  I just heard rumor of it from the guys.  You

2    asked me a general question, and I answered it.

3    Q.          Okay.

4    A.          It didn't compare with what was going on

5    with the criminal activity of Michele Frenchko.

6    Q.          Okay.  Well, regarding what you're

7    describing as criminal activity, the charges against her

8    were voluntarily dismissed by a special prosecutor,

9    weren't they?

10   A.          We're talking difference between knowingly

11   doing something and someone with mental issues, so if

12   there's a question -- or are you questioning -- I guess

13   I'll just leave that one go.  Go ahead and ask your

14   question.

15   Q.          Well, the special prosecutor voluntarily

16   dismissed the charges against Commissioner Frenchko,

17   correct?

18   A.          That's what he did.

19   Q.          Okay.  So she wasn't actually convicted of

20   any crime, correct?

21   A.          I believe she would have been if she went

22   to trial.

23   Q.          Okay.  That's your belief?

24   A.          Yes.

25   Q.          Okay.  Apparently it wasn't the special

1    prosecutor's belief, though, correct?

2    A.            No, it was not.

3    Q.            Okay.  We can give that report back to the

4    reporter.  I'm going to play a video for you, and the way

5    our day's going, it's going to have an ad for Planet

6    Fitness we're going to have to sit through.  And there's

7    no sound, of course.

8                       (Recording being played.)

9    Q.            So I'm going to represent to you that I

10   think that's Mr. Glenn who was a husband of a county

11   employee and a member of the public, and I think what we

12   would agree was depicted there that Mr. Glenn, as a member

13   of the public, was dancing during his statement to the

14   commissioners, flicking off Commissioner Frenchko,

15   continuing to talk after he sat back down and continuing

16   to flick her off, correct?

17   A.            You showed me a snippet.  I don't know

18   what the totality of the meeting was at that point if

19   that's for open discussion by the public.  I don't have

20   enough information or when that was.  I'm guessing this

21   happened during COVID, because I see some people wearing

22   masks.

23   Q.            Okay.  Well, you agree watching that video

24   that your deputy didn't even really respond to it,

25   correct?

```
1    A.          I didn't see.

2    Q.          Want me to play the video again?

3    A.          Sure.  Play it again.

4    Q.          Sure.

5    A.          Do you have a question in there before you

6    play the video?  What are you looking for me to answer?

7    Q.          I mean, what are you asking me?

8    A.          I'm asking you what the question is.

9    Q.          I asked you --

10   A.          You asked me about Mr. Glenn and then you

11   asked me about the deputy.

12   Q.          I asked you whether or not he responded to

13   the situation.

14                    (Recording being played.)

15   Q.          Who's the deputy there?

16   A.          I can't tell.

17   Q.          Okay.  You would agree that he didn't

18   respond in any way, correct?

19   A.          No.  He never moved.

20   Q.          Okay.  How many meetings have you watched?

21   A.          Not too many.

22   Q.          Then how do you know how much latitude your

23   deputies normally give the public?

24   A.          I know what they tell me.

25   Q.          Okay.  So you know what they tell you.  I
```

1   mean, I asked Wix that same question, and he didn't really

2   have an answer for me.  So, I mean, I'm asking you, how

3   much latitude do you train your deputies to give the

4   general public?

5   A.            I don't train them.

6   Q.            Okay.  So what's the policy on how much

7   latitude they give the general public?

8   A.            They have discretion to make the decision.

9   Those guys -- the deputies that were there made a

10  decision, and I support their decision.

11  Q.            Okay.  The deputy there made the decision to

12  really not even warn him about continuing to talk when

13  they try to start the meeting back up?

14  A.            Based on the snippet that you showed me,

15  I -- the only commissioner I could see was Fuda.  He did

16  not seem upset.  I hear a voice in the background

17  laughing, which sounds like Michele Frenchko.  She

18  didn't seem very upset.  She seemed amused and made a

19  comment that the guy was racist.

20  Q.            Uh-huh.

21  A.            That's what I observed.

22  Q.            Well, so do you know how often the

23  commissioners interrupt one another?

24  A.            No, I don't.

25  Q.            Do you know how often the public interrupts

1    the commissioners?

2    A.            No, I don't.

3    Q.            Do you know if the deputies are at every

4    meeting?

5    A.            Well, my first four years in office they

6    were rarely, if ever, at a meeting.  When Michele

7    Frenchko took office, they started having to attend the

8    meetings because of the disruptions.

9    Q.            Okay.  Well, earlier -- actually, I think it

10   was Sergeant Ross testified that they were invited to just

11   provide security.  Do you disagree with that statement?

12   A.            Invited?

13   Q.            Yes.

14   A.            We are asked by the commissioners to

15   provide security.  We wouldn't just send somebody just

16   for something to do.

17   Q.            Okay.

18   A.            I can tell you that none of our deputies

19   just show up for a commissioners' meeting because they

20   were invited for their pleasure to attend the meeting.

21   That never happened.

22   Q.            Well, what I asked Ross yesterday, and he

23   said that they were there to provide security, not manage

24   the meetings.

25   A.            That's correct.

```
 1   Q.              Okay.  So he said it was for human safety

 2   not --

 3   A.              Correct.

 4   Q.              Okay.  On March 9th, two thousand and --

 5                   MR. BETRAS:  One second, Matt.  Can we

 6   take a short break?

 7                   MR. MILLER-NOVAK:  Sure.

 8                        (Off the record.)

 9                   MR. MILLER-NOVAK:  Back on the record.

10   Q.              So I want to talk about the meeting on

11   March 9th, 2023.  Do you recall why you went to that

12   meeting?

13   A.              Yes.  We had a letter from the

14   commissioners' office requesting me to attend an

15   additional budget meeting explaining the budget meeting

16   that we already had.

17   Q.              Okay.  And it was a commissioners' meeting,

18   correct?

19   A.              Yes.

20   Q.              Okay.  And, I mean, at some point you were

21   going to speak, correct?

22   A.              I was asked to address an issue.

23   Q.              Okay.  And when you got up to speak, you

24   walked over towards Commissioner Frenchko?

25   A.              No, I did not.
```

```
 1   Q.            You did not walk --

 2   A.            I did not walk towards Commissioner

 3   Frenchko.

 4   Q.            That's your testimony under oath?

 5   A.            That's my testimony under oath.

 6   Q.            You never walked in her direction?

 7   A.            I never walked in her direction.  Anybody

 8   that says that it's a lie.

 9   Q.            You never walked towards her direction

10   and --

11   A.            No.

12   Q.            -- reached for her phone while talking to

13   her?

14   A.            Never happened.  Never happened.

15   Q.            Did you get up out of your seat at any

16   point?

17   A.            Yes, I did.

18   Q.            Did you tell a reporter at Channel 21 that

19   you were allowed to move her cell phone?

20   A.            I don't recall saying that word exactly.

21   I know I wouldn't have said that.

22   Q.            You said you would not say that?

23   A.            That's not how I would have phrased

24   something.

25   Q.            Did you tell the reporter at Channel 21 that
```

```
1    Ms. Frenchko tried to slap your hand?

2    A.            No.  I told the reporter at 21 that

3    Michele Frenchko struck my hand.

4    Q.            Okay.  How was your hand by her?

5    A.            My hand was not by her.

6    Q.            So why would you tell the reporter at

7    Channel 21 that Ms. Frenchko tried to strike your hand if

8    your hand wasn't in striking distance?

9    A.            Because she shoved a phone stand into my

10   personal space within inches of me, and I reached out as

11   she went to sit back down and moved the phone out of my

12   personal space, and she tried to grab the phone or slap

13   me, and she did.  She hit me on the hand, the stand fell

14   over on the table, and that was the end of the incident.

15   Q.            Okay.  So your testimony is that she walked

16   towards you?

17   A.            She did.

18   Q.            Okay.

19   A.            I never walked towards Michele Frenchko.

20   Q.            This thing's a little touchy.  God willing,

21   this will work.  All right.  Play the moment of the video.

22   A.            I can't see the video.

23   Q.            Okay.  Well, I'll turn it towards you.

24                     (Recording being played.)

25   Q.            Okay.  You stand up there, correct?
```

```
 1    A.              Yes, sir.

 2    Q.              You would agree it appears she turns her

 3    phone around, correct?

 4    A.              She does, yes.

 5    Q.              Okay.  Now, you don't see her walking with

 6    the phone at this point, do you?

 7    A.              Not yet.

 8    Q.              Okay.

 9                        (Recording being played.)

10    A.              Show the rest of the video.  Where's the

11    rest of the video?

12    Q.              That is the rest of the video.  So at any

13    point before the phone is moved do you see that phone --

14    do you see her actually walk forward with the phone?

15                    MS. SUDHOFF:  Objection.

16    Q.              You're walking towards her in that video.

17    A.              I was not walking towards her.  If you

18    take a look, it's all angles.  I'm sitting over here at

19    the end of the table.  I got up and walked directly to

20    the end of that table.  If you take a look, there's a

21    chair next to her.  She's not at the end of the table.

22    There's a large chair.  She got up and took that phone

23    and went like this.  And as soon as she went to sit back

24    down, I tried to move the phone out of my personal

25    space, and she smacked my hand and it fell over.  Not as
```

1    you've testified.

2                        (Recording being played.)

3    A.              Where's the rest of the video?  That's

4    incomplete.

5    Q.              The whole video's here.  Do you want to

6    watch an hour and a half right now?

7    A.              I'm saying it's missing where she came at

8    me.

9    Q.              We produced it to your counsel.  You have

10   every opportunity to watch the whole video.  So right

11   there you get up.  I'm telling you right now, I don't see

12   her phone screen move, do you?

13   A.              Keep watching.

14   Q.              Do you see things diminish in the distance?

15   A.              No.

16   Q.              Okay.

17   A.              See -- that's missing some of the video.

18   Q.              You're saying it's missing some of the

19   video?

20   A.              I'm saying that somebody redacted some of

21   that video.

22   Q.              That's your testimony today.  You believe

23   that that video was altered?

24   A.              I believe it's incomplete.

25   Q.              Okay.  What proof do you have of that?

1   A.          Well, I have this lying person who has

2   produced this video for you.  I don't have -- has this

3   been forensically studied?  I have your statement that

4   you've testified to.  I told you what I testified to.  I

5   never walked at Michele Frenchko.  She came at me.  She

6   struck me.  I never -- I never touched her.

7   Q.          Okay.  So you know what, I am happy to

8   provide your counsel with the video.  They have it.  It's

9   on Facebook Live, is it not?  So it's on Facebook Live.

10  A.          No.  The actual phone should be

11  forensically analyzed.

12  Q.          Well, actually, Facebook Live uploads

13  directly to Facebook, correct?

14  A.          I don't know.  I don't participate.

15  Q.          You're not aware of that?

16  A.          I don't participate in Facebook

17  whatsoever.

18  Q.          Okay.  So you're not aware that when

19  someone --

20  A.          Who's authenticated the video?

21  Q.          Let me finish my question.  So you're not

22  aware that when someone films something on Facebook Live

23  it immediately goes onto Facebook?

24  A.          I don't participate in Facebook.

25  Q.          Okay.  So that video, I'm going to represent

```
 1   to you, was videotaped on -- it was sent on her phone

 2   directly to Facebook.

 3   A.           You're testifying to that?

 4   Q.           I'm not testifying.  I'm representing that.

 5   Because my follow-up question is --

 6   A.           I don't know that that's true.

 7   Q.           Are you accusing someone at Facebook of

 8   altering the video?

 9   A.           No.  I'm saying that you're testifying

10   that that's the case.

11   Q.           Yeah.

12   A.           Prove to me that that's the case.  I don't

13   know what this Facebook Live is.

14   Q.           Okay.

15   A.           You asked me what my testimony is.  She

16   struck me.  She knocked the phone over.  I don't know

17   what else you want from me.

18   Q.           So you're accusing her of striking you?

19   A.           She did.

20   Q.           Then why didn't you arrest her?

21   A.           It was petty.

22   Q.           Okay.  So you'll arrest her --

23   A.           I didn't arrest her.

24   Q.           You'll have your -- your deputies will

25   arrest her --
```

```
 1   A.            I didn't have my deputies --

 2   Q.            Your deputies will arrest her --

 3                 MS. SUDHOFF:  Objection.

 4   Q.            -- for disrupting a meeting with her mouth,

 5   but you think it would be petty to arrest her for

 6   battering you?  That's your testimony today?

 7                 MS. SUDHOFF:  Objection.

 8   A.            Do you have a question?  Ask the question.

 9   Q.            I just asked the question.  Is that your

10   testimony today, that it would be petty to arrest a

11   commissioner for battering a sheriff?

12                 MR. YOSOWITZ:  Objection.

13   Q.            Are you going to answer?

14   A.            Yes.

15   Q.            It would be petty?

16   A.            No.  I felt that it would be ridiculous to

17   arrest her for smacking my hand, incidental contact;

18   wasn't that big of a deal.

19   Q.            Okay.

20   A.            That's my testimony.

21   Q.            Okay.  Where's the surveillance video from

22   that day?

23   A.            I don't control that surveillance video.

24   Q.            Okay.  There is surveillance cameras in that

25   room, correct?
```

```
1    A.          Not that I know of.

2    Q.          Okay.  So your statement to the reporter

3    that day, Leslie, was that you had every right to move her

4    phone, correct?

5    A.          She stuck that phone within inches of me,

6    and I pushed it out of my way.  She's in my personal

7    space.

8    Q.          Okay.

9    A.          If I jumped right up -- if I jumped right

10   up in your face right now and shoved my phone within

11   inches of you, what's your natural reaction going to be?

12   Q.          Not to hit your phone.

13   A.          Not to hit my phone.  You don't move?

14   Q.          I might move backwards, but I wouldn't hit

15   your phone.

16   A.          If you touched it, now what happens?

17   Q.          What's that?

18   A.          And you touched the phone -- you just move

19   like this and she smacks your hand and the phone falls

20   over.  Whose fault is that?

21   Q.          If you -- what's your thing?  So you reach

22   for a phone --

23   A.          If I smack your hand --

24   Q.          Okay.

25   A.          -- and that phone falls over, whose fault
```

1   is that?

2   Q.          Well, if you're reaching for my phone, you

3   don't think I have a right to defend my property?

4   A.          I never actually touched it until she

5   touched me.

6   Q.          Okay.  So your testimony earlier was you

7   didn't even walk towards her, correct?

8   A.          I did not walk towards her.

9   Q.          Okay.  You didn't walk in her direction?

10  A.          I did not walk in her direction.

11  Counselor, she's sitting in a chair just like this.

12  There's an empty seat.  You can see it in the video.  I

13  was sitting in the far corner.  I got up and I walked to

14  the end of the table.  I never walked towards her,

15  unless you're saying walk to the end of table is walking

16  towards her, no.  She got that phone and had it out here

17  like this and then pushed it right into my chest.

18  Q.          Like actually physically into your chest?

19  A.          She has it on a stand, went like this, and

20  I'm going to tell you, I waited until she started to

21  back away because she's off balance because that chair

22  was in the way, and as soon as I started to reach

23  towards that phone, she slapped me on the hand.

24  Q.          Okay.

25  A.          That is my testimony.

1  Q.          You just admitted you reached towards the

2  phone?

3  A.          Yes, I did.

4  Q.          Okay.  But you said you waited until she

5  could back up.

6  A.          Yes.

7  Q.          Okay.  It wasn't an immediate reaction then?

8  A.          No.

9  Q.          Okay.  So it wasn't an immediate reaction to

10 her putting the phone in front of your face, because you

11 just said you waited for her back up.

12 A.          I wanted it out of my personal space.

13 Q.          Okay.  So you chose to move her phone out of

14 your personal space?

15 A.          Yes.

16 Q.          Okay.  Did you ask to move her phone?

17 A.          No, I did not.

18 Q.          Okay.  All right.  So if the chair's sitting

19 next to her -- is by her and the end of the table is by

20 her, then you were walking in her direction, correct?

21 A.          No.

22 Q.          Okay.  So if the end of the table is right

23 next to her, it's not walking in her direction?

24 A.          I walked from that corner to the end of

25 the table.  I never walked towards her.

```
 1   Q.            And she was by the end of the table,
 2   correct?
 3   A.                 No.  There was a chair at the end of the
 4   table.  She reached around it.
 5   Q.            Okay.
 6   A.            What happens -- you watch the video, okay?
 7   So objectively look at that video and -- I didn't slip
 8   that chair in there.  She didn't slip that chair in
 9   there.
10   Q.            Okay.
11   A.            Nobody wanted to sit next to her.
12   Q.            Okay.  All right.  Well, I can tell you, I
13   did watch the video and I saw her turn the phone, it
14   appears, from -- because you can see the camera angle, it
15   turns, and then I didn't see it move forward from there.
16   That's -- do you disagree with that?
17   A.            I disagree completely with that.
18   Q.            Okay.
19   A.            And I gave you a list of everybody I knew
20   of that was at that meeting, and I'm sure when you
21   deposed all those people that I gave you on the list as
22   to what they saw, that's what they told you.
23   Q.            Well, I haven't deposed them yet, but, yeah.
24   A.            You probably won't because they're going
25   to tell you an answer you don't want to hear.
```

```
 1    Q.              No, you've already told me the answers I
 2    want to hear.
 3    A.              Okay.
 4    Q.              So let's see.  I want to talk about your
 5    text messages again.  So you said that your text messages
 6    from July 7th, 2022, to Nadine Grimley no longer are in
 7    your possession, correct?
 8    A.              I don't have them.
 9    Q.              Okay.  Because you didn't preserve them,
10    correct?
11    A.              Preserve them for how long?  I mean,
12    eventually they were of no value.
13    Q.              Okay.
14                    MR. MILLER-NOVAK:  Can you hand him
15    Exhibit 5?
16    Q.              Have you seen that document before?
17    A.              Yes.
18    Q.              What is it?
19    A.              It's a letter.
20    Q.              Okay.  Actually, let's go to the second
21    page, because it's backwards in time.  So on the second
22    page, this is a letter from Victor Vigluicci.  Is that --
23    A.              No, that's not correct.
24    Q.              Okay.  Who's the letter from?
25    A.              Raymond Srp.
```

```
1    Q.              Okay.  Raymond Srp.  You're correct.  And

2    it's to the Trumbull County Sheriff's Office.  Do you see

3    that?

4    A.              Yes.

5    Q.              As well as Trumbull County Commissioners.

6    Do you see that?

7    A.              Yes.

8    Q.              And it says, Dear Trumbull County

9    Commissioners and Sheriff Palmer, correct?

10   A.              Yes.

11   Q.              And I know your name's not Sheriff Palmer.

12   It's Sheriff Monroe, correct?

13   A.              Yeah.  Well, Chief Deputy Palmer was

14   actually dealing with this Srp and handling this case.

15   Q.              Okay.  Thanks.  So in here it says, my name

16   is Raymond Srp, and I've been appointed as special

17   prosecuting attorney of Warren Municipal Court Case Number

18   2022 CRB 1240.  Do you see that?

19   A.              Yes.

20   Q.              And you agree that that is the case of the

21   State of Ohio versus Michele N. Frenchko, correct?

22   A.              Yes, I agree to that.

23   Q.              Okay.  Here it says yesterday on

24   August 4th, 2022, Judge Frost ordered the following to be

25   preserved.  Do you see that?
```

```
 1    A.          Yes.

 2    Q.          Number one, all surveillance video at the

 3    administrative building and sheriff's building where

 4    sheriff's employees and county commissioners or their

 5    staff (including Jim Misocky, past employee) are in

 6    communication with the sheriff's staff are on the fifth

 7    floor.  Do you see that?

 8    A.          Yes.

 9    Q.          Okay.  Number two, it says, personal cell

10    phones and all county building logs, emails, personal text

11    messages, written notes and correspondence, Messenger

12    messages on Facebook, Instagram and all other app or

13    social media platforms between and among commissioners'

14    staff, commissioners, sheriff's staff and sheriff and Jim

15    Misocky between May 4th to August 4th, 2022.  Do you see

16    that?

17    A.          Yes.

18    Q.          Okay.  Next one says, all emails or

19    correspondence, text or videos, social media posts and

20    otherwise relating to the disruption of a lawful meeting

21    statute from any commissioner, sheriffs or auditor's staff

22    (including Jim Misocky) containing any reference to

23    Commissioner Frenchko.  Do you see that?

24    A.          Yes.

25    Q.          Following paragraph says, take any and all
```

1    steps necessary to preserve the above-mentioned

2    information so that the state may comply with Judge

3    Frost's order.  If you have any questions, please feel

4    free to contact me.  Do you see that?

