**In The Matter Of:**

*Niki Frenchko v.*
*Paul Monroe, et al.*

---

*Harold A. Wix*
*August 21, 2023*

---

*Miami Valley Reporting, LLC*
*4246 McCandliss Road*
*Troy, Ohio 45373*
*(937) 440-1400*
*angeladilts@miamivalleyreporting.com*

Original File 230821hw.txt

**Min-U-Script® with Word Index**

1

1            UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF OHIO
2                 EASTERN DIVISION

3   NIKI FRENCHKO,          )
                            )
4           Plaintiff,      )
                            )
5      -vs-                 )   Case Number 4:23-cv-00781
                            )
6   PAUL MONROE, et al.,    )
                            )
7           Defendants.     )

8

9            ZOOM CONFERENCE DEPOSITION OF HAROLD A.

10  WIX, taken by me, Susan L. Bickert, a court

11  reporter and Notary Public in and for the State of

12  Ohio, at large, as upon Cross Examination, on

13  Monday, August 21, 2023, commencing at 9:30 o'clock

14  a.m. on behalf of the Plaintiff.

15

16

17

18

19

20

21

22

23

24

25

2

1    APPEARANCES:

2           ON BEHALF OF THE PLAINTIFF:

3               MATT MILLER-NOVAK, Esq.
                STEVEN C. DAVIS, Esq.
4               Barron Peck Bennie & Schlemmer Co.
                3074 Madison Road
5               Cincinnati, Ohio  45209
                513.533.2030
6               MMN@bpbslaw.com
                SCD@bpbslaw.com
7
            ON BEHALF OF DEFENDANTS SGT. HAROLD WIX
8           AND SGT. ROBERT ROSS:

9               ANDREW N. YOSOWITZ, Esq.
                Teetor Westfall
10              200 E. Campus View Blvd., Suite 200
                Columbus, Ohio  43235
11              614.368.0410
                ayosowitz@teetorlaw.com
12
            ON BEHALF OF DEFENDANTS SHERIFF PAUL
13          MONROE, FRANK FUDA, MAURO CANTALAMESSA,
            TRUMBULL COUNTY, OHIO, TRUMBULL COUNTY
14          COMMISSIONERS AND TRUMBULL COUNTY
            SHERIFF'S OFFICE:
15
                HELEN K. SUDHOFF, Esq.
16              DANIEL T. DOWNEY, Esq.
                Fishel Downey Albrecht & Riepenhoff
17              7775 Walton Parkway, Suite 200
                New Albany, Ohio  43054
18              614.221.8769
                hsudhoff@fisheldowney.com
19              ddowney@fisheldowney.com

20          ALSO PRESENT:

21              Niki Frenchko, Plaintiff

22

23

24

25

INDEX TO EXAMINATION

| | Page |
|---|---|
| Cross Examination by Mr. Miller-Novak ..... | 4 |
| Cross Examination by Ms. Sudhoff .......... | 95 |
| Recross Examination by Mr. Miller-Novak ... | 97 |

INDEX TO EXHIBITS

| Depo. Ex. No. | Description | Page |
|---|---|---|
| 1 | Frenchko Arrest Report | 48 |
| 2 | July 5, 2022, letter to Commissioner from Paul S. Monroe, Trumbull County Sheriff | 69 |
| 3 | Wix Pages 3218-3228, AT&T reports of telephone calls | 72 |
| 4 | Wix Pages 3878-3879, AT&T reports of text messages | 83 |
| 5 | Defendants Harold Wix and Robert Ross's Responses to Plaintiff's Request for Admission, First and Second Set of Interrogatories and Request for Production of Documents | 87 |

4

1                    HAROLD A. WIX,

2    a witness being of lawful age, having been duly

3    cautioned and sworn, did testify upon his oath as

4    follows:

5                    CROSS EXAMINATION

6    BY MR. MILLER-NOVAK:

7              Q    Hello, Mr. Wix.

8              A    Hello.

9              Q    How are you doing today.

10             A    Doing good.  Thank you.

11             Q    My name is Matt Miller-Novak.  I

12   represent Commissioner Frenchko in this case.

13             I know we have not met before in person.

14   I'm going to ask you some questions today.  Before

15   I get started, have you ever been deposed before?

16             A    Yes, sir.

17             Q    Okay.  When were you deposed?

18             A    I would say it was three to four

19   years ago.  I was a Sergeant.  One of the deputies

20   was in an accident.  I had to do a depo for an

21   insurance company.

22             (Whereupon, the court reporter

23   interrupted to ask for the camera to zoom in on the

24   witness).

25             A    So, yes, I have.  It was a few

5

1   years.  I did a depo for an insurance company.

2              Q    Okay.  Thank you.  Well, then you've

3   got a little bit of deposition experience, but I'm

4   just going to go over just some basics here in

5   terms of rules so this goes as well as it possibly

6   can.  All right?

7              A    (Nodding in the affirmative.)

8              Q    So the important thing to remember

9   -- and really what most of these rules have to deal

10  with -- is that you're being transcribed.  So

11  that's what Susan there is doing.  She's taking a

12  written record of everything you and I say today.

13  Because of that, we want to make sure that all of

14  your responses are verbal in nature.  So you say

15  like "yes" or "no" rather than "uh-huhs" or

16  "nah-uhs."  And, obviously, shaking your head isn't

17  very good for a verbal record.  Is that clear?

18             A    Yes.

19             Q    You already passed the first test.

20  You said yes.  So a couple other things, too.

21             Because she is typing and doing shorthand

22  in real time, we have to try our best to not

23  interrupt one another.  So if I'm asking a

24  question, please let me finish before you respond.

25  Okay?

6

1          A     Yes.

2          Q     And I'm going to do my best that

3    when you're answering that I won't interrupt you as

4    well.  Number one, it's rude.  And, number two, it

5    will mess up the record.  Okay?

6          A     Yeah.

7          Q     So we probably will interrupt each

8    other a couple times.  It just happens.  But we're

9    going to try to avoid it the best we can.

10          The other thing, if you need a break or

11    anything like that today, please let me know.

12    You're allowed to take a break at any time you need

13    to take a break.  The only thing I ask is if

14    there's a question on the floor that you answer

15    that and then ask to take a break.  Is that okay?

16          A     Yes.

17          Q     And then, you know, finally I'm

18    going to ask a question.  This one's weird.  We

19    just always ask it in every deposition.

20          Do you have any medical condition -- and

21    you don't have to tell me what it is -- but do you

22    have any medical condition or are you on any

23    medication that would interfere with your ability

24    to accurately recall history today?

25          A     No.

7

1          Q    Okay.  Well, we'll just kind of get
2    going to the nitty-gritty here then.
3          So can you please state your full name
4    for the record?
5          A    Yes, Harold A. Wix.
6          Q    And it says S-G-T there on the
7    screen, so you are a Sergeant currently; is that
8    correct?
9          A    Correct.
10          Q    Well, I'll refer to you as Sergeant
11    Wix today if I need to get your attention.  If you
12    need to get my attention for any reason, please
13    feel free to call me Matt.  Okay?
14          A    Yes, sir.
15          Q    I don't have a rank, so we'll just
16    go for Matt.
17          So how long have you been in law
18    enforcement?
19          A    Approximately 26 years.
20          Q    Where did you start?
21          A    Started at -- was part-time in
22    Warren Township.
23          Q    Warren Township is that different
24    than Warren City?
25          A    Yes.  I also was in Warren City as

8

1   well.

2             Q     Where is Warren Township?

3             A     It is west of Warren City.

4             Q     Okay.  And so you started there you

5   said 26 years ago.  That would have been 1997;

6   correct?

7             A     Yeah.  I started in '96, late '96.

8             Q     And then when did you transfer to

9   Warren City?

10            A     It was in '97.

11            Q     How long were you there?

12            A     Approximately a year.

13            Q     And what were your duties at Warren

14  City?

15            A     I worked in the corrections.  They

16  had a jail.

17            Q     Okay.  So you were like a city jail

18  --

19            A     Yeah.

20            Q     -- personnel?

21            A     Yes.

22            Q     When did you leave Warren City?

23            A     It was within that year.

24            Q     And where did you go?

25            A     Trumbull County Sheriff's Office.

9

```
 1              Q    So most of your career has been in
 2    Trumbull County Sheriff's Office?
 3              A    Correct.
 4              Q    And what was your first set of
 5    duties at Trumbull County?
 6              A    I was in the Jail Division.
 7              Q    You were in the jail.  How long were
 8    you in the Jail Division?
 9              A    Approximately ten years.
10              Q    So 2008?  Does that sound correct?
11              A    Correct.
12              Q    What did you do in the Jail
13    Division?
14              A    Correctional duties.
15              Q    And you're married; correct?
16              A    Correct.
17              Q    What's the name of your wife?
18              A    Tracy.
19              Q    Tracy Wix?
20              A    Yes, sir.
21              Q    Is that Tracy with an I or a Y?
22              A    Y.
23              Q    Is she a deputy as well?
24              A    She is not.
25              Q    Has she ever been a deputy?
```

10

1           A     No, sir.

2           Q     So after ten years working in the

3     Jail Division, where did you go?

4           A     Road Division.

5           Q     Are you still in Road Division?

6           A     I am.

7           Q     What are your duties in Road

8     Division?

9           A     Supervisor for Day Turn for Road

10    Operations.

11          Q     So are you on the street patrolling

12    often?

13          A     Correct.

14          Q     What kind of training have you gone

15    through?  Before you were a deputy, for instance,

16    what was your initial training?

17          A     The police academy.

18          Q     And how much did you learn about law

19    in the Police Academy?

20          A     Standard.  Standard to be

21    proficient.

22          Q     Okay.  What do you mean by

23    "standard"?  Can you explain a little bit?

24          A     The hours.  That there was a certain

25    amount of hours you had to have training in order

11

1   to become state certified.

2           Q    Did you spend time learning about

3   criminal codes?

4           A    Yes.

5           Q    Generally what codes were you

6   learning about?

7           A    The 29 sections and also 45

8   sections.

9           Q    Did you receive any training about

10  public meetings oversight or public meetings

11  criminal codes?

12          A    No.

13          Q    Did you receive any training about

14  constitutional issues while you were in the

15  academy?

16          A    Yes.

17          Q    What constitutional issues did you

18  learn about?

19          A    I do believe we touched base on

20  pretty much everything that deals with the

21  constitution.

22          Q    Does that include the Fourth

23  Amendment?

24          A    Correct.

25          Q    What about the First Amendment?

12

1          A     Yes.

2          Q     What type of things did you learn

3    about the First Amendment?

4          A     That would be freedom of speech.

5          Q     Did you learn anything about

6    viewpoint discrimination?

7          A     I don't recall.

8          Q     Well, this is going to be a tough

9    question.  How many arrests have you had in your

10   career?  Do you know?

11         A     I could not tell you.  I apologize.

12   More than ten.

13         Q     More than ten?

14         A     More than ten.

15         Q     Probably more than a hundred;

16   correct?

17         A     There's a good possibility.

18         Q     So as a deputy do you kind of have

19   like -- I know that, obviously, you were trained in

20   the academy, but throughout your career do you have

21   updated trainings?

22         A     Yes.

23         Q     Okay.  So attorneys have things

24   called CLEs, like continuing legal education.  So

25   do you go through things like that?

13

1           A     Yes, sir.

2           Q     And what kind of updated trainings

3    do you have throughout your career?

4           A     They're called continuous

5    professional training, CPTs.

6           Q     Do any of those trainings update you

7    let's just say on like new constitutional

8    developments?

9           A     Yes.

10          Q     Any of those trainings you received

11   since graduating the Academy dealt with the First

12   Amendment?

13          A     I'm sure they did.

14          Q     Do you recall any of them

15   specifically?

16          A     Not specifically, no.

17          Q     Have you received any trainings

18   whatsoever on criminal codes relating to public

19   meetings?

20          A     I don't believe so.

21          Q     So a large -- a large reason we're

22   all here today involves a meeting on July 7th,

23   2022; correct?

24          A     Correct.

25          Q     Prior to that meeting, had you ever

14

1  been trained on any laws relating to disrupting a

2  public meeting?

3          A    No.

4          Q    Had you ever worked as a security

5  detail in a Commissioners meeting prior to that

6  day?

7          A    No.

8          Q    During your time as a -- let me go

9  backwards.

10          So when you were being trained in the

11  academy, did you receive any public records

12  training?

13          A    No.

14          Q    During your time has a deputy have

15  you received any public records training?

16          A    I don't believe so.

17          Q    Are you familiar with the County's

18  records retention schedule?

19          A    I don't believe so.

20          Q    So you've never received a copy of

21  the Sheriff's Department's records retention

22  schedule?

23          A    I'm not familiar what a records

24  retention schedule is.  Can you kind of elaborate?

25  Is it like for report writing or --

15

1          Q    Well, okay.  As long as your counsel

2    doesn't mind me giving a statement and not a

3    question, I don't mind answering that question.

4          So records retention schedule is a

5    schedule that's created by each department

6    typically in a public body that determines when

7    public records can or cannot be destroyed.

8          A    Understand.  And that would be no.

9          Q    So you've never seen that?

10         A    No.

11         Q    Okay.  I want to talk a little bit

12   about cellphones and your use of cellphones as a

13   deputy.  Okay?

14         A    Yes.

15         Q    All right.  So what model of

16   cellphone did you have during July of 2022?

17         A    I had an Apple iPhone 14 -- 12.

18   Excuse me.  12.

19         Q    Do you still have that phone?

20         A    I do not.

21         Q    What happened to it?

22         A    I was having some computer issues

23   with the phone.  It wasn't working properly.

24         Q    When was that?

25         A    Three, four months ago

16

1    approximately.

2              Q     Where is the phone now?

3              A     AT&T has it.

4              Q     You mean you turned it in to AT&T

5    and traded it in?

6              A     Correct.

7              Q     Does the County pay for your

8    cellphone?

9              A     No.

10             Q     So you're required to pay for that

11   out of your own pocket?

12             A     Correct.

13             Q     And the County doesn't supply you a

14   cellphone at all?

15             A     No.

16             Q     But you would agree that sometimes

17   you use your cellphone for County business;

18   correct?

19             A     Correct.

20             Q     You guys have a union?

21             A     Yes.

22             Q     Your union didn't negotiate to get

23   your cellphone paid for?

24             A     No.  They've never tried to do that.

25             Q     That's wrong.

17

```
 1           All right.  So you're using your
 2  cellphone sometimes for County business.  Is it
 3  safe to say that sometimes you call other deputies
 4  on your phone?
 5           A    Yes, sir.
 6           Q    And sometimes when you call other
 7  deputies on the phone you're kind of discussing
 8  what's going on at any given moment?
 9           A    Correct.
10           Q    Do you sometimes use text messages
11  for County business?
12           A    Yes.
13           Q    So sometimes when you're text
14  messaging other deputies you're maybe discussing a
15  case or something like that; correct?
16           A    Correct.
17           Q    I'm going to ask you a question.  Do
18  you guys ever gossip?
19           A    Sure.
20           Q    So sometimes when something goes on
21  at the office you text one another and kind of talk
22  about it?
23           A    Yes.
24           Q    So you are human.
25           A    Yes, sir.
```

18

1          Q    Okay.  Yeah, I think we all do that
2     a little bit.
3          So has no one ever told you that it's
4     possible that your text messages that you send on
5     your phone are public records?
6          A    No, no, no.
7          Q    So in no training whatsoever has
8     anybody ever suggested that any of your text
9     messages about a case or between other deputies are
10     public records?
11          A    Correct.
12          Q    When you have trainings are they --
13     are they put on by the County themselves or do you
14     get outside trainers?
15          A    Both.
16          Q    Both.  Okay.  So when the internal
17     trainings are done, who conducts those typically?
18          A    It depends on the training topic.
19          Q    Okay.  So if there's a particular
20     topic and there's a particular deputy that's well
21     versed in that topic, he or she might provide that
22     training?
23          A    That's correct.
24          Q    Okay.  So just to be clear, at no
25     time -- there has never been an internal training

19

1   about records retentions or public records that you
2   received?
3           A    Correct.
4           Q    So sitting here today, do you have
5   any knowledge about how long you're supposed to
6   retain text messages between yourself and other
7   deputies?
8           A    No, sir.
9           Q    When you turned your phone in to
10  AT&T, I'm guessing that you did that as like an
11  exchange to upgrade your phone; is that correct?
12          A    That's correct.
13          Q    When you did that, did you back up
14  any of the text messages between yourself and other
15  deputies?
16          A    I did not, but the AT&T store did.
17          Q    The AT&T store did?
18          A    Yes.
19          Q    And where are those messages that
20  have been backed up?
21          A    On my current phone right now.  My
22  iPhone 14.
23          Q    So the messages have been
24  transferred from that phone to your new phone?
25          A    Correct.

20

1          Q     Have you ever deleted text messages
2     on your phone within the last five years?
3          A     Not that I'm aware of.  I don't
4     delete much.
5          Q     Did you set your phone to "delete
6     text messages"?
7          A     I did not.
8          Q     Does that mean you still have --
9     does that mean you still have text messages from
10    five years ago?
11         A     No.  I don't think they stay on the
12    phone that long.
13         Q     Would you agree that if you wanted
14    to back up text messages on your phone, take screen
15    shots of them or other methods, that you would be
16    able to do that?
17         A     I think so.
18         Q     So is it your testimony today that
19    on the iPhone 12 that the default setting isn't to
20    save your text messages forever?
21         A     I don't know.  I don't know how to
22    change any settings on a cellphone.  I do not know.
23    I don't know how to do that --
24         Q     Okay.
25         A     -- to change settings for text

21

1    messages to default, whatever.

2             Q     So your testimony today is that

3    you've never changed any setting on your phone to

4    delete text messages after 30 days?

5             A     That's correct.

6             Q     If I were to tell you and to

7    represent that my understanding is on the iPhone 12

8    that the default setting for logging -- or

9    maintaining text messages is forever, and that you

10   have to go in and change it to either 30 days or

11   one year for them automatically to delete, would

12   you disagree with that statement?

13            A     No.

14            Q     Do you send emails in your

15   professional capacity?

16            A     I do.

17            Q     Do you ever delete those emails?

18            A     I do not.

19            Q     Do you have any knowledge of what a

20   Records Retention Commission is?

21            A     No.

22            Q     Have you ever submitted any records

23   to the Commission for deletion?

24            A     No.

25            Q     I want to move on here a little bit.

22

1          So you attended the Commissioners meeting
2    of July 7th, 2022; correct?
3          A     Correct.
4          Q     Earlier you testified that you have
5    never worked any Commissioners meeting prior to
6    July 7th, 2022?
7          A     That's correct.
8          Q     Had you ever worked at like a Warren
9    City Council meeting when you were in Warren?
10          A     No.  Not Warren City, no.
11          Q     So you've never provided security
12    detail at any public body meeting prior to July
13    7th, 2022?
14          A     Incorrect.  I have.
15          Q     Okay.  What meeting?
16          A     Township meetings.
17          Q     So you attended township meetings at
18    Warren Township?
19          A     No.  They were -- not Warren
20    Township, no.  It was Southington Township.
21          Q     When was that?
22          A     Fifteen-plus years ago.
23          Q     Were you paid to do that?
24          A     Yes.
25          Q     But you didn't work for that

23

1    township?