5    A.          Yes.

6    Q.          Okay.  What steps did you take to maintain

7    your text messages after receiving this?

8    A.          Didn't do anything with them.  Just left

9    them alone.

10   Q.          Okay.  But --

11   A.          Just left them on my phone.

12   Q.          Okay.  What steps did you tell your deputies

13   to maintain their text messages?

14   A.          I didn't tell them anything.

15   Q.          So when you got this and it says Judge Frost

16   ordered the following to be preserved; and, number two, it

17   says personal cell phones and county building phone logs,

18   emails and whatever, and when you go to the bottom of that

19   page it says sheriff's staff, correct?

20   A.          Yes.

21   Q.          Okay.  So you have a letter from a special

22   prosecutor saying that you have been ordered to have the

23   sheriff's staff preserve their text messages from that

24   time period, correct?

25   A.          Yes.

1    Q.            And you didn't tell a single deputy to

2    maintain --

3    A.            No.  I already answered this question

4    earlier in the deposition.

5    Q.            Okay.  So the answer is no?

6    A.            No.  The answer is I told you that Chief

7    Deputy Jeff Palmer issued a memo to all of our staff,

8    and you requested that memo to get a copy from our

9    attorney.

10   Q.            Okay.

11   A.            You said that earlier about three hours

12   ago.

13   Q.            So when I talked to Sergeant Ross earlier,

14   he said that he was not informed to preserve any of his

15   text messages.

16                 MR. YOSOWITZ:  Objection.

17   Q.            And he manually deleted them; is that

18   untrue?

19                 MS. SUDHOFF:  Objection.

20   A.            Do you have a question?  I mean, you made

21   a statement.  You didn't make a question.

22   Q.            I just said, is that true?

23   A.            I don't know what the question is.  Can

24   you please repeat it?

25   Q.            Okay.  So if I'm telling you earlier that

1    Sergeant Ross testified that he was not told to preserve

2    his text messages and he manually deleted them, do you

3    have any reason to believe that is not true?

4                    MR. YOSOWITZ:  Objection.

5                    MS. SUDHOFF:  Objection.

6    A.              I testified that a letter was put out to

7    the deputies to preserve their text messages.

8    Q.              Okay.  On the first page, if you go to that,

9    this is an email from William Danso.

10   A.              How do you know it's an email?

11   Q.              I'm sorry.  It's a letter.  It looks like --

12   it's from Dennis Watkins, actually, Trumbull County

13   Prosecuting Attorney.  It's signed William Danso at the

14   bottom.  Do you see that?

15   A.              Yes, I do see that.

16   Q.              It says, Dear Sheriff Monroe, you have

17   provided us with a letter dated August 5th, 2022, from

18   Raymond Srp and assisting prosecuting attorney assigned to

19   handle the above-captioned case.  Do you see that?

20   A.              Yes.

21   Q.              Okay.  In that letter Attorney Srp explains

22   that Judge Frost has issued an order to preserve certain

23   data and sets forth three categories of data subject to

24   that order.  Do you see that?

25   A.              Yes.

1    Q.          While we have not been and will not be

2    involved in this matter due to a conflict of interest with

3    our statutory clients -- and this is in bold -- it is

4    important that you take any and all steps necessary to

5    preserve the information and data described in that letter

6    and that you communicate this duty to your staff as

7    applicable.  Do you see that?

8    A.          Yes.

9    Q.          Okay.  This letter was sent to you on

10   August 5th, 2022, correct?

11   A.          That's what it says.

12   Q.          And it was sent to you five days after you

13   received the order from Judge Frost, correct?

14              MS. SUDHOFF:  Objection.

15   A.          I'd say no.

16   Q.          Okay.  Why do you say no?

17   A.          Five days after?  This is dated

18   August 5th, the other one is dated August 5th.  I don't

19   know what the math is here or where you're getting

20   your -- okay.  I see August 10th on the top.  Okay.

21   Q.          It's kind of jammed under that stuff.

22   A.          All right.

23   Q.          Do you see that?

24   A.          Yes.

25   Q.          Okay.  So this --

1  A.          I don't know what other answer you want me

2  to give you other than I told you that Chief Palmer

3  addressed us and posted a memo on it.

4  Q.          You don't have your text messages from that

5  day, do you?

6  A.          No, I don't.

7  Q.          And you didn't take any steps to preserve

8  your own text messages, did you?

9  A.          How do you preserve a text message?  I

10 just didn't do anything.

11 Q.          You can print it, correct?

12 A.          I don't know how you print it.

13 Q.          Take a screenshot of it, correct?

14 A.          I don't know.  I'm telling you, I'm not a

15 tech guy.  I don't know how you do these -- print from

16 your phone stuff other than emails.

17 Q.          Can you hire a tech guy?

18 A.          Could.

19 Q.          Okay.

20 A.          Preserve it.  If I didn't do anything with

21 it, it's preserved.

22 Q.          Is your iPhone set to automatically delete

23 text messages?

24 A.          I don't know.

25 Q.          Did you check that day?

```
 1   A.              I did not.

 2   Q.              If your cell phone is not set to

 3   automatically delete text messages, they could only be

 4   manually deleted then; would you agree with that

 5   statement?

 6   A.              I don't know.  I don't know about -- I

 7   don't play with the phones.  I don't play with social

 8   media.  I'm just not a fan of it.

 9   Q.              Okay.  So why did you not hire somebody or

10   talk to somebody who did know those things?

11   A.              I didn't know anything could happen to

12   them.

13   Q.              Okay.  I'm going to hand you -- you can hand

14   that back to the reporter.

15        (Whereupon Plaintiff's Exhibit 13 was marked.)

16   Q.              Okay.  If you actually go to the second

17   page, because as email threads go, the further down,

18   further back, the earlier it is.  So in the middle of the

19   second page it's an email from Raymond Srp sent to David

20   Betras on August 8th, 2022, at 11:54 a.m.  Do you see

21   that?

22   A.              Yes.

23   Q.              Okay.  This says, Attorney Betras, I've

24   attached a letter I sent on August 5th, 2022, to the

25   Trumbull County Sheriff and Trumbull County Commissioners
```

1    regarding the preservation request in this case.  Do you

2    see that?

3    A.          I see that he claimed that he sent a

4    letter.

5    Q.          Well, we just looked at a letter that --

6    A.          I never spoke with Dave Betras over this.

7    Q.          Okay.  I didn't say you did.

8    A.          Okay.

9    Q.          This is a letter sent from Raymond Srp.  He

10   says that he sent you a letter on August 5th, which is the

11   letter we just looked at, correct?

12   A.          Yes.

13   Q.          Okay.  It says I spoke with Trumbull County

14   Sheriff Monroe and his IT department this morning.  Do you

15   see that?

16   A.          Yes.

17   Q.          Okay.  So you do have an IT department,

18   correct?

19   A.          Yes.

20   Q.          Okay.  And it says and they need more

21   information to adequately comply with your request.  Do

22   you see that?

23   A.          Yes.

24   Q.          Please provide the following clarification,

25   and a parenthetical.  It says, the numbers in this email

1    correlate to the number request in your motion.  Do you

2    see that?

3    A.          Yes.

4    Q.          Number 1, which dates and times would you

5    like camera footage on the administrative building?  Do

6    you see that?

7    A.          Yes.

8    Q.          Let's just go to number 2.  It says,

9    Trumbull County and the State of Ohio do not have any

10   control over person -- that's probably a typo -- personal

11   electronic devices of employees; do you see that?

12   A.          Yes.

13   Q.          Okay.  But earlier you testified that text

14   messages on personal phones can be public records,

15   correct?

16   A.          Yes.

17   Q.          Okay.  So that's not correct, then, is it?

18               MS. SUDHOFF:  Objection.

19   A.          I didn't write this.

20   Q.          Okay.  Or their social media platforms.  Are

21   there specific publicly available social media posts you

22   would like us to search for?  We should be able to pull

23   the county phone logs and search for official county

24   emails, but we need to know what you're specifically

25   looking for in official emails to make the search more

1    effective.  Do you see that?

2    A.          Yes.

3    Q.          Again, we do not have any control over

4    personal accounts and devices.  Do you see that?

5    A.          Yes.

6    Q.          Do you disagree with that?

7    A.          No.

8    Q.          So you agree that you have no control over

9    your deputies' business text messages on their personal

10   devices?

11   A.          No.

12   Q.          How is it that when you receive a

13   spoliation -- reservation order from a Court that

14   specifically says to preserve text messages on personal

15   phones -- as well as personal phones and to take steps

16   necessary to preserve that that you don't have control

17   over their phones?

18   A.          I answered your question already.  We sent

19   a memo out telling them, you know, not to delete their

20   stuff, leave it on your phone; because you want some

21   specific way you want it preserved, I don't know how to

22   do that.  I don't know how to preserve phone logs.  I

23   don't know how to preserve text messages.  So I did

24   nothing with them.

25   Q.          So your IT department was involved, though.

1    A.              Our IT department is involved to the

2    extent that if you look at the original preservation

3    letter, we probably have 300 cameras, and to preserve

4    footage from every single camera, you can't do it.

5    There's just too much data.  It wouldn't make sense to

6    preserve video footage of a hallway that nobody uses or

7    a weight room that has nothing to do with this case.

8    Why would you take up all that data space for months?

9    Q.              Because the judge ordered you to.

10   A.              So we don't have the ability to do that.

11   Q.              Okay.  So the IT department, they don't know

12   how to screenshot text messages?

13   A.              I don't know.

14   Q.              Okay.  Do you think it sounds like a complex

15   thing to back up a text message?

16   A.              I mean, I don't do it.  I don't --

17   Q.              Okay.

18   A.              -- save text messages.  I don't do that.

19   Q.              The last paragraph says, Sheriff Monroe

20   indicated to me he is willing to comply with your request

21   to the best of his ability.  Do you see that?

22   A.              Yes.

23   Q.              Okay.  It was a judge's order, correct?

24   A.              Yes.

25   Q.              All right.  So it wasn't really David

1    Betras's request at that point, correct?

2    A.            And we did what he asked.

3    Q.            Okay.  How did you do what he asked?

4    A.            I deleted nothing from my phone.  We put a

5    memo out to the deputies, and I have to assume that they

6    followed that request.

7    Q.            Okay.  Well, I mean, I can tell you now that

8    between you and Deputy Ross and Deputy Wix, not a single

9    one of you has a text message from that day.  Do you have

10   any reason to disagree with that?

11   A.            No.  There wouldn't have been anything

12   there anyhow.

13   Q.            Well, how do you know that?  Because you

14   testified earlier you --

15   A.            Because I read your complaint that was

16   complete fabrication about some ridiculous conspiracy,

17   and it never happened.  There was no text message that

18   this stuff happened.  It's made up in somebody with --

19   that's mentally disturbed in their mind.

20   Q.            Okay.  There's no text message at all.

21   A.            There is no message.  There's no message

22   with a conspiracy.

23   Q.            And you were ordered by a judge to preserve

24   every text message.

25   A.            You can't preserve what's not there.

1    Q.          No.  He didn't tell you to preserve a

2    specific text message.  He told you to preserve every text

3    message, didn't he?

4    A.          No.  I think it had to do with just that

5    case.

6    Q.          No.  It did not.

7    A.          Okay.  Well, I don't have them.

8    Q.          Okay.

9    A.          I don't have them.

10   Q.          He told you to preserve text messages for an

11   entire month -- actually more than that.  From May 4th to

12   August 4th of 2022, correct?

13   A.          Okay.

14   Q.          And none of those text messages are here,

15   correct?

16   A.          I don't have any of them.

17   Q.          Okay.  So you failed then?

18               MS. SUDHOFF:  Objection.

19   A.          No.

20   Q.          So you didn't fail to comply with that

21   order?

22   A.          No.  I complied with the order.

23   Q.          How did you comply with it?  The text

24   messages aren't there.

25   A.          I didn't get rid of those messages.  They

1    were there.

2    Q.          No.  The order didn't say to not delete

3    them.  It said to preserve them, correct?

4    A.          It's your word.  I don't know how else you

5    want me to preserve.

6    Q.          It was Judge Frost's word.

7    A.          You want to use semantics --

8    Q.          Let me finish my question.

9    A.          No.  Let me finish my answer.

10   Q.          I was on a question.

11   A.          Okay.  Go ahead.

12   Q.          Judge Frost's order said to preserve them,

13   correct?

14   A.          I'd have to go back and reread it.

15   Q.          That's fine.

16   A.          Preserve is your interpretation.  By

17   leaving them on my phone, they're preserved.

18   Q.          If they're not here, they're not preserved?

19   A.          No longer are they preserved.

20   Q.          Okay.  They're no longer preserved?

21   A.          No longer preserved.

22   Q.          Is it your testimony today that you still

23   have the same phone?

24   A.          Yes.

25   Q.          And did you provide it to your counsel to

| | |
|---|---|
| 1 | review for the text messages on that day? |
| 2 | A.        What is your question? |
| 3 | Q.        Did you provide that phone to your counsel |
| 4 | to review to find those text messages? |
| 5 | A.        Physically give them my phone? |
| 6 | Q.        Correct. |
| 7 | A.        No. |
| 8 | Q.        Okay. |
| 9 | MR. MILLER-NOVAK:  I want to take a break. |
| 10 | (Off the record.) |
| 11 | MS. SUDHOFF:  Earlier in the deposition |
| 12 | today Sheriff Paul Monroe referenced a memo he sent |
| 13 | after receiving the order to preserve, and counsel for |
| 14 | defendants will produce said memo to plaintiff's |
| 15 | counsel. |
| 16 | MR. MILLER-NOVAK:  Okay. |
| 17 | MS. SUDHOFF:  We'll review. |
| 18 | SIGNATURE NOT WAIVED |
| 19 | (Deposition concluded at 4:42 p.m.) |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1

2                          REPORTER'S CERTIFICATE

3

4

5         I certify that this transcript, consisting of 123

6    pages, is a complete, true and correct transcript of the

7    proceedings had and the testimony taken in this case as

8    shown by my stenotype notes taken at the time said

9    testimony was taken.

10

11

12                        _____

13                        Jodie L. Algarin
                          Registered Professional Reporter
14                        Certified Realtime Reporter

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF NOTARY

 2

 3    COMPLETED BY DEPONENT:

 4

 5    I, PAUL MONROE, have read the foregoing pages of my
      testimony or have had them read to me and have noted any
 6    changes in form or substance of my testimony with their
      respective corrections and the reasons on the following
 7    errata sheet(s).

 8

 9                    _____
                      PAUL MONROE                 Date
10

11

12

13    COMPLETED BY NOTARY PUBLIC

14

15    I, _____, a Notary Public in and for the
      State of _____, hereby acknowledge that the
16    above named witness personally appeared before me, swore
      to the truth of the foregoing statements and signed above
17    as his/her own true act and deed.

18

19                    _____
                      Notary                      Date
20

21                    _____
                      Commission Expiration
22

23

24

25
```

```
1                    E R R A T A   P A G E

2

3           I, PAUL MONROE, the witness herein, have
            read the transcript of my testimony taken
4           on September 14, 2023, or have had the
            transcript read to me, and the same is true
5           and correct, with the exception of the
            following changes noted below, if any:

6

7      PAGE   LINE         CORRECTION, CHANGE & REASON

8      _____  _____   _____

9      _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24

25           _____  _____
             PAUL MONROE                         Date
```

1              A & A Reporting & Transcription Services
               837 Boardman-Canfield Rd., Suite 203
2              Youngstown, Ohio  44512

3              September 25, 2023

4

5  Helen K. Sudhoff, Esquire
   Fishel Downey Albrecht & Riepenhoff, LLP
6  7775 Walton Parkway, Suite 200
   New Albany, Ohio  43054

7

8  RE:  Niki Frenchko VS Paul Monroe, et al.

9  Dear Ms. Sudhoff

10 Enclosed please find your copy of the deposition of Paul
   Monroe taken on September 14, 2023.  The original
11 certificate and correction pages are attached.  It is my
   understanding from our discussion that you will arrange to
12 have Mr. Monroe read and sign your copy of the transcript.

13 After the transcript has been signed, please mail the
   originals of Pages 122 and 123 to me at the above address.
14 If I have not received the signed pages within 30 days of
   your receipt of this letter, pursuant to the Rules of
15 Civil Procedure, signature will be waived.

16 Thank you for your time and consideration in this matter.
   If you have any questions, please don't hesitate to call
17 me at the above number.

18 Sincerely,

19

20 Jodie L. Algarin

21 Enclosure

22 cc:  Atty. Matt Miller-Novak
        Atty. David Betras
23      Atty. Andrew Yosowitz

24

25

MR. BETRAS: [10]  16/6 16/9 19/24 20/1 34/24 48/15 48/19 66/14 71/4 92/5

MR. MILLER-NOVAK: [24]  16/14 32/24 33/2 35/2 48/13 48/18 48/20 59/16 59/19 65/12 66/2 66/9 66/25 69/13 70/4 71/6 77/13 83/22 83/24 92/7 92/9 104/14 120/9 120/16

MR. YOSOWITZ: [16]  15/24 16/4 16/8 16/13 39/20 40/2 55/1 66/4 66/12 66/15 67/1 82/10 84/17 99/12 108/16 109/4

MS. FRENCHKO: [3]  35/1 57/20 71/1

MS. SUDHOFF: [40]  16/3 26/12 28/21 29/2 31/3 33/1 40/3 41/14 48/14 49/3 49/12 54/25 57/10 58/15 65/13 65/16 68/24 69/5 70/5 70/11 70/22 71/1 73/22 77/12 77/19 77/21 78/2 83/20 86/18 86/24 95/15 99/3 99/7 108/19 109/5 110/14 114/18 118/18 120/11 120/17

THE WITNESS: [5]  48/16 49/7 65/17 71/5 77/20

'

'20 [1]  22/1
'21 [1]  22/1
'22 [1]  82/10
'85 [1]  13/4

0

00781 [1]  1/9

1

10 [4]  4/16 4/18 72/7 72/8
100 [1]  67/22
108 [2]  4/7 4/10
109 [2]  4/8 4/10
10:25 [1]  49/15
10th [1]  110/20
11 [4]  4/19 75/23 75/24 76/2
110 [1]  4/10
112 [1]  4/21
114 [1]  4/10
118 [1]  4/10
11:14 [2]  76/23 77/10
11:16 [5]  68/21 68/23 69/24 73/2 73/3
11:16:30 [1]  68/20
11:20 [6]  73/18 73/19 82/8 82/12 82/25 83/1
11:22 [1]  73/19
11:24 [1]  82/3
11:26 [3]  77/2 77/7 78/20
11:30 [1]  73/14
11:32 [1]  75/8
11:34 [1]  75/10
11:45 [1]  30/11
11:52 [2]  80/9 80/18
11:54 [1]  112/20
11:55 [2]  83/10 83/11
12 [5]  4/20 23/5 69/24 80/5 80/6
1216 [1]  2/24
122 [1]  124/13
123 [3]  27/11 121/5 124/13
1240 [1]  105/18
12:00 [1]  28/13
13 [2]  4/21 112/15
1350 [1]  2/7
14 [5]  1/17 3/6 73/13 123/4 124/10
15 [1]  4/7
15:15 [3]  67/22 67/24 68/3
15:15:06 [1]  68/4
15:16 [1]  68/22
15:16:12 [2]  69/15 69/22
15:16:30 [1]  73/10
15:26 [1]  78/19
16 [2]  4/7 4/9
1600 [1]  67/12
18 [1]  73/10
1985 [2]  8/3 13/3
1:10 [1]  3/6
1st [5]  36/1 36/13 36/22 39/16 40/7

2

200 [4]  2/16 2/16 2/23 124/6
2015 [1]  10/4
2016 [1]  10/5
2017 [1]  9/18
2020 [2]  82/7 82/11
2022 [22]  23/4 32/15 33/9 36/1 36/13 36/22 40/7 46/17 67/3 69/21 77/17 80/9 82/12 104/6 105/18 105/24 106/15 109/17 110/10 112/20 112/24 118/12
2023 [6]  1/17 3/6 92/11 123/4 124/3 124/10
203 [1]  124/1
21 [4]  93/18 93/25 94/2 94/7
22 [1]  69/9
221-1216 [1]  2/24
23 [1]  69/9
25 [1]  124/3
26 [1]  4/9
27 [1]  57/8
28 [1]  4/9
29 [1]  4/9
2975 [2]  76/19 76/21
2977 [2]  77/1 78/13
2977's [1]  77/4
2978 [1]  78/18
2990 [1]  78/23
2991 [1]  78/25
2992 [1]  78/25
2993 [1]  78/25
2994 [1]  78/25
2995 [1]  78/25

3

30 [2]  32/11 124/14
300 [1]  116/3
3074 [1]  2/6
31 [1]  4/9
33 [1]  4/14
330 [2]  2/11 70/9
37 [1]  79/5
39 [1]  4/7

4

40 [2]  4/7 4/9
4000 [1]  2/17
41 [1]  4/9
412-4000 [1]  2/17
43054 [2]  2/24 124/6
43235 [1]  2/16
44406 [1]  2/10
44512 [1]  124/2
45209 [1]  2/6
4:23 [1]  1/9
4:42 [1]  120/19
4th [5]  105/24 106/15 106/15 118/11 118/12

5

50 [1]  27/25
513 [1]  2/7
54 [1]  4/9
55 [1]  4/7
57 [1]  4/10
58 [1]  4/10
5th [7]  33/9 109/17 110/10 110/18 110/18 112/24 113/10

6

614 [2]  2/17 2/24
64 [1]  4/17
6630 [2]  2/10 3/7

7

7/7/22 [1]  69/9
72 [1]  4/18
721-1350 [1]  2/7
73 [1]  4/10
746-8484 [1]  2/11
75 [1]  4/19
77 [1]  4/10
7775 [2]  2/23 124/6
78 [1]  4/10
788 [3]  69/9 69/12 69/17
791 [2]  67/25 67/25
792 [5]  68/7 68/9 69/15 69/18 69/19
793 [1]  73/10
798 [1]  75/8
7th [8]  32/15 46/17 69/21 77/17 80/9 82/7 82/11 104/6

8

80 [1]  4/20
81 [1]  4/15
837 [1]  124/1
84 [1]  4/7
8484 [1]  2/11
86 [1]  4/10
8th [1]  112/20

9

9038 [3]  68/14 70/13 72/23
95 [1]  4/10
99 [2]  4/7 4/10
9th [3]  22/24 92/4 92/11

A

a.m [14]  49/15 68/21 69/24 73/3 73/14 75/8 76/23 77/2 78/20 80/9 80/18 82/8 82/12 112/20
ability [3]  15/5 116/10 116/21
able [4]  7/22 11/14 11/24 114/22
about [56]  8/1 8/14 8/20 10/4 11/6 12/10 12/16 13/16 14/4 18/24 22/16 22/19 22/20 27/19 31/10 32/8 32/9 33/22 35/12 36/13 36/24 37/2 39/19 40/1 40/5 40/7 40/9 40/12 40/14 42/22 43/1 43/4 44/10 46/16 46/19 52/6 54/12 54/17 56/2 58/12 66/1 74/4 74/7 74/10 81/12 81/23 85/16 86/15 89/10 89/11 90/12 92/10 104/4 108/11 112/6 117/16
above [8]  1/15 72/19 107/1 109/19 122/16 122/16 124/13 124/17
above-captioned [1]  109/19
above-entitled [1]  1/15
above-mentioned [1]  107/1
absolutely [4]  18/15 28/5 48/24 67/7
abuse [1]  55/22
abused [1]  55/19
abuses [1]  36/16
academy [5]  12/22 12/25 13/1 13/5 13/9
according [1]  73/18
accounts [1]  115/4
accumulate [1]  14/22
accurate [3]  23/10 43/24 69/4
accusation [1]  44/21
accusations [1]  45/7
accusing [2]  98/7 98/18
acknowledge [1]  122/15
across [1]  5/24
act [3]  13/13 45/12 122/17
action [2]  1/19 81/8
actions [1]  55/24
activities [3]  24/3 26/20 29/5
activity [2]  87/5 87/7
actual [1]  97/10
actually [17]  8/20 29/25 67/12 77/11 80/21 81/17 87/19 91/9 95/14 97/12 101/4 101/18 104/20 105/14 109/12 112/16 118/11
actus [2]  13/21 14/9
ad [1]  88/5
added [1]  34/4
addition [1]  6/23
additional [1]  92/15
address [3]  27/15 92/22 124/13
addressed [1]  111/3
adequately [1]  113/21
administrative [3]  34/14 106/3 114/5
admitted [1]  102/1
admittedly [1]  67/16
adult [1]  36/3
advice [1]  79/16
advised [1]  37/23
afforded [1]  86/8
aforesaid [1]  1/19
after [27]  9/6 14/4 36/21 50/5 50/19 52/6 54/17 56/9 57/1 57/5 57/9 58/9 58/12 59/23 62/19 64/15 73/21 77/17 78/5 80/20 81/12 88/15 107/7 110/12 110/17 120/13 124/13
afterwards [2]  56/12 57/7
again [8]  73/13 75/7 76/22 78/8 89/2 89/3 104/5 115/3
against [5]  41/8 43/16 62/3 87/7 87/16
agenda [1]  21/14
aggravated [1]  18/6
ago [8]  8/4 40/15 58/8 58/16 59/8 63/14 63/14 108/12
agree [22]  13/24 15/10 20/7 39/10 52/11 53/18 66/10 69/3 69/25 70/4 70/5 70/7 70/15 70/23 88/12 88/23 89/17 95/2 105/20 105/22 112/4 115/8
agreed [3]  3/4 3/9 46/15
agreement [2]  1/16 1/18
ahead [6]  16/11 19/24 66/2 69/1 87/13 119/11
ahold [1]  60/9
al [2]  1/11 124/8
Albany [2]  2/24 124/6
Albrecht [2]  2/23 124/5
Algarin [4]  1/16 3/11 121/12 124/20
all [49]  12/14 12/15 16/10 16/14 19/16 20/10 20/10 24/16 28/16 32/13 32/14 35/20 36/21 37/4 37/7 41/11 45/1 48/21 49/1 49/10 49/11 52/24 65/8 65/9 66/10 68/8 71/8

**A**

**all... [22]** 75/22 76/21 79/6 80/3 82/14 84/19 94/21 95/18 102/18 103/12 103/21 106/2 106/10 106/12 106/18 106/25 108/7 110/4 110/22 116/8 116/25 117/20
**allegations [6]** 36/13 38/3 41/17 41/22 44/24 45/1
**alleged [1]** 36/15
**allow [1]** 7/1
**allowed [7]** 11/13 31/13 48/19 48/23 53/20 71/3 93/19
**alone [1]** 107/9
**along [2]** 47/5 49/6
**already [6]** 6/19 61/16 92/16 104/1 108/3 115/18
**altered [1]** 96/23
**altering [1]** 98/8
**always [2]** 21/21 61/24
**am [7]** 15/3 35/24 43/7 48/14 48/23 77/4 97/7
**among [1]** 106/13
**amount [1]** 16/10
**amounts [1]** 15/13
**ample [1]** 86/5
**amused [1]** 90/18
**analogy [1]** 55/20
**analysis [1]** 29/18
**analyzed [1]** 97/11
**Andrew [2]** 2/15 124/23
**angle [1]** 103/14
**angles [1]** 95/18
**annoying [2]** 72/6 76/17
**another [4]** 16/1 19/10 55/3 90/23
**answer [16]** 16/1 49/4 49/5 58/8 71/23 77/20 78/16 84/12 89/6 90/2 99/13 103/25 108/5 108/6 111/1 119/9
**answered [4]** 17/17 87/2 108/3 115/18
**answering [1]** 72/14
**answers [1]** 104/1
**anybody [8]** 25/16 30/23 34/11 35/3 40/6 51/23 71/2 93/7
**anyhow [1]** 117/12
**anything [13]** 10/12 13/14 29/20 32/17 44/7 45/4 62/12 107/8 107/14 111/10 111/20 112/11 117/11
**anywhere [2]** 17/6 84/20
**apology [3]** 43/7 44/19 45/3 45/5
**app [1]** 106/12
**apparently [2]** 52/3 87/25
**APPEARANCES [1]** 1/24
**appeared [1]** 122/16
**appears [6]** 76/22 77/15 77/23 82/14 95/2 103/14

**applicable [1]** 110/7
**appointed [1]** 105/16
**appropriate [1]** 37/15
**approval [2]** 25/20 27/2
**approved [2]** 24/24 25/21
**approximately [6]** 57/4 59/23 73/6 73/20 76/18 80/19
**area [2]** 11/14 18/2
**aren't [2]** 26/22 118/24
**around [4]** 30/6 39/19 95/3 103/4
**arrange [1]** 124/11
**arrest [27]** 19/2 19/4 56/24 57/1 58/5 58/6 58/10 58/12 59/23 63/13 74/4 77/17 78/6 79/15 80/20 81/12 81/21 82/19 82/25 98/20 98/22 98/23 98/25 99/2 99/9 99/10 99/17
**arrested [15]** 51/2 51/6 56/9 57/5 59/22 60/6 61/16 61/17 73/7 73/17 73/18 73/21 74/1 74/9 86/17
**arrests [2]** 17/21 19/1
**article [1]** 81/11
**as [67]** 5/3 5/6 5/16 6/13 11/21 11/21 12/12 12/18 14/24 14/24 15/15 17/1 17/22 19/12 22/17 22/17 24/3 26/1 33/3 34/4 34/4 35/25 38/6 38/12 38/24 39/5 39/10 39/11 39/11 43/8 43/14 43/20 44/14 44/20 45/6 52/3 60/10 60/10 64/5 64/8 66/13 68/25 69/5 71/13 72/21 75/23 79/21 80/5 81/20 87/7 88/12 94/10 95/23 95/23 95/25 101/22 101/22 103/21 105/5 105/5 105/16 110/6 112/17 115/15 115/15 121/7 122/17
**ascertained [1]** 50/3
**ask [18]** 7/7 7/11 7/13 7/25 25/8 27/8 27/13 33/23 34/21 47/3 50/5 50/6 64/10 74/15 79/12 87/13 99/8 102/16
**asked [30]** 17/18 28/2 31/9 32/21 37/3 45/4 45/24 45/25 46/1 46/4 46/24 47/9 50/7 54/8 54/20 78/4 79/14 87/2 89/9 89/10 89/11 89/12 90/1 91/14 91/22 92/22 98/15 99/9 117/2 117/3
**asking [5]** 15/3 34/9 53/17 71/16 81/15 82/22 89/7 89/8 90/2
**asks [1]** 49/3
**aspect [1]** 20/13
**assaults [1]** 17/16
**assigned [4]** 18/10 49/24 50/13 109/18

**assist [2]** 12/14 72/14
**assisted [1]** 3/13
**assisting [1]** 109/18
**assume [2]** 63/11 117/5
**assuming [2]** 12/19 63/17
**attached [2]** 112/24 124/11
**attend [9]** 12/22 21/4 21/6 21/18 24/15 24/19 91/7 91/20 92/14
**attended [4]** 20/23 21/2 21/9 21/12
**attending [1]** 47/25
**attends [1]** 86/7
**attention [2]** 5/19 36/8
**attorney [13]** 20/1 24/16 48/11 48/25 49/4 71/2 72/14 105/17 108/9 109/13 109/18 109/21 112/23
**attorneys [1]** 64/15
**Atty [4]** 3/7 124/22 124/22 124/23
**audience [2]** 52/19 53/15
**auditor's [1]** 106/21
**August [11]** 105/24 106/15 109/17 110/10 110/18 110/18 110/20 112/20 112/24 113/10 118/12
**Austintown [2]** 18/23 18/25
**authenticated [1]** 97/20
**automated [1]** 68/7
**automatically [2]** 75/3 111/22 112/3
**available [2]** 3/15 114/21
**aviation [1]** 66/16
**avoid [1]** 72/9
**aware [10]** 25/19 47/12 51/2 56/10 56/15 59/21 73/5 97/15 97/18 97/22
**away [2]** 45/20 101/21
**ayosowitz [1]** 2/17

**B**

**back [31]** 9/4 9/5 9/7 9/9 13/6 15/6 27/18 28/1 44/17 45/14 59/19 73/1 73/9 74/6 79/1 80/3 83/24 86/3 88/3 88/15 90/13 92/9 94/11 95/23 101/21 102/5 102/11 112/14 112/18 116/15 119/14
**background [1]** 90/16
**backwards [2]** 100/14 104/21
**bad [1]** 52/4
**balance [1]** 101/21
**ballpark [1]** 76/16
**bank [4]** 30/5 30/5 30/7 30/10
**banks [1]** 30/6
**Barron [1]** 2/5
**Bart [4]** 11/9 11/12 11/13 12/5
**Bart's [1]** 12/7
**based [4]** 27/11 79/2

82/24 90/14
**Bates [1]** 82/1
**battering [2]** 99/6 99/11
**be [82]** 1/17 3/5 3/10 3/12 3/15 10/4 15/21 15/25 16/1 16/25 17/14 19/4 19/9 19/10 19/15 19/17 19/20 19/21 22/19 23/9 23/11 25/14 25/20 27/6 27/21 28/1 28/2 29/4 29/21 30/1 30/6 30/11 30/19 31/19 32/1 36/2 44/19 45/5 45/10 45/20 45/24 47/21 47/25 49/24 52/4 53/23 53/24 54/1 54/3 54/7 54/8 54/9 54/13 56/23 60/17 66/17 66/18 66/19 67/4 67/12 78/19 78/20 79/18 80/18 83/6 84/9 84/12 86/7 86/21 97/10 99/5 99/10 99/15 99/16 100/11 105/24 107/16 110/1 110/3 114/14 114/22 124/15
**beat [1]** 55/17
**because [44]** 6/18 6/23 6/25 7/7 9/8 15/1 26/5 27/15 29/4 30/14 31/9 32/5 38/11 39/19 39/22 45/19 67/3 68/22 69/2 69/7 70/10 70/24 72/6 74/14 78/1 79/4 84/10 88/21 91/8 91/19 94/9 98/5 101/21 101/21 102/10 103/14 103/24 104/9 104/21 112/17 115/20 116/9 117/13 117/15
**become [2]** 56/10 56/15
**becomes [1]** 55/22
**been [46]** 5/3 5/22 6/1 6/11 9/19 13/2 13/4 21/6 21/14 25/11 33/3 37/11 37/23 38/22 41/8 41/10 41/11 41/21 41/24 42/1 42/1 42/2 42/8 42/10 42/18 46/13 47/23 50/1 51/4 51/5 51/21 51/22 61/16 61/17 61/18 68/7 69/2 73/20 74/7 87/21 97/3 105/16 107/22 110/17 117/11 124/13
**before [31]** 1/16 5/15 5/22 7/2 26/25 33/4 46/16 46/20 48/2 48/4 48/5 50/21 50/24 60/18 61/14 62/3 62/16 62/24 63/7 63/15 63/20 64/1 64/21 73/6 77/16 78/4 85/11 89/5 95/13 104/16 122/16
**began [1]** 48/3
**beginning [1]** 10/8
**begins [1]** 35/24
**Behalf [3]** 2/4 2/14 2/20
**behavior [2]** 6/25 86/6
**behind [4]** 66/22 66/24 67/4 67/6
**being [10]** 20/14 21/10

21/13 55/15 83/10 88/8 89/14 94/24 95/9 96/2