2             A    No.

3             Q    Did they contract with the Sheriff's

4    Department to provide security?

5             A    No.

6             Q    Then why were you doing that?

7             A    It was in my job capacity in

8    reference to an environmental -- I had

9    environmental work to do, and I worked with

10   multiple townships to attend their meetings.  I was

11   paid overtime for my duties.

12            Q    But you had never attended a

13   Trumbull County Commissioners meeting in the past?

14            A    I have.  Not to work it, but I have.

15            Q    When was the last time before July

16   7th, 2022, that you attended a meeting?

17            A    I'm going to say it was December of

18   -- December of '21.

19            Q    Was Commissioner Frenchko in office

20   at that time?

21            A    I do believe so, yes.

22            Q    How were you instructed to attend

23   the July 7th, 2022, Commissioner meeting?

24            A    How was I instructed?

25            Q    Yes.

24

```
1              A    I was told by the Lieutenant that I
2      had to attend the meeting.
3              Q    Lieutenant who?
4              A    Lt. Kaintz.
5              Q    Can you spell that, please??
6              A    Yes, sir.  It's K-A-I-N-T-Z.
7              Q    And what reason did he provide you
8      for attending the meeting?
9              A    I do believe he was unable to attend
10     the meeting.
11             Q    Did he say why he was unable?
12             A    He did not.
13             Q    Did he give you any instructions
14     about the meeting?
15             A    He did not.  Just to attend it for
16     security with another deputy.
17             Q    Who was the other deputy?
18             A    Sergeant Ross.
19             Q    Did Sheriff Monroe call you that
20     day?
21             A    He did not.
22             Q    Did you call Sheriff Monroe that
23     day?
24             A    I did not.
25             Q    So it's your testimony today that
```

**Miami Valley Reporting, LLC  (937) 440-1400**

25

1  neither you nor Sheriff Monroe called each other

2  that morning?

3            A     That's correct.

4            Q     Do you know Sheriff Monroe's phone

5  number?

6            A     I have it in my phone.

7            Q     Can you tell me what it is?

8            A     I have to look it up.  Would you

9  like me to look it up?

10           Q     Do you know if his cellphone ends in

11 9037?

12           A     I don't recall.

13           Q     Why don't you go ahead and look it

14 up.

15           A     Yes, sir.  That is correct, 9037.

16           Q     So when Mr. Kaintz told you to

17 attend the meeting, he gave you no instructions at

18 all?

19           A     Yes, he did.

20           Q     What were his instructions?

21           A     I had to be there by 10:30.

22           Q     Anything else?

23           A     Not that I recall.

24           Q     Did he tell you anything about a

25 letter that the Sheriff had written?

26

1           A     No.

2           Q     Were you aware that Sheriff Monroe

3    wrote a letter to be read at that meeting?

4           A     No.

5           Q     Are you aware that prior to that

6    meeting Miss Frenchko had read a letter that had

7    complained about certain conditions in the County

8    jail?

9           A     Okay.  No, I didn't know.

10          Q     You didn't know prior to that

11   meeting that Commissioner Frenchko had made

12   statements that were critical of the jail and the

13   jail doctor?

14          A     Correct.

15          Q     You did know that or you didn't

16   know?

17          A     Oh, no, I did not know that.  That's

18   correct.  I did not know prior to the meeting that

19   he was reading a letter -- she was reading a

20   letter.

21          Q     Have you ever talked to Dr. Malvasi

22   in the past?

23          A     Yes.

24          Q     What's your relationship to Dr.

25   Malvasi?

27

```
 1          A    Professional.

 2          Q    Have you ever talked to Dr. Malvasi

 3   about Commissioner Frenchko in the past?

 4          A    No.

 5          Q    Have you ever talked to Sheriff

 6   Monroe about Commissioner Frenchko in the past?

 7          A    Not that I recall, no.

 8               What happened?  Did we lose something?

 9   Am I here?

10          Q    You're here.

11          A    There was something that came up on

12   the screen.  Sorry.

13          Q    No, I saw it, too.  I'm sure it was

14   Andrew's fault.

15          A    I have no idea.  I think you can

16   still hear me, but there's some kind of icon on the

17   screen.

18               MS. SUDHOFF:  If I may interrupt, it

19   appears a phone call has been added to our Zoom,

20   and they're not on mute, and I'm not sure who it

21   is.

22               MR. DAVIS:  Hey, Matt, that's me.

23               MR. MILLER-NOVAK:  Can you mute your

24   phone, Steve?

25               MR. DAVIS:  I think so.  Hold on.
```

28

1          MR. MILLER-NOVAK:  It's my partner, Steve
2  Davis.  He's using the phone thing to call in.
3          MR. DAVIS:  Hold on just a moment.
4          MR. MILLER-NOVAK:  Sorry.  We'll go off
5  the record.  I don't want this on the record, if
6  that's okay, Susan.
7          (Whereupon, a discussion was held off the
8  record.)
9  BY MR. MILLER-NOVAK (Continuing):
10          Q    Did you do anything to prepare for
11  the July 7th, 2022, meeting?
12          A    I did not.
13          Q    When did you first learn about the
14  disturbing a public meeting statute?
15          A    I don't know.  I just know you got
16  to behave in a meeting.
17          Q    Did you have any training on that
18  statute prior to July 7th, 2022?
19          A    I did not.
20          Q    Were you aware of the contents of
21  that statute before July 7th, 2022?
22          A    No.
23          Q    Did you know the code number of that
24  statute before July 7th, 2022?
25          A    I did not.

29

1              Q    When you arrested Commissioner
2    Frenchko, you arrested her according to that
3    statute; correct?
4              A    Correct.
5              Q    But you didn't know its contents
6    when you arrested her?
7              A    A little bit.
8              Q    What did you know?
9              A    That you can't be disruptive in a
10   meeting.
11             Q    That's all you knew?
12             A    (Nodding in the affirmative.)
13             Q    Did you know the mens rea of that
14   statute?
15             A    I did not.
16             Q    Did you know what conduct in that
17   statute constitutes disruption?
18             A    Yes.
19             Q    What conduct?
20             A    Stopping the meeting.
21             Q    Stopping the meeting?
22             A    Yeah, yeah, stopping the meeting.
23             Q    What else?
24             A    To put it in layman's terms, you
25   know, just -- I'm kind of at a loss for words right

30

1   now in reference to -- the conduct -- the person's

2   conduct in the meeting.

3            Q    Well, what about their conduct in a

4   meeting makes it disturbing?

5            A    Stopping the meeting from

6   progression.

7            Q    Okay.  What about offensive

8   behavior?

9            A    Obviously, offensive behavior.

10            Q    How many people have you arrested

11   under that statute in the past?

12            A    I don't believe any.

13            Q    So Commissioner Frenchko is the

14   first person you've ever arrested under that

15   statute?

16            A    I do believe so.

17            Q    Prior to that meeting, did you have

18   any discussions with Commissioner Fuda?

19            A    I have not.

20            Q    Did you know Commissioner Fuda

21   before that meeting?

22            A    Yes.

23            Q    How did you know him?

24            A    Professionally.

25            Q    How often did you talk to him?

31

1           A      Probably once a year.

2           Q      Have you ever talked to him about

3     Commissioner Frenchko?

4           A      I did not.

5           Q      Have you ever talked to the Clerk

6     Paula Klotz about Commissioner Frenchko?

7           A      No.

8           Q      Have you ever talked to Commissioner

9     Mauro Cantalamessa about Commissioner Frenchko

10    before that meeting?

11          A      No.

12          Q      What are Robert's Rules of Order?

13          A      I don't -- I don't know what

14    Robert's Rules are.

15          Q      Okay.  What were the rules of

16    decorum that the Commissioners used as of July 7th,

17    2022?

18          A      That I do not know.

19          Q      So if you don't know the rules of

20    decorum, how would you know whether or not someone

21    has a right to speak at a certain point in time?

22          A      I do know that Commissioner Fuda is

23    the presiding commissioner.  He's the one that

24    keeps order of the meetings.

25          Q      What are the responsibilities of the

32

1    presiding official?

2              A     Other than keeping order, I do not

3    know.

4              Q     Okay.  So you weren't familiar with

5    what powers he had as of July 7th, 2022?

6              A     Correct.

7              Q     How did you know that he had any

8    powers?

9              A     He's the one that hits the gavel,

10   starts the meeting.

11             Q     Okay.  That's it?  That's all you

12   knew?

13             A     For right now, yes.

14             Q     So when you got your training on

15   constitutional law, would you agree with the

16   following statement:  It's important that you apply

17   the laws equally to people?

18             A     Correct.

19             Q     And that it's not appropriate to

20   apply the law differently to different suspects

21   based upon their viewpoints?

22             A     Correct.

23             Q     Would you agree that if there was a

24   rule of decorum that it needed to be applied to

25   individuals the same regardless of their

33

1  viewpoints?

2          A    Could you reiterate again?

3          Q    Sure.  If there was a rule of

4  decorum, would you agree that those rules needed to

5  be applied to everybody equally regardless of

6  viewpoint?

7          A    Yes.

8          MR. YOSOWITZ:  Objection.

9          MR. MILLER-NOVAK:  So based upon that,

10  would you agree that Commissioner Frenchko should

11  not have been punished for violations of the rules

12  that other Commissioners had violated in the past?

13          MR. YOSOWITZ:  Objection.  You can

14  answer.

15          THE WITNESS:  Reiterate again.  I'm

16  sorry.

17  BY MR. MILLER-NOVAK (Continuing):

18          Q    That's fine.  Would you agree that

19  based upon that, that Commissioner Frenchko should

20  not be punished for violating rules that other

21  Commissioners violated in the past?

22          A    I'm having a hard time understanding

23  the question.  I'm having a little bit of a hard

24  time understanding the question.  Can you rephrase

25  the question?

34

1          Q    I can try.  And, by the way, I'm
2     glad that you did that 'cause if you ever don't
3     understand a question, let me know.  I'm not
4     perfect.  I'm not going to always ask perfect
5     questions.
6               So a little bit ago you testified that
7     you believed that rules shouldn't be applied
8     differently to people based upon their viewpoints;
9     correct?
10          A    Correct.
11          Q    Well, wouldn't you also agree that
12    if let's say Mauro Cantalamessa violated one rule,
13    and he was not punished, that Commissioner Frenchko
14    shouldn't be punished for violating that same rule;
15    correct?
16          A    No.
17               MS. SUDHOFF:  Objection, form and
18    speculation.
19    MR. MILLER-NOVAK (Continuing):
20          Q    Okay.  Well, why no?
21          A    I would hold Cantalamessa -- in
22    reference to your example, I would hold
23    Cantalamessa the same as Commissioner Frenchko.
24          Q    Oh, okay.  So then you agree that if
25    Commissioner Frenchko is going to be punished for

35

1   violating the rules, so should Mauro Cantalamessa;

2   correct?

3           A    Yes.

4           Q    So why did you arrest Commissioner

5   Frenchko during the July 7th, 2022, meeting?

6           A    Her conduct stopped the meeting.

7           Q    How did it stop the meeting?

8           A    She stopped the meeting from going

9   forward.

10          Q    Well, she was talking when you

11  arrested her; correct?

12          A    I believe so.

13          Q    Isn't part of a Commissioners

14  meeting that Commissioners speak?

15          A    Yes.

16          Q    So she's one of the three

17  Commissioners; correct?

18          A    Yes.

19          Q    And she's speaking when you arrested

20  her?

21          A    I do believe she was at the time.

22          Q    Okay.  So correct me if I'm wrong.

23  The entire point of a Commissioners meeting is for

24  the Commissioners to speak about county business;

25  correct?

36

1              A    Correct.

2              Q    And sometimes those Commissioners

3    have disagreements; correct?

4              A    Correct.

5              Q    And sometimes those Commissioners

6    argue about things; correct?

7              A    Yes.

8              Q    And sometimes those Commissioners

9    interrupt each other; correct?

10             A    Correct.

11             Q    It would be safe to say -- have you

12   ever watched meetings of the Commissioners in the

13   past?

14             A    Not in its entirety, no.

15             Q    Okay.  So are you aware that all the

16   Commissioners interrupt each other all the time?

17             MR. YOSOWITZ:  Objection.

18             THE WITNESS:  No.

19   BY MR. MILLER-NOVAK (Continuing):

20             Q    You're not aware of that?

21             A    No.

22             Q    So you're not aware that there's

23   times where Mauro Cantalamessa talks over people?

24             MR. YOSOWITZ:  Objection.  Go ahead.

25             THE WITNESS:  No.

37

1   BY MR. MILLER-NOVAK (Continuing):

2           Q    You're not aware that there's times

3   that Mauro Cantalamessa interrupts people while

4   they're speaking?

5           A    No, I'm not aware.

6           Q    Are you aware that in previous

7   meetings Frank Fuda has interrupted speakers in the

8   public?

9           A    No.

10          Q    Before you arrested Commissioner

11  Frenchko, did Commissioner Fuda call out your name?

12          A    No.

13          Q    So at no time did Commissioner Fuda

14  say the name Wix?

15          A    No.

16          Q    Before you arrested Commissioner

17  Frenchko, did either of the Commissioners say she

18  was being disruptive?

19          A    After watching the video, yes.

20          Q    What do you mean by "after watching

21  the video"?

22          A    I watched the video of the incident.

23          Q    Okay.  So you didn't hear them call

24  her disruptive the day of the meeting?

25          A    Not that I recall, no.

38

1          Q    How did you know that Commissioner
2     Frenchko's behavior, if at all, was abnormal from
3     prior meetings?
4          A    I don't.
5          Q    At the moment you arrested
6     Commissioner Frenchko she was being critical of the
7     Sheriff's Department, was she not?
8          A    At the time I didn't know that.
9          Q    So you didn't even know what she was
10    saying at the time?
11         A    No.  I was way in the back.  I was
12    having a hard time hearing.
13         Q    Did you send any text messages
14    during the meeting?
15         A    I don't recall.
16         Q    Before you arrested Commissioner
17    Frenchko, did you call anybody?
18         A    There's a possibility I did, but I
19    don't -- I don't remember.
20         Q    Do you remember what time it was
21    when you arrested Commissioner Frenchko?
22         A    Right off the top of my head, I do
23    not.
24         Q    When you arrested her you had her
25    stand up; correct?

39

```
 1              A     Correct.
 2              Q     And you escorted her out of the
 3    room; correct?
 4              A     Correct.
 5              Q     And you decided to cuff her;
 6    correct?
 7              A     Yes.
 8              Q     You didn't have to do that; correct?
 9              A     No, I did.
10              Q     You could have issued her a summons,
11    couldn't you?
12              A     I probably could have.
13              Q     So you did not need to cuff her;
14    correct?
15              A     No, I did 'cause she was arrested.
16              Q     So you're saying every time you've
17    ever arrested somebody you put them in cuffs?
18              A     That's correct.
19              Q     Every time you arrest somebody, do
20    you take them into custody?
21              A     Correct.
22              Q     So you've never issued anybody a
23    summons?
24              A     I have.
25              Q     And when you issue them a summons,
```

40

1    do you take them in custody?
2            A    I did not.
3            Q    So I'm confused.  So you haven't
4    necessarily taken someone into custody every single
5    time you've arrested them; correct?
6            A    Correct.  Summons in lieu of arrest.
7            Q    Okay.  Are you aware that disturbing
8    a public meeting is a Misdemeanor 4?
9            A    Yes.
10            Q    Would you consider that not a very
11   serious crime?
12            A    It's a crime.
13            Q    It's a crime, but it's a low level
14   crime; correct?
15            A    Correct.
16            Q    It's not a violent crime, is it?
17            A    It's not considered a violent crime,
18   no.
19            Q    Was Commissioner Frenchko doing
20   anything violent at the time of her arrest?
21            A    No.
22            Q    Did you have any reason that she was
23   going to commit any violence at the time of her
24   arrest?
25            A    No.

1        Q    Did you have any suspicion whether
2   or not she was armed at the time of her arrest?
3        A    No.
4        Q    Is it possible that you could have
5   issued her a summons at the time of her arrest in
6   lieu of taking her into custody?
7        A    Yes.
8        Q    Did you call anybody before taking
9   her into custody?
10       A    I did not.
11       Q    Do you remember that the time of her
12  arrest was approximately 11:20 a.m.?
13       A    Are you telling me?  Yeah, I think
14  so.
15       Q    Okay.  How long did it take her from
16  the time that you escorted her out of the room to
17  take her to the station?
18       A    I can't be exact, but probably
19  within five minutes.
20       Q    Did you call anybody about her
21  arrest when you were at the station?
22       A    I did not.
23       Q    Did you call Sheriff Monroe after
24  you arrested Commissioner Frenchko?
25       A    No.

42

1          Q     Did Sheriff Monroe call you after
2     you arrested Commissioner Frenchko?
3          A     He did not.
4          Q     So it's your testimony today under
5     oath that you did not dial the number
6     1-330-609-9037 after arresting Commissioner
7     Frenchko?
8          A     No.
9          Q     Did you call Sheriff Monroe at all
10    on July 7th, 2023 -- I'm sorry -- July 7th, 2022?
11         A     I don't believe so.  I don't recall.
12         Q     Did Sheriff Monroe call you at any
13    time on July 7th, 2022?
14         A     I don't believe so.
15         Q     So your testimony today under oath,
16    at no time during July 7th, 2022, did you call
17    Sheriff Monroe?
18         A     That's correct.
19         Q     And your testimony is also that at
20    no time on July 7th, 2022, that Sheriff Monroe
21    called you?
22         A     Correct.
23         Q     So I'm going to ask a couple
24    questions about process of arrest, and I want you
25    to talk to me like I know nothing.

43

1              So after you arrest somebody and you
2    handcuff them and you take them into custody,
3    what's the next step in the process before charging
4    them?
5              A    I transport them to the jail.
6              Q    What happens after you get 'em to
7    the jail?
8              A    I give 'em to the corrections
9    officers.
10             Q    Then what?
11             A    I go do my report.
12             Q    Okay.  And what happens after your
13   report?
14             A    Depending on the charge, I either
15   talk to the prosecutor or I issue them a summons.
16             Q    Did you talk to the prosecutor in
17   this case?
18             A    I did not.
19             Q    So you did not reach out to the
20   prosecutor at any point?
21             A    No.
22             Q    Do you know if Sheriff Monroe
23   reached out to the prosecutor at any point?
24             A    I do not know.
25             Q    Did you provide a summons at any

44

1    point to Commissioner Fuda?

2          A    Yes.

3          Q    When did you provide the summons?

4          A    After I went back to the office and

5    myself and Sergeant Ross did the report and

6    completed the necessary paperwork for Miss

7    Frenchko.

8          Q    Okay.  So your testimony today is

9    after arresting the Commissioner during her own

10   meeting before issuing a summons you never called

11   the prosecutor?

12         A    Correct.

13         Q    And you never called the Sheriff?

14         A    Correct.

15         Q    And the Sheriff never called you?

16         A    I do believe that's correct, yes.

17         Q    Did you contact or discuss the

18   matter with any of your superior officers?

19         A    No.

20         Q    Did Sergeant Ross discuss the matter

21   with any superior officers?