**belief [4]** 26/5 72/18 87/23 88/1
**below [2]** 80/25 123/5
**Bennie [1]** 2/5
**besides [1]** 40/6
**besmirched [1]** 40/23
**best [7]** 7/1 10/4 67/16 78/17 79/18 81/25 116/21
**Betras [8]** 2/9 2/9 3/7 19/13 112/20 112/23 113/6 124/22
**Betras's [1]** 117/1
**better [3]** 17/18 66/10 83/6
**between [13]** 3/4 3/9 13/12 14/17 15/10 16/19 26/1 48/25 79/1 87/10 106/13 106/15 117/8
**big [1]** 99/18
**Bill [1]** 79/1
**bill's [1]** 68/8
**bit [7]** 6/12 23/3 35/24 37/6 67/15 69/2 76/25
**bkmlaws.com [1]** 2/11
**Blair [4]** 35/7 35/8 35/9 35/10
**blindly [2]** 70/23 71/23
**blow [1]** 57/25
**board [4]** 2/20 20/15 54/2 54/3
**Boardman [2]** 18/23 124/1
**Boardman-Canfield [1]** 124/1
**boards [1]** 20/12
**boating [1]** 66/16
**bold [1]** 110/3
**book [1]** 19/16
**booking [2]** 57/2 60/15
**both [4]** 1/2 41/1 77/16 85/15
**bottom [4]** 82/1 82/3 107/18 109/14
**Boulevard [1]** 2/16
**bpbslaw.com [1]** 2/7
**break [7]** 7/10 7/14 49/9 59/17 77/12 92/6 95/19
**Brian [3]** 47/23 75/10 75/11
**Briefly [1]** 64/2
**bring [1]** 12/2
**brought [1]** 46/4
**budget [2]** 92/15 92/15
**building [5]** 106/3 106/3 106/10 107/17 114/5
**bureau [2]** 82/9 92/5
**burglary [1]** 27/10
**business [4]** 23/25 52/12 78/9 115/9
**butcher [3]** 17/13 75/10 75/11

**C**

**calendar [1]** 74/6
**call [25]** 23/17 23/19 27/15 27/19 48/2 48/5

## C

**call... [19]** 52/20 57/21 62/20 62/22 62/24 63/2 63/4 63/7 65/21 76/12 77/6 77/24 78/5 78/13 79/5 84/8 84/11 84/14 124/16
**called [14]** 5/3 46/24 56/25 57/14 57/17 57/24 58/1 63/23 76/23 77/1 77/2 77/10 77/10 79/2
**calling [3]** 48/4 49/14 49/18
**calls [3]** 77/15 79/1 79/3
**came [3]** 22/9 96/7 97/5
**camera [3]** 103/14 114/5 116/4
**cameras [2]** 99/24 116/3
**campaign [2]** 10/9 12/8
**Campaigning [1]** 11/22
**Campus [1]** 2/16
**can [43]** 5/10 7/1 10/17 16/8 28/3 29/4 30/14 30/23 31/16 31/19 31/21 31/22 31/24 32/2 33/2 42/17 44/16 45/14 53/24 55/8 64/25 65/2 65/12 65/22 66/11 80/13 81/17 81/25 83/20 83/24 88/3 91/18 92/5 101/12 103/12 103/14 104/14 108/23 111/11 111/17 112/13 114/14 117/7
**can't [6]** 45/13 75/2 89/16 94/22 116/4 117/25
**Canfield [2]** 3/8 124/1
**Cant [1]** 10/14
**Cantalamessa [5]** 2/21 9/24 10/16 10/19 33/12
**capable [1]** 31/6
**capacity [1]** 75/13
**captain [4]** 34/23 50/1 60/2 60/3
**captioned [1]** 109/19
**car [1]** 19/19
**care [13]** 36/8 36/13 36/16 37/4 41/3 41/9 41/22 42/2 42/3 42/23 43/1 43/4 71/4
**career [1]** 17/20
**careful [1]** 45/20
**carrier [2]** 59/1 64/16
**case [21]** 1/8 5/14 6/2 6/7 31/25 54/11 54/11 64/17 70/25 79/25 81/1 98/10 98/12 105/14 105/17 105/20 109/19 113/1 116/7 118/5 121/7
**categories [1]** 109/23
**causation [1]** 13/22
**cause [3]** 1/15 1/19 63/12
**caused [1]** 81/5
**cc [1]** 124/22
**cell [17]** 23/4 23/17 23/19 23/21 23/24 23/25 26/1 26/4 26/4 26/6 26/10 26/16 58/7 93/19 106/9 107/17 112/2

## central

**central [1]** 57/2
**certain [12]** 16/16 28/25 31/2 32/11 41/25 45/23 46/2 54/14 63/23 84/7 84/12 109/22
**certificate [3]** 121/2 122/1 124/11
**Certified [1]** 121/13
**certify [1]** 121/5
**chair [8]** 10/6 95/21 95/22 101/11 101/21 103/3 103/8 103/8
**chair's [1]** 102/18
**Change [1]** 23/3 123/7
**changes [2]** 122/6 123/5
**Channel [4]** 57/8 93/18 93/25 94/7
**charge [6]** 53/11 53/13 53/14 54/24 61/3 61/14
**charged [4]** 51/15 60/22 61/24 86/22
**charges [16]** 16/25 60/19 61/6 61/18 62/3 62/16 62/19 62/24 63/7 63/12 63/15 63/20 79/10 79/13 87/7 87/16
**Charter [1]** 6/3
**chase [1]** 80/23
**check [1]** 111/25
**checked [1]** 37/4
**chest [2]** 101/17 101/18
**chief [8]** 9/11 9/12 9/13 32/21 34/19 105/13 108/6 111/2
**chose [1]** 102/13
**Cincinnati [1]** 2/6
**circumstance [1]** 31/2
**citizen [1]** 33/16
**city [1]** 60/24
**civil [3]** 1/18 6/3 124/15
**claimed [2]** 36/2 113/3
**clarification [1]** 113/24
**clarify [1]** 7/6
**class [3]** 24/10 24/11 24/12
**clear [2]** 6/21 10/18
**clearance [1]** 79/9
**clearly [1]** 7/22
**Clemans [2]** 75/11 75/15
**clerks [1]** 45/23
**client [1]** 16/11
**clients [1]** 110/3
**clog [1]** 28/6
**Co [1]** 2/5
**code [2]** 16/22 55/7
**collect [1]** 30/2
**Columbus [1]** 2/16
**column [4]** 65/2 65/22 67/17 76/9
**come [7]** 5/24 43/17 46/25 50/11 68/22 75/16 84/11
**comes [2]** 18/8 19/11
**coming [1]** 55/10
**comment [1]** 90/19
**comments [4]** 35/12 36/7 36/11 37/2
**commercial [1]** 12/4

## commission

**commission [6]** 24/25 25/17 25/21 27/1 27/13 122/21
**commissioner [45]** 10/2 10/7 12/12 21/1 21/22 22/3 22/12 22/16 22/20 33/12 33/12 33/13 35/25 36/12 36/25 37/23 38/7 39/5 39/11 40/20 40/22 42/25 43/8 43/22 44/6 45/24 46/19 59/22 73/6 73/17 73/21 73/25 74/9 77/17 78/6 80/20 81/21 87/16 88/14 90/15 92/24 93/2 99/11 106/21 106/14
**commissioner's [1]** 43/14
**commissioners [17]** 2/20 45/21 45/25 46/5 46/12 47/2 47/12 52/12 88/14 90/23 91/1 91/14 105/5 105/9 106/4 106/14 112/25
**commissioners' [16]** 20/20 20/23 21/7 21/9 21/12 21/19 36/1 46/25 51/13 51/22 52/10 52/11 91/19 92/14 92/17 106/13
**communicate [1]** 110/6
**communication [1]** 106/6
**companies [1]** 69/7
**companion [1]** 19/6
**compare [1]** 87/4
**complaint [5]** 33/16 38/1 44/11 44/13 117/15
**complete [2]** 117/16 121/6
**completed [4]** 84/2 85/12 122/3 122/13
**completely [2]** 79/25 103/17
**completion [1]** 84/6
**complex [2]** 56/5 116/14
**complied [1]** 118/22
**comply [5]** 107/2 113/21 116/20 118/20 118/23
**computer [1]** 3/13
**computer-assisted [1]** 3/13
**computers [1]** 50/12
**concept [1]** 65/22
**concerns [1]** 49/13
**concluded [1]** 120/19
**conduct [4]** 23/24 52/3 52/12 54/24
**conducted [1]** 85/24
**confirm [1]** 64/11
**conflict [1]** 110/2
**conflicted [2]** 79/16 79/22
**confused [2]** 16/9 16/12
**connection [2]** 67/10 76/8
**consecutive [1]** 9/20
**consider [1]** 22/19
**consideration [1]** 124/16
**considered [1]** 12/7
**consisting [1]** 121/5
**conspiracy [2]** 117/16 117/22

## constituent

**constituent [1]** 39/1
**contact [2]** 99/17 107/4
**contacted [4]** 56/13 56/20 60/1 60/2
**contacting [1]** 63/20
**containing [1]** 106/22
**contains [1]** 80/10
**continuing [3]** 88/15 88/15 90/12
**contracts [1]** 75/16
**contractual [1]** 6/9
**contrary [1]** 37/19
**control [6]** 53/3 99/23 114/10 115/3 115/8 115/16
**conversation [3]** 47/15 65/25 79/5
**conversations [3]** 35/20 48/25 72/13
**convicted [1]** 87/19
**cooperation [1]** 15/4
**cooperative [1]** 32/1
**Coordinated [3]** 66/4 66/5 66/8
**cops [3]** 19/22 19/23 20/4
**copy [7]** 32/25 33/19 46/11 80/14 108/8 124/10 124/12
**corner [5]** 64/12 82/6 84/3 101/13 102/24
**correct [149]**
**correction [2]** 123/7 124/11
**corrections [1]** 122/6
**correlate [1]** 114/1
**correspondence [2]** 106/11 106/19
**couldn't [1]** 55/4
**counsel [12]** 1/19 2/1 3/4 3/10 23/8 71/12 96/9 97/8 119/25 120/3 120/13 120/15
**Counselor [1]** 101/11
**count [1]** 81/25
**county [31]** 2/20 2/20 2/21 10/2 12/6 21/16 23/15 36/3 38/13 38/16 38/24 40/25 41/3 41/9 41/12 56/4 64/9 88/10 105/2 105/5 105/8 106/4 106/10 107/17 109/12 112/25 112/25 113/13 114/9 114/23 114/23
**county's [1]** 41/16
**course [2]** 64/16 88/7
**court [10]** 1/1 1/20 31/25 60/19 61/18 62/17 62/25 63/16 105/17 115/13
**covering [1]** 19/10
**COVID [1]** 88/21
**CRB [1]** 105/18
**create [1]** 53/8
**crime [13]** 13/13 13/13 13/16 14/5 14/14 15/22 19/7 19/9 19/10 62/6 87/20
**crimes [4]** 15/18 16/17 18/14 86/23

## criminal

**criminal [9]** 14/5 14/19 15/21 15/21 17/7 31/12 54/24 87/5 87/7
**critical [2]** 22/15 22/18
**criticized [1]** 22/13
**CROSS [2]** 4/3 5/8
**cruisers [1]** 50/14
**crushed [1]** 55/15
**crying [1]** 55/5
**custody [2]** 36/17 83/4
**CV [1]** 1/9

## D

**damage [3]** 38/15 38/24 43/23
**damages [2]** 38/10 38/13
**Dan [7]** 34/16 34/16 34/22 34/22 35/1 56/14 56/15
**dancing [1]** 88/13
**Danso [6]** 77/25 78/5 79/1 79/6 109/9 109/13
**Darn [1]** 66/8
**data [5]** 109/23 109/23 110/5 116/5 116/8
**date [7]** 65/3 76/7 82/7 83/17 122/9 122/19 123/25
**dated [4]** 33/9 109/17 110/17 110/18
**dates [3]** 9/6 81/14 81/15 114/4
**Dave [5]** 19/13 19/15 75/20 75/21 113/6
**David [5]** 2/9 3/7 112/19 116/25 124/22
**day [25]** 43/18 44/11 47/4 47/19 47/22 47/25 48/3 48/6 48/8 49/15 49/25 61/25 62/14 62/22 65/7 74/18 79/7 82/24 86/11 99/22 100/3 111/5 111/25 117/9 120/1
**day's [1]** 88/5
**daylight [2]** 66/22 66/23
**days [6]** 32/12 34/1 84/21 110/12 110/17 124/14
**dbetras [1]** 2/11
**deal [4]** 30/21 31/11 50/13 99/18
**dealing [2]** 31/24 105/14
**deals [1]** 17/15
**dealt [1]** 21/15
**Dear [3]** 105/8 109/16 124/9
**decide [1]** 27/4
**decides [1]** 30/20
**decision [4]** 90/8 90/10 90/10 90/11
**deed [1]** 122/17
**defend [1]** 101/3
**defendant [7]** 14/23 15/1 15/5 15/21 15/22 28/13 28/15
**defendant's [2]** 4/13 31/20
**defendants [6]** 1/12 2/14 2/20 30/10 31/13 120/14

## D

delete [15]  25/9 26/25 27/14 27/16 28/4 59/9 74/16 74/17 74/22 74/25 75/1 111/22 112/3 115/19 119/2
deleted [7]  34/5 74/14 74/20 108/17 109/2 112/4 117/4
deletion [2]  25/20 27/4
deliver [1]  45/21
delivered [4]  44/20 45/6 45/24 46/7
demand [3]  45/2 45/4 45/13
demands [1]  45/8
Democratic [1]  9/23
Dennis [1]  109/12
deny [1]  81/18
department [13]  8/6 17/9 24/21 32/10 32/14 32/22 50/24 51/1 113/14 113/17 115/25 116/1 116/11
department's [1]  44/3
Depends [2]  52/16 84/18
depicted [1]  88/12
DEPONENT [1]  122/3
deposed [4]  5/22 5/25 103/21 103/23
deposition [11]  1/5 1/15 3/5 3/10 3/14 3/15 3/17 108/4 120/11 120/19 124/10
deputies [29]  17/2 23/18 23/18 23/19 23/19 23/22 28/9 39/18 39/21 40/1 40/7 51/3 54/18 63/22 79/15 81/2 81/8 86/12 89/23 90/3 90/9 91/3 91/18 98/24 99/1 99/2 107/12 109/7 117/5
deputies' [1]  115/9
deputy [19]  17/14 28/2 28/4 28/14 28/18 28/19 34/19 47/24 51/4 59/25 88/24 89/11 89/15 90/11 105/13 108/1 108/7 117/8 117/8
described [1]  110/5
describing [1]  87/7
desk [1]  46/14
destroying [1]  15/22
detail [1]  20/14
detective [15]  8/21 8/25 9/5 9/9 14/21 15/7 17/15 17/22 17/25 18/3 18/12 28/23 85/5 85/15 86/1
detectives [1]  22/10
determination [1]  25/12
determine [1]  29/19
determined [1]  16/25
Development [1]  6/4
devices [3]  114/11 115/4 115/10
didn't [43]  10/13 23/1 31/8 42/19 42/19 44/8 45/16 54/6 58/4 60/8 62/22 66/17 79/24 87/4

88/24 89/1 89/17 90/1 90/18 98/20 98/23 99/1 101/7 101/9 103/7 103/8 103/15 104/9 107/8 107/14 108/1 108/21 111/7 111/10 111/20 112/11 113/7 114/19 118/1 118/3 118/20 118/25 119/2
difference [4]  13/12 14/17 15/10 87/10
differences [1]  16/19
different [10]  15/13 16/19 17/8 17/9 17/14 26/3 45/8 76/6 78/11 83/13
difficult [1]  66/19
diligence [1]  38/11
diminish [1]  96/14
directed [1]  16/23
direction [7]  93/6 93/7 93/9 101/9 101/10 102/20 102/23
directly [3]  95/19 97/13 98/2
disagree [6]  42/6 91/11 103/16 103/17 115/6 117/10
discretion [1]  90/8
discuss [5]  21/19 46/23 58/5 60/21 63/10
discussed [2]  63/11 63/13
discussing [1]  54/18
discussion [2]  88/19 124/11
dismissed [3]  87/8 87/16
dispatch [4]  82/3 82/18 84/9 84/10
dispatcher [1]  83/3
dispute [2]  6/8 64/17
disrupting [2]  55/6 99/4
disruption [1]  106/20
disruptions [2]  81/4 91/8
disruptive [3]  55/23 55/25 86/6
distance [2]  94/8 96/14
distinction [1]  26/1
distress [2]  55/3 55/16
DISTRICT [4]  1/1 1/2 1/20 1/20
disturbed [1]  117/19
disturbing [2]  50/16 51/16
DiVieste [2]  11/9 12/5
DIVISION [2]  1/3 1/21
do [211]
doctor [1]  36/18
document [4]  28/19 29/5 29/8 104/16
documentation [1]  44/10
does [20]  6/23 7/15 10/24 13/5 23/14 33/17 38/15 48/16 65/18 66/2 67/13 69/5 75/3 75/13 80/13 82/18 82/21 84/5 84/15 95/4
doesn't [5]  28/16 39/7 44/1 44/13 53/6

dog [1]  72/21
doing [7]  6/19 29/25 38/10 50/11 69/2 74/8 87/11
domestic [1]  17/6
don't [143]
done [6]  41/20 44/18 45/16 62/2 75/2 75/25
door [1]  60/5
doubt [1]  49/8
down [15]  18/8 34/1 37/6 37/9 55/21 57/2 60/23 69/18 76/25 80/21 81/17 88/15 94/11 95/24 112/17
Downey [2]  2/23 124/5
Dr. [6]  36/19 36/21 37/7 41/5 41/7 42/2
draft [1]  39/23
drafted [1]  33/11
drafts [2]  33/24 34/4
Drive [2]  2/10 3/7
drug [1]  18/19
drugs [2]  19/18 20/5
due [3]  38/10 68/8 110/2
duly [1]  5/4
during [8]  16/2 17/22 22/24 23/4 53/2 66/21 88/13 88/21
duty [1]  110/6

## E

each [5]  6/24 7/2 45/24 46/5 46/12
earlier [18]  26/15 54/15 72/12 73/16 77/24 81/23 86/10 86/15 91/9 101/6 108/4 108/11 108/13 108/25 112/18 114/13 117/14 120/11
easier [2]  11/2 14/17
EASTERN [9]  1/3 1/21 66/18 66/21 67/12 68/20 68/23 73/2 77/7
effective [1]  115/1
eight [1]  8/21
either [9]  20/2 22/11 49/14 49/16 50/1 56/20 70/12 73/19 79/25
elected [2]  11/16 43/13
electronic [2]  33/19 114/11
elements [4]  13/16 14/4 14/5 52/1
else [6]  35/3 40/9 51/23 71/3 98/17 119/4
email [5]  109/9 109/10 112/17 112/19 113/25
emails [7]  35/17 106/10 106/18 107/18 111/16 114/24 114/25
emotional [3]  55/3 55/16 55/22
emotionally [1]  55/15
employee [4]  55/3 55/5 88/11 106/5

employees [3]  43/23 106/4 114/11
empty [1]  101/12
Enclosed [1]  124/10
Enclosure [1]  124/21
end [11]  94/14 95/19 95/20 95/21 101/14 101/15 102/19 102/22 102/24 103/1 103/3
endorsed [1]  9/22
ends [3]  68/14 70/12 72/23
enforcement [5]  8/2 12/19 19/25 20/11 32/1
enforcing [1]  53/18
England [1]  66/13
enjoyable [1]  20/10
enough [3]  14/3 52/4 88/20
entire [3]  9/3 43/12 118/11
entitled [4]  1/15 42/22 43/1 43/3
equals [1]  68/23
errata [1]  122/7
Esquire [5]  2/5 2/9 2/15 2/22 124/5
essentially [2]  66/11 66/20
establish [2]  14/25 28/24
established [1]  37/18
estimate [2]  18/25 59/24
et [2]  1/11 124/8
even [7]  20/3 44/9 78/10 86/6 88/24 90/12 101/7
event [1]  74/7
eventually [1]  104/12
ever [19]  5/22 9/19 16/22 19/1 19/15 19/22 20/17 20/20 20/23 21/6 21/9 22/12 22/15 24/5 44/6 50/3 50/23 63/25 91/6
every [11]  22/9 24/10 43/18 52/8 67/11 91/3 96/10 100/3 116/4 117/24 118/2
everybody [2]  56/4 103/19
everything [4]  18/5 52/7 66/14 76/18
evidence [5]  14/22 15/14 15/22 30/1 30/12
exact [3]  9/6 52/1 74/1
exactly [4]  13/15 41/4 86/25 93/20
exaggerated [2]  22/11 38/15
except [1]  56/6
exception [1]  123/5
excessive [1]  42/12
exchanged [1]  77/15
exhibit [23]  4/14 4/15

4/16 4/17 4/18 4/19 4/20 4/21 33/3 45/15 64/5 64/7 72/3 72/8 73/1 75/23 75/24 76/2 80/5 80/6 81/20 104/15 112/15
exhibits [3]  4/13 72/5 80/4
exist [1]  59/14
existed [1]  59/10
existing [1]  37/19
expect [3]  44/19 45/5 45/12
Expectation [1]  45/8
expected [1]  45/10
experience [1]  20/11
Expiration [1]  122/21
explained [1]  66/9
explaining [1]  92/15
explains [1]  109/21
explanation [1]  69/7
extensive [1]  29/18
extent [2]  77/21 116/2
eyes [1]  34/13

## F

fabricated [2]  22/11 38/14
fabrication [1]  117/16
face [3]  55/4 100/10 102/10