22         A    I'm not aware.  I'm not aware of it.

23         Q    Did Sergeant Ross discuss the matter

24   with Sheriff Monroe?

25         A    I have no idea.

45

1          Q     Did Detective Mackey participate in

2     the investigation and prosecution of Commissioner

3     Frenchko?

4          A     Yes.

5          Q     Did Detective Mackey have any role

6     in filing the charges?

7          A     No.

8          Q     What was Detective Mackey's role?

9          A     I don't know.

10         Q     Before issuing the summons, did you

11    review any of the prior meetings?

12         A     No.

13         Q     Did you investigate what rules of

14    procedure that the Commissioners utilized before

15    issuing the summons?

16         A     No.

17         Q     So it's your testimony today that

18    you issued your summons solely on what occurred on

19    July 7th, 2022?

20         A     Correct.

21         MR. MILLER-NOVAK:  I would like to take a

22    five-minute break myself.  Is that okay Sergeant

23    Ross -- or Sergeant Wix?  Sorry.

24         THE WITNESS:  No problem.  Yes, sir.

25         MR. MILLER-NOVAK:  So everybody you want

46

1  to take a five-minute break?

2          (Whereupon, a recess was taken.)

3          Q     Sergeant Wix, a little bit ago I

4  asked you whether or not you heard either

5  Commissioner say something about Commissioner

6  Frenchko being disruptive.  Do you remember that?

7          A     I do, yes.

8          Q     So your testimony is today that you

9  didn't hear them say that she was being disruptive?

10         A     Let me reiterate, if you don't mind,

11  'cause I don't recall a hundred percent.  Let me go

12  back to my meeting.

13         Q     Well, what are you looking at right

14  now?

15         A     I'm looking at my written report.

16         Q     Well, why don't we go through that

17  together.  Is that okay?

18         A     Yeah, okay.

19         Q     Yeah, I sent it as an exhibit.  So

20  why don't we do that together.  We can put it on

21  the shared screen I think maybe.

22         A     That I have no idea how to do that.

23         MR. YOSOWITZ:  He has to do it.

24         THE WITNESS:  Oh, okay.

25         MR. MILLER-NOVAK:  Yeah, I'm going to

47

1    try.

2              MR. YOSOWITZ:  We have it.

3              MR. MILLER-NOVAK:  Well, I'm going to

4    mark it as an exhibit I think.  I'm going to try to

5    do shared screen and put it up there and wow

6    everybody with my technological skills.  Maybe.  Or

7    disappoint everybody by failing.  One thing or the

8    other is going to happen here in a second.  Can you

9    see the report?

10             MR. YOSOWITZ:  No.

11             MR. MILLER-NOVAK:  No?

12             MR. YOSOWITZ:  It just says you started

13   screen share.

14             MR. MILLER-NOVAK:  There's a thing it

15   says "Open.  This site is trying to open Zoom

16   meetings."

17             MR. YOSOWITZ:  Okay.  There it is.

18             MR. MILLER-NOVAK:  You got it?

19             MR. YOSOWITZ:  Yeah.

20             MR. MILLER-NOVAK:  Do you still see it?

21             MR. YOSOWITZ:  Yes.

22             MR. MILLER-NOVAK:  Okay.  Is it moving

23   down and all that?

24             MR. YOSOWITZ:  Yes.

25   BY MR. MILLER-NOVAK (Continuing):

48

1          Q    Okay.  Great.  That's the most
2    successful thing I've ever done.
3               So if we're looking at this right now,
4    there's a first page that says CFS Summary; is that
5    correct?
6          A    I believe it's correct, yes.
7          Q    Okay.
8               MR. MILLER-NOVAK:  Susan, I'd like to tag
9    this as Exhibit 1.
10                         (WHEREUPON, Deposition
11                         Exhibit Number 1 was
12                         marked for purposes of
13                         identification.)
14         Q    And my pdf has 11 pages here.  Is
15   that what you have, Sergeant?
16         A    I have to count them.
17         Q    I just want to make sure we're
18   looking at the same exact thing.  That's all.
19         A    I have ten.  I think it might be
20   that CFS Summary is what I don't have.
21         Q    So you don't have this first page
22   that says CFS 22-07729 at the top left-hand corner,
23   CFS number?
24         A    That's correct.
25         Q    So you're starting on CFS People

49

1   Supplement?

2            A     Correct, yes.

3            MR. MILLER-NOVAK:  Okay.  Andrew, I think

4   I emailed the document to you this morning.  Did

5   you get it?

6            MR. YOSOWITZ:  Okay.  He's looking at CFS

7   Summary.

8            MR. MILLER-NOVAK:  Yeah, I just want to

9   make sure that -- 'cause when I admit the exhibit I

10  want to admit all eleven pages so it's a complete

11  document.  So he has it now?

12  BY MR. MILLER-NOVAK (Continuing):

13           Q     You got it now, Sergeant Wix?

14           A     Yes.

15           Q     So if you take a look at this, is

16  this your police report from that day?

17           A     Yes.

18           Q     So it has the name -- under Caller

19  it has Name.  It says Frenchko, Michele Nicole.  Do

20  you see that?

21           A     That's correct.

22           Q     And the Location says Trumbull

23  County Administration.  Do you see that?

24           A     I see that.

25           Q     Let's go to the second page.  Okay.

50

1    This page seems to record a little bit more

2    information.  That's Commissioner Frenchko's home

3    address, which I'm not going to read into the

4    record; correct?

5              A    Correct.

6              Q    So the third page seems to get to

7    some more substantive information.  So

8    Administrative it says Trumbull County Sheriff's

9    Office.  Do you see that?

10             A    Yes.

11             Q    And the date is July 7th, 2022;

12   correct?

13             A    Yes.

14             Q    And the Report Date and Time says

15   11:22.  Do you see that?

16             A    Yes.

17             Q    And then to the right it says

18   Incident Occurred, and it says 11:24.  Do you see

19   that?

20             A    Yes.

21             Q    Okay.  So I'm a little bit confused.

22   So where it says Report Date and Time, is that the

23   time that you're recording that you've taken the

24   report?

25             A    Which one are you referring to?  I'm

51

1   sorry.

2           Q    Well, so it says Ohio Uniform

3   Incident Report, and there's three like boxes.  On

4   the left it says Report Date and Time.  In the

5   middle it says Incident Occurred From.  And then on

6   the right it says Incident Occurred To.  Do you see

7   that?

8           A    Yes.

9           Q    So on the left is that the time of

10  the day that you took the report?  Is that what

11  that means?

12          A    That's the time of -- yes.

13          Q    Okay.  And the middle it says this

14  is the time that the incident begins; correct?

15          A    Occurred From, yes.

16          Q    And then Occurred To is on the

17  right; correct?

18          A    Correct.

19          Q    So as of the middle this records

20  that the incident leading to the arrest started at

21  11:20 a.m.; correct?

22          A    Correct.

23          Q    Because this is military time, I

24  assume?

25          A    That is correct.

52

1          Q     And then it Occurred To at 11:24.
2     So you're saying the incident stopped at 11:24;
3     correct?
4          A     Yes.
5          Q     So it says the report was taken at
6     11:22 a.m.  Is that just not accurate?
7          A     It's a good possibility.
8          Q     'Cause you would have taken the
9     report after the incident was complete; correct?
10         A     Yes.
11         Q     Okay.  So do you know what time that
12    would have been in reality?
13         A     No, I do not.
14         Q     Okay.  Underneath the offense says
15    Disturbing A Lawful Meeting.  Do you see that?
16         A     I do.
17         Q     And the code says 2917.12.  Do you
18    see that?
19         A     I do.
20         Q     Okay.  Earlier you said you didn't
21    know that code number at the time of the actual
22    arrest; correct?
23         A     That's correct.
24         Q     So how did you find that code
25    number?

53

1          A    I had to look the code number up.

2          Q    So you looked it up at the station?

3          A    Correct.

4          Q    Here you did not designate any

5    subsection of that code; correct?

6          A    That's correct.

7          Q    And you weren't entirely sure what

8    subsection you arrested her under because you

9    weren't even sure of the code number; correct?

10         A    Correct.

11         Q    At the bottom of this page it says

12   the Reporting Officer is Sergeant Robert Ross;

13   correct?

14         A    That's correct.

15         Q    So did he fill this out, or did you

16   fill this out?

17         A    He filled that out.  Sergeant Ross

18   filled it out.

19         Q    And it says the Approving Officer is

20   Brian Kaintz; correct?

21         A    That is correct.

22         Q    So he is the individual who asked

23   you to go and cover this meeting; correct?

24         A    Correct.

25         Q    Does Brian Kaintz usually work at

54

1    Commissioner meetings?

2              A     Yes.

3              Q     Is he there at every meeting?

4              A     I don't know.

5              Q     Do you know if the Sheriff's

6    Department even regularly provided meeting security

7    prior to July 7th, 2022?

8              A     I do believe they did, yes.

9              Q     And who is the deputy that was in

10   charge of providing that security on a regular

11   basis?

12             A     I'm assuming by rank, so it would

13   have been Lieutenant Kaintz.

14             Q     I'm going to go to the next page.

15   Okay.  The next page is largely blank, I'm assuming

16   because it didn't involve either a vehicle or

17   property; correct?

18             A     Correct.

19             Q     On the next page it says Arrest

20   Supplement; correct?

21             A     Yes, Suspect/Arrest Supplement.

22             Q     There's a part in the middle it says

23   Arrestee Armed With, and it says the number 99.  Do

24   you see that?

25             A     That's correct.

55

1          Q     What does that mean?

2          A     Number 99 is Unknown.

3          Q     Okay.  So here it says U is Unknown

4     on the actual page.  When you look at the code 99

5     it says None on the top left-hand corner; correct?

6          A     Correct.

7          Q     So 99 actually means None?

8          A     Oh, yes, yes.  Sorry about that.

9     Yes, 99 is none.

10          Q     Okay.  So, in other words, you're

11     determining that she was unarmed?

12          A     That's correct.

13          Q     Okay.  Arrest/Offense Description it

14     says Disturbing A Lawful Meeting; correct?

15          A     Correct.

16          Q     And it says 2917.12; correct?

17          A     Correct.

18          Q     And it says M4S; correct?

19          A     Correct.

20          Q     What does the S stand for?

21          A     I do not know.

22          Q     So you didn't write that?

23          A     That's correct.

24          Q     The next page is a narrative

25     statement, and this looks like a statement that was

56

1    drafted by Sergeant Robert Ross; correct?

2         A    Correct.

3         Q    Well, I'm going to ask Ross about

4    his own statement.  I want to go to yours.  Looks

5    like it's two more pages down the line.

6         Do you see your statement that begins on

7    July 7th, 2022?

8         A    Yes.

9         Q    Okay.  It starts with, "During the

10   lawful meeting and a reading of an official

11   document by Clerk Paula Vivoda-Klotz Commissioner

12   Frenchko removed herself from her Commissioner's

13   desk and sat in the first row of the general

14   seating public side of the room and continued

15   recording the reading of the document with her

16   cellphone."  Do you see that?

17        A    Yeah.

18        Q    Okay.  What's wrong with that?

19        A    Nothing.

20        Q    "While the Clerk was reading the

21   document Frenchko began to verbally interrupt the

22   Clerk to the point she became visibly emotional and

23   tried to hide her face with the document while

24   reading."  What's relevant about that?

25        A    She had stopped the meeting from

57

1   going forward.

2           Q    Well, how does that stop it from

3   going forward?  She just was hiding her face.  She

4   continues to read; right?

5           A    Yeah.  She started to be disruptive.

6   If you read further down, that was when

7   Commissioner Fuda warned Frenchko numerous times to

8   stop being disruptive.

9           Q    Okay.  So your testimony is now that

10  you actually heard Commissioner Fuda --

11          A    Right.  I did not hear Cantalamessa.

12  I heard Fuda.

13          Q    Okay.  So you heard Fuda tell

14  Commissioner Frenchko she was being disruptive?

15          A    Yes.

16          Q    And that --

17          A    A point of order.  He was trying to

18  put her a point of order.

19          Q    Okay.  Do you know if in past

20  meetings Commissioner Frenchko has ever asked or

21  called out for point of order when Commissioner

22  Fuda was talking?

23          A    No.

24          Q    Do you know when she's done that

25  whether or not he's ever listened?

58

1          A    I have no idea.

2          Q    It says Commissioner Fuda warned

3    Frenchko numerous times to stop being disruptive by

4    calling "Point of order" and banging his gavel and

5    which she did not comply; correct?

6          A    Yes.

7          Q    So is it fair to say that a large

8    point of your determination that Commissioner

9    Frenchko was being disruptive had to do with the

10   fact that Commissioner Fuda was saying she was

11   being disruptive?

12         A    Yes.

13         Q    The next statement says, "Frenchko

14   was given ample opportunity to stop her disruptive

15   behavior, even more opportunity than the general

16   public who attends would be afforded."  Do you see

17   that?

18         A    I do.

19         Q    How do you know that?

20         A    How do I know that?

21         Q    Yes, how do you know that?

22         A    I mean, I had given breaks before to

23   individuals.  I've been there to the point to

24   where, you know, I kind of was laxed a little bit,

25   and then when things started getting really out of

59

1    hand then I had to do what I had to do.  But she

2    was afforded -- she was a Commissioner.  She was

3    afforded a little extra latitude.

4              Q    Okay.  Well, but that's not what the

5    statement says.  The statement says is you gave her

6    more opportunity to be disruptive than you would a

7    member of the general public.

8              A    Correct.  I mean, if somebody from

9    the general public would have -- yes, yes.  I mean,

10   if they would have been acting up, they would have

11   been probably arrested and removed from the meeting

12   as well.

13             Q    You've never actually removed a

14   member of the public from a Trumbull County

15   Commissioners meeting; correct?

16             A    Correct.

17             Q    Okay.  So how would you know how

18   much latitude you would give a member of the public

19   at a Trumbull County Commissioners meeting?

20             A    I know it's not a Trumbull County

21   Commissioners meeting, but I did work other

22   meetings in townships.

23             Q    Okay.  They have different rules of

24   decorum than the Trumbull County Commissioners

25   meetings?

60

1           A     They do.  They do.  I'm assuming so.
2    I'm assuming they do.
3           Q     Okay.  Have you ever arrested
4    somebody for disrupting a public meeting at any of
5    the Township's meetings?
6           A     No.
7           Q     When you had to remove someone from
8    a Township meeting, how do you ever even remove
9    someone from a Township meeting?
10          A     I'm sorry.  Reiterate.
11          Q     Did you ever remove a member of the
12   public from a Township meeting in Warren Township?
13          A     No.
14          Q     So you never even removed a member
15   of the public from a Township meeting?
16          A     Not that I recall.
17          Q     Okay.  Did you ever remove someone
18   from the City of Warren meetings?
19          A     No.
20          Q     Have you ever in your life even
21   removed a member of the public from a public
22   meeting?
23          A     I don't recall.
24          Q     Okay.  But that's in the report;
25   correct?

61

```
 1              A    It's in the report that what?
 2    Explain yourself.  What's in my report?
 3              Q    Well, I'm just reading your report.
 4    It says, "Frenchko was given ample opportunity to
 5    stop her disruptive behavior, even more opportunity
 6    than the general public who attends would be
 7    afforded."
 8              A    Yes.
 9              Q    Correct?
10              A    Correct.
11              Q    Well, what's the basis of --
12              A    I kind of sat on my hands a little
13    -- I kind of sat on my hands per se a little too
14    long.
15              Q    Okay.  But you're comparing her
16    conduct to the members of the general public;
17    correct?
18              A    Correct.
19              Q    That's what this statement says;
20    correct?
21              A    Yes.
22              Q    Okay.  And you said you gave her
23    more opportunity than you would someone in the
24    general public?
25              A    Yeah, because she's a Commissioner.
```

62

1          Q    Okay.  But you've never even removed
2     someone from the general public?
3          A    Okay.
4          Q    So how would you know how much ample
5     opportunity you would give to a member of the
6     general public in a Trumbull County Commissioners
7     Meeting?
8          A    Well, to put it -- to try to
9     explain myself, it would be because she's the
10    Commissioner.  I mean, I didn't want to arrest her.
11         Q    Then why did you arrest her?
12         A    Because she broke the law.
13         Q    How do you know she broke the law?
14    I mean, earlier you testified you weren't even
15    familiar with the statute when you arrested her.
16         A    Familiar enough.
17         Q    You couldn't cite the code number;
18    correct?
19         A    I could not.
20         Q    And you couldn't cite the context of
21    the code before arresting her, so you didn't even
22    know what the code said before you arrested her?
23         A    Correct.
24         Q    But now you're testifying that you
25    knew enough about that code to decide to arrest a

63

1  Commissioner at her own meeting?

2          A    For behavior, yes.  That's what I

3  was there for to keep the meeting orderly.

4          Q    Okay.  And you arrested her because

5  the Commissioners were saying she was being

6  disruptive?

7          MR. YOSOWITZ:  Objection.  Go ahead.

8          THE WITNESS:  No, no.

9  BY MR. MILLER-NOVAK:

10          Q    Then why did you arrest her?

11          A    Because she had stopped the meeting,

12  would not let the meeting go forward.

13          Q    No, she was trying to finish what

14  she was saying; correct?

15          A    I don't know what she was saying.

16          Q    Okay.  She was reading a statement

17  that she had prepared; correct?

18          A    I don't think she was reading

19  anything.

20          Q    At the time of her arrest Paula had

21  just gotten done reading a letter that was written

22  by Sheriff Monroe; correct?

23          A    Okay.  Yes.

24          Q    And that letter was critical of

25  Commissioner Frenchko, was it not?

64

1          A     After the meeting I realized it was.

2          Q     Okay.  So you didn't hear that the

3   letter actually demanded that Commissioner Frenchko

4   apologize to the Sheriff's Department?

5          A     No.

6          Q     Okay.  So you're unaware that when

7   Commissioner Frenchko was talking she was

8   responding to the criticisms of that letter?

9          A     Yeah, I wasn't -- apparently she

10  was, but I wasn't paying attention to that.

11         Q     Okay.  So you weren't even paying

12  attention to what she was saying when you decided

13  to arrest her?

14         A     Correct.

15         Q     Are you aware that in previous

16  meetings members of the public have actually

17  danced?

18         A     No.

19         Q     Are you aware that a member of the

20  public at a previous meeting -- actually, I think

21  it was the spouse of a public employee flicked off

22  Commissioner Frenchko?

23         A     I'm not aware of that.

24         Q     How would you describe the

25  orderliness of a typical Trumbull County

65

1    Commissioners meeting?

2              A    I don't know.  I mean, from being in

3    a meeting from my marine (sic) patrols, pretty

4    boring.  Really boring.

5              Q    Are you talking about a

6    Commissioners meeting was boring?

7              A    Yes.

8              Q    That's fair.  So you've never

9    witnessed prior arguments in Commissioners

10   meetings?

11             A    No.

12             Q    Okay.  I want to go to the next

13   page.  I know you didn't write this, but I still

14   want to ask you some questions about it.  Okay?