Facebook [12]  97/9 97/9 97/12 97/13 97/16 97/22 97/23 97/24 98/2 98/7 98/13 106/12
fact [5]  37/5 44/5 52/6 54/17 55/2
facts [3]  16/23 43/16 60/25
fail [1]  118/20
failed [1]  118/17
fair [3]  14/3 16/18 53/22
falls [3]  32/6 100/19 100/25
false [4]  44/21 44/24 45/1 45/7
familiar [5]  15/18 25/24 50/15 52/1 70/3
families [1]  42/13
family [6]  11/6 11/20 12/1 12/16 12/17 43/21
fan [1]  112/8
far [5]  11/21 14/24 22/17 34/4 101/13
fast [4]  8/23 8/23 8/24 60/10
fault [2]  100/20 100/25
federal [1]  31/25
feel [3]  7/7 7/11 107/3
fell [2]  94/13 95/25
felt [3]  21/18 21/21 99/16
female [1]  83/10
few [3]  6/1 6/11 8/4
fifth [1]  106/6
file [4]  37/25 44/13 79/9 79/13
filed [9]  44/11 60/19 61/18 62/3 62/17 62/25 63/8 63/16 63/20

**F**

**fill [1]** 84/15
**films [1]** 97/22
**final [1]** 33/21
**financial [2]** 11/3 11/25
**find [6]** 19/14 60/4 60/9 76/15 120/4 124/10
**fine [5]** 5/17 5/21 71/9 71/25 119/15
**finish [6]** 7/2 7/14 9/7 97/21 119/8 119/9
**finished [2]** 3/14 3/16
**firm [1]** 75/12
**first [17]** 5/3 5/21 8/1 8/2 10/3 21/24 21/25 40/20 43/8 50/18 56/10 71/8 82/2 83/9 84/24 91/5 109/8
**Fishel [2]** 2/23 124/5
**fisheldowney.com [1]** 2/25
**Fitness [1]** 88/6
**five [4]** 57/6 66/23 110/12 110/17
**flat [1]** 38/22
**flat-out [1]** 38/22
**flick [1]** 88/16
**flicking [1]** 88/14
**floor [1]** 106/7
**follow [7]** 38/7 39/5 39/7 39/12 54/6 67/6 98/5
**follow-up [1]** 98/5
**followed [1]** 117/6
**following [8]** 67/5 72/17 105/24 106/25 107/16 113/24 122/6 123/5
**follows [2]** 5/7 76/16
**footage [3]** 114/5 116/4 116/6
**force [3]** 18/10 39/12 42/12
**forced [1]** 81/8
**foregoing [2]** 122/5 122/16
**forensic [1]** 29/18
**forensically [2]** 97/3 97/11
**forgive [1]** 80/11
**form [2]** 84/6 122/6
**forth [2]** 79/1 109/23
**forum [3]** 44/20 45/6 45/11
**forward [2]** 95/14 103/15
**found [3]** 22/7 39/18 57/4
**four [10]** 13/6 24/10 66/22 67/4 67/6 67/11 68/22 73/6 76/17 91/5
**Frank [1]** 2/21
**frankly [1]** 30/23
**free [3]** 7/7 7/11 107/4
**FRENCHKO [40]** 1/7 5/14 21/22 22/4 22/12 22/16 22/20 33/13 36/12 36/15 36/25 38/6 42/25 43/8 43/22 55/2 57/5 59/22 60/6 73/6 73/17 73/21 73/25 86/5 86/12 87/5 87/16 88/14 90/17

**G**

**game [1]** 69/1
**gather [1]** 84/19
**gave [9]** 45/22 46/2 46/9 58/25 58/25 81/2 86/12 103/19 103/21
**general [6]** 38/16 86/7 86/13 87/2 90/4 90/7
**general's [1]** 24/16
**get [22]** 5/19 8/2 11/16 27/19 29/6 31/21 31/22 32/24 43/21 44/17 55/17 55/19 60/9 60/10 69/19 75/15 76/16 79/9 93/15 96/11 108/8 118/25
**gets [1]** 39/19
**getting [1]** 110/19
**give [15]** 14/16 45/14 46/5 46/11 61/5 71/17 76/20 79/16 80/3 88/3 89/23 90/3 90/7 111/2 120/5
**given [3]** 36/16 52/15 86/5
**gives [2]** 68/25 68/25
**Glenn [3]** 88/10 88/12 89/10
**go [46]** 15/6 15/24 16/4 16/11 19/24 27/11 27/13 27/18 27/19 28/12 28/18 35/23 37/6 37/9 43/6 44/8 59/19 64/25 66/2 67/16 69/9 73/1 73/10 74/24 76/25 78/22 80/10 80/20 80/21 83/8 83/9 83/20 83/24 84/3 84/22 86/3 87/13 87/13 104/20 107/18 109/8 112/16 112/17 114/8 119/11 119/14
**God [1]** 94/20
**goes [3]** 52/9 76/7 97/23
**going [54]** 7/25 19/21 21/16 22/1 28/3 33/18 33/23 34/20 37/6 38/12

**H**

**half [7]** 8/14 18/24 60/13 80/19 80/19 81/12 96/6
**hallway [1]** 116/6
**hand [25]** 33/2 46/7 64/5 64/12 71/20 72/2 75/23 80/4 82/6 84/3 94/1 94/3 94/4 94/5 94/7 94/8 94/13 95/25 99/17 100/19 100/23 101/23 104/14 112/13 112/13
**hand-delivered [1]** 46/7
**handle [1]** 109/19
**handling [2]** 53/15 105/14
**hands [1]** 45/15
**handy [2]** 75/22 76/1
**hang [2]** 60/7 79/4
**hang-up [1]** 79/4
**happen [2]** 6/23 112/11
**happened [13]** 30/5 35/20 37/5 44/18 47/13 60/22 68/18 88/21 91/21 93/14 93/14 117/17 117/18
**happens [5]** 43/17 52/7 57/24 100/16 103/6
**happy [1]** 97/7

**47/14 47/18 47/24 56/9** 58/7 60/23 61/3 64/5 64/10 64/14 64/21 65/6 66/21 69/8 69/18 70/10 70/23 71/23 72/2 74/6 75/23 75/23 76/18 78/10 78/22 80/2 80/3 80/4 80/4 80/7 84/12 87/4 88/4 88/5 88/5 88/6 88/9 92/21 97/25 99/13 100/11 101/20 103/24 112/13
**good [6]** 17/12 22/5 22/6 43/18 49/12 76/5
**Google [1]** 69/5
**got [9]** 16/9 45/19 53/6 92/23 95/19 95/22 101/13 101/16 107/15
**government [3]** 31/14 32/2 37/20
**grab [1]** 94/12
**grand [1]** 16/24
**great [2]** 26/14 56/6
**Greenwich [1]** 66/12
**Grimley [11]** 57/20 57/21 57/22 71/13 72/24 72/24 72/25 77/16 80/8 86/11 104/6
**Grimley's [2]** 73/3 76/22
**grocery [2]** 29/13 29/15
**guess [13]** 7/17 17/11 18/2 18/22 19/22 19/17 20/14 22/1 23/18 56/8 67/14 72/7 85/21 87/12
**guessing [1]** 88/20
**guesstimate [1]** 56/11
**guy [5]** 51/20 75/6 90/19 111/15 111/17
**guys [4]** 52/7 78/9 87/1 90/9

**hard [1]** 43/18
**harm [1]** 13/22
**Harold [4]** 2/14 47/21 49/24 85/2
**has [24]** 10/23 22/12 24/21 25/15 27/9 27/12 27/14 27/23 28/5 28/7 42/1 53/19 54/19 56/4 76/6 76/8 82/2 97/1 97/2 101/19 109/22 116/7 117/9 124/13
**hasn't [1]** 25/11
**hates [1]** 19/24
**have [165]**
**haven't [2]** 5/25 103/23
**having [3]** 5/3 29/17 91/7
**he's [1]** 49/3
**head [2]** 14/3 42/3
**headed [2]** 21/17 27/7
**heading [1]** 30/10
**headquarters [2]** 10/11 12/8
**hear [3]** 90/16 103/25 104/2
**heard [3]** 52/6 54/17 87/1
**held [1]** 50/23
**Helen [4]** 2/22 65/12 70/4 124/5
**Helen's [2]** 16/11 37/11
**help [5]** 10/9 11/4 11/19 34/11 58/18
**helped [1]** 39/23
**helpful [2]** 19/17 20/10
**helping [1]** 11/16
**her [98]** 3/12 21/24 22/8 23/1 23/2 38/11 39/12 40/1 40/7 40/10 40/12 43/1 43/4 44/24 44/24 45/14 53/8 55/24 56/7 57/2 57/14 57/18 58/1 58/5 58/11 58/12 59/23 60/10 60/10 61/3 61/14 61/24 62/3 63/7 63/15 63/22 63/23 73/4 74/10 80/3 81/2 81/12 82/15 85/8 86/6 87/7 88/16 93/6 93/7 93/9 93/12 93/13 93/19 94/4 94/5 95/2 95/5 95/14 95/16 95/17 95/21 96/12 97/6 98/1 98/18 98/20 98/22 98/23 98/25 99/2 99/4 99/5 99/17 100/3 100/7 101/8 101/9 101/10 101/14 101/16 102/10 102/11 102/13 102/16 102/19 102/19 102/20 102/23 102/23 102/25 103/11 103/13 122/17
**hereby [1]** 122/15
**herein [1]** 123/3
**hereto [1]** 3/5
**hesitate [1]** 124/16
**hey [2]** 28/3 44/16
**him [15]** 10/1 12/13 19/16 33/2 36/24 47/1 47/3 48/8 56/21 75/13

**79/9 79/12 85/25 90/12** 104/14
**hire [2]** 111/17 112/9
**his [22]** 3/14 3/17 11/6 11/13 11/17 11/18 12/16 12/17 36/18 37/2 41/7 47/8 50/10 52/3 71/1 78/9 88/13 108/14 109/2 113/14 116/21 122/17
**his/her [1]** 122/17
**history [2]** 8/1 12/18
**hit [4]** 94/13 100/12 100/13 100/14
**hold [1]** 80/7
**homicide [12]** 8/22 15/2 15/7 15/9 15/11 15/11 15/14 16/18 17/22 17/25 18/3 18/10
**homicides [2]** 17/21 18/17
**honestly [1]** 72/6
**hour [6]** 60/13 80/19 80/19 80/23 81/12 96/6
**hours [8]** 66/22 66/23 67/4 67/6 67/12 68/22 68/23 108/11
**however [1]** 53/3
**Howland [6]** 8/6 8/7 8/10 9/1 9/12 9/13
**Howland's [1]** 18/22
**hsudhoff [1]** 2/25
**huh [3]** 6/20 53/11 90/20
**huh-uhs [1]** 6/20
**huhs [1]** 6/20
**human [2]** 6/25 92/1
**Huntington [1]** 30/7
**husband [1]** 88/10

**I**

**I'd [5]** 61/14 61/14 79/3 110/15 119/14
**I'll [8]** 12/2 13/20 26/14 67/16 71/20 83/16 87/13 94/23
**I'm [83]** 7/20 7/25 8/20 12/19 15/3 19/21 21/3 22/1 25/1 25/24 27/7 29/12 30/10 32/11 33/18 33/19 33/23 34/25 37/6 41/24 45/19 45/23 46/2 46/13 48/7 52/7 52/13 53/17 54/14 55/9 56/8 58/7 59/24 60/20 63/17 63/22 63/23 64/10 64/14 64/21 65/6 65/13 66/20 69/8 70/3 70/9 70/23 71/9 71/15 71/16 71/23 72/2 74/19 75/6 75/22 77/9 78/10 78/22 80/4 80/7 84/7 84/12 88/4 88/9 88/20 89/8 90/2 95/18 96/7 96/11 96/20 97/25 98/4 98/4 98/9 98/9 101/20 103/20 108/25 109/11 111/14 111/14 112/8 112/13
**I've [5]** 21/21 41/24 50/17 105/16 112/23

**I**

**idea [5]** 43/19 47/8 47/18 66/7 70/19
**identified [2]** 71/13 72/18
**identifies [1]** 72/17
**identity [1]** 86/25
**ignorant [1]** 19/21
**illness [1]** 51/21
**imagine [3]** 12/23 16/17 39/18
**immediate [2]** 102/7 102/9
**immediately [3]** 56/24 81/4 97/23
**important [1]** 110/4
**improper [1]** 38/3
**inaccurately [1]** 40/23
**inappropriate [2]** 33/15 47/13
**inappropriately [1]** 40/23
**incarcerated [1]** 36/3
**inches [3]** 94/10 100/5 100/11
**incident [7]** 82/7 82/25 83/13 83/17 83/18 84/19 94/14
**incidental [1]** 99/17
**include [2]** 31/1 31/17
**including [2]** 106/5 106/22
**incomplete [2]** 96/4 96/24
**INDEX [1]** 3/19
**indicated [1]** 116/20
**individual [3]** 54/12 86/15 86/21
**individuals [1]** 72/17
**inform [2]** 60/25 61/2
**information [7]** 38/12 72/17 84/20 88/20 107/2 110/5 113/21
**informed [1]** 108/14
**initial [1]** 8/9
**initiate [1]** 37/25
**initiating [1]** 37/15
**inmate [8]** 36/3 36/16 37/3 42/9 42/11 43/20 44/8 44/9
**inmate's [1]** 44/7
**inmates [3]** 38/4 41/3 43/20
**inmates' [1]** 42/13
**inside [1]** 32/14
**Instagram [1]** 106/12
**instance [1]** 30/4
**intent [3]** 47/1 47/2 47/11
**intentional [2]** 15/11 15/15
**intentions [1]** 30/15
**interacting [1]** 12/12
**interaction [1]** 60/11
**interest [1]** 110/2
**interior [1]** 80/12
**interpretation [1]** 119/16
**Interrogatories [1]** 72/9
**Interrogatory [1]** 71/7
**interrupt [3]** 6/24 52/14

90/23
**interrupts [1]** 90/25
**interview [1]** 44/8
**interviewed [2]** 85/9 85/12
**interviews [2]** 85/17 85/23
**inventory [1]** 50/13
**investigate [3]** 18/5 47/12 61/11
**investigated [1]** 38/22
**investigating [4]** 15/17 16/16 16/20 44/6
**investigation [6]** 22/9 27/24 37/16 37/18 62/3 62/5
**investigations [1]** 22/8
**investigatory [1]** 37/19
**invited [7]** 21/6 21/10 21/13 53/20 91/10 91/12 91/20
**involuntary [1]** 14/17
**involve [2]** 15/20 24/2
**involved [4]** 36/13 110/2 115/25 116/1
**involves [1]** 36/8
**iPhone [2]** 23/5 111/22
**irreparable [1]** 43/22
**isn't [2]** 81/1 83/12
**issue [2]** 57/3 92/22
**issued [3]** 45/10 108/7 109/22
**issues [2]** 54/20 87/11
**it's [55]** 6/1 6/11 10/15 11/2 11/18 18/8 19/6 25/9 31/5 32/11 33/6 33/11 37/9 37/10 39/25 40/20 40/20 47/7 47/11 48/24 52/14 59/8 62/5 66/12 66/16 68/11 68/22 76/5 78/11 79/21 82/1 83/10 84/24 88/5 93/8 95/18 97/9 102/23 104/19 104/21 105/2 105/12 109/10 109/11 109/12 109/13 110/21 111/21 112/19 117/18 119/4
**item [8]** 64/23 67/25 69/12 69/19 76/6 76/18 77/4 78/13
**itself [1]** 32/3

**J**

**jail [16]** 36/3 36/8 36/14 40/25 41/3 41/9 41/23 42/3 42/9 42/14 42/23 43/1 43/4 43/19 44/9 83/11
**jammed [1]** 110/21
**January [1]** 21/25
**Jeff [2]** 34/16 108/7
**Jim [3]** 106/5 106/14 106/22
**job [3]** 43/14 43/18 53/8
**Jodie [4]** 1/16 3/11 121/12 124/20
**Jolene [1]** 85/5

**judge [9]** 105/24 107/2 107/15 109/22 110/13 116/9 117/23 119/16 119/12
**judge's [1]** 116/23
**July [11]** 23/4 32/15 33/9 46/17 67/3 69/21 77/17 80/9 82/7 82/11 104/6
**jumped [2]** 100/9 100/9
**June [5]** 36/1 36/13 36/22 39/16 40/7
**jurisdiction [1]** 79/25
**jury [2]** 16/24 30/19
**just [66]** 6/12 10/17 10/25 11/23 12/12 13/20 14/16 16/9 18/16 20/9 26/14 27/8 29/22 30/4 30/6 30/9 37/3 38/11 38/25 43/16 45/19 47/2 47/11 48/24 49/5 52/19 55/14 55/16 55/19 56/5 57/2 64/10 64/21 64/25 65/1 65/7 66/16 68/2 69/19 71/16 71/23 78/10 79/4 82/2 85/20 87/1 87/13 91/10 91/15 91/15 91/19 99/9 100/18 101/11 102/1 102/11 107/8 107/11 108/22 111/10 112/8 113/5 113/11 114/8 116/5 118/4
**justice [5]** 15/18 15/20 19/2 20/7 37/20
**justifies [1]** 54/24

**K**

**Kaintz [4]** 47/23 50/2 50/7 50/13
**keep [5]** 11/15 72/3 75/22 76/1 96/13
**kind [21]** 6/12 10/11 11/3 12/2 12/8 13/2 13/21 13/22 17/4 19/6 24/5 34/9 53/2 64/21 64/25 65/1 65/21 75/22 76/1 81/25 110/21
**Klotz [2]** 56/2 56/2
**knew [5]** 14/22 60/23 70/20 70/25 103/19
**knocked [2]** 60/5 98/16
**know [134]**
**knowingly [1]** 87/10
**knowledge [1]** 22/13
**knows [1]** 69/8
**Kopp [1]** 2/9

**L**

**lack [2]** 36/16 38/12
**lane [1]** 18/8
**large [1]** 95/22
**last [3]** 5/25 43/6 116/19
**later [3]** 61/25 73/11 73/13
**latitude [5]** 81/2 86/12 89/22 90/3 90/7
**laughing [1]** 90/17
**law [9]** 8/2 12/18 13/20 17/7 19/25 20/11 32/1

75/12 81/7
**lawful [1]** 106/20
**laws [1]** 13/10
**lawsuits [5]** 41/8 41/10 41/12 41/17 42/1
**lay [1]** 55/21
**learn [1]** 13/21
**least [4]** 37/24 39/22 63/19 85/12
**leave [4]** 54/8 54/20 87/13 115/20
**leaving [1]** 119/17
**led [1]** 80/23
**left [9]** 46/6 64/12 64/22 65/15 76/2 76/7 84/3 107/8 107/11
**left-hand [2]** 64/12 84/3
**legal [1]** 79/16
**Leslie [1]** 100/3
**less [2]** 20/9 79/4
**Lester [10]** 34/17 34/22 35/2 40/16 56/14 56/15 59/25 60/2 60/3 73/16 82/3 97/21 119/8 119/9
**let [6]** 15/6 27/18 83/3 97/21 119/8 119/9
**let's [16]** 15/10 17/15 28/13 29/22 30/4 30/6 30/9 49/9 52/18 55/7 55/10 78/10 82/2 104/4 104/20 114/8
**letter [53]** 33/4 33/6 33/11 33/21 33/25 34/2 34/12 34/13 35/7 35/13 35/18 35/23 35/25 36/2 36/7 36/12 36/24 37/7 38/23 39/16 39/23 40/1 40/7 40/10 40/13 44/6 44/23 45/14 45/21 46/16 47/1 47/9 80/14 80/16 92/13 104/19 104/22 109/6 109/11 110/9 112/24 113/4 113/5 113/9 113/10 113/11 116/3 124/14 116/21
**letterhead [1]** 33/6
**lie [7]** 20/6 29/16 30/22 30/23 31/2 31/11 93/8
**lies [1]** 38/22
**lieutenant [3]** 50/2 50/12 60/9
**like [45]** 10/12 13/2 13/14 16/10 16/17 18/23 19/6 20/12 20/15 20/15 24/16 31/7 39/2 39/3 42/12 43/22 48/24 52/19 53/4 53/7 55/22 60/15 61/14 61/14 65/21 70/7 71/12 73/9 77/1 77/1 77/17 77/23 83/14 84/24 85/8 90/17 95/23 100/19 101/11 101/17 101/18 101/19 109/11 114/5 114/22 116/14
**limit [2]** 53/23 54/2
**limited [1]** 18/16
**line [2]** 33/16 123/7
**lines [2]** 47/5 49/6

**list [11]** 27/25 70/12 70/19 70/20 70/25 71/17 75/20 75/21 78/12 103/19 103/21
**listed [1]** 82/24
**listened [1]** 62/10
**little [13]** 6/12 13/17 18/23 19/21 23/3 35/23 60/5 67/15 69/1 76/25 78/11 80/19 94/20
**Live [5]** 97/9 97/9 97/12 97/22 98/13
**LLP [2]** 2/3 124/5
**locate [1]** 28/24
**located [1]** 29/9
**location [5]** 12/7 28/9 28/14 28/19 28/25
**locations [1]** 30/15
**log [1]** 65/1
**logs [8]** 59/2 63/24 63/25 64/15 106/10 107/17 114/23 115/22
**long [8]** 8/12 8/19 8/25 9/2 9/12 13/5 53/3 60/15 67/17 84/15 104/11
**longer [10]** 13/7 23/9 25/10 25/13 27/22 74/11 104/6 119/19 119/20 119/21
**longest [1]** 79/5
**look [23]** 28/1 28/25 35/7 38/25 48/23 55/7 55/8 55/10 55/14 65/16 69/6 69/15 70/21 73/19 75/7 76/2 78/12 82/1 84/1 95/18 95/20 103/7 116/2
**looked [6]** 48/21 54/23 64/20 86/10 113/5 113/11
**looking [6]** 38/23 63/23 74/6 77/22 89/6 114/25
**looks [8]** 70/6 71/12 73/9 77/1 77/1 84/24 85/8 109/11
**lot [7]** 10/23 11/10 12/5 20/4 22/7 50/13 52/8
**loud [1]** 64/10
**LPA [1]** 2/5
**lunacy [1]** 23/2
**lunch [2]** 28/3 28/12
**lying [3]** 16/2 31/7 97/1

**M**

**M-O-N-R-O-E [1]** 5/12
**Mackey [4]** 85/8 85/15 85/18 86/1
**made [11]** 16/12 17/21 20/9 22/15 81/18 82/25 90/9 90/11 90/18 108/20 117/18
**Madison [1]** 2/6
**mail [1]** 124/13
**mailbox [1]** 18/6
**maintain [3]** 107/6 107/13 108/2
**major [1]** 34/22
**make [11]** 6/19 7/15 28/16 38/21 47/11 48/16 67/13 90/8 108/21 114/25

**M**

make... [1] 116/5