15             A    Okay.

16             Q    Thank you.  So on Thursday, July

17   7th, 2023, it says, "Detective Wayne Mackey and I

18   were informed of an incident that just occurred in

19   the Commissioners hearing at a meeting."  Do you

20   see that?

21             A    I see it.

22             Q    Did you inform the detectives of

23   what occurred?

24             A    I did not.

25             Q    Do you know who did?

66

```
1                A    I do not.
2                Q    These look like statements that were
3    made by Paula, which is the Clerk; is that correct?
4                A    I would assume so, yes.
5                Q    Do you understand that the Clerk is
6    the employee of the Commissioners?
7                A    Yes.
8                Q    Here it states that "Paula stated
9    that Commissioner Frenchko was filming the meeting
10   with her cellphone on Facebook Live and continued
11   to film her reading the letter."  Do you see that?
12               A    I see that.
13               Q    "At one point Frenchko got up out of
14   her seat at the bench and went to the first row of
15   public seating and continued to film Paula reading
16   the letter."  Do you see that?
17               A    I do.
18               Q    "Frenchko made comments while
19   filming Paula stating, 'Oh, it's hard for you.  You
20   shouldn't be the Clerk if you can't have a camera
21   on you.'"  Do you see that?
22               A    Yes.
23               Q    Are you aware that when Commissioner
24   Frenchko said that she was responding to a
25   statement made by Paula to her?
```

67

```
 1              A    No.
 2              Q    Okay.  So you're not aware that
 3    Paula told her she didn't want to be filmed?
 4              A    Yes, I did hear that.  I'm sorry.  I
 5    did hear that at the meeting.
 6              Q    Okay.  Do you believe that Paula had
 7    the right to tell her to stop filming?
 8              A    I mean, if she felt uncomfortable, I
 9    suppose so.
10              Q    So you're not aware of whether or
11    not the public has the right to film open
12    government meetings?
13              A    Incorrect.  I am aware of that.
14              Q    So isn't it correct that people are
15    allowed to film public meetings?
16              A    Yes.
17              Q    Okay.  So, in other words, if Paula
18    says, "Stop filming this meeting," it doesn't
19    really matter; correct?
20              A    Correct.
21              Q    This continues that she became
22    "nervous and stressed out because Frenchko has
23    filmed Paula many times in the past at meetings on
24    Facebook Live and said some 'not so nice things'
25    that the public and her family have seen."  Do you
```

68

1   see that?

2           A    I see that.

3           Q    What's the relevance of that?

4           A    I have no idea.  I can't speak for

5   Paula.

6           Q    Okay.  "Paula stated that she took a

7   deep breath, and Fuda told her to continue to read

8   the letter," correct?

9           A    Yes.

10          Q    Do you know whether or not this

11  letter was listed on the agenda that day?

12          A    I do not know.

13          Q    Okay.  Do you know whether or not

14  it's normal for a letter to just be randomly read

15  during a meeting?

16          A    Don't know.

17          Q    Do you know whether or not

18  Commissioner Fuda could have just read the letter

19  himself?

20          A    I have no idea.

21          Q    Okay.  Do you know whether or not it

22  was necessary to make the Clerk read a letter?

23          A    No.

24          Q    All right.  Is Exhibit 1 here a fair

25  and accurate depiction of your police report?

69

```
 1              A    Yes.

 2              Q    Okay.  You can set that down.  I'm

 3      going to try to bring up another document.  God

 4      knows whether or not it will work.

 5              Do you see a new document on the screen

 6      over there?

 7              A    Yes.

 8              Q    It says Trumbull County Sheriff's

 9      Office, Sheriff Paul S. Monroe?

10              A    Yes.

11              Q    And the date is July 5th, 2022?

12              A    Yes.

13              Q    Okay.  I'm going to mark this

14      Exhibit 2.

15                            (WHEREUPON, Deposition

16                            Exhibit Number 2 was

17                            marked for purposes of

18                            identification.)

19              Q    Do you see me scrolling down?

20              A    I do.

21              Q    Okay.  So it says, "Commissioner:  I

22      am writing this letter as a response to

23      Commissioner Frenchko's reading at the June 1st,

24      2022, Commissioners public meeting of a letter

25      claiming to be written by the mother of a
```

70

1  previously incarcerated adult inmate."  Do you see
2  that?
3          A    I do.
4          Q    Okay.  Have you seen this letter
5  prior to today?
6          A    No.  Never seen that letter prior to
7  today.
8          Q    You've never seen this letter?
9          A    No.
10         Q    You did not see this letter prior to
11  the July 7th, 2022, Commissioners meeting?
12         A    That is correct.  I've never seen
13  the letter prior to today.
14         Q    Are you aware that this is a letter
15  that Paula Klotz was reading during that meeting?
16         A    No.
17         Q    Okay then.  After you took
18  Commissioner Frenchko into custody and you had her
19  at the station, how long did it take you to decide
20  to actually file a complaint in the Warren
21  Municipal Court?
22         A    It was that day.  I can't tell you
23  the exact time, but it was that day.  I finished up
24  the report and the paperwork, and I do believe
25  Sergeant Ross filed the charges.

71

1          Q    And what investigation did you do

2     into the Commissioners' rules of decorum prior to

3     filing those charges?

4          A    I did none.

5          Q    What -- how many meetings and prior

6     meetings did you watch and view prior to filing

7     those charges?

8          A    None.

9          Q    Did you question or investigate

10    Commissioner Fuda at all before filing those

11    charges?

12         A    No.

13         Q    So you didn't ask Commissioner Fuda

14    about the rules of public participation or

15    Commissioner participation during meetings?

16         A    No.

17         Q    You didn't question Commissioner

18    Fuda at all about his powers as the president?

19         A    No.

20         Q    Did you question Commissioner Fuda

21    whether or not he was treating her differently or

22    the same as Commissioner Cantalamessa during the

23    July 7th, 2022, meeting?

24         A    No.

25         Q    Okay.  I'm going to bring up another

72

1    exhibit.  We're going to mark this as Exhibit 3.
2                          (WHEREUPON, Deposition
3                          Exhibit Number 3 was
4                          marked for purposes of
5                          identification.)
6            Q    And can you see an AT&T page that
7    says AT&T Mobility?
8            A    I can see AT&T, but the rest of it's
9    quite small, unreadable.  There you go.  That's a
10   little better, yes.
11           Q    Does that help?  Well, that's a
12   little bit too big it looks like.  Is that good?
13           A    Yeah.  I can make it out, yeah.
14           Q    Your attorney should have a copy
15   there.  I emailed it this morning.
16           MR. MILLER-NOVAK:  Andrew, do you have a
17   copy?
18           MR. YOSOWITZ:  Yeah.  What pages?
19           MR. MILLER-NOVAK:  This is the one that
20   says -- I had it labelled Wix Pages 3218.  You got
21   it?
22           MR. YOSOWITZ:  Yeah.
23   BY MR. MILLER-NOVAK (Continuing):
24           Q    Okay.  Sergeant Wix, is your
25   cellphone number 330-883-6975?

73

1            A    Yes.

2            Q    Okay.  I'm going to represent to you

3    that I subpoenaed your phone logs from AT&T for

4    both voice and text message, and this is what they

5    provided me regarding your voice logs.  Do you

6    understand that?

7            A    Yes.

8            Q    Do you have any reason to believe

9    that these are inaccurate?

10           A    No.

11           Q    Okay.  I'm going to scroll down to

12   the day of the arrest, and I got good news and bad

13   news.  So I'm going to try to explain how these

14   phone records work a little bit.  I'm going to do

15   the best to teach you those things.  So the good

16   news is is that this is military time, and I know

17   that you know how to talk military time; correct?

18           A    Yeah.  Okay.

19           Q    You understand military time;

20   correct?

21           A    Yes, yes.

22           Q    And, typically speaking, for

23   instance, that 1300 hours would be 1:00 p.m.;

24   correct?

25           A    Yes, sir.

74

1          Q     Okay.  Now, what you're going to see
2     -- I'm going to go to this page, and this would be
3     -- at the top it says 1316 on the item.  Do you see
4     that?
5          A     Yes.
6          Q     Okay.  And it says Connection Date.
7     Do you see that, Conn. Date?
8          A     Yes.
9          Q     And it says July 7th, 2022.  Do you
10    see that?
11         A     Yes.
12         Q     And it says Connection Time, and it
13    says (UTC).  Do you see that?
14         A     I do.
15         Q     Okay.  So UTC time is actually
16    Uniform Time Code.  Do you understand that?
17         A     I do.
18         Q     So do you know that Daylight Savings
19    Time is actually four hours ahead of Eastern time?
20    Do you understand that?
21         A     Okay.
22         Q     So when something says 1300 hours at
23    1:00 p.m., it would actually be four hours earlier.
24    Do you understand that?
25         A     Yes.

75

1          Q    So, technically speaking, 1600 hours
2    would be noon in UTC.  Do you understand?
3          A    Yes.
4          Q    Okay.  I'm going to go down to item
5    number 1330.  Do you see that on the side?
6          A    Yes.
7          Q    According to this sheet, at 11:43:01
8    UTC time on July 7th, 2022, an originating number
9    of 1-330-609-9037 called 1-330-883-6975.  Do you
10   see that?
11         A    I do.
12         Q    Okay.  So earlier you testified that
13   1-330-609-9037 was Sheriff Monroe's phone number;
14   correct?
15         A    Correct.
16         Q    So it appears that he called you on
17   July 7th, 2022, at 11:43 UTC; correct?
18         A    Correct.
19         Q    Earlier you testified that he never
20   called you that day.
21         A    Okay.
22         Q    So do you stand by that testimony
23   after seeing this phone report?
24         A    Yes.
25         Q    So you're saying that this phone

76

1    report from AT&T is incorrect?

2              A    I'm not.

3              Q    Then where is the disconnect?

4              A    The disconnect is I don't -- I don't

5    remember that number calling my phone.

6              Q    Okay.  Well, earlier you didn't

7    testify that you didn't remember.  You said he did

8    not call you; correct?

9              A    Correct.  Correct, yeah, I believe

10   that he did not.

11             That's 11:50.  What time would that have

12   been?

13             MR. YOSOWITZ:  Just answer his questions.

14   BY MR. MILLER-NOVAK (Continuing):

15             Q    So is it your testimony today that

16   you did not talk to Sheriff Monroe that day?

17             A    Yeah, I don't recall.

18             Q    So you just don't recall?

19             A    Correct.

20             Q    I'm going to have you go to the next

21   page.  I'm going to have you go to item number

22   1344.  Do you see that?

23             A    Yes.

24             Q    Here on July 7th, 2022, according to

25   1344, at 15:32:59 UTC -- which I'm going to

77

1    represent is 11:32 a.m. Eastern Standard time -- it
2    looks like the number 1-330-883-6975 called
3    1-330-609-9037; correct?
4               A    Correct.
5               Q    Okay.  So according to this phone
6    report, at 11:32 a.m. you dialed Sheriff Monroe's
7    number; correct?
8               A    It appears so.
9               Q    So you did call him right after
10   arresting Commissioner Frenchko; correct?
11              A    That's what it says on the document.
12   I don't recall that.
13              Q    And you don't recall him calling you
14   minutes later?
15              A    Correct.
16              Q    So according to these phone reports,
17   you either called him or he called you
18   approximately three times on July 7th, 2022;
19   correct?
20              A    I don't know.  I've only seen the
21   two so far.  The 1344 and whatever the other one
22   was number.
23              Q    Okay.  Well, there's another one at
24   15:33:10 where he dialed your number.  Do you see
25   that?  It's on 1347.

78

```
 1              A     1347.  Okay.
 2              Q     It appears that 1-330-609-9037
 3    dialed 1-330-883-6975; correct?
 4              A     Okay.  Yes.
 5              Q     Okay.  So he also dialed your number
 6    once that day; correct?
 7              A     Correct.
 8              Q     Okay.  So far we've seen in these
 9    phone reports that on July 7th, 2022, there was
10    three times where your phones called one another;
11    correct?
12              A     Yes.
13              Q     Who is Nicholas Timko?
14              A     That's my Lieutenant.
15              Q     Did you call him that day?
16              A     I don't recall.  There's a good
17    possibility.  I talk to him on a daily basis.
18              Q     Did you call him during the meeting
19    that day?
20              A     I don't recall that.
21              Q     So you don't remember having any
22    discussion with Nicholas Timko the day that you
23    arrested Commissioner Frenchko?
24              A     Correct.
25              Q     If I were to tell you that you
```

79

1    called him at 11:11 a.m. on July 7th, 2022, would

2    you deny that?

3              A    No.  I wouldn't deny that, but I

4    don't recall.  I don't recall calling him.

5              Q    That would be approximately nine

6    minutes before you arrested Commissioner Frenchko;

7    correct?

8              A    Yes.

9              Q    So you don't remember whether or not

10   you called Deputy Timko right before arresting

11   Commissioner Frenchko?

12             A    Correct.

13             Q    Who is William Kata?

14             A    He's a deputy on Road Patrol.

15             Q    Was he a deputy as of July 7th,

16   2022?

17             A    Yes.

18             Q    Is he still a deputy?

19             A    Yes.

20             Q    Do you remember calling him that

21   morning?

22             A    No.

23             Q    Do you remember calling him after

24   arresting Commissioner Frenchko?

25             A    No, sir.

80

1          Q    Do you remember whether or not you

2     also called Sheriff Monroe later at 4:39 p.m. that

3     day?

4          A    1348.  Is that the one he's

5     referring to?  I think that's that All Text similar

6     to Supervisor Group Chat.  On 1348 there's like

7     multiple numbers.  There's a number underneath that

8     one that's marked in parentheses an F on 1348.

9     That number -- this number right here I think that

10    might be our All Text.  We're in a group text

11    message.  So when a supervisor sends out a text

12    message, it goes to all supervisors and all

13    administration.

14         Q    Okay.  But this is not the text

15    report.  This is the phone report.  This is voice.

16         A    Okay.

17         Q    Okay.  All right.  Look at 15:33:10

18    on 1347.  Do you see that?

19         A    Not yet.  1348, yes.

20         Q    Okay.  1347 is above that.  There's

21    no F there, is there?

22         A    Underneath, no.

23         Q    And on 1346 the originating number

24    is 1-330-609-9037.  Looks like that's the

25    originating number, and the terminating number is

81

1  1-330-883-6975; correct?

2          A    Correct.

3          Q    And there's no F there; correct?

4          A    Correct.

5          Q    All right.  So it looks like Sheriff

6  Monroe called you at 15:33:09 UTC time; correct?

7          A    Yeah.  What was the duration of the

8  time?  .02 and 0:00.  So I obviously didn't talk to

9  him.

10          Q    Okay.  But he called you; correct?

11          A    I'm assuming so.  That's what the

12  paper says.

13          Q    So the group text message that

14  you're talking about where the originating number

15  is 1-317-664-9900?

16          A    I'm assuming so.  I'm not familiar

17  with the number.

18          Q    Okay.  But there are group text

19  messages that go out?

20          A    Correct.

21          Q    Do you know if you received any

22  group text messages that day?

23          A    No, I don't recall.

24          Q    I have an item 1387.  Do you see

25  that?

82

1              A    Not yet.  Hold on.  1387, yes.

2              Q    It looks like on July 7, 2022, at

3    20:39:12 1-330-609-9037 called 1-330-883-6975.  Do

4    you see that?

5              A    I see that.

6              Q    So do you recall Sheriff Monroe

7    calling you at 6:39 (sic) p.m. on July 7th, 2022?

8              A    No, I do not.

9              Q    So earlier when you said that he

10   didn't call you at all, you were incorrect then;

11   correct?

12             A    Looks that way, yeah.  I don't

13   remember any of the phone calls.

14             Q    So you wouldn't remember the

15   contents or the subject matter of any of those

16   phone calls?

17             A    That's correct.

18             Q    So you don't recall whether or not

19   you discussed the arrest of Commissioner Frenchko

20   with Sheriff Monroe that day?

21             A    Correct.

22             Q    Does he call you every day?

23             A    He does not.

24             Q    How often does Sheriff Monroe call

25   you?

83

1              A     It's sporadic.  It could be once a

2     week.  It could be once every two weeks, a few

3     times a day.  Just depending on -- he's my boss, so

4     I do have contact with my boss.

5              Q     Under oath today are you going to

6     testify that the Sheriff did not call you about

7     arresting a Commissioner of the County on July 7th,

8     2022?

9              A     Under oath, yes.

10             Q     But earlier you're saying you didn't

11    even remember whether or not he did call you?

12             A     Correct.

13             Q     You don't remember what you talked

14    about with him?

15             A     That's correct.  I know for a fact

16    it wasn't to arrest Frenchko.

17             Q     Well, before you're saying he didn't

18    call you after to talk about it?

19             A     Not that I recall, no.

20             Q     Not that you recall.

21                        (WHEREUPON, Deposition

22                        Exhibit Number 4 was

23                        marked for purposes of

24                        identification.)

25             Q     All right.  I'm going to bring up

84

1    what I'm going to mark as Exhibit 4, which has the

2    heading Wix Pages 3878 to 3879 that I sent to your

3    attorney earlier today.  Do you see that?

4            A    I do.  You have to blow it up,

5    though, if you don't mind.

6            Q    Oh, sure.  Is that better?

7            A    Yes.  Yeah, that's fine.

8            Q    Okay.  Well, hopefully your attorney

9    can put it in front of you, too.

10           A    Yeah, he's got it in front of me.

11   It's a little easier on the screen.  It's a little

12   brighter.  That's all right.

13           Q    I'm going to represent to you that

14   these are the phone reports of your text messages

15   the day of the arrest.  Do you have any reason to

16   disagree with that statement?

17           A    No.

18           Q    Who is John Hughes?

19           A    He's a deputy.

20           Q    Do you remember texting him at 7:06

21   a.m. on July 7, 2022?

22           A    No.

23           Q    Do you know if you were working and

24   on the clock as of 7:06 a.m. that day?

25           A    Yes.

85

1          Q    You would have been?

2          A    I would have been, yes.

3          Q    When did your shift start that day?

4          A    At 7:00 o'clock in the morning, yes.

5          Q    Whose number is 330-609-3220?

6          A    I would have to look that up.  I

7    don't know.

8          Q    Do you mind doing that?

9          A    No, that's fine.

10          Q    Thank you.

11          A    What was the number?  609?

12          MR. YOSOWITZ:  609-3220.

13          THE WITNESS:  I have no results on my

14    phone.  I don't know whose that number is.

15    BY MR. MILLER-NOVAK (Continuing):

16          Q    Okay.  Who is Jonathan Ball?

17          A    He was a deputy at the time for the

18    Sheriff's office.  He no longer works with the

19    Sheriff's office.

20          Q    Do you remember calling him the

21    morning of July 7, 2022?

22          A    I do not.

23          Q    Are you aware that a special

24    prosecutor was appointed regarding this case?

25          A    Yes, I was aware.

86

1            Q     Are you aware that that special

2    prosecutor voluntarily dismissed the charges

3    against Commissioner Frenchko?

4            A     I did find out.

5            Q     Do you know why that happened?

6            A     I have no idea.  I never met him.

7            Q     So you never talked to the special

8    prosecutor at all?

9            A     That's correct.

10           Q     He never took a statement from you?

11           A     No.

12           Q     Are you aware that the Defendant

13   requested certain phone records from the County?