makes [2] 25/12 67/15
making [2] 59/24 76/12
Malvasi [5] 36/19 36/21 37/7 41/5 41/7
Malvasi's [1] 42/2
man [1] 80/22
manage [2] 72/5 91/23
mandated [1] 17/6
manipulating [1] 43/21
manslaughter [2] 14/18 14/18
manually [7] 27/16 74/22 75/1 75/4 108/17 109/2 112/4
many [9] 17/20 17/21 21/1 42/16 51/1 51/11 78/9 89/20 89/21
Marcello [4] 85/6 85/16 85/20 85/21
March [3] 22/24 92/4 92/11
mark [3] 14/4 75/23 80/4
marked [7] 33/3 64/5 64/7 72/8 75/24 80/6 112/15
Markota [1] 2/9
masks [1] 88/22
Masley [1] 57/18
Mason [3] 34/16 35/1 35/12
Mason's [1] 34/22
math [1] 110/19
Matt [10] 2/5 5/13 5/19 19/14 35/8 35/10 70/24 71/2 92/5 124/22
matter [2] 110/2 124/16
Mauro [11] 2/21 9/24 10/3 10/14 10/17 10/18 10/18 11/4 11/17 46/16 46/16
Mauro's [1] 11/20
may [10] 3/5 3/10 3/12 21/14 28/1 28/4 74/7 106/15 107/2 118/11
maybe [6] 6/12 18/19 18/23 19/18 22/22 26/14
McDonald's [1] 28/3
mean [24] 12/1 31/22 36/11 44/4 51/4 52/3 52/18 59/12 63/11 63/13 66/9 67/7 82/18 82/21 82/23 84/5 89/7 90/1 90/2 92/20 104/11 108/20 116/16 117/7
media [7] 23/2 25/11 106/13 106/19 112/8 114/20 114/21
medical [16] 36/8 36/8 36/13 36/18 37/4 41/2 41/9 41/18 41/22 42/2 42/3 42/20 42/22 43/1 43/4 44/9
medication [2] 7/18 7/19
medications [2] 7/20 7/21
meet [2] 10/3 21/24
meeting [56] 20/15 20/21
20/24 21/10 21/13 21/19 22/24 22/25 36/1 38/14 38/20 46/17 46/20 46/25 47/4 47/10 47/22 47/25 48/2 48/4 48/6 49/25 50/5 50/8 50/16 50/19 50/21 50/24 51/4 51/13 51/16 51/19 52/8 52/16 53/6 54/13 55/6 56/18 74/9 81/3 81/4 83/1 88/18 90/13 91/4 91/6 91/19 91/20 92/10 92/12 92/15 92/15 92/17 99/4 103/20 106/20
meetings [14] 11/15 20/12 20/18 21/1 21/7 51/9 51/22 52/10 52/11 86/16 86/22 89/20 91/8 91/24
member [9] 51/3 51/19 52/3 52/19 53/1 54/6 86/13 88/11 88/12
members [6] 11/6 11/20 12/1 12/16 34/15 53/24
memo [9] 32/22 32/25 108/7 108/8 111/3 115/19 117/5 120/12 120/14
men [1] 40/24
mens [2] 13/21 14/11
mental [7] 13/13 14/13 14/23 15/4 51/21 54/20 87/11
mentally [1] 117/19
mention [1] 56/1
mentioned [2] 34/20 107/1
mentioning [1] 56/7
message [32] 23/21 25/13 27/9 27/23 28/12 28/17 29/11 29/12 29/13 29/14 29/21 30/11 30/18 59/13 59/14 65/3 67/18 67/19 67/22 68/7 68/19 79/4 111/9 116/15 117/9 117/17 117/20 117/21 117/21 117/24 118/2 118/3
messaged [2] 57/8 73/2
messages [55] 24/2 25/6 25/9 25/17 26/6 26/11 26/19 26/22 27/1 27/5 27/16 27/21 27/25 30/14 31/17 31/19 32/5 49/21 58/18 59/3 65/7 65/8 65/9 74/10 74/12 74/18 74/25 75/2 77/16 104/5 104/5 106/11 106/12 107/7 107/13 107/23 108/15 109/2 109/7 111/4 111/8 111/23 112/3 114/14 115/9 115/14 115/23 116/12 116/18 118/10 118/14 118/24 118/25 120/1 120/4
messaging [2] 58/11 58/12
Messenger [1] 106/11
met [1] 5/15
Michele [11] 36/15 53/6 55/2 60/6 87/5 90/17 91/6 94/3 94/19 97/5 105/21
middle [7] 37/9 37/10 40/20 74/8 80/22 86/5 112/18
might [3] 53/3 53/23 100/14
mile [1] 80/23
military [5] 67/8 67/10 68/20
Miller [5] 2/5 4/3 5/9 5/13 124/22
Miller-Novak [5] 2/5 4/3 5/9 5/13 124/22
million [2] 67/22 67/23
mind [4] 19/11 35/24 66/10 117/19
mine [1] 75/21
minus [1] 68/22
minute [1] 76/20
minutes [11] 56/11 57/5 57/6 57/9 57/15 58/9 59/22 73/6 73/13 73/20 84/20
miserable [1] 67/15
Misocky [3] 106/5 106/15 106/22
missing [4] 65/13 96/7 96/17 96/18
mmn [1] 2/7
model [1] 23/4
modems [1] 50/12
mom [2] 55/16 55/19
moment [3] 16/10 83/21 94/21
MONROE [21] 1/5 1/11 2/20 5/2 5/12 5/13 56/6 72/16 81/1 105/12 109/16 113/14 116/19 120/12 122/5 122/9 123/3 123/25 124/8 124/10 124/12
month [1] 118/11
months [5] 8/21 13/6 63/14 63/14 116/8
more [12] 29/18 51/12 51/18 54/13 54/16 56/4 81/2 86/6 86/12 113/20 114/25 118/11
morning [3] 49/19 49/22 113/14
most [2] 25/2 56/5
Mostly [2] 11/23 12/5
mother [3] 36/2 44/8 55/15
motion [1] 114/1
mouth [1] 99/4
move [12] 56/9 69/18 93/19 95/24 96/12 100/3 100/13 100/14 100/18 102/13 102/16 103/15 116/12 116/18 116/20 120/1 120/4
moved [4] 8/21 89/19 94/11 95/13
moving [2] 83/3 83/15
MR [4] 4/3 4/7 5/9 124/12
Mr. [17] 5/13 12/10 12/11 12/14 34/18 35/7
35/9 40/12 40/16 45/23 48/2 63/2 77/25 78/5 88/10 88/12 89/10
Mr. Blair [2] 35/7 35/9
Mr. Danso [2] 77/25 78/5
Mr. Fuda [4] 12/10 12/11 12/14 45/23
Mr. Glenn [3] 88/10 88/12 89/10
Mr. Lester [1] 40/16
Mr. Monroe [1] 5/13
Mr. Palmer [1] 34/18
Mr. Timko [1] 40/12
Mr. Timko's [1] 63/2
Mr. Wix [1] 48/2
MS [2] 4/9 124/9
Ms. [6] 5/14 38/6 57/5 86/12 94/1 94/7
Ms. Frenchko [6] 5/14 38/6 57/5 86/12 94/1 94/7
much [5] 66/10 89/22 90/3 90/6 116/5
multiple [5] 33/24 34/1 34/6 86/16 86/22
municipal [6] 60/19 61/18 62/17 62/25 63/16 105/17
murder [2] 15/14 18/6
must [1] 39/5

**N**

Nadine [19] 49/18 49/22 57/8 57/18 57/21 57/21 58/6 58/9 59/11 59/12 71/13 72/23 73/3 76/22 77/16 80/8 81/18 86/11 104/6
Nadine's [1] 70/15
name [7] 5/10 34/24 36/18 56/5 57/19 63/2 105/15
name's [4] 5/13 19/13 19/14 105/11
named [1] 122/16
names [2] 5/21 34/20
narrative [3] 84/22 84/25 86/4
natural [1] 100/11
nature [1] 6/7
necessarily [2] 53/14 64/10
necessary [3] 107/1 110/4 115/16
need [5] 7/10 58/7 72/13 113/20 114/24
needed [1] 14/22
needs [1] 38/7
negative [2] 22/18 22/20
negatively [1] 40/25
negligent [2] 15/11 15/15
negotiate [1] 75/16
Neither [1] 77/9
Nelson [2] 75/12 75/16
nerdy [1] 65/25
never [30] 11/3 20/3 28/25 31/25 37/3 37/5 44/10 44/11 44/18 50/20 59/10 59/11 78/1 78/4
35/9 40/12 40/16 45/23 48/2 63/2 77/25 78/5 88/10 88/12 89/10
new [3] 2/24 50/10 124/6
news [4] 39/19 76/5 80/7 86/10
next [13] 7/17 9/15 40/19 67/17 68/6 68/8 78/22 81/7 95/21 102/19 102/23 103/11 106/18
Nicholas [2] 63/3 63/4
NIKI [5] 1/7 56/9 56/24 58/5 124/8
nobody [3] 69/8 103/11 116/6
nobody's [1] 18/2
none [2] 91/18 118/14
noon [4] 29/14 29/15 30/5 67/12
normal [3] 6/25 79/22 81/2
normally [2] 60/15 89/23
north [1] 80/19
NORTHERN [2] 1/2 1/18
not [151]
Notary [7] 1/16 3/11 5/4 122/1 122/13 122/15 122/19
noted [2] 122/5 123/5
notes [2] 106/11 121/8
nothing [9] 5/5 19/3 19/3 27/21 38/15 67/7 115/24 116/7 117/4
notified [1] 74/2
Novak [6] 2/5 4/3 5/9 5/13 19/14 124/22
number [40] 18/11 41/8 41/17 44/25 45/2 64/9 64/11 64/16 64/23 67/17 67/17 67/19 68/11 68/12 68/16 68/19 70/6 70/7 70/9 70/16 70/18 70/21 71/7 71/13 72/23 73/3 76/11 76/12 76/18 76/22 77/3 77/4 105/17 106/2 106/9 107/16 114/1 114/4 114/8 124/17
numbers [9] 67/7 70/20 70/25 72/18 76/7 76/15 79/2 81/24 113/25

**O**

Oaks [1] 6/3
oath [3] 6/13 93/4 93/5
object [1] 16/8
Objection [32] 15/24 16/3 16/4 26/12 28/21 29/2 31/3 39/20 40/2 40/3 41/14 54/25 55/1 57/10 58/15 73/22 77/19 78/2 84/17 86/18 86/24 95/15 99/3 99/7 99/12 108/16 108/19 109/4 109/5 110/14 114/18 118/18
OBJECTIONS [1] 4/6

**O**

**objectively [1]** 103/7
**observed [1]** 90/21
**obstruction [4]** 15/18
15/20 19/2 20/7
**obtain [1]** 79/22
**obviously [2]** 65/2 72/12
**occasions [1]** 37/24
**occurred [2]** 25/3 58/12
**occurring [1]** 52/23
**off [10]** 29/17 59/18
77/14 83/20 83/23 88/14
88/16 92/8 101/21 120/10
**offense [1]** 82/15
**offenses [1]** 18/19
**office [27]** 2/21 10/8
11/22 16/24 21/15 22/2
22/8 24/17 26/20 34/19
38/16 41/24 42/10 42/18
44/12 46/4 46/24 52/9
56/25 60/7 75/17 79/14
79/24 91/5 91/7 92/14
105/2
**officer [5]** 8/11 8/13 8/16
31/6 53/12
**Officer's [1]** 13/1
**officers [3]** 5/24 31/1
31/6
**offices [1]** 3/7
**official [7]** 12/19 26/10
38/24 44/14 81/8 114/23
114/25
**officials [1]** 44/16
**often [5]** 22/14 29/16
30/21 90/22 90/25
**Oh [1]** 65/13
**OHIO [15]** 1/2 1/17 1/21
2/6 2/10 2/16 2/24 3/8
3/12 13/1 17/6 105/21
114/9 124/2 124/6
**okay [317]**
**once [4]** 22/22 64/21 78/8
83/1
**one [42]** 10/15 11/8 14/8
14/11 15/21 25/20 30/9
31/1 31/25 41/21 42/17
44/25 45/12 45/22 45/23
45/25 49/9 50/3 51/12
51/18 53/19 54/13 54/16
55/9 64/4 64/25 66/20
67/22 68/6 68/9 84/24
85/2 85/5 85/16 86/4
87/13 90/23 92/5 106/2
106/18 110/18 117/9
**one's [1]** 26/16
**one-time [1]** 25/20
**online [1]** 80/8
**only [10]** 7/13 8/20 19/9
19/11 40/22 42/17 57/14
60/11 90/15 112/3
**open [1]** 88/19
**operating [1]** 40/24
**opinion [4]** 22/3 38/6
38/17 38/18
**opinions [3]** 42/22 43/1
43/4
**opportunity [4]** 61/13
86/6 86/7 96/10

**opposed [2]** 15/15 26/2
**order [11]** 107/3 109/22
109/24 110/13 115/13
116/23 118/21 118/22
119/2 119/12 120/13
**ordered [5]** 105/24
107/16 107/22 116/9
117/23
**orderly [1]** 80/3
**original [2]** 116/2 124/10
**originals [1]** 124/13
**originating [4]** 67/17
67/19 70/6 76/11
**other [34]** 6/24 7/2 11/19
12/1 16/21 18/14 18/20
23/17 23/18 23/22 25/11
25/22 26/2 28/5 31/7
31/24 34/13 34/20 39/18
39/21 39/25 40/4 44/7
44/15 52/9 56/5 61/9
68/12 71/2 106/12 110/18
111/1 111/2 111/16
**otherwise [2]** 72/18
106/20
**our [17]** 18/2 22/10 32/22
36/16 37/4 50/12 52/7
75/16 81/1 81/8 88/5
91/18 108/7 108/8 110/3
116/1 124/11
**out [34]** 19/3 19/14 19/18
27/21 32/22 38/13 38/22
38/25 39/19 43/21 44/8
57/4 60/4 60/7 60/9 60/10
64/10 72/3 80/7 80/12
83/1 83/2 84/15 93/15
94/10 94/11 95/24 100/6
101/16 102/12 102/13
109/6 115/19 117/5
**over [21]** 6/8 32/21 54/1
57/15 58/16 59/8 65/14
79/25 83/9 92/24 94/14
95/18 95/25 98/16 100/20
100/25 113/6 114/10
115/3 115/8 115/17
**owe [1]** 43/14
**own [7]** 26/4 26/5 26/6
72/18 74/25 111/8 122/17

**P**

**P-A-U-L [1]** 5/12
**p.m [3]** 3/6 28/13 120/19
**page [35]** 4/3 4/7 4/9 4/14
4/15 4/16 4/17 4/18 4/19
4/20 4/21 37/11 40/19
40/21 68/1 69/9 78/22
80/10 80/10 80/21 81/24
82/2 83/8 83/9 84/3 84/23
85/16 86/5 104/21 104/22
107/19 109/8 112/17
112/19 123/7
**pages [6]** 84/24 121/6
122/5 124/11 124/13
124/14
**paid [2]** 41/12 42/13
**Palmer [8]** 32/21 34/16
34/18 105/9 105/11
105/13 108/7 111/2
**paragraph [5]** 40/20

40/21 43/6 106/25 116/19
**parent [1]** 36/12
**parenthetical [1]** 113/25
**Parkway [2]** 2/23 124/6
**part [1]** 52/16
**partial [1]** 80/16
**participate [7]** 7/13
23/2 52/15 71/3 97/14
97/16 97/24
**participation [4]** 52/20
53/2 53/15 54/4
**particular [6]** 15/1 28/14
28/18 28/20 29/9 53/19
**parties [1]** 3/5
**parts [2]** 32/14 34/5
**party [3]** 9/22 9/23 41/2
**past [6]** 21/18 22/16 51/9
51/13 75/2 106/5
**patrol [3]** 8/11 8/12 8/16
**patrolman [1]** 17/12
**PAUL [14]** 1/5 1/11 2/20
5/2 5/12 5/18 56/6 120/22
122/5 122/9 123/3 123/25
124/8 124/10
**Paul's [1]** 5/17
**Paula [1]** 56/2
**pause [1]** 61/22
**pay [1]** 23/15
**Peace [1]** 13/1
**Peck [1]** 2/5
**pending [1]** 1/19
**people [13]** 11/15 27/25
28/24 29/16 40/4 43/17
43/19 51/2 51/8 51/15
60/15 88/21 103/21
**per [1]** 41/1
**performance [2]** 40/24
41/1
**period [1]** 107/24
**permission [1]** 52/15
**person [12]** 24/19 25/15
29/15 30/15 30/15 35/22
51/12 54/16 81/2 87/1
97/1 114/10
**personal [23]** 20/11
25/22 25/23 26/1 26/4
26/10 26/16 75/21 94/10
94/12 95/24 100/6 102/12
102/14 106/9 106/10
107/17 114/10 114/14
115/4 115/9 115/14
115/15
**personally [1]** 122/16
**petty [4]** 98/21 99/5
99/10 99/15
**phone [94]** 23/4 23/6
23/9 23/12 23/13 23/14
23/15 23/17 23/19 23/21
23/24 25/15 26/4 26/4
26/6 26/10 26/16 28/6
28/25 29/4 29/18 29/19
31/25 48/7 48/9 57/25
58/7 59/2 59/4 59/5 63/18
63/24 63/25 64/11 64/15
65/21 68/19 69/7 70/7
70/15 70/18 71/1 71/13
72/18 74/25 77/6 77/15
79/3 93/12 93/19 94/9

94/11 94/12 95/3 95/6
95/13 95/13 95/14 95/22
95/24 96/12 97/10 98/1
98/16 100/4 100/5 100/10
100/12 100/13 100/15
100/18 100/19 100/22
100/25 101/2 101/16
101/23 102/2 102/10
102/13 102/16 103/13
107/11 107/17 111/16
112/2 114/23 115/20
115/22 117/4 119/17
119/23 120/3 120/5
**phones [10]** 25/22 25/23
26/1 106/10 107/17 112/7
114/14 115/15 115/15
115/17
**phonetic [1]** 57/18
**phrased [1]** 93/23
**physically [2]** 101/18
120/5
**pick [2]** 28/4 28/12
**piece [2]** 30/1 30/12
**ping [1]** 29/17
**place [2]** 53/9 77/6
**placed [1]** 53/24
**places [1]** 56/5
**plaintiff [3]** 1/8 2/4 72/19
**plaintiff's [7]** 64/7 72/8
75/24 76/1 80/6 112/15
120/14
**Planet [1]** 88/5
**platforms [2]** 106/13
114/20
**play [7]** 88/4 89/2 89/3
89/6 94/21 112/7 112/7
**played [5]** 88/8 89/14
94/24 95/9 96/2
**plays [1]** 2/7
**please [12]** 5/11 7/7 7/11
19/16 46/11 83/25 107/3
108/24 113/24 124/10
124/13 124/16
**pleasure [1]** 91/20
**pocket [1]** 20/6
**point [15]** 12/23 44/23
45/2 55/3 56/25 60/3 62/7
62/11 63/6 88/18 92/20
93/16 95/6 95/13 117/1
**pointer [1]** 37/11
**police [7]** 8/6 9/11 26/3
73/18 80/23 84/16 85/11
**policy [6]** 24/22 24/24
25/6 32/9 61/9 90/6
**political [1]** 11/24
**politics [1]** 10/13
**poor [2]** 6/8 41/22
**pop [1]** 80/12
**pop-ups [1]** 80/12
**portable [1]** 83/2
**portion [1]** 80/16
**portrayed [1]** 40/25
**position [2]** 8/9 43/14
**possess [1]** 26/4
**possession [1]** 104/7
**possibilities [1]** 31/10
**possible [2]** 39/25 60/11
**posted [5]** 80/8 80/14

81/12 81/16 111/3
**posts [2]** 106/19 114/21
**potentially [3]** 16/1 28/19
54/10
**power [1]** 39/12
**precinct [1]** 10/6
**precise [1]** 28/10
**prefer [1]** 5/15
**present [1]** 16/23
**presentation [3]** 37/10
37/15 40/22
**preservation [2]** 113/1
116/2
**preserve [30]** 32/17
32/22 104/9 104/11 107/1
107/23 108/14 109/1
109/7 109/22 110/5 111/7
111/9 111/20 115/14
115/16 115/22 115/23
116/3 116/6 117/23
117/25 118/1 118/2
118/10 119/3 119/5
119/12 119/16 120/13
**preserved [9]** 105/25
107/16 111/21 115/21
119/17 119/18 119/19
119/20 119/21
**president [1]** 75/11
**presiding [1]** 53/12
**press [1]** 74/8
**pretend [1]** 19/15
**pretty [5]** 39/15 41/20
71/9