14           A     Yes.

15           Q     Are you aware that they requested

16   text messages from the County?

17           A     Yes.

18           Q     Were you told to preserve those text

19   messages?

20           A     At the time, yes.

21           Q     Do you know if Deputy Ross was told

22   to preserve those text messages?

23           A     I do believe he was.

24           Q     Did you do that?

25           A     I did.

87

1          Q     Do you know where they are now?

2          A     I do not.

3          Q     Are you aware whether or not at any

4    time after the arrest that either Commissioner

5    Frenchko or her counsel had threatened litigation

6    against the County?

7          A     No.

8          Q     Are you aware at any time that

9    either Commissioner Frenchko or counsel claimed

10   that the arrest of her was an unconstitutional

11   arrest?

12         A     No.

13         Q     Did you see any news reporting after

14   the arrest?

15         A     Yes.

16                         (WHEREUPON, Deposition

17                         Exhibit Number 5 was

18                         marked for purposes of

19                         identification.)

20         Q     Okay.  I'm going to bring up what

21   I'll mark as Exhibit 5.  These are both yours and

22   Robert Ross's Responses to Plaintiff's Requests for

23   Admission, First and Second Set of Interrogatories

24   and Request for Production of Documents.  Do you

25   see that?

88

```
 1              A    Yes.
 2              Q    Did you answer these questions along
 3    with your counsel?
 4              A    Yes.
 5              Q    Okay.  Now I'm just going to have
 6    you look through them generally.  And, actually,
 7    I'm going to have you go to the second page.  And
 8    on Interrogatory number 3 it says, "Provide the
 9    make and model of every cellphone as well as the
10    operating system that the following officials used
11    between May 1st, 2022, and the present, regardless
12    of whether the phone was provided by the County or
13    was a personal device."  Do you see that?
14              A    Yes.
15              Q    Okay.  So under your answer it says
16    you don't know the make and model of everybody
17    else, but it says Harold Wix, it says iPhone 12.
18    Do you see that?
19              A    That's correct.
20              Q    Do you know if you had an iPhone 12
21    or an iPhone 11 at the time?
22              A    I'm assuming it was -- now that you
23    bring it up, I don't know.  It might have been 12.
24    It might have been a 12.  It might have been an 11.
25    It says here it's a 12, so I'm going to safely
```

89

1   assume it's a 12.

2          Q    Well, the phone report says it's an

3   Apple iPhone 11.  Do you see those?

4          A    Okay.  Got you.

5          Q    I mean --

6          A    That means it's quite a few years

7   old.

8          Q    I mean, I'll represent to you I

9   don't know the exact model of my phone as it sits

10  in my pocket.  I'm just asking, do you have any

11  reason to disagree with AT&T that it may, in fact,

12  have been an iPhone 11?

13         A    No.

14         Q    Okay.  You don't camp out at the

15  iPhone store every time they have a new phone come

16  out?

17         A    No, no.  They're usually paid off

18  awhile after till I start having problems with

19  them.

20         Q    Who is Deputy Lou Padula?  Do you

21  know him?

22         A    Yes, he's a deputy.

23         Q    Is he currently with the Sheriff's

24  Department?

25         A    Yes.

90

1          Q    Okay.  What are his responsibili-
2    ties?
3          A    He's a school resource officer
4    during school time, and then I do believe he works
5    the Civil Division when there's no school.
6          Q    What about Nick Backus?  Who is he?
7          A    The same.  He's on SRO.  He's a
8    civil deputy.
9          Q    So when you say civil deputy, what
10   do you mean by that?
11         A    He's in a different division.  He
12   works the courts.
13         Q    And then Padula when he's working
14   not in the school, what does Padula do?
15         A    He works the courts.
16         Q    So both Backus and Padula work the
17   courts?
18         A    Yes.
19         Q    I want to go to Request for
20   Production number 8.  It says to "Produce any and
21   all text messages sent and received by Harold Wix
22   on July 7, 2022, between 10:00 a.m. and 2:00 p.m."
23   Do you see that?
24         A    I do.
25         Q    It says, "Defendants do not have any

91

1   documents responsive to this request.  His text
2   messages do not go back that far."  Do you see
3   that?
4           A    I do.
5           Q    What does that mean?
6           A    When you requested 'em I didn't have
7   them.
8           Q    Why not?
9           A    I'm assuming they fell off.  I get a
10  lot of messages.  I don't know if they rewrite,
11  overwrite, but I know they weren't deleted.
12          Q    Your testimony today is that your
13  phone automatically deletes them?
14          A    That I have no idea.  I can't say
15  that.  I just know they weren't there.
16          Q    But you didn't take pictures of any
17  text messages that day?
18          A    I did not.
19          Q    But you were aware that there was a
20  preservation letter?
21          A    At the time?
22          Q    Yeah.  After July 7th, 2022, were
23  you aware that there was request for documents and
24  preservation of text messages?
25          A    Not that I recall, no.

92

1          Q    Okay.  Earlier you said that you
2     were aware or someone told you that your text
3     messages were requested to be preserved.
4          A    Okay.
5          Q    Well, are you changing that now, or
6     is it still that you were aware that there was a
7     request for preservation?
8          A    I don't know about any request.  I
9     don't know when I got the request.  So, yeah, I
10    guess I'll change it.
11         Q    If you're text messaging another
12    deputy about County business, do you not believe
13    that you have the duty to maintain those text
14    messages?
15         MR. YOSOWITZ:  Objection.  Go ahead.
16         THE WITNESS:  Yeah.
17    BY MR. MILLER-NOVAK (Continuing):
18         Q    You believe you do?
19         A    I do.
20         Q    What steps do you take to maintain
21    those text messages?
22         A    I don't delete 'em.
23         Q    Okay.  But do you ensure that
24    they're maintained and not deleted by your phone?
25         A    No, I don't do anything.  I know I

93

1    just don't delete 'em.

2            Q    Are you aware that iPhone 11

3    automatically saves text messages?

4            A    No.

5            Q    Are you aware that the default for

6    saving text messages is forever?

7            A    No.

8            Q    Are you aware that you have to

9    manually change it to 30 days or one year?

10           A    I am not aware.

11           Q    Are you aware that there's only

12   three options for the preservation of text messages

13   on an iPhone?

14           A    No.

15           Q    Are you aware that those three

16   options are either forever, 30 days or one year?

17           A    No.

18           MR. MILLER-NOVAK:  Okay.  I'd like to

19   take a break for another ten minutes.

20           (Whereupon, a recess was taken.)

21           Q    All right.  Sergeant Wix, I have a

22   few more questions.

23           After you arrested Commissioner Frenchko

24   and you take her back to the -- hold on one second.

25   Can we go off the record?

94

1                (Whereupon, a brief discussion was held
2       off the record.)
3                Q    So after you arrest Commissioner
4       Frenchko and she's at the station, did you watch
5       the video or any video or any recording of the
6       meeting while you were filling out the report?
7                A    No.
8                Q    So you filled out the report
9       completely from memory?
10               A    Correct.
11               Q    Did you talk to any witnesses before
12      you filled out the report?
13               A    I did not.
14               Q    Did you talk to Paula Klotz before
15      filling out the report?
16               A    No.
17               Q    Okay.  So you arrested her.  You
18      took her back to the station, and you filled out
19      the report without any further investigation
20      whatsoever?
21               A    Correct.
22               MR. MILLER-NOVAK:  I have no further
23      questions.
24               MS. SUDHOFF:  I have a couple.
25

95

1                    CROSS EXAMINATION
2     BY MS. SUDHOFF:
3            Q    So, Sergeant Wix, prior to the start
4     of the July 7th, 2022, Commissioners meeting did
5     you know you were going to arrest Miss Frenchko?
6            A    No.
7            Q    Who made the decision to arrest Miss
8     Frenchko?
9            A    I did.
10           Q    Were you ordered by the Sheriff to
11    arrest Miss Frenchko?
12           A    No.
13           Q    Were you ordered by anyone in the
14    Sheriff's Office to arrest Miss Frenchko?
15           A    No.
16           Q    Have you ever been ordered to arrest
17    someone at any time during your career with
18    Trumbull County?
19           A    No.
20           Q    Did you form a plan to arrest Miss
21    Frenchko with former Commissioner Fuda?
22           A    No.
23           Q    Did you form a plan to arrest Miss
24    Frenchko with current Commissioner Cantalamessa?
25           A    No.

96

1          Q    Did you form a plan to arrest Miss
2     Frenchko with former Clerk Paula Vivoda-Klotz?
3          A    No.
4          Q    Did you form a plan to arrest Miss
5     Frenchko with any Commissioner employee?
6          A    No.
7          Q    Did you discuss potentially
8     arresting Miss Frenchko at any point prior to her
9     arrest?
10         A    No.
11         Q    Do you recall about how long Miss
12    Frenchko was in the Trumbull County Jail?
13         A    I do not.  It wasn't very long.
14         Q    It wasn't for, say, overnight?
15         A    Correct.
16         MS. SUDHOFF:  All right.  I also have no
17    further questions.
18         MR. MILLER-NOVAK:  Andrew, do you have
19    any questions?  Otherwise, I might have a couple
20    follow-ups.
21         MR. YOSOWITZ:  I don't have any
22    questions.
23
24
25

97

<pre>
 1                  RECROSS EXAMINATION
 2   BY MR. MILLER-NOVAK:
 3          Q    Sergeant Wix, in your report you
 4   refer numerous times to the fact that Commissioner
 5   Fuda was stating that Commissioner Frenchko was
 6   being, quote, unquote, disruptive; correct?
 7          A    For point of order.
 8          Q    It's a point of order.  So the
 9   report never says the word "disruptive"?
10          A    It does.
11          Q    Because Commissioner Fuda kept
12   saying that Commissioner Frenchko was being
13   disruptive; correct?
14          A    Correct.
15          Q    And that was what prompted you to
16   understand or believe that she was being
17   disruptive; correct?
18          A    Correct.
19          MR. MILLER-NOVAK:  No further questions.
20          MR. YOSOWITZ:  Okay.  He'll read.
21          THE COURT REPORTER:  Okay.  Thank you.
22          Did you want this transcribed, sir?
23          MR. YOSOWITZ:  Yes.
24          MR. MILLER-NOVAK:  Susan, Sergeant Wix
25   would like it transcribed, and he wants to pay for
</pre>

98

1    the original, and I'll pay for a copy.

2              I would like it transcribed, Susan.

3              THE COURT REPORTER:  Thank you.

4              MR. YOSOWITZ:  I'll take a pdf copy or

5    e-tran, whatever.

6              THE COURT REPORTER:  Ms. Sudhoff?

7              MS. SUDHOFF:  I'll also take a copy.

8              MR. DOWNEY:  We'd like a condensed copy.

9              (The taking of the deposition concluded

10   at 11:46 o'clock a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

99

1          I, HAROLD A. WIX, do hereby certify that

2     the foregoing is a true and accurate transcript of

3     my testimony.

4

5                          _____

6                               HAROLD A. WIX

7     STATE OF OHIO              )

                                 )   SS:

8     COUNTY OF _____  )

9          Sworn to before me and subscribed in my

10    presence by the same HAROLD A. WIX  this _____ day

11    of _____, 2023.

12

13                          _____

                                  NOTARY PUBLIC

14    My Commission expires: _____

15

16

17

18

19

20

21

22

23

24

25

100

1          PLEASE USE THIS ERRATA SHEET TO MAKE ANY

2    AND ALL CORRECTIONS BY LISTING THE PAGE NUMBER,

3    LINE NUMBER AND THEN A BRIEF DESCRIPTION OF THE

4    ERROR.  PLEASE DO NOT MAKE ANY MARKS OR CORRECTIONS

5    ON THE TRANSCRIPT.  IF NEEDED, USE THE BACK OF THIS

6    SHEET.

7          UPON COMPLETION, PLEASE SIGN AND DATE THIS

8    SHEET AT THE BOTTOM.  THANK YOU.

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   SIGNATURE:_____DATE:_____

101

```
1    STATE OF OHIO        )
                          )    SS:    C-E-R-T-I-F-I-C-A-T-E
2    COUNTY OF MIAMI      )

3                 I, SUSAN L. BICKERT, a Court Reporter and

4    Notary Public in and for the State of Ohio at

5    large, duly commissioned and qualified,

6                 DO HEREBY CERTIFY that the above-named

7    HAROLD A. WIX was by me first sworn to testify to

8    the truth, the whole truth, and nothing but the

9    truth; that his testimony was reduced to writing by

10   me stenographically in the presence of the witness

11   and thereafter reduced to typewriting; that the

12   signature of the witness to the deposition was

13   expressly not waived, and was taken at the time and

14   place hereinafter set forth, pursuant to Notice and

15   Agreement of Counsel.

16                 I FURTHER CERTIFY that I am not a rela-

17   tive nor attorney for either party herein, nor in

18   any manner interested in the event of this action.

19                 IN WITNESS WHEREOF, I have hereunto set

20   my hand and seal of office August 26, 2023.

21

22                          /s/ Susan L. Bickert

                            SUSAN L. BICKERT
23                          Notary Public, State of Ohio
                            My Commission expires:  8-23-28
24

25
```

## A

**ability (1)**
6:23
**able (1)**
20:16
**abnormal (1)**
38:2
**above (1)**
80:20
**academy (6)**
10:17,19;11:15;
12:20;13:11;14:11
**accident (1)**
4:20
**according (5)**
29:2;75:7;76:24;
77:5,16
**accurate (2)**
52:6;68:25
**accurately (1)**
6:24
**acting (1)**
59:10
**actual (2)**
52:21;55:4
**actually (11)**
55:7;57:10;
59:13;64:3,16,20;
70:20;74:15,19,23;
88:6
**added (1)**
27:19
**address (1)**
50:3
**Administration (2)**
49:23;80:13
**Administrative (1)**
50:8
**Admission (1)**
87:23
**admit (2)**
49:9,10
**adult (1)**
70:1
**affirmative (2)**
5:7;29:12
**afforded (4)**
58:16;59:2,3;
61:7
**again (2)**
33:2,15
**against (2)**
86:3;87:6
**age (1)**
4:2
**agenda (1)**
68:11
**ago (7)**
4:19;8:5;15:25;
20:10;22:22;34:6;
46:3

**agree (9)**
16:16;20:13;
32:15,23;33:4,10,
18;34:11,24
**ahead (5)**
25:13;36:24;
63:7;74:19;92:15
**allowed (2)**
6:12;67:15
**along (1)**
88:2
**always (2)**
6:19;34:4
**Amendment (4)**
11:23,25;12:3;
13:12
**amount (1)**
10:25
**ample (3)**
58:14;61:4;62:4
**Andrew (3)**
49:3;72:16;
96:18
**Andrew's (1)**
27:14
**apologize (2)**
12:11;64:4
**apparently (1)**
64:12
**appears (4)**
27:19;75:16;
77:8;78:2
**Apple (2)**
15:17;89:3
**applied (3)**
32:24;33:5;34:7
**apply (2)**
32:16,20
**appointed (1)**
85:24
**appropriate (1)**
32:19
**Approving (1)**
53:19
**Approximately (7)**
7:19;8:12;9:9;
16:1;41:12;77:18;
79:5
**argue (1)**
36:6
**arguments (1)**
65:9
**armed (2)**
41:2;54:23
**arrest (39)**
35:4;39:19;40:6,
20,24;41:2,5,12,21;
42:24;43:1;51:20;
52:22;54:19;62:10,
11,25;63:10,20;
64:13;73:12;82:19;
83:16;84:15;87:4,
10,11,14;94:3;

95:5,7,11,14,16,20,
23;96:1,4,9
**Arrest/Offense (1)**
55:13
**arrested (28)**
29:1,2,6;30:10,
14;35:11,19;37:10,
16;38:5,16,21,24;
39:15,17;40:5;
41:24;42:2;53:8;
59:11;60:3;62:15,
22;63:4;78:23;
79:6;93:23;94:17
**Arrestee (1)**
54:23
**arresting (8)**
42:6;44:9;62:21;
77:10;79:10,24;
83:7;96:8
**arrests (1)**
12:9
**assume (3)**
51:24;66:4;89:1
**assuming (8)**
54:12,15;60:1,2;
81:11,16;88:22;
91:9
**AT&T (11)**
16:3,4;19:10,16,
17;72:6,7,8;73:3;
76:1;89:11
**attend (6)**
23:10,22;24:2,9,
15;25:17
**attended (4)**
22:1,17;23:12,16
**attending (1)**
24:8
**attends (2)**
58:16;61:6
**attention (4)**
7:11,12;64:10,12
**attorney (3)**
72:14;84:3,8
**attorneys (1)**
12:23
**automatically (3)**
21:11;91:13;
93:3
**avoid (1)**
6:9
**aware (38)**
20:3;26:2,5;
28:20;36:15,20,22;
37:2,5,6;40:7;
44:22,22;64:15,19,
23;66:23;67:2,10,
13;70:14;85:23,25;
86:1,12,15;87:3,8;
91:19,23;92:2,6;
93:2,5,8,10,11,15
**awhile (1)**
89:18

## B

**back (9)**
19:13;20:14;
38:11;44:4;46:12;
91:2;93:24;94:18;
100:5
**backed (1)**
19:20
**Backus (2)**
90:6,16
**backwards (1)**
14:9
**bad (1)**
73:12
**Ball (1)**
85:16
**banging (1)**
58:4
**base (1)**
11:19
**based (4)**
32:21;33:9,19;
34:8
**basics (1)**
5:4
**basis (3)**
54:11;61:11;
78:17
**became (2)**
56:22;67:21
**become (2)**
11:1
**began (1)**
56:21
**begins (2)**
51:14;56:6
**behave (1)**
28:16
**behavior (6)**
30:8,9;38:2;
58:15;61:5;63:2
**bench (1)**
66:14
**best (4)**
5:22;6:2,9;73:15
**better (2)**
72:10;84:6
**big (1)**
72:12
**bit (14)**
5:3;10:23;15:11;
18:2;21:25;29:7;
33:23;34:6;46:3;
50:1,21;58:24;
72:12;73:14
**blank (1)**
54:15
**blow (1)**
84:4
**body (2)**
15:6;22:12

**boring (3)**
65:4,4,6
**boss (2)**
83:3,4
**Both (5)**
18:15,16;73:4;
87:21;90:16
**bottom (2)**
53:11;100:8
**boxes (1)**
51:3
**break (7)**
6:10,12,13,15;
45:22;46:1;93:19
**breaks (1)**
58:22
**breath (1)**
68:7
**Brian (2)**
53:20,25
**brief (2)**
94:1;100:3
**brighter (1)**
84:12
**bring (5)**
69:3;71:25;
83:25;87:20;88:23
**broke (2)**
62,13
**business (5)**
16:17;17:2,11;
35:24;92:12

## C

**call (27)**
7:13;17:3,6;
24:19,22;27:19;
28:2;37:11,23;
38:17;41:8,20,23;
42:1,9,12,16;76:8;
77:9;78:15,18;
82:10,22,24;83:6,
11,18
**called (21)**
12:24;13:4;25:1;
42:21;44:10,13,15;
57:21;75:9,16,20;
77:2,17,17;78:10;
79:1,10;80:2;81:6,
10;82:3
**Caller (1)**
49:18
**calling (8)**
58:4;76:5;77:13;
79:4,20,23;82:7;
85:20
**calls (2)**
82:13,16
**came (1)**
27:11
**camera (2)**
4:23;66:20