**previously [1]** 36/2
**print [5]** 80/11 80/12
111/11 111/12 111/15
**printout [1]** 80/22
**prior [4]** 13/2 37/15
37/24 37/24
**prisoner [2]** 83/3 83/15
**Privilege [1]** 48/20
**privileged [3]** 49/1 49/5
49/9
**privy [1]** 52/7
**Pro [1]** 23/5
**probable [1]** 63/12
**probably [19]** 8/20 13/6
13/7 16/18 18/24 19/17
21/25 34/16 35/22 39/25
56/11 61/12 62/15 79/3
82/25 83/2 103/24 114/10
116/3
**problem [3]** 44/12 44/16
51/20
**problems [1]** 54/18
**procedural [1]** 37/20
**procedure [6]** 1/18 25/19
37/25 60/23 79/22 124/15
**procedures [4]** 38/7 39/5
39/8 39/13
**proceedings [1]** 121/7
**process [5]** 19/14 45/15
56/23 57/3 80/1
**produce [2]** 58/24 120/14
**produced [2]** 96/9 97/2
**production [1]** 69/6
**professional [2]** 41/1
121/13

**P**

**professionally** [1] 45/13
**professions** [1] 66/15
**progress** [3] 27/10 62/6 65/2
**promoted** [1] 9/4
**proof** [1] 96/25
**proper** [2] 37/25 38/12
**properly** [2] 43/15 84/16
**properties** [3] 11/23 12/4 12/5
**property** [2] 11/14 101/3
**prosecute** [1] 14/14
**prosecuted** [4] 51/19 51/25 54/9 54/21
**prosecuting** [3] 105/17 109/13 109/18
**prosecutions** [1] 31/12
**prosecutor** [11] 60/24 62/20 62/22 62/24 63/20 79/19 79/22 79/23 87/8 87/15 107/22
**prosecutor's** [3] 16/24 79/24 88/1
**protect** [1] 43/19
**protocol** [1] 37/19
**prove** [2] 28/13 98/12
**provide** [13] 17/1 17/4 17/8 47/2 54/2 54/4 91/11 91/15 91/23 97/8 113/24 119/25 120/3
**provided** [10] 11/25 26/16 44/9 59/1 64/16 70/19 70/21 70/24 71/17 109/17
**providers** [1] 32/1
**providing** [3] 11/23 41/2 47/22
**proving** [1] 15/4
**public** [58] 1/16 3/11 5/4 20/12 20/18 22/21 24/5 24/8 26/6 26/11 26/22 27/6 27/12 30/21 32/6 33/20 36/1 37/10 37/14 38/14 38/20 38/24 42/21 43/7 43/8 43/12 43/15 43/25 44/14 44/15 44/20 45/6 45/11 50/16 51/3 51/16 51/18 52/4 52/14 53/2 53/19 53/24 54/4 54/6 55/4 81/3 86/7 86/13 88/11 88/13 88/19 89/23 90/4 90/7 90/25 114/14 122/13 122/15
**public's** [2] 52/23 53/1
**publication** [2] 44/20 45/6
**publicly** [3] 22/15 55/5 114/21
**pull** [1] 114/22
**purpose** [2] 14/18 27/24
**pursuant** [3] 1/15 1/18 124/14
**pushed** [2] 100/6 101/17
**put** [12] 11/24 12/2 25/11 32/22 34/13 38/13 55/2 55/15 61/21 78/8 109/6 117/4

**putting** [2] 66/18 102/10

**Q**

**quarter** [1] 85/16
**question** [38] 7/6 7/14 7/17 13/15 14/1 14/2 14/4 17/17 26/13 27/8 33/24 36/10 39/4 49/4 71/24 74/15 78/4 81/15 83/6 87/2 87/12 87/14 89/5 89/8 90/1 97/21 98/5 99/8 99/8 99/9 108/3 108/20 108/21 108/23 115/18 119/8 119/10 120/2
**questioning** [1] 16/2 87/12
**questions** [7] 5/18 7/5 8/1 55/9 58/8 107/3 124/16
**quick** [2] 60/10 77/12
**quite** [1] 30/23
**quotations** [1] 81/1
**quote** [3] 80/25 81/7 81/11

**R**

**racist** [1] 90/19
**radio** [1] 83/22
**range** [3] 65/7 69/19 76/15
**rarely** [2] 5/24 91/6
**Raymond** [6] 104/25 105/1 105/16 109/18 112/19 113/9
**Rd** [1] 124/1
**RE** [1] 124/8
**rea** [2] 13/21 14/11
**reach** [3] 43/21 100/21 101/22
**reached** [4] 93/12 94/10 102/1 103/4
**reaching** [1] 101/2
**reaction** [3] 100/11 102/7 102/9
**read** [20] 3/16 36/6 36/12 36/25 39/16 44/6 46/25 47/3 47/8 47/9 47/18 50/17 50/18 50/20 117/15 122/5 122/5 123/3 123/4 124/12
**reading** [7] 16/21 35/25 40/1 40/7 40/10 40/12 76/6
**real** [1] 27/24
**really** [11] 16/22 19/3 19/11 38/12 52/24 53/17 72/7 88/24 90/1 90/12 116/25
**Realtime** [1] 121/13
**reason** [7] 7/5 7/11 42/6 64/17 109/3 117/10 123/7
**reasons** [1] 122/6
**recall** [8] 7/23 35/15 48/4 48/8 57/17 72/9 92/11 93/20
**receipt** [1] 124/14
**receive** [5] 11/19 13/10 13/19 24/8 115/12
**received** [9] 11/3 12/19

16/18 20/17 24/5 33/19 65/3 110/13 124/14
**receiving** [3] 76/13 107/7 120/13
**recent** [1] 25/2
**recognize** [2] 72/22 81/20
**recollection** [1] 10/4
**record** [17] 5/11 6/16 7/1 24/24 25/17 27/12 47/8 47/18 59/18 59/20 77/14 83/20 83/23 83/25 92/8 92/9 120/10
**record's** [2] 6/21 10/17
**Recording** [5] 88/8 89/14 94/24 95/9 96/2
**recordings** [1] 62/11
**records** [34] 24/6 24/8 24/21 24/25 25/5 25/20 25/21 25/22 26/2 26/7 26/11 26/22 27/1 27/6 27/13 29/1 29/4 31/13 31/16 32/6 32/9 32/23 33/20 37/4 44/10 48/7 48/9 57/23 58/6 63/18 73/20 73/24 77/22 114/14
**redacted** [1] 96/20
**refer** [2] 5/15 17/25
**reference** [1] 106/22
**referenced** [1] 121/3
**referring** [4] 10/18 14/5 41/5 78/14
**refers** [1] 85/23
**Reflex** [1] 16/14
**refresh** [1] 6/12
**regaining** [1] 43/8
**regarding** [14] 18/14 25/6 38/3 41/9 41/12 41/22 42/2 42/9 42/13 50/14 81/21 84/6 87/6 113/1
**Registered** [1] 121/13
**related** [2] 15/22 26/20
**relates** [1] 50/16
**relating** [2] 35/17 106/20
**relation** [1] 11/17
**release** [1] 57/3
**relevant** [1] 31/19
**remember** [10] 40/18 46/9 49/14 49/16 49/18 49/21 57/12 58/9 58/11 75/3
**remembered** [1] 40/16
**removal** [1] 52/2
**removed** [15] 51/3 51/6 51/7 51/8 51/12 51/19 51/22 52/4 54/7 54/13 54/16 80/1 81/3 86/16 86/21
**repeat** [1] 108/24
**rephrase** [1] 26/15
**report** [14] 26/3 65/6 73/18 80/8 80/14 80/22 81/21 84/2 84/16 84/18 85/11 85/16 86/11 88/3
**reported** [1] 121/3
**reporter** [10] 78/11 88/4 93/18 93/25 94/2 94/6 100/2 112/14 121/13

121/13
**REPORTER'S** [1] 121/2
**Reporting** [1] 124/1
**reports** [1] 65/19
**represent** [12] 5/14 13/20 16/6 33/18 43/15 64/14 65/6 66/21 75/14 83/16 88/9 97/25
**representing** [1] 98/4
**reputation** [1] 41/2
**request** [10] 31/13 31/17 32/2 33/20 113/1 113/21 114/1 116/20 117/1 117/6
**requested** [1] 108/8
**requesting** [2] 43/7 92/14
**require** [1] 15/13
**required** [1] 14/13
**requires** [1] 15/20
**reread** [1] 119/14
**research** [1] 20/4
**reservation** [1] 115/13
**reserve** [2] 8/11 8/12
**respective** [1] 122/6
**respond** [2] 88/24 89/18
**responded** [1] 89/12
**response** [3] 33/15 35/25 50/10
**rest** [4] 95/10 95/11 95/12 96/3
**restate** [1] 26/13
**restore** [1] 44/5
**retained** [2] 27/6 75/19
**retention** [4] 24/22 25/5 25/6 32/9
**retentions** [2] 24/24 25/17
**reus** [2] 13/21 14/9
**review** [4] 79/14 120/1 120/4 120/17
**revised** [2] 16/22 55/6
**rid** [1] 118/25
**ridiculous** [3] 28/22 99/16 117/16
**Riepenhoff** [2] 2/23 124/5
**right** [37] 16/7 16/15 19/16 20/10 24/16 25/8 29/8 41/11 47/7 49/10 49/11 52/12 52/18 54/3 58/3 65/16 68/12 75/22 76/21 80/25 82/6 82/14 94/21 96/6 96/10 96/11 100/3 100/9 100/9 100/10 101/3 101/17 102/18 102/22 103/12 110/22 116/25
**right-hand** [1] 82/6
**rights** [1] 31/20
**road** [6] 2/6 9/5 9/8 9/8 9/10 17/14
**robbing** [1] 30/5
**Robert** [2] 2/14 84/24
**room** [3] 83/1 99/25 116/7
**Ross** [12] 2/14 47/24 48/5 49/15 56/20 60/18 83/7 91/10 91/22 108/13 109/1 117/8

**Ross's** [2] 56/24 84/25
**roughly** [1] 18/22
**rules** [9] 1/18 53/3 53/5 53/7 53/8 53/9 53/18 54/4 124/14
**rumor** [1] 87/1
**run** [2] 10/8 64/21
**running** [1] 11/22

**S**

**safeguards** [1] 37/20
**safety** [1] 92/1
**said** [41] 9/8 12/2 15/1 16/11 27/12 29/12 29/13 29/23 31/8 33/20 39/1 46/11 47/10 48/10 56/8 59/21 60/7 60/8 60/8 60/9 64/20 67/11 77/24 78/1 79/15 81/1 82/10 91/23 92/1 93/21 93/22 102/4 102/11 104/5 108/11 108/14 108/22 119/3 119/12 120/14 121/8
**same** [11] 23/13 23/14 37/11 43/20 44/20 45/6 45/11 71/9 90/1 119/23 123/4
**sat** [2] 34/1 88/15
**satellite** [1] 29/10
**save** [1] 116/18
**saved** [1] 34/6
**savings** [2] 66/22 66/23
**saw** [2] 103/13 103/22
**say** [38] 10/17 10/18 15/10 17/15 20/5 20/6 20/15 22/25 24/11 25/25 28/13 29/14 29/17 29/22 30/4 30/9 31/4 31/8 32/9 44/1 44/16 44/9 52/19 53/22 57/7 58/4 61/10 61/13 64/10 71/19 78/3 79/3 79/18 93/22 110/15 110/16 113/7 119/2
**saying** [19] 11/3 15/3 27/20 28/14 49/3 51/18 54/19 55/22 59/11 68/8 68/21 70/1 93/20 96/7 96/18 96/20 98/9 101/15 107/22
**says** [46] 25/6 28/12 30/10 33/15 37/10 40/19 40/21 41/4 43/7 43/25 44/19 45/5 64/23 65/10 67/17 72/16 73/2 80/22 80/25 82/3 82/3 82/6 82/18 83/12 84/5 86/5 93/8 105/8 105/15 105/23 106/9 106/18 106/25 107/15 107/17 107/19 109/16 110/11 112/23 113/10 113/13 113/20 113/25 114/8 115/14 116/19
**Schlemmer** [1] 2/5
**school** [2] 13/21 20/15
**Scott** [1] 27/11
**screen** [1] 96/12
**screens** [1] 80/12

**S**

screenshot [2] 111/13 116/12
search [4] 17/7 114/22 114/23 114/25
searching [1] 20/5
seat [2] 93/15 101/12
second [16] 19/22 33/24 34/24 60/8 65/2 68/1 71/8 71/10 80/10 85/2 86/4 92/5 104/20 104/21 112/16 112/19
seconds [4] 69/24 73/10 73/10 79/5
security [5] 20/14 47/22 91/11 91/15 91/23
see [96] 21/16 29/13 30/11 36/4 37/14 37/16 37/20 38/1 38/4 43/9 43/16 44/21 58/7 58/18 63/18 64/23 64/25 65/2 65/3 65/10 65/22 65/23 68/7 68/8 69/16 69/19 70/13 70/20 72/19 73/11 73/14 76/8 76/13 76/19 76/23 77/2 78/23 80/9 80/13 80/15 80/16 80/22 80/23 81/5 81/9 81/12 84/2 84/3 85/2 85/6 85/18 86/8 88/21 89/1 90/15 94/22 95/5 95/13 95/14 96/11 96/14 96/17 101/12 105/2 105/6 105/18 105/25 106/7 106/15 106/23 107/4 109/14 109/15 109/19 109/24 110/7 110/20 110/23 112/20 113/2 113/3 113/15 113/22 114/2 114/6 114/11 115/1 115/4 116/21
seeing [2] 30/11 57/23
seem [4] 27/13 53/7 90/16 90/18
seemed [1] 90/18
seems [2] 8/23 56/5
seen [4] 31/25 33/4 62/13 104/16
seizure [1] 17/7
semantics [1] 119/7
send [5] 26/10 26/19 27/1 35/17 91/15
sending [1] 49/21
sense [4] 7/15 28/16 67/13 116/5
sent [21] 27/25 29/22 59/2 65/3 67/18 67/19 67/21 68/19 69/7 69/21 71/7 98/1 110/9 110/12 112/19 112/24 113/3 113/9 113/10 115/18 120/12
separate [2] 37/24 65/19
September [5] 1/17 3/6 123/4 124/3 124/10
sergeant [6] 9/4 9/9 48/5

Services [1] 124/1
set [3] 81/17 111/22 112/2
sets [1] 109/23
settled [2] 41/17 42/2
settlement [1] 41/22
settlements [4] 41/12 42/9 42/13 42/22
seven [2] 8/21 58/9
several [2] 51/21 57/14
Seville [2] 2/10 3/7
sexual [1] 17/15
share [1] 37/7
she [64] 21/23 22/1 22/7 22/8 22/9 38/10 39/4 39/7 39/10 39/15 44/8 44/13 45/15 55/4 55/5 56/9 60/12 60/22 61/16 61/17 73/9 73/13 73/18 74/8 76/23 77/10 81/5 81/7 81/8 85/23 87/19 87/21 87/21 90/17 90/18 94/9 94/11 94/12 94/13 94/13 94/15 94/17 95/2 95/4 95/22 95/23 95/25 96/7 97/5 97/5 98/15 98/16 98/19 100/5 100/19 101/4 101/16 101/19 101/20 101/23 102/4 103/1 103/4 103/8
she's [12] 6/15 43/3 44/11 53/11 53/11 53/13 53/14 69/1 95/21 100/6 101/11 101/21
sheet [1] 122/7
sheriff [25] 2/20 6/5 9/16 9/17 9/19 16/6 17/1 24/3 39/11 39/12 51/5 64/8 67/5 72/16 79/21 99/11 105/9 105/11 105/12 106/14 109/16 112/25 113/14 116/19 120/12
sheriff's [18] 2/21 21/15 24/21 32/10 32/14 34/19 38/15 44/12 50/24 52/9 75/17 105/2 106/3 106/4 106/6 106/14 107/19 107/23
sheriffs [1] 106/21
short [1] 92/6
shorten [2] 10/25 78/10
shorthand [1] 3/10
shoved [2] 94/9 100/10
show [11] 15/14 19/22 19/23 20/3 20/9 28/9 30/14 38/20 55/6 91/19 95/10
showed [3] 14/23 88/17 90/14
showing [1] 83/10
shown [1] 121/8
shows [2] 19/25 20/1
sign [3] 3/16 12/2 124/12
signage [1] 11/14
signature [3] 3/14 120/18 124/15
signed [4] 109/13 122/16

signs [2] 11/15 11/24
silly [1] 27/13
since [6] 9/19 41/24 42/2 42/9 42/18 53/6
Sincerely [1] 124/18
single [5] 22/9 52/8 108/1 116/4 117/8
sir [6] 22/17 69/20 75/25 80/1 86/9 95/1
sister [2] 63/4 63/10
sit [4] 88/6 94/11 95/23 103/11
sitting [4] 95/18 101/11 101/13 102/18
situation [1] 89/13
size [2] 18/22 18/24
slap [2] 94/1 94/12
slapped [1] 101/23
slip [2] 103/7 103/8
smack [1] 100/23
smacked [1] 95/25
smacking [1] 99/17
smacks [1] 100/19
smaller [1] 18/23
smashed [1] 18/5
SMS [2] 65/10 65/16
snippet [2] 88/17 90/14
so [197]
social [6] 23/2 106/13 106/19 112/7 114/20 114/21
some [27] 7/25 11/13 12/1 12/4 12/22 12/23 24/2 25/11 31/16 36/6 36/7 36/11 41/10 41/11 53/2 54/20 58/7 63/6 70/21 80/13 88/21 92/20 96/17 96/18 96/20 115/20 117/16
somebody [13] 17/11 19/2 20/5 29/23 38/11 38/23 54/18 83/4 91/15 96/20 112/9 112/10 117/18
someone [10] 19/10 19/18 30/5 43/22 45/25 81/4 87/11 97/19 97/22 98/7
someone's [1] 29/5
something [21] 20/15 21/14 21/16 21/19 28/1 28/4 30/19 32/5 38/11 40/15 44/17 49/5 50/11 57/24 64/9 70/24 74/8 87/11 91/16 93/24 97/22
something's [1] 49/9
sometimes [11] 6/24 14/16 19/6 24/1 26/19 27/17 30/14 53/24 72/5 75/4 84/11
somewhere [4] 19/5 27/20 28/18 47/5
soon [2] 95/23 101/22
sorry [7] 34/25 37/25 48/15 51/5 77/9 77/11 109/11
Sort [1] 86/4

sound [4] 37/19 62/10 83/14 88/7
sounds [3] 53/22 90/17 116/14
space [7] 94/10 94/12 95/25 100/7 102/12 102/14 116/8
speak [4] 7/2 53/20 92/21 92/23
speaking [4] 7/2 43/11 52/18 53/19
special [7] 79/19 79/23 87/8 87/15 87/25 105/16 107/21
specific [3] 114/21 115/21 118/2
specifically [3] 21/15 114/24 115/14
speculate [1] 82/22
speed [1] 71/16
spell [1] 5/10
spelling [1] 57/18
spoke [5] 22/10 40/9 44/10 113/6 113/13
spoliation [1] 115/13
Srp [8] 104/25 105/1 105/14 105/16 109/18 109/21 112/19 113/9
staff [14] 34/14 34/15 35/3 35/4 41/7 106/5 106/6 106/14 106/14 106/21 107/19 107/23 108/7 110/6
stamped [1] 82/1
stand [5] 66/3 94/9 94/13 94/25 101/19
standard [1] 66/13
stands [1] 19/3
start [4] 76/21 82/2 84/23 90/13
started [5] 60/7 83/3 91/7 101/20 101/22
starts [3] 37/14 57/25 69/9
state [13] 1/17 3/11 5/10 13/13 14/13 14/23 15/4 17/6 24/15 105/21 107/2 114/9 122/15
stated [1] 47/6
statement [9] 22/18 22/20 81/18 88/13 91/11 97/3 100/2 108/21 112/5
statements [5] 22/16 22/19 37/24 38/21 122/16
STATES [2] 1/1 1/20
statute [6] 50/15 50/20 50/23 54/23 61/2 106/21
statutes [2] 14/6 16/19
statutory [1] 110/3
stenotype [1] 121/8
step [3] 9/15 43/8 63/19
steps [6] 107/1 107/6 107/12 110/4 111/7 115/15
still [14] 16/8 18/12 23/6 23/13 23/14 30/1 32/13 59/2 59/5 69/17 76/16 78/12 83/9 119/22

stint [1] 17/22
stipulate [1] 66/11
stipulated [2] 3/4 3/9
STIPULATIONS [1] 3/1
stop [2] 19/12 86/6
storage [1] 11/14
store [2] 29/13 29/15
stream [1] 28/5
Street [1] 27/11
strictly [1] 18/2
strike [1] 94/7
striking [2] 94/8 98/18
struck [3] 94/3 97/6 98/16
stuck [1] 100/5
studied [1] 97/3
stuff [6] 38/13 70/3 110/21 111/16 115/20 117/18
subdivisions [1] 17/9
subject [3] 23/3 33/16 109/23
submit [1] 25/16
subpoena [1] 58/25
subpoenaed [3] 64/15 64/18 64/19
subpoenas [1] 29/6
substance [1] 122/6
subtract [1] 67/11
subtracting [1] 76/17
such [3] 37/10 37/14 43/14
Sudhoff [4] 2/22 4/9 124/5 124/9