**camp (1)**
89:14

**can (21)**
5:6;6:9;7:3;
10:23;14:24;15:7;
24:5;25:7;27:15,
23;33:13,24;34:1;
46:20;47:8;69:2;
72:6,8,13;84:9;
93:25

**Cantalamessa (10)**
31:9;34:12,21,
23;35:1;36:23;
37:3;57:11;71:22;
95:24

**capacity (2)**
21:15;23:7

**career (5)**
9:1;12:10,20;
13:3;95:17

**case (5)**
4:12;17:15;18:9;
43:17;85:24

**cause (5)**
34:2;39:15;
46:11;49:9;52:8

**cautioned (1)**
4:3

**cellphone (12)**
15:16;16:8,14,
17,23;17:2;20:22;
25:10;56:16;66:10;
72:25;88:9

**cellphones (2)**
15:12,12

**certain (4)**
10:24;26:7;
31:21;86:13

**certified (1)**
11:1

**CFS (6)**
48:4,20,22,23,
25;49:6

**change (5)**
20:22,25;21:10;
92:10;93:9

**changed (1)**
21:3

**changing (1)**
92:5

**charge (2)**
43:14;54:10

**charges (6)**
45:6;70:25;71:3,
7,11;86:2

**charging (1)**
43:3

**Chat (1)**
80:6

**cite (2)**
62:17,20

**City (10)**
7:24,25;8:3,9,14,
17,22;22:9,10;
60:18

**Civil (3)**
90:5,8,9

**claimed (1)**
87:9

**claiming (1)**
69:25

**clear (2)**
5:17;18:24

**Clerk (9)**
31:5;56:11,20,
22;66:3,5,20;
68:22;96:2

**CLEs (1)**
12:24

**clock (1)**
84:24

**code (13)**
28:23;52:17,21,
24;53:1,5,9;55:4;
62:17,21,22,25;
74:16

**codes (4)**
11:3,5,11;13:18

**comments (1)**
66:18

**Commission (2)**
21:20,23

**Commissioner (89)**
4:12;23:19,23;
26:11;27:3,6;29:1;
30:13,18,20;31:3,6,
8,9,22,23;33:10,19;
34:13,23,25;35:4;
37:10,11,13,16;
38:1,6,16,21;
40:19;41:24;42:2,
6;44:1,9;45:2;46:5,
5;50:2;54:1;56:11;
57:7,10,14,20,21;
58:2,8,10;59:2;
61:25;62:10;63:1,
25;64:3,7,22;66:9,
23;68:18;69:21,23;
70:18;71:10,13,15,
17,20,22;77:10;
78:23;79:6,11,24;
82:19;83:7;86:3;
87:4,9;93:23;94:3;
95:21,24;96:5;
97:4,5,11,12

**Commissioners (33)**
14:5;22:1,5;
23:13;31:16;33:12,
21;35:13,14,17,23,
24;36:2,5,8,12,16;
37:17;45:14;59:15,
19,21,24;62:6;
63:5;65:1,6,9,19;
66:6;69:24;70:11;
95:4

**Commissioners' (1)**

**71:2**

**Commissioner's (1)**
56:12

**commit (1)**
40:23

**company (2)**
4:21;5:1

**comparing (1)**
61:15

**complained (1)**
26:7

**complaint (1)**
70:20

**complete (2)**
49:10;52:9

**completed (1)**
44:6

**completely (1)**
94:9

**COMPLETION (1)**
100:7

**comply (1)**
58:5

**computer (1)**
15:22

**concluded (1)**
98:9

**condensed (1)**
98:8

**condition (2)**
6:20,22

**conditions (1)**
26:7

**conduct (7)**
29:16,19;30:1,2,
3;35:6;61:16

**conducts (1)**
18:17

**confused (2)**
40:3;50:21

**Conn (1)**
74:7

**Connection (2)**
74:6,12

**consider (1)**
40:10

**considered (1)**
40:17

**constitutes (1)**
29:17

**constitution (1)**
11:21

**constitutional (4)**
11:14,17;13:7;
32:15

**contact (2)**
44:17;83:4

**contents (3)**
28:20;29:5;
82:15

**context (1)**
62:20

**continue (1)**

**68:7**

**continued (3)**
56:14;66:10,15

**continues (2)**
57:4;67:21

**continuing (12)**
12:24;28:9;
33:17;34:19;36:19;
37:1;47:25;49:12;
72:23;76:14;85:15;
92:17

**continuous (1)**
13:4

**contract (1)**
23:3

**copy (7)**
14:20;72:14,17;
98:1,4,7,8

**corner (2)**
48:22;55:5

**Correctional (1)**
9:14

**corrections (4)**
8:15;43:8;100:2,
4

**Council (1)**
22:9

**counsel (4)**
15:1;87:5,9;88:3

**count (1)**
48:16

**County (29)**
8:25;9:2,5;16:7,
13,17;17:2,11;
18:13;23:13;26:7;
35:24;49:23;50:8;
59:14,19,20,24;
62:6;64:25;69:8;
83:7;86:13,16;
87:6;88:12;92:12;
95:18;96:12

**County's (1)**
14:17

**couple (5)**
5:20;6:8;42:23;
94:24;96:19

**court (5)**
4:22;70:21;
97:21;98:3,6

**courts (3)**
90:12,15,17

**cover (1)**
53:23

**CPTs (1)**
13:5

**created (1)**
15:5

**crime (6)**
40:11,12,13,14,
16,17

**criminal (3)**
11:3,11;13:18

**critical (3)**

**26:12;38:6;**
63:24

**criticisms (1)**
64:8

**CROSS (2)**
4:5;95:1

**cuff (2)**
39:5,13

**cuffs (1)**
39:17

**current (2)**
19:21;95:24

**currently (2)**
7:7;89:23

**custody (7)**
39:20;40:1,4;
41:6,9;43:2;70:18

**D**

**daily (1)**
78:17

**danced (1)**
64:17

**date (8)**
50:11,14,22;
51:4;69:11;74:6,7;
100:7

**DAVIS (4)**
27:22,25;28:2,3

**Day (26)**
10:9;14:6;24:20,
23;37:24;49:16;
51:10;68:11;70:22,
23;73:12;75:20;
76:16;78:6,15,19,
22;80:3;81:22;
82:20,22;83:3;
84:15,24;85:3;
91:17

**Daylight (1)**
74:18

**days (4)**
21:4,10;93:9,16

**deal (1)**
5:9

**deals (1)**
11:20

**dealt (1)**
13:11

**December (2)**
23:17,18

**decide (2)**
62:25;70:19

**decided (2)**
39:5;64:12

**decision (1)**
95:7

**decorum (6)**
31:16,20;32:24;
33:4;59:24;71:2

**deep (1)**
68:7

**default (4)**
20:19;21:1,8;
93:5
**Defendant (1)**
86:12
**Defendants (1)**
90:25
**delete (7)**
20:4,5;21:4,11,
17;92:22;93:1
**deleted (3)**
20:1;91:11;
92:24
**deletes (1)**
91:13
**deletion (1)**
21:23
**demanded (1)**
64:3
**deny (2)**
79:2,3
**department (6)**
15:5;23:4;38:7;
54:6;64:4;89:24
**Department's (1)**
14:21
**Depending (2)**
43:14;83:3
**depends (1)**
18:18
**depiction (1)**
68:25
**depo (2)**
4:20;5:1
**deposed (2)**
4:15,17
**deposition (8)**
5:3;6:19;48:10;
69:15;72:2;83:21;
87:16;98:9
**deputies (7)**
4:19;17:3,7,14;
18:9;19:7,15
**deputy (22)**
9:23,25;10:15;
12:18;14:14;15:13;
18:20;24:16,17;
54:9;79:10,14,15,
18;84:19;85:17;
86:21;89:20,22;
90:8;9:92:12
**describe (1)**
64:24
**Description (2)**
55:13;100:3
**designate (1)**
53:4
**desk (1)**
56:13
**destroyed (1)**
15:7
**detail (2)**
14:5;22:12

**Detective (4)**
45:1,5,8;65:17
**detectives (1)**
65:22
**determination (1)**
58:8
**determines (1)**
15:6
**determining (1)**
55:11
**developments (1)**
13:8
**device (1)**
88:13
**dial (1)**
42:5
**dialed (4)**
77:6,24;78:3,5
**different (4)**
7:23;32:20;
59:23;90:11
**differently (3)**
32:20;34:8;
71:21
**disagree (3)**
21:12;84:16;
89:11
**disagreements (1)**
36:3
**disappoint (1)**
47:7
**disconnect (2)**
76:3,4
**discrimination (1)**
12:6
**discuss (4)**
44:17,20,23;96:7
**discussed (1)**
82:19
**discussing (2)**
17:7,14
**discussion (3)**
28:7;78:22;94:1
**discussions (1)**
30:18
**dismissed (1)**
86:2
**disrupting (2)**
14:1;60:4
**disruption (1)**
29:17
**disruptive (19)**
29:9;37:18,24;
46:6,9;57:5,8,14;
58:3,9,11,14;59:6;
61:5;63:6;97:6,9,
13,17
**disturbing (5)**
28:14;30:4;40:7;
52:15;55:14
**Division (9)**
9:6,8,13;10:3,4,
5,8;90:5,11

**doctor (1)**
26:13
**document (9)**
49:4,11;56:11,
15,21,23;69:3,5;
77:11
**Documents (3)**
87:24;91:1,23
**done (4)**
18:17;48:2;
57:24;63:21
**down (7)**
47:23;56:5;57:6;
69:2,19;73:11;75:4
**DOWNEY (1)**
98:8
**Dr (3)**
26:21,24;27:2
**drafted (1)**
56:1
**duly (1)**
4:2
**duration (1)**
81:7
**During (15)**
14:8,14;15:16;
35:5;38:14;42:16;
44:9;56:9;68:15;
70:15;71:15,22;
78:18;90:4;95:17
**duties (5)**
8:13;9:5,14;
10:7;23:11
**duty (1)**
92:13

**E**

**Earlier (11)**
22:4;52:20;
62:14;74:23;75:12,
19;76:6;82:9;
83:10;84:3;92:1
**easier (1)**
84:11
**Eastern (2)**
74:19;77:1
**education (1)**
12:24
**either (9)**
21:10;37:17;
43:14;46:4;54:16;
77:17;87:4,9;93:16
**elaborate (1)**
14:24
**eleven (1)**
49:10
**else (3)**
25:22;29:23;
88:17
**em (5)**
43:6,8;91:6;
92:22;93:1

**emailed (2)**
49:4;72:15
**emails (2)**
21:14,17
**emotional (1)**
56:22
**employee (3)**
64:21;66:6;96:5
**ends (1)**
25:10
**enforcement (1)**
7:18
**enough (2)**
62:16,25
**ensure (1)**
92:23
**entire (1)**
35:23
**entirely (1)**
53:7
**entirety (1)**
36:14
**environmental (2)**
23:8,9
**equally (2)**
32:17;33:5
**ERRATA (1)**
100:1
**ERROR (1)**
100:4
**escorted (2)**
39:2;41:16
**e-tran (1)**
98:5
**even (13)**
38:9;53:9;54:6;
58:15;60:8,14,20;
61:5;62:1,14,21;
64:11;83:11
**everybody (5)**
33:5;45:25;47:6,
7;88:16
**exact (4)**
41:18;48:18;
70:23;89:9
**EXAMINATION (3)**
4:5;95:1;97:1
**example (1)**
34:22
**exchange (1)**
19:11
**Excuse (1)**
15:18
**exhibit (15)**
46:19;47:4;48:9,
11;49:9;68:24;
69:14,16;72:1,1,3;
83:22;84:1;87:17,
21
**experience (1)**
5:3
**explain (4)**
10:23;61:2;62:9;

73:13
**extra (1)**
59:3

**F**

**face (2)**
56:23;57:3
**Facebook (2)**
66:10;67:24
**fact (4)**
58:10;83:15;
89:11;97:4
**failing (1)**
47:7
**fair (3)**
58:7;65:8;68:24
**familiar (6)**
14:17,23;32:4;
62:15,16;81:16
**family (1)**
67:25
**far (3)**
77:21;78:8;91:2
**fault (1)**
27:14
**feel (1)**
7:13
**fell (1)**
91:9
**felt (1)**
67:8
**few (4)**
4:25;83:2;89:6;
93:22
**Fifteen-plus (1)**
22:22
**file (1)**
70:20
**filed (1)**
70:25
**filing (4)**
45:6;71:3,6,10
**fill (2)**
53:15,16
**filled (5)**
53:17,18;94:8,
12,18
**filling (2)**
94:6,15
**film (4)**
66:11,15;67:11,
15
**filmed (2)**
67:3,23
**filming (4)**
66:9,19;67:7,18
**finally (1)**
6:17
**find (2)**
52:24;86:4
**fine (3)**
33:18;84:7;85:9

**finish (2)**
5:24;63:13
**finished (1)**
70:23
**first (12)**
5:19;9:4;11:25;
12:3;13:11;28:13;
30:14;48:4,21;
56:13;66:14;87:23
**five (3)**
20:2,10;41:19
**five-minute (2)**
45:22;46:1
**flicked (1)**
64:21
**floor (1)**
6:14
**following (2)**
32:16;88:10
**follows (1)**
4:4
**follow-ups (1)**
96:20
**forever (4)**
20:20;21:9;93:6,
16
**form (5)**
34:17;95:20,23;
96:1,4
**former (2)**
95:21;96:2
**forward (4)**
35:9;57:1,3;
63:12
**four (4)**
4:18;15:25;
74:19,23
**Fourth (1)**
11:22
**Frank (1)**
37:7
**free (1)**
7:13
**freedom (1)**
12:4
**Frenchko (73)**
4:12;23:19;26:6,
11;27:3,6;29:2;
30:13;31:3,6,9;
33:10,19;34:13,23,
25;35:5;37:11,17;
38:6,17,21;40:19;
41:24;42:2,7;44:7;
45:3;46:6;49:19;
56:12,21;57:7,14,
20;58:3,9,13;61:4;
63:25;64:3,7,22;
66:9,13,18,24;
67:22;70:18;77:10;
78:23;79:6,11,24;
82:19;83:16;86:3;
87:5,9;93:23;94:4;
95:5,8,11,14,21,24;

96:2,5,8,12;97:5,12
**Frenchko's (3)**
38:2;50:2;69:23
**front (2)**
84:9,10
**Fuda (23)**
30:18,20;31:22;
37:7,11,13;44:1;
57:7,10,12,13,22;
58:2,10;68:7,18;
71:10,13,18,20;
95:21;97:5,11
**full (1)**
7:3
**further (5)**
57:6;94:19,22;
96:17;97:19

**G**

**gave (3)**
25:17;59:5;
61:22
**gavel (2)**
32:9;58:4
**general (9)**
56:13;58:15;
59:7,9;61:6,16,24;
62:2,6
**Generally (2)**
11:5;88:6
**given (4)**
17:8;58:14,22;
61:4
**giving (1)**
15:2
**glad (1)**
34:2
**God (1)**
69:3
**goes (3)**
5:5;17:20;80:12
**good (8)**
4:10;5:17;12:17;
52:7;72:12;73:12,
15;78:16
**gossip (1)**
17:18
**government (1)**
67:12
**graduating (1)**
13:11
**Great (1)**
48:1
**Group (5)**
80:6,10;81:13,
18,22
**guess (1)**
92:10
**guessing (1)**
19:10
**guys (2)**
16:20;17:18

**H**

**hand (1)**
59:1
**handcuff (1)**
43:2
**hands (2)**
61:12,13
**happen (1)**
47:8
**happened (3)**
15:21;27:8;86:5
**happens (3)**
6:8;43:6,12
**hard (4)**
33:22,23;38:12;
66:19
**HAROLD (4)**
4:1;7:5;88:17;
90:21
**head (2)**
5:16;38:22
**heading (1)**
84:2
**hear (7)**
27:16;37:23;
46:9;57:11;64:2;
67:4,5
**heard (4)**
46:4;57:10,12,13
**hearing (2)**
38:12;65:19
**held (2)**
28:7;94:1
**Hello (2)**
4:7,8
**help (1)**
72:11
**herself (1)**
56:12
**Hey (1)**
27:22
**hide (1)**
56:23
**hiding (1)**
57:3
**himself (1)**
68:19
**history (1)**
6:24
**hits (1)**
32:9
**Hold (6)**
27:25;28:3;
34:21,22;82:1;
93:24
**home (1)**
50:2
**hopefully (1)**
84:8
**hours (7)**
10:24,25;73:23;

74:19,22,23;75:1
**Hughes (1)**
84:18
**human (1)**
17:24
**hundred (2)**
12:15;46:11

**I**

**icon (1)**
27:16
**idea (8)**
27:15;44:25;
46:22;58:1;68:4,
20;86:6;91:14
**identification (5)**
48:13;69:18;
72:5;83:24;87:19
**important (2)**
5:8;32:16
**inaccurate (1)**
73:9
**incarcerated (1)**
70:1
**incident (10)**
37:22;50:18;
51:3,5,6,14,20;
52:2,9;65:18
**include (1)**
11:22
**Incorrect (4)**
22:14;67:13;
76:1;82:10
**individual (1)**
53:22
**individuals (2)**
32:25;58:23
**inform (1)**
65:22
**information (2)**
50:2,7
**informed (1)**
65:18
**initial (1)**
10:16
**inmate (1)**
70:1
**instance (2)**
10:15;73:23
**instructed (2)**
23:22,24
**instructions (3)**
24:13;25:17,20
**insurance (2)**
4:21;5:1
**interfere (1)**
6:23
**internal (2)**
18:16,25
**Interrogatories (1)**
87:23
**Interrogatory (1)**

88:8
**interrupt (7)**
5:23;6:3,7;
27:18;36:9,16;
56:21
**interrupted (2)**
4:23;37:7
**interrupts (1)**
37:3
**into (8)**
39:20;40:4;41:6,
9;43:2;50:3;70:18;
71:2
**investigate (2)**
45:13;71:9
**investigation (3)**
45:2;71:1;94:19
**involve (1)**
54:16
**involves (1)**
13:22
**iPhone (12)**
15:17;19:22;
20:19;21:7;88:17,
20,21;89:3,12,15;
93:2,13
**issue (2)**
39:25;43:15
**issued (4)**
39:10,22;41:5;
45:18
**issues (3)**
11:14,17;15:22
**issuing (3)**
44:10;45:10,15
**item (4)**
74:3;75:4;76:21;
81:24

**J**

**jail (13)**
8:16,17;9:6,7,8,
12;10:3;26:8,12,
13;43:5,7;96:12
**job (1)**
23:7
**John (1)**
84:18
**Jonathan (1)**
85:16
**July (43)**
13:22;15:16;
22:2,6,12;23:15,
23;28:11,18,21,24;
31:16;32:5;35:5;
42:10,10,13,16,20;
45:19;50:11;54:7;
56:7;65:16;69:11;
70:11;71:23;74:9;
75:8,17;76:24;
77:18;78:9;79:1,
15;82:2,7;83:7;