suit [1] 6/3
Suite [4] 2/16 2/23 124/1 124/6
summons [1] 57/3
supplement [1] 85/18
supplements [1] 84/23
support [2] 11/25 90/10
supposed [2] 52/24
sure [21] 6/19 9/6 16/13 21/3 25/1 33/1 33/19 46/14 53/10 55/9 60/20 63/22 71/9 74/19 77/13 83/22 86/25 89/3 89/4 92/7 103/20
surprised [1] 19/4
surveillance [7] 32/8 32/9 32/13 99/21 99/23 99/24 106/2
swore [1] 122/16
sworn [1] 5/4
syllables [2] 10/23 11/10

**T**

table [12] 7/14 94/14 95/19 95/20 95/21 101/14 101/15 102/19 102/22 102/25 103/1 103/4
take [22] 7/10 7/13 7/20 13/5 38/23 49/9 59/16 77/12 81/8 84/15 84/20 92/6 95/18 95/20 106/25 107/6 110/4 111/7 111/13 115/15 116/8 120/9
taken [9] 1/15 3/5 3/10

**T**

**taken... [6]** 57/2 121/7 121/8 121/9 123/3 124/10
**Takes [1]** 82/14
**taking [2]** 6/15 44/7
**talk [19]** 36/21 36/24 40/4 40/5 40/6 40/12 46/15 46/16 46/19 52/24 53/3 60/18 60/24 79/6 88/15 90/12 92/10 104/4 112/10
**talked [10]** 14/4 39/22 39/25 40/5 63/15 63/22 72/12 81/23 86/15 108/13
**talking [15]** 6/25 13/16 27/19 31/9 33/22 40/14 40/16 48/8 49/16 53/1 54/12 56/2 58/9 87/10 93/12
**task [2]** 18/10 76/17
**taught [1]** 13/12
**teach [1]** 24/11
**tech [3]** 75/6 111/15 111/17
**technically [1]** 40/21
**Teetor [1]** 2/15
**telephone [1]** 35/21
**tell [25]** 7/18 19/12 27/10 31/24 44/24 47/14 50/9 61/7 72/13 80/2 89/16 89/24 89/25 91/18 93/18 93/25 94/6 101/20 103/12 103/25 107/12 107/14 108/1 117/7 118/1
**telling [8]** 28/17 28/18 44/12 45/19 96/11 108/25 111/14 115/19
**ten [6]** 56/11 57/4 57/6 59/22 73/20 84/20
**tend [1]** 6/24
**tends [2]** 19/9 19/10
**tenure [1]** 9/3
**term [1]** 17/12
**terminating [2]** 70/9 76/12
**terms [2]** 9/20 56/23
**testified [14]** 5/6 26/15 32/7 70/24 73/16 83/17 91/10 96/1 97/4 97/4 109/1 109/6 114/13 117/14
**testify [2]** 5/4 7/22
**testifying [5]** 71/14 71/15 98/3 98/4 98/9
**testimony [22]** 31/5 47/7 47/17 54/15 74/3 74/5 93/4 93/5 94/15 96/22 98/15 99/6 99/10 99/20 101/6 101/25 119/22 121/7 121/9 122/5 122/6 123/3
**tettorlaw.com [1]** 2/17
**text [93]** 23/21 24/2 25/6 25/9 25/13 25/16 26/6 26/10 26/19 26/22 26/25 27/5 27/9 27/10 27/14 27/16 27/21 27/23 28/5 28/12 28/17 29/11 29/12

29/13 29/14 29/21 30/11 30/14 30/17 31/17 31/19 32/5 49/21 57/8 58/11 58/11 58/18 59/3 59/11 59/13 59/14 65/3 65/7 65/8 65/9 65/19 67/18 67/19 67/21 68/7 68/19 73/2 74/4 74/10 74/11 74/18 74/25 75/1 76/6 77/16 104/5 104/5 106/10 106/19 107/7 107/13 107/23 108/15 109/2 109/7 111/4 111/8 111/9 111/23 112/3 114/13 115/9 115/14 115/23 116/12 116/15 116/18 117/9 117/17 117/20 117/24 118/2 118/2 118/10 118/14 118/23 120/1 120/4
**texted [7]** 28/2 58/17 59/12 73/9 73/13 75/7 75/13
**texting [2]** 68/11 74/7
**texts [1]** 74/6
**than [23]** 16/21 17/15 17/18 26/3 28/5 31/24 44/7 51/12 51/18 52/9 54/13 54/16 56/5 71/2 76/6 78/11 81/2 83/13 86/7 86/12 111/2 111/16 118/11
**Thank [4]** 45/20 70/11 78/17 124/16
**thanks [4]** 17/17 20/9 34/11 105/15
**their [21]** 19/18 22/10 25/16 28/24 42/13 42/22 43/21 79/14 83/2 90/10 91/20 106/4 107/13 107/23 109/7 114/20 115/9 115/17 115/19 117/19 122/6
**them [54]** 11/25 20/13 21/4 31/21 31/23 32/2 43/21 48/23 49/9 49/17 50/3 54/7 58/20 58/22 58/23 58/24 59/1 59/9 60/11 60/21 61/5 61/7 64/18 64/19 64/20 68/25 74/14 74/16 74/20 74/22 75/19 90/5 103/23 104/8 104/9 104/11 107/8 107/9 107/11 107/14 108/17 109/2 112/12 115/19 115/24 118/7 118/9 118/16 119/3 119/3 119/12 119/17 120/5 122/5
**there's [24]** 13/21 15/10 17/5 26/1 27/10 41/11 41/21 42/8 44/16 46/13 52/8 53/2 53/7 79/4 81/1 81/24 87/12 88/6 95/20 95/22 101/12 116/5 117/20 117/21
**these [16]** 35/20 43/17 43/19 43/20 43/23 48/21

64/15 65/8 65/9 67/8 67/16 72/9 72/14 74/5 77/22 111/15
**they'll [1]** 20/6
**they're [12]** 23/18 29/16 29/25 38/21 52/15 53/20 59/4 103/24 119/17 119/18 119/18 119/20
**thing [5]** 7/13 12/3 19/11 100/21 116/15
**thing's [1]** 94/20
**things [13]** 7/23 18/20 29/7 37/12 48/21 49/10 53/3 65/1 71/16 80/13 84/12 96/14 112/10
**think [38]** 11/18 25/14 25/25 26/9 27/5 27/20 28/22 29/9 31/6 41/21 42/17 43/23 44/4 44/15 49/5 50/10 52/6 53/9 54/1 54/15 54/24 55/20 55/21 56/8 62/15 63/18 70/22 71/7 73/19 84/14 84/23 88/10 88/11 91/9 99/5 101/3 116/14 118/4
**third [7]** 41/2 65/22 71/8 76/8 80/21 83/8 85/5
**third-party [1]** 41/2
**Thirteen [1]** 9/14
**those [34]** 14/8 15/17 16/24 24/2 26/11 26/22 26/25 27/1 27/21 29/6 31/16 32/17 32/22 34/15 40/6 41/12 49/6 51/15 53/5 73/24 74/10 74/11 75/22 78/25 79/2 80/3 85/15 85/17 90/9 103/21 112/10 118/14 118/25 120/4
**though [6]** 19/17 27/8 45/19 72/3 88/1 115/25
**thought [1]** 84/7
**thousand [2]** 22/1 92/4
**threads [1]** 112/17
**three [7]** 13/6 39/22 40/6 57/9 63/14 108/11 109/23
**through [7]** 24/15 35/23 37/18 64/22 67/16 71/12 88/6
**throw [3]** 19/16 38/25 43/16
**throwing [1]** 19/18
**ticket [1]** 19/13
**Tigers [1]** 8/7
**time [77]** 3/6 5/25 6/5 8/17 9/2 9/7 10/6 10/8 12/8 20/10 22/10 25/9 25/20 28/10 28/18 28/20 28/24 28/25 29/9 35/8 43/20 46/14 51/1 52/20 53/19 53/23 54/2 56/25 60/4 60/17 62/8 62/11 64/4 65/1 65/22 66/4 66/5 66/8 66/12 66/13 66/18 66/20 66/21 66/22 66/23 67/4 67/8 67/10 67/10 67/11 67/12 68/2 68/20 68/23 73/2 73/25 74/1

75/15 76/8 77/7 78/19 79/3 79/20 82/7 82/15 82/19 83/15 83/17 84/2 84/5 84/8 84/9 84/14 104/21 107/24 121/8 124/16
**times [6]** 14/22 20/4 68/24 81/14 81/15 114/4
**Timko [1]** 40/12
**Timko's [3]** 63/2 63/4 63/10
**TOC [1]** 84/5
**TOD [1]** 84/9
**today [13]** 5/15 5/21 7/10 7/23 31/5 47/17 74/3 86/15 96/22 99/6 99/10 119/22 120/12
**told [20]** 23/1 23/8 38/11 42/5 47/1 48/7 48/9 49/4 60/6 73/16 86/11 94/2 97/4 103/22 104/1 108/6 109/1 111/2 118/2 118/10
**too [6]** 11/10 19/19 27/8 69/7 89/21 116/5
**took [7]** 22/1 22/10 63/19 71/4 77/6 91/7 95/22
**top [8]** 64/11 65/9 65/15 65/23 76/2 82/6 84/3 110/20
**totality [2]** 55/24 88/18
**touched [5]** 97/6 100/16 100/18 101/4 101/5
**touchy [1]** 94/20
**tough [1]** 10/15
**towards [17]** 16/23 21/17 92/24 93/2 93/9 94/16 94/19 94/23 95/16 95/17 101/7 101/8 101/14 101/16 101/23 102/1 102/25
**tower [2]** 29/19 29/19
**Township [2]** 8/6 8/10
**tracing [1]** 29/9
**track [1]** 60/10
**traded [2]** 23/9 23/12
**traditional [1]** 65/21
**traffic [1]** 19/12
**train [2]** 90/3 90/5
**training [11]** 12/20 13/1 13/10 16/19 16/22 17/5 17/14 20/17 24/6 24/9 50/23
**trainings [3]** 17/1 17/4 17/8
**transcribed [1]** 3/12
**transcript [8]** 3/14 3/16 121/5 121/6 123/3 123/4 124/12 124/13
**transcription [2]** 3/13 124/1
**transport [1]** 83/12
**transported [1]** 83/11
**treatment [5]** 38/3 42/9 42/11 42/14 42/20
**trial [1]** 87/22
**tried [5]** 22/8 94/1 94/7 94/12 95/24
**tries [1]** 19/15

**true [6]** 98/6 108/22 109/3 121/6 122/17 123/4
**Trumbull [18]** 2/20 2/20 2/20 12/5 36/3 38/13 40/25 41/3 56/4 64/9 105/2 105/5 105/8 109/12 112/25 112/25 113/13 114/9
**trust [4]** 43/9 43/25 44/3 44/5
**truth [6]** 5/5 5/5 5/6 38/18 43/15 122/16
**truthful [1]** 38/21
**try [5]** 43/19 44/5 44/15 80/3 90/13
**trying [6]** 28/24 55/21 68/2 72/6 75/15 83/9
**turn [2]** 74/23 103/13
**turned [1]** 32/21
**turnover [1]** 46/13
**turns [3]** 27/21 95/2 103/15
**two [15]** 10/25 21/25 34/20 37/24 45/2 45/8 46/23 63/14 72/5 84/24 85/9 85/12 92/4 106/9 107/16
**type [1]** 12/22
**typically [5]** 52/18 53/19 57/24 81/3 84/15
**typo [1]** 114/10

**U**

**uh [3]** 6/20 53/11 90/20
**Uh-huh [2]** 53/11 90/20
**uh-huhs [1]** 6/20
**uhs [1]** 6/20
**unaware [1]** 27/7
**uncle [1]** 11/18
**unclear [1]** 7/6
**under [6]** 6/13 53/10 61/3 93/4 93/5 110/21
**underneath [1]** 32/6
**understand [15]** 6/13 6/15 6/21 7/3 7/7 14/8 26/9 55/20 64/8 64/22 67/18 68/20 71/22 72/2 79/21
**understanding [3]** 25/10 53/12 124/11
**understood [1]** 56/8
**unfortunately [3]** 65/18 80/11 81/25
**unfounded [1]** 22/11
**unilaterally [1]** 27/4
**UNITED [2]** 1/1 1/20
**Universal [3]** 66/4 66/5 66/8
**unless [1]** 101/15
**unnecessarily [1]** 40/23
**until [4]** 52/15 101/4 101/20 102/4
**untrue [1]** 108/18
**untruthful [1]** 38/14
**up [37]** 19/10 22/10 25/14 28/4 28/6 28/12 38/20 46/4 46/25 53/7 54/1 54/3 54/19 55/17

**U**

up... [23] 57/25 64/25 68/2 70/21 71/16 79/4 90/13 91/19 92/23 93/15 94/25 95/19 95/22 96/11 98/5 100/9 100/10 101/13 102/5 102/11 116/8 116/15 117/18
upcoming [1] 74/7
updates [1] 17/7
uploads [1] 97/12
upon [1] 72/17
ups [1] 80/12
upset [3] 39/15 90/16 90/18
upstairs [1] 45/22
us [9] 11/2 29/16 30/22 44/10 44/12 77/9 109/17 111/3 114/22
usage [4] 65/10 65/16 76/3 76/6
use [17] 3/12 6/19 6/20 10/12 11/13 13/25 22/8 23/17 23/19 23/21 23/24 26/10 26/15 30/12 66/13 72/18 119/7
used [1] 1/17
uses [1] 116/6
usually [2] 19/9 53/2
UTC [6] 65/23 66/1 67/12 69/22 70/3 76/17

**V**

valuable [2] 29/4 37/11
value [12] 25/11 25/13 25/15 27/9 27/12 27/14 27/22 27/23 28/5 28/7 28/15 104/12
variety [1] 17/5
various [1] 66/15
vehicles [1] 50/11
vendor [1] 41/2
verbally [1] 55/19
verify [1] 68/24
versions [1] 34/6
versus [1] 105/21
very [6] 30/21 32/1 37/11 60/5 65/25 90/18
via [1] 35/20
victim [1] 22/7
Victor [1] 104/22
video [33] 61/15 62/7 62/13 62/14 88/4 88/23 89/2 89/6 94/21 94/22 95/10 95/11 95/12 95/16 96/3 96/10 96/17 96/19 96/21 96/23 97/2 97/8 97/20 97/25 98/8 99/21 99/23 101/12 103/6 103/7 103/13 106/2 116/6
video's [1] 96/5
videos [5] 32/8 32/10 32/14 32/18 106/19
videotaped [1] 98/1
View [1] 2/16
viewed [1] 63/25
Vigluicci [1] 104/22
village [1] 82/14

Villanueva [1] 50/2
violated [1] 81/7
violence [1] 17/7
visibly [1] 55/4
Vivoda [1] 56/2
Vivoda-Klotz [1] 56/2
voice [4] 43/3 65/19 76/3 90/16
voluntarily [2] 87/8 87/15
voluntary [1] 14/18
VS [2] 1/9 124/8

**W**

wait [1] 16/10
waited [3] 101/20 102/4 102/11
waived [3] 3/15 120/18 124/15
walk [10] 45/20 60/7 93/1 93/2 95/14 101/7 101/8 101/9 101/10 101/15
walked [13] 45/22 92/24 93/6 93/7 93/9 94/15 94/19 95/19 97/5 101/13 101/14 102/24 102/25
walking [6] 95/5 95/16 95/17 101/15 102/20 102/23
wall [1] 43/16
Walton [2] 2/23 124/6
want [34] 5/19 6/12 6/19 6/20 7/1 7/6 14/25 23/1 28/1 35/23 37/9 43/6 47/10 52/20 59/16 61/11 64/10 70/12 78/8 84/2 86/3 89/2 92/10 96/5 98/17 103/25 104/2 104/4 111/1 115/20 115/21 119/5 119/7 120/9
wanted [10] 21/16 21/18 46/25 47/3 47/9 61/10 61/21 69/19 102/12 103/11
wants [1] 28/13
warn [1] 90/12
Warren [3] 63/5 63/16 105/17
Warren's [1] 63/20
wasn't [16] 26/14 28/14 44/9 50/7 54/22 55/11 56/18 86/16 86/22 87/19 87/25 94/8 99/18 102/7 102/9 116/25
watch [12] 19/23 19/25 20/1 55/16 55/19 61/14 62/14 62/16 96/6 96/10 103/6 103/13
watched [3] 19/22 62/7 89/20
watching [3] 62/19 88/23 96/13
Watkins [1] 109/12
way [11] 10/25 21/21 65/18 70/21 78/17 84/1 88/4 89/18 100/6 101/22 115/21
Wayne [1] 85/8

we'll [8] 5/21 10/25 55/8 59/19 76/21 80/9 81/24 120/17
we're [15] 6/24 10/18 28/3 31/9 40/14 48/19 66/23 69/18 72/7 75/23 80/2 80/3 80/4 87/10 88/6
we've [2] 41/20 69/2
wearing [1] 88/21
week [1] 21/25
weight [1] 116/7
well-established [1] 37/18
went [11] 9/4 9/5 9/9 9/11 27/14 87/21 92/11 94/11 95/23 95/23 101/19
were [64] 5/25 6/5 8/12 8/25 9/8 9/9 9/12 9/13 9/22 11/16 13/9 13/12 14/21 14/21 15/1 15/6 15/9 15/17 16/17 16/20 25/8 28/23 28/23 29/9 33/24 34/15 34/21 36/16 39/15 42/5 44/24 45/1 45/16 50/11 51/15 54/18 55/24 59/21 60/19 61/3 62/3 62/16 62/25 63/7 63/16 63/20 75/15 79/2 79/15 80/1 83/1 83/14 87/8 90/9 91/6 91/10 91/20 91/23 92/20 93/19 102/20 104/12 117/23 119/1
weren't [2] 18/16 87/9
Westfall [1] 2/15
whacky [1] 80/13
what [139]
what's [15] 13/15 22/3 30/17 32/9 33/2 55/18 57/18 59/13 63/2 64/5 90/6 100/11 100/17 100/21 117/25
whatever [4] 33/20 47/10 52/20 107/18
whatsoever [2] 79/17 97/17
when's [1] 5/25
Where's [4] 71/1 95/10 96/3 99/21
WHEREUPON [6] 5/1 64/7 72/8 75/24 80/6 112/15
whether [8] 25/12 27/5 41/16 49/8 51/2 57/17 79/12 89/12
which [13] 11/8 14/13 16/20 45/23 69/9 69/24 71/9 73/3 83/10 86/4 90/17 113/10 114/4
while [4] 51/4 51/4 93/12 110/1
who [27] 5/24 21/23 25/12 27/25 34/15 34/21 40/5 40/9 46/2 46/9 46/14 48/9 49/24 50/6 51/21 54/18 54/19 56/13 57/23 58/17 67/18 67/21 72/17 86/7 88/10 97/1 112/10

who's [10] 34/18 35/3 35/9 75/10 75/20 76/12 76/12 89/15 97/20 104/24
Whoever [1] 46/11
whoever's [1] 53/18
whole [3] 5/5 96/5 96/10
whose [3] 70/18 100/20 100/25
wild [1] 80/13
wildly [1] 76/5
will [14] 3/15 31/11 68/24 71/19 76/15 84/11 84/12 94/21 98/24 99/2 110/1 120/14 124/11 124/15
William [3] 79/6 109/9 109/13
willing [2] 94/20 116/20
window [1] 19/18
within [8] 3/11 32/10 36/8 57/6 94/10 100/5 100/10 124/14
without [10] 15/4 21/10 21/13 29/17 38/10 38/23 44/6 57/23 63/23 74/6
witness [5] 3/16 5/3 48/17 122/16 123/3
witness's [1] 3/13
witnesses [2] 85/9 85/12
Wix [13] 2/14 47/21 48/2 49/15 49/24 56/20 56/23 60/18 83/7 83/16 85/2 90/1 117/8
Wix's [1] 86/3
women [1] 40/24
won't [1] 103/24
wonderful [1] 56/7
word [8] 13/24 34/7 36/7 36/7 44/7 93/20 119/4 119/6
worded [1] 13/20
words [3] 6/19 45/9 61/10
work [7] 8/1 8/22 10/2 18/12 43/18 44/15 94/21
worked [1] 20/20
working [5] 16/17 20/12 20/13 46/14 52/8
workmanship [1] 6/8
workplace [1] 12/13
works [1] 64/22
wouldn't [12] 19/4 25/9 28/9 28/19 29/19 29/21 44/14 91/15 93/21 100/14 116/5 117/11
write [3] 19/13 34/11 114/19
writing [1] 35/24
written [6] 6/16 7/1 30/17 36/2 80/8 106/11
wrote [5] 34/1 38/23 80/17 85/16 85/21

**X**

X's [1] 28/4

**Y**

yard [1] 12/2
yeah [20] 10/16 18/1

19/15 19/21 29/4 36/15 42/12 43/23 44/2 44/4 46/13 52/22 57/6 61/20 67/6 68/5 71/21 98/11 103/23 105/13
year [8] 8/14 9/17 25/2 40/15 58/8 58/16 59/8 63/14
years [8] 6/1 6/11 8/4 9/6 9/14 18/11 24/10 91/5 91/22 105/23
yesterday [4] 58/17 66/1 91/22 105/23
yet [6] 45/16 61/10 61/18 75/19 95/7 103/23
Yosowitz [3] 2/15 4/7 124/23
you'll [3] 71/17 98/22 98/24
you're [44] 6/13 6/18 11/2 15/3 16/16 25/19 27/7 27/19 27/20 28/14 28/17 30/11 33/22 43/11 49/12 51/18 52/16 54/12 55/21 55/22 56/1 56/7 59/11 68/1 68/11 68/21 70/1 71/14 78/13 81/14 87/6 95/16 96/18 97/15 97/18 97/21 98/3 98/9 98/18 101/2 101/15 105/1 110/19 114/24
you've [12] 9/19 17/21 21/12 42/10 42/18 44/18 51/4 51/4 51/12 96/1 97/4 104/1
Youngstown [2] 2/10 124/2
yours [2] 56/6 56/6

**Z**

zone [1] 66/20