84:21;85:21;90:22;
91:22;95:4
**June (1)**
69:23

## K

**Kaintz (5)**
24:4;25:16;
53:20,25;54:13
**K-A-I-N-T-Z (1)**
24:6
**Kata (1)**
79:13
**keep (1)**
63:3
**keeping (1)**
32:2
**keeps (1)**
31:24
**kept (1)**
97:11
**kind (12)**
7:1;10:14;12:18;
13:2;14:24;17:7,
21;27:16;29:25;
58:24;61:12,13
**Klotz (3)**
31:6;70:15;
94:14
**knew (3)**
29:11;32:12;
62:25
**knowledge (2)**
19:5;21:19
**knows (1)**
69:4

## L

**labelled (1)**
72:20
**large (3)**
13:21,21;58:7
**largely (1)**
54:15
**last (2)**
20:2;23:15
**late (1)**
8:7
**later (2)**
77:14;80:2
**latitude (2)**
59:3,18
**law (6)**
7:17;10:18;
32:15,20;62:12,13
**lawful (4)**
4:2;52:15;55:14;
56:10
**laws (2)**
14:1;32:17
**laxed (1)**

58:24
**layman's (1)**
29:24
**leading (1)**
51:20
**learn (5)**
10:18;11:18;
12:2,5;28:13
**learning (2)**
11:2,6
**leave (1)**
8:22
**left (2)**
51:4,9
**left-hand (2)**
48:22;55:5
**legal (1)**
12:24
**letter (25)**
25:25;26:3,6,19,
20;63:21,24;64:3,
8;66:11,16;68:8,
11,14,18,22;69:22,
24;70:4,6,8,10,13,
14;91:20
**level (1)**
40:13
**lieu (2)**
40:6;41:6
**Lieutenant (4)**
24:1,3;54:13;
78:14
**life (1)**
60:20
**line (2)**
56:5;100:3
**listed (1)**
68:11
**listened (1)**
57:25
**LISTING (1)**
100:2
**litigation (1)**
87:5
**little (20)**
5:3;10:23;15:11;
18:2;21:25;29:7;
33:23;34:6;46:3;
50:1,21;58:24;
59:3;61:12,13;
72:10,12;73:14;
84:11,11
**Live (2)**
66:10;67:24
**Location (1)**
49:22
**logging (1)**
21:8
**logs (2)**
73:3,5
**long (11)**
7:17;8:11;9:7;
15:1;19:5;20:12;

41:15;61:14;70:19;
96:11,13
**longer (1)**
85:18
**look (10)**
25:8,9,13;49:15;
53:1;55:4;66:2;
80:17;85:6;88:6
**looked (1)**
53:2
**looking (5)**
46:13,15;48:3,
18;49:6
**looks (8)**
55:25;56:4;
72:12;77:2;80:24;
81:5;82:2,12
**lose (1)**
27:8
**loss (1)**
29:25
**lot (1)**
91:10
**Lou (1)**
89:20
**low (1)**
40:13
**Lt (1)**
24:4

## M

**M4S (1)**
55:18
**Mackey (3)**
45:1,5;65:17
**Mackey's (1)**
45:8
**maintain (2)**
92:13,20
**maintained (1)**
92:24
**maintaining (1)**
21:9
**makes (1)**
30:4
**Malvasi (3)**
26:21,25;27:2
**manually (1)**
93:9
**many (4)**
12:9;30:10;
67:23;71:5
**marine (1)**
65:3
**mark (5)**
47:4;69:13;72:1;
84:1;87:21
**marked (6)**
48:12;69:17;
72:4;80:8;83:23;
87:18
**MARKS (1)**

100:4
**married (1)**
9:15
**Matt (4)**
4:11;7:13,16;
27:22
**matter (5)**
44:18,20,23;
67:19;82:15
**Mauro (5)**
31:9;34:12;35:1;
36:23;37:3
**may (3)**
27:18;88:11;
89:11
**maybe (3)**
17:14;46:21;
47:6
**mean (17)**
10:22;16:4;20:8,
9;37:20;55:1;
58:22;59:8,9;
62:10,14;65:2;
67:8;89:5,8;90:10;
91:5
**means (3)**
51:11;55:7;89:6
**medical (2)**
6:20,22
**medication (1)**
6:23
**meeting (85)**
13:22,25;14:2,5;
22:1,5,9,12,15;
23:13,16,23;24:2,8,
10,14;25:17;26:3,
6,11,18;28:11,14,
16;29:10,20,21,22;
30:2,4,5,17,21;
31:10;32:10;35:5,
6,7,8,14,23;37:24;
38:14;40:8;44:10;
46:12;52:15;53:23;
54:3,6;55:14;
56:10,25;59:11,15,
19,21;60:4,8,9,12,
15,22;62:7;63:1,3,
11,12;64:1,20;
65:1,3,6,19;66:9;
67:5,18;68:15;
69:24;70:11,15;
71:23;78:18;94:6;
95:4
**meetings (26)**
11:10,10;13:19;
22:16,17;23:10;
31:24;36:12;37:7;
38:3;45:11;47:16;
54:1;57:20;59:22,
25;60:5,18;64:16;
65:10;67:12,15,23;
71:5,6,15
**member (8)**

59:7,14,18;
60:11,14,21;62:5;
64:19
**members (2)**
61:16;64:16
**memory (1)**
94:9
**mens (1)**
29:13
**mess (1)**
6:5
**message (4)**
73:4;80:11,12;
81:13
**messages (33)**
17:10;18:4,9;
19:6,14,19,23;20:1,
6,9,14,20;21:1,4,9;
38:13;81:19,22;
84:14;86:16,19,22;
90:21;91:2,10,17,
24;92:3,14,21;
93:3,6,12
**messaging (2)**
17:14;92:11
**met (2)**
4:13;86:6
**methods (1)**
20:15
**Michele (1)**
49:19
**middle (4)**
51:5,13,19;54:22
**might (7)**
18:21;48:19;
80:10;88:23,24;
96:19
**military (4)**
51:23;73:16,17,
19
**MILLER-NOVAK (38)**
4:6,11;27:23;
28:1,4,9;33:9,17;
34:19;36:19;37:1;
45:21,25;46:25;
47:3,11,14,18,20,
22,25;48:8;49:3,8,
12;63:9;72:16,19,
23;76:14;85:15;
92:17;93:18;94:22;
96:18;97:2,19,24
**mind (5)**
15:2,3;46:10;
84:5;85:8
**minutes (4)**
41:19;77:14;
79:6;93:19
**Misdemeanor (1)**
40:8
**Miss (12)**
26:6;44:6;95:5,7,
11,14,20,23;96:1,4,
8,11

**Mobility (1)**
72:7
**model (4)**
15:15;88:9,16;
89:9
**moment (3)**
17:8;28:3;38:5
**Monroe (21)**
24:19,22;25:1;
26:2;27:6;41:23;
42:1,9,12,17,20;
43:22;44:24;63:22;
69:9;76:16;80:2;
81:6;82:6,20,24
**Monroe's (3)**
25:4;75:13;77:6
**months (1)**
15:25
**More (12)**
12:12,13,14,15;
50:1,7;56:5;58:15;
59:6;61:5,23;93:22
**morning (6)**
25:2;49:4;72:15;
79:21;85:4,21
**most (3)**
5:9;9:1;48:1
**mother (1)**
69:25
**move (1)**
21:25
**moving (1)**
47:22
**much (5)**
10:18;11:20;
20:4;59:18;62:4
**multiple (2)**
23:10;80:7
**Municipal (1)**
70:21
**mute (2)**
27:20,23
**myself (3)**
44:5;45:22;62:9

**N**

**nah-uhs (1)**
5:16
**name (7)**
4:11;7:3;9:17;
37:11,14;49:18,19
**narrative (1)**
55:24
**nature (1)**
5:14
**necessarily (1)**
40:4
**necessary (2)**
44:6;68:22
**need (5)**
6:10,12;7:11,12;
39:13

9
**needed (3)**
32:24;33:4;
100:5
**negotiate (1)**
16:22
**neither (1)**
25:1
**nervous (1)**
67:22
**new (4)**
13:7;19:24;69:5;
89:15
**news (4)**
73:12,13,16;
87:13
**next (8)**
43:3;54:14,15,
19;55:24;58:13;
65:12;76:20
**nice (1)**
67:24
**Nicholas (2)**
78:13,22
**Nick (1)**
90:6
**Nicole (1)**
49:19
**nine (1)**
79:5
**nitty-gritty (1)**
7:2
**Nodding (2)**
5:7;29:12
**None (5)**
55:5,7,9;71:4,8
**noon (1)**
75:2
**nor (1)**
25:1
**normal (1)**
68:14
**number (44)**
6:4,4;25:5;
28:23;42:5;48:11,
23;52:21,25;53:1,
9;54:23;55:2;
62:17;69:16;72:3,
25;75:5,8,13;76:5,
21;77:2,7,22,24;
78:5;80:7,9,9,23,
25,25;81:14,17;
83:22;85:5,11,14;
87:17;88:8;90:20;
100:2,3
**numbers (1)**
80:7
**numerous (3)**
57:7;58:3;97:4

**O**

**oath (5)**
4:3;42:5,15;83:5,

9
**Objection (7)**
33:8,13;34:17;
36:17,24;63:7;
92:15
**obviously (4)**
5:16;12:19;30:9;
81:8
**occurred (9)**
45:18;50:18;
51:5,6,15,16;52:1;
65:18,23
**o'clock (2)**
85:4;98:10
**off (8)**
28:4,7;38:22;
64:21;89:17;91:9;
93:25;94:2
**offense (1)**
52:14
**offensive (2)**
30:7,9
**Office (10)**
8:25;9:2;17:21;
23:19;44:4;50:9;
69:9;85:18,19;
95:14
**Officer (3)**
53:12,19;90:3
**officers (3)**
43:9;44:18,21
**official (2)**
32:1;56:10
**officials (1)**
88:10
**often (3)**
10:12;30:25;
82:24
**Ohio (1)**
51:2
**old (1)**
89:7
**once (4)**
31:1;78:6;83:1,2
**One (22)**
4:19;5:23;6:4;
17:21;18:3;21:11;
31:23;32:9;34:12;
35:16;47:7;50:25;
66:13;72:19;77:21,
23;78:10;80:4,8;
93:9,16,24
**one's (1)**
6:18
**only (3)**
6:13;77:20;
93:11
**open (3)**
47:15,15;67:11
**operating (1)**
88:10
**Operations (1)**
10:10

**opportunity (7)**
58:14,15;59:6;
61:4,5,23;62:5
**options (2)**
93:12,16
**order (10)**
10:25;31:12,24;
32:2;57:17,18,21;
58:4;97:7,8
**ordered (3)**
95:10,13,16
**orderliness (1)**
64:25
**orderly (1)**
63:3
**original (1)**
98:1
**originating (3)**
75:8;80:23,25;
81:14
**Otherwise (1)**
96:19
**out (5)**
16:11;37:11;
39:2;41:16;43:19,
23;53:15,16,17,18;
57:21;58:25;66:13;
67:22;72:13;80:11;
81:19;86:4;89:14,
16;94:6,8,12,15,18
**outside (1)**
18:14
**over (3)**
5:4;36:23;69:6
**overnight (1)**
96:14
**oversight (1)**
11:10
**overtime (1)**
23:11
**overwrite (1)**
91:11
**own (4)**
16:11;44:9;56:4;
63:1

**P**

**Padula (4)**
89:20;90:13,14,
16
**page (17)**
48:4,21;49:25;
50:1,6;53:11;
54:14,15,19;55:4,
24;65:13;72:6;
74:2;76:21;88:7;
100:2
**pages (6)**
48:14;49:10;
56:5;72:18,20;84:2
**paid (4)**
16:23;22:23;

23:11;89:17
**paper (1)**
81:12
**paperwork (2)**
44:6;70:24
**parentheses (1)**
80:8
**part (2)**
35:13;54:22
**participate (1)**
45:1
**participation (2)**
71:14,15
**particular (2)**
18:19,20
**partner (1)**
28:1
**part-time (1)**
7:21
**passed (1)**
5:19
**past (10)**
23:13;26:22;
27:3,6;30:11;
33:12,21;36:13;
57:19;67:23
**Patrol (1)**
79:14
**patrolling (1)**
10:11
**patrols (1)**
65:3
**Paul (1)**
69:9
**Paula (17)**
31:6;56:11;
63:20;66:3,8,15,19,
25;67:3,6,17,23;
68:5,6;70:15;
94:14;96:2
**pay (4)**
16:7,10;97:25;
98:1
**paying (2)**
64:10,11
**pdf (2)**
48:14;98:4
**people (7)**
30:10;32:17;
34:8;36:23;37:3;
48:25;67:14
**per (1)**
61:13
**percent (1)**
46:11
**perfect (2)**
34:4,4
**person (2)**
4:13;30:14
**personal (1)**
88:13
**personnel (1)**
8:20

**person's (1)**
30:1
**phone (42)**
15:19,23;16:2;
17:4,7;18:5;19:9,
11,21,24,24;20:2,5,
12,14;21:3;25:4,6;
27:19,24;28:2;
73:3,14;75:13,23,
25;76:5;77:5,16;
78:9;80:15;82:13,
16;84:14;85:14;
86:13;88:12;89:2,
9,15;91:13;92:24
**phones (1)**
78:10
**pictures (1)**
91:16
**Plaintiff's (1)**
87:22
**plan (4)**
95:20,23;96:1,4
**please (8)**
5:24;6:11;7:3,
12;24:5;100:1,4,7
**pm (5)**
73:23;74:23;
80:2;82:7;90:22
**pocket (2)**
16:11;89:10
**point (16)**
31:21;35:23;
43:20,23;44:1;
56:22;57:17,18,21;
58:4,8,23;66:13;
96:8;97:7,8
**police (4)**
10:17,19;49:16;
68:25
**possibility (4)**
12:17;38:18;
52:7;78:17
**possible (2)**
18:4;41:4
**possibly (1)**
5:5
**potentially (1)**
96:7
**powers (3)**
32:5,8;71:18
**prepare (1)**
28:10
**prepared (1)**
63:17
**present (1)**
88:11
**preservation (4)**
91:20,24;92:7;
93:12
**preserve (2)**
86:18,22
**preserved (1)**
92:3

**president (1)**
71:18
**presiding (2)**
31:23;32:1
**pretty (2)**
11:20;65:3
**previous (3)**
37:6;64:15,20
**previously (1)**
70:1
**Prior (22)**
13:25;14:5;22:5,
12;26:5,10,18;
28:18;30:17;38:3;
45:11;54:7;65:9;
70:5,6,10,13;71:2,
5,6;95:3;96:8
**probably (6)**
6:7;12:15;31:1;
39:12;41:18;59:11
**problem (1)**
45:24
**problems (1)**
89:18
**procedure (1)**
45:14
**process (2)**
42:24;43:3
**Produce (1)**
90:20
**Production (2)**
87:24;90:20
**professional (3)**
13:5;21:15;27:1
**Professionally (1)**
30:24
**proficient (1)**
10:21
**progression (1)**
30:6
**prompted (1)**
97:15
**properly (1)**
15:23
**property (1)**
54:17
**prosecution (1)**
45:2
**prosecutor (8)**
43:15,16,20,23;
44:11;85:24;86:2,8
**provide (6)**
18:21;23:4;24:7;
43:25;44:3;88:8
**provided (4)**
22:11;54:6;73:5;
88:12
**providing (1)**
54:10
**public (40)**
11:10,10;13:18;
14:2,11,15;15:6,7;
18:5,10;19:1;

22:12;28:14;37:8;
40:8;56:14;58:16;
59:7,9,14,18;60:4,
12,15,21,21;61:6,
16,24;62:2,6;
64:16,20,21;66:15;
67:11,15,25;69:24;
71:14
**punished (5)**
33:11,20;34:13,
14,25
**purposes (5)**
48:12;69:17;
72:4;83:23;87:18
**put (8)**
18:13;29:24;
39:17;46:20;47:5;
57:18;62:8;84:9

**Q**

**quite (2)**
72:9;89:6
**quote (1)**
97:6

**R**

**randomly (1)**
68:14
**rank (2)**
7:15;54:12
**rather (1)**
5:15
**rea (1)**
29:13
**reach (1)**
43:19
**reached (1)**
43:23
**read (10)**
26:3,6;50:3;57:4,
6;68:7,14,18,22;
97:20
**reading (14)**
26:19,19;56:10,
15,20,24;61:3;
63:16,18,21;66:11,
15;69:23;70:15
**real (1)**
5:22
**reality (1)**
52:12
**realized (1)**
64:1
**really (4)**
5:9;58:25;65:4;
67:19
**reason (7)**
7:12;13:21;24:7;
40:22;73:8;84:15;
89:11
**recall (27)**

6:24;12:7;13:14;
25:12,23;27:7;
37:25;38:15;42:11;
46:11;60:16,23;
76:17,18;77:12,13;
78:16,20;79:4,4;
81:23;82:6,18;
83:19,20;91:25;
96:11
**receive (3)**
11:9,13;14:11
**received (7)**
13:10,17;14:15,
20;19:2;81:21;
90:21
**recess (2)**
46:2;93:20
**record (11)**
5:12,17;6:5;7:4;
28:5,5,8;50:1,4;
93:25;94:2
**recording (3)**
50:23;56:15;
94:5
**records (16)**
14:11,15,18,21,
23;15:4,7;18:5,10;
19:1,1;21:20,22;
51:19;73:14;86:13
**RECROSS (1)**
97:1
**refer (2)**
7:10;97:4
**reference (3)**
23:8;30:1;34:22
**referring (2)**
50:25;80:5
**regarding (2)**
73:5;85:24
**regardless (3)**
32:25;33:5;
88:11
**regular (1)**
54:10
**regularly (1)**
54:6
**reiterate (4)**
33:2,15;46:10;
60:10
**relating (2)**
13:18;14:1
**relationship (1)**
26:24
**relevance (1)**
68:3
**relevant (1)**
56:24
**remember (18)**
5:8;38:19,20;
41:11;46:6;76:5,7;
78:21;79:9,20,23;
80:1;82:13,14;
83:11,13;84:20;

85:20
**remove (4)**
60:7,8,11,17
**removed (6)**
56:12;59:11,13;
60:14,21;62:1
**rephrase (1)**
33:24
**report (34)**
14:25;43:11,13;
44:5;46:15;47:9;
49:16;50:14,22,24;
51:3,4,10;52:5,9;
60:24;61:1,2,3;
68:25;70:24;75:23;
76:1;77:6;80:15,
15;89:2;94:6,8,12,
15,19;97:3,9
**reporter (4)**
4:22;97:21;98:3,
6
**Reporting (2)**
53:12;87:13
**reports (3)**
77:16;78:9;
84:14
**represent (6)**
4:12;21:7;73:2;
77:1;84:13;89:8
**Request (7)**
87:24;90:19;
91:1,23;92:7,8,9
**requested (4)**
86:13,15;91:6;
92:3
**Requests (1)**
87:22
**required (1)**
16:10
**resource (1)**
90:3
**respond (1)**
5:24
**responding (2)**
64:8;66:24
**response (1)**
69:22
**responses (2)**
5:14;87:22
**responsibili- (1)**
90:1
**responsibilities (1)**
31:25
**responsive (1)**
91:1
**rest (1)**
72:8
**results (1)**
85:13
**retain (1)**
19:6
**retention (5)**
14:18,21,24;

15:4;21:20
**retentions (1)**
  19:1
**review (1)**
  45:11
**rewrite (1)**
  91:10
**right (27)**
  5:6;15:15;17:1;
  19:21;29:25;31:21;
  32:13;38:22;46:13;
  48:3;50:17;51:6,
  17;57:4,11;67:7,
  11;68:24;77:9;
  79:10;80:9,17;
  81:5;83:25;84:12;
  93:21;96:16
**Road (5)**
  10:4,5,7,9;79:14
**Robert (3)**
  53:12;56:1;
  87:22
**Robert's (2)**
  31:12,14
**role (2)**
  45:5,8
**room (3)**
  39:3;41:16;
  56:14
**Ross (11)**
  24:18;44:5,20,
  23;45:23;53:12,17;
  56:1,3;70:25;86:21
**Ross's (1)**
  87:22
**row (2)**
  56:13;66:14
**rude (1)**
  6:4
**rule (4)**
  32:24;33:3;
  34:12,14
**rules (15)**
  5:5,9;31:12,14,
  15,19;33:4,11,20;
  34:7;35:1;45:13;
  59:23;71:2,14

**S**

**safe (2)**
  17:3;36:11
**safely (1)**
  88:25
**same (6)**
  32:25;34:14,23;
  48:18;71:22;90:7
**sat (3)**
  56:13;61:12,13
**save (1)**
  20:20
**saves (1)**
  93:3

**saving (1)**
  93:6
**Savings (1)**
  74:18
**saw (1)**
  27:13
**saying (12)**
  38:10;39:16;
  52:2;58:10;63:5,
  14,15;64:12;75:25;
  83:10,17;97:12
**schedule (5)**
  14:18,22,24;
  15:4,5
**school (4)**
  90:3,4,5,14
**screen (9)**
  7:7;20:14;27:12,
  17;46:21;47:5,13;
  69:5;84:11
**scroll (1)**
  73:11
**scrolling (1)**
  69:19
**se (1)**
  61:13
**seat (1)**
  66:14
**seating (2)**
  56:14;66:15
**second (5)**
  47:8;49:25;
  87:23;88:7;93:24
**sections (2)**
  11:7,8
**security (5)**
  14:4;22:11;23:4;
  24:16;54:6,10
**seeing (1)**
  75:23
**seems (2)**
  50:1,6
**send (3)**
  18:4;21:14;
  38:13
**sends (1)**
  80:11
**sent (3)**
  46:19;84:2;
  90:21
**Sergeant (21)**
  4:19;7:7,10;
  24:18;44:5,20,23;
  45:22,23;46:3;
  48:15;49:13;53:12,
  17;56:1;70:25;
  72:24;93:21;95:3;
  97:3,24
**serious (1)**
  40:11
**set (4)**
  9:4;20:5;69:2;
  87:23

**setting (3)**
  20:19;21:3,8
**settings (2)**
  20:22,25
**S-G-T (1)**
  7:6
**shaking (1)**
  5:16
**share (1)**
  47:13
**shared (2)**
  46:21;47:5
**sheet (4)**
  75:7;100:1,6,8
**Sheriff (29)**
  24:19,22;25:1,4,
  25;26:2;27:5;
  41:23;42:1,9,12,17,
  20;43:22;44:13,15,
  24;63:22;69:9;
  75:13;76:16;77:6;
  80:2;81:5;82:6,20,
  24;83:6;95:10
**Sheriff's (13)**
  8:25;9:2;14:21;
  23:3;38:7;50:8;
  54:5;64:4;69:8;
  85:18,19;89:23;
  95:14
**shift (1)**
  85:3
**shorthand (1)**
  5:21
**shots (1)**
  20:15
**sic (2)**
  65:3;82:7
**side (2)**
  56:14;75:5
**SIGN (1)**
  100:7
**SIGNATURE_DATE_ (1)**
  100:25
**similar (1)**
  80:5
**single (1)**
  40:4
**site (1)**
  47:15
**sits (1)**
  89:9
**sitting (1)**
  19:4
**skills (1)**
  47:6
**small (1)**
  72:9
**solely (1)**
  45:18
**somebody (5)**
  39:17,19;43:1;
  59:8;60:4
**someone (9)**

31:20;40:4;60:7,
  9,17;61:23;62:2;
  92:2;95:17
**sometimes (10)**
  16:16;17:2,3,6,
  10,13,20;36:2,5,8
**Sorry (9)**
  27:12;28:4;
  33:16;42:10;45:23;
  51:1;55:8;60:10;
  67:4
**sound (1)**
  9:10
**Southington (1)**
  22:20
**speak (4)**
  31:21;35:14,24;
  68:4
**speakers (1)**
  37:7
**speaking (4)**
  35:19;37:4;
  73:22;75:1
**special (3)**
  85:23;86:1,7
**specifically (2)**
  13:15,16
**speculation (1)**
  34:18
**speech (1)**
  12:4
**spell (1)**
  24:5
**spend (1)**
  11:2
**sporadic (1)**
  83:1
**spouse (1)**
  64:21
**SRO (1)**
  90:7
**stand (3)**
  38:25;55:20;
  75:22
**Standard (4)**
  10:20,20,23;77:1
**start (4)**
  7:20;85:3;89:18;
  95:3
**started (8)**
  4:15;7:21;8:4,7;
  47:12;51:20;57:5;
  58:25
**starting (1)**
  48:25
**starts (2)**
  32:10;56:9
**state (2)**
  7:3;11:1
**stated (2)**
  66:8;68:6
**statement (15)**
  15:2;21:12;

32:16;55:25,25;
  56:4,6;58:13;59:5,
  5;61:19;63:16;
  66:25;84:16;86:10
**statements (2)**
  26:12;66:2
**states (1)**
  66:8
**stating (2)**
  66:19;97:5
**station (6)**
  41:17,21;53:2;
  70:19;94:4,18
**statute (10)**
  28:14,18,21,24;
  29:3,14,17;30:11,
  15;62:15
**stay (1)**
  20:11
**step (1)**
  43:3
**steps (1)**
  92:20
**Steve (7)**
  27:24;28:1
**still (9)**
  10:5;15:19;20:8,
  9;27:16;47:20;
  65:13;79:18;92:6
**stop (8)**
  35:7;57:2,8;58:3,
  14;61:5;67:7,18
**stopped (5)**
  35:6,8;52:2;
  56:25;63:11
**Stopping (4)**
  29:20,21,22;30:5
**store (3)**
  19:16,17;89:15
**street (1)**
  10:11
**stressed (1)**
  67:22
**subject (1)**
  82:15
**submitted (1)**
  21:22
**subpoenaed (1)**
  73:3
**subsection (2)**
  53:5,8
**substantive (1)**
  50:7
**successful (1)**
  48:2
**SUDHOFF (7)**
  27:18;34:17;
  94:24;95:2;96:16;
  98:6,7
**suggested (1)**
  18:8
**Summary (3)**
  48:4,20;49:7

Case: 4:23-cv-00781-JPC  Doc #: 45-1  Filed: 10/20/23  111 of 113.  PageID #: 779

Niki Frenchko v.                                                      Harold A. Wix
Paul Monroe, et al.                                                   August 21, 2023

summons (12)
39:10,23,25;
40:6;41:5;43:15,
25;44:3,10;45:10,
15,18
superior (2)
44:18,21
Supervisor (3)
10:9;80:6,11
supervisors (1)
80:12
Supplement (3)
49:1;54:20,21
supply (1)
16:13
suppose (1)
67:9
supposed (1)
19:5
sure (11)
5:13;13:13;
17:19;27:13,20;
33:3;48:17;49:9;
53:7,9;84:6
Susan (5)
5:11;28:6;48:8;
97:24;98:2
Suspect/Arrest (1)
54:21
suspects (1)
32:20
suspicion (1)
41:1
sworn (1)
4:3
system (1)
88:10

**T**

tag (1)
48:8
talk (13)
15:11;17:21;
30:25;42:25;43:15,
16;73:17;76:16;
78:17;81:8;83:18;
94:11,14
talked (8)
26:21;27:2,5;
31:2,5,8;83:13;
86:7
talking (5)
35:10;57:22;
64:7;65:5;81:14
talks (1)
36:23
teach (1)
73:15
technically (1)
75:1
technological (1)
47:6

telling (1)
41:13
ten (7)
9:9;10:2;12:12,
13,14;48:19;93:19
terminating (1)
80:25
terms (2)
5:5;29:24
test (1)
5:19
testified (5)
22:4;34:6;62:14;
75:12,19
testify (3)
4:3;76:7;83:6
testifying (1)
62:24
testimony (13)
20:18;21:2;
24:25;42:4,15,19;
44:8;45:17;46:8;
57:9;75:22;76:15;
91:12
texting (1)
84:20
things' (1)
67:24
third (1)
50:6
though (1)
84:5
threatened (1)
87:5
three (8)
4:18;15:25;
35:16;51:3;77:18;
78:10;93:12,15
throughout (2)
12:20;13:3
Thursday (1)
65:16
ties (1)
90:2
till (1)
89:18
times (10)
6:8;36:23;37:2;
57:7;58:3;67:23;
77:18;78:10;83:3;
97:4
Timko (3)
78:13,22;79:10
today (23)
4:9,14;5:12;6:11,
24;7:11;13:22;
19:4;20:18;21:2;
24:25;42:4,15;
44:8;45:17;46:8;
70:5,7,13;76:15;
83:5;84:3;91:12
together (2)
46:17,20

told (8)
18:3;24:1;25:16;
67:3;68:7;86:18,
21;92:2
took (5)
51:10;68:6;
70:17;86:10;94:18
top (4)
38:22;48:22;
55:5;74:3
topic (3)
18:18,20,21
touched (1)
11:19
tough (1)
12:8
Township (14)
7:22,23;8:2;
22:16,17,18,20,20;
23:1;60:8,9,12,12,
15
townships (2)
23:10;59:22
Township's (1)
60:5
Tracy (3)
9:18,19,21
traded (1)
16:5
trained (3)
12:19;14:1,10
trainers (1)
18:14
training (14)
10:14,16,25;
11:9,13;13:5;
14:12,15;18:7,18,
22,25;28:17;32:14
trainings (7)
12:21;13:2,6,10,
17;18:12,17
transcribed (4)
5:10;97:22,25;
98:2
TRANSCRIPT (1)
100:5
transfer (1)
8:8
transferred (1)
19:24
transport (1)
43:5
treating (1)
71:21
tried (2)
16:24;56:23
Trumbull (15)
8:25;9:2,5;
23:13;49:22;50:8;
59:14,19,20,24;
62:6;64:25;69:8;
95:18;96:12
try (8)

5:22;6:9;34:1;
47:1,4;62:8;69:3;
73:13
trying (3)
47:15;57:17;
63:13
Turn (1)
10:9
turned (2)
16:4;19:9
two (4)
6:4;56:5;77:21;
83:2
type (1)
12:2
typical (1)
64:25
typically (3)
15:6;18:17;
73:22
typing (1)
5:21

**U**

uh-huhs (1)
5:15
unable (2)
24:9,11
unarmed (1)
55:11
unaware (1)
64:6
uncomfortable (1)
67:8
unconstitutional (1)
87:10
under (9)
30:11,14;42:4,
15;49:18;53:8;
83:5,9;88:15
Underneath (3)
52:14;80:7,22
Uniform (2)
51:2;74:16
union (2)
16:20,22
Unknown (2)
55:2,3
unquote (1)
97:6
unreadable (1)
72:9
up (22)
6:5;19:13,20;
20:14;25:8,9,14;
27:11;38:25;47:5;
53:1,2;59:10;
66:13;69:3;70:23;
71:25;83:25;84:4;
85:6;87:20;88:23
update (1)
13:6

updated (2)
12:21;13:2
upgrade (1)
19:11
upon (6)
4:3;32:21;33:9,
19;34:8;100:7
use (5)
15:12;16:17;
17:10;100:1,5
used (2)
31:16;88:10
using (2)
17:1;28:2
usually (2)
53:25;89:17
UTC (7)
74:13,15;75:2,8,
17;76:25;81:6
utilized (1)
45:14

**V**

vehicle (1)
54:16
verbal (2)
5:14,17
verbally (1)
56:21
versed (1)
18:21
video (5)
37:19,21,22;
94:5,5
view (1)
71:6
viewpoint (2)
12:6;33:6
viewpoints (3)
32:21;33:1;34:8
violated (3)
33:12,21;34:12
violating (3)
33:20;34:14;
35:1
violations (1)
33:11
violence (1)
40:23
violent (3)
40:16,17,20
visibly (1)
56:22
Vivoda-Klotz (2)
56:11;96:2
voice (3)
73:4,5;80:15
voluntarily (1)
86:2

**W**

Niki Frenchko v.
Paul Monroe, et al.

Harold A. Wix
August 21, 2023

**wants (1)**
97:25
**warned (2)**
57:7;58:2
**Warren (17)**
7:22,23,24,25;
8:2,3,9,13,22;22:8,
9,10,18,19;60:12,
18;70:20
**watch (2)**
71:6;94:4
**watched (2)**
36:12;37:22
**watching (2)**
37:19,20
**way (3)**
34:1;38:11;
82:12
**Wayne (1)**
65:17
**week (1)**
83:2
**weeks (1)**
83:2
**weird (1)**
6:18
**weren't (7)**
32:4;53:7,9;
62:14;64:11;91:11,
15
**west (1)**
8:3
**What's (9)**
9:17;17:8;26:24;
43:3;56:18,24;
61:2,11;68:3
**whatsoever (3)**
13:18;18:7;
94:20
**Whereupon (10)**
4:22;28:7;46:2;
48:10;69:15;72:2;
83:21;87:16;93:20;
94:1
**Whose (2)**
85:5,14
**wife (1)**
9:17
**William (1)**
79:13
**within (3)**
8:23;20:2;41:19
**without (1)**
94:19
**witness (10)**
4:2,24;33:15;
36:18,25;45:24;
46:24;63:8;85:13;
92:16
**witnessed (1)**
65:9
**witnesses (1)**
94:11

**WIX (18)**
4:1,7;7:5,11;
9:19;37:14;45:23;
46:3;49:13;72:20,
24;84:2;88:17;
90:21;93:21;95:3;
97:3,24
**word (1)**
97:9
**words (3)**
29:25;55:10;
67:17
**work (8)**
22:25;23:9,14;
53:25;59:21;69:4;
73:14;90:16
**worked (5)**
8:15;14:4;22:5,
8;23:9
**working (4)**
10:2;15:23;
84:23;90:13
**works (4)**
85:18;90:4,12,15
**wow (1)**
47:5
**write (2)**
55:22;65:13
**writing (2)**
14:25;69:22
**written (5)**
5:12;25:25;
46:15;63:21;69:25
**wrong (3)**
16:25;35:22;
56:18
**wrote (1)**
26:3

**Y**

**year (6)**
8:12,23;21:11;
31:1;93:9,16
**years (10)**
4:19;5:1;7:19;
8:5;9:9;10:2;20:2,
10;22:22;89:6
**YOSOWITZ (23)**
33:8,13;36:17,
24;46:23;47:2,10,
12,17,19,21,24;
49:6;63:7;72:18,
22;76:13;85:12;
92:15;96:21;97:20,
23;98:4
**you' (1)**
66:21

**Z**

**zoom (3)**
4:23;27:19;

47:15

**0**

**0:00 (1)**
81:8
**02 (1)**
81:8

**1**

**1 (3)**
48:9,11;68:24
**1:00 (2)**
73:23;74:23
**10:00 (1)**
90:22
**10:30 (1)**
25:21
**11 (6)**
48:14;88:21,24;
89:3,12;93:2
**11:11 (1)**
79:1
**11:20 (2)**
41:12;51:21
**11:22 (2)**
50:15;52:6
**11:24 (3)**
50:18;52:1,2
**11:32 (2)**
77:1,6
**11:43 (1)**
75:17
**11:46 (1)**
98:10
**11:50 (1)**
76:11
**12 (10)**
15:17,18;20:19;
21:7;88:17,20,23,
24,25;89:1
**1300 (2)**
73:23;74:22
**1316 (1)**
74:3
**1-317-664-9900 (1)**
81:15
**1330 (1)**
75:5
**1-330-609-9037 (7)**
42:6;75:9,13;
77:3;78:2;80:24;
82:3
**1-330-883-6975 (5)**
75:9;77:2;78:3;
81:1;82:3
**1344 (3)**
76:22,25;77:21
**1346 (1)**
80:23
**1347 (4)**
77:25;78:1;

80:18,20
**1348 (4)**
80:4,6,8,19
**1387 (2)**
81:24;82:1
**14 (2)**
15:17;19:22
**15:32:59 (1)**
76:25
**15:33:09 (1)**
81:6
**15:33:10 (1)**
77:24
**1600 (1)**
75:1
**1997 (1)**
8:5
**1st (2)**
69:23;88:11

**2**

**2 (2)**
69:14,16
**2:00 (1)**
90:22
**20:39:12 (1)**
82:3
**2008 (1)**
9:10
**2022 (43)**
13:23;15:16;
22:2,6,13;23:16,
23;28:11,18,21,24;
31:17;32:5;35:5;
42:10,13,16,20;
45:19;50:11;54:7;
56:7;69:11,24;
70:11;71:23;74:9;
75:8,17;76:24;
77:18;78:9;79:1,
16;82:2,7;83:8;
84:21;85:21;88:11;
90:22;91:22;95:4
**2023 (2)**
42:10;65:17
**21 (1)**
23:18
**22-07729 (1)**
48:22
**26 (2)**
7:19;8:5
**29 (1)**
11:7
**2917.12 (2)**
52:17;55:16

**3**

**3 (3)**
72:1,3;88:8
**30 (4)**
21:4,10;93:9,16

**3218 (1)**
72:20
**330-609-3220 (1)**
85:5
**330-883-6975 (1)**
72:25
**3878 (1)**
84:2
**3879 (1)**
84:2

**4**

**4 (3)**
40:8;83:22;84:1
**4:39 (1)**
80:2
**45 (1)**
11:7

**5**

**5 (2)**
87:17,21
**5th (1)**
69:11

**6**

**6:39 (1)**
82:7
**609 (1)**
85:11
**609-3220 (1)**
85:12

**7**

**7 (4)**
82:2;84:21;
85:21;90:22
**7:00 (1)**
85:4
**7:06 (2)**
84:20,24
**7th (37)**
13:22;22:2,6,13;
23:16,23;28:11,18,
21,24;31:16;32:5;
35:5;42:10,10,13,
16,20;45:19;50:11;
54:7;56:7;65:17;
70:11;71:23;74:9;
75:8,17;76:24;
77:18;78:9;79:1,
15;82:7;83:7;
91:22;95:4

**8**

**8 (1)**
90:20

## 9

**9037 (2)**
  25:11,15
**96 (2)**
  8:7,7
**97 (1)**
  8:10
**99 (5)**
  54:23;55:2,4,7,9