## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **NIKI FRENCHKO** | : | **Case Number:** 4:23-cv-00781 |
| | : | |
| | : | **Judge:** J. Phillip Calabrese |
| | : | |
| Plaintiff, | : | |
| -vs- | : | |
| | : | |
| **PAUL MONROE, et al** | : | |
| | : | |
| | : | |
| Defendants. | : | |

---

### PLAINTIFF NIKI FRENCHKO'S *PARTIAL* MOTION FOR SUMMARY JUDGMENT AND MOTION FOR SANCTIONS

---

Plaintiff Niki Frenchko moves this Court for partial summary judgment under Fed. Rule 56 against all Defendants. In addition, Frenchko moves for Sanctions under Fed. Rule 37 against Defendants Trumbull County, Trumbull County Sheriff's Department, Trumbull County Commissioners, Sheriff Paul Monroe, Robert Ross, and Mauro Cantalamessa for the spoliation of evidence. A Memorandum in Support of this Motion is attached.

Respectfully Submitted,


***/s/ Matt Miller-Novak***
Matthew Miller-Novak (0091402)
Steven C. Davis, Esq. (0065838)
Barron, Peck, Bennie & Schlemmer
3074 Madison Road
Cincinnati, Ohio 45209
(513) 721-1350
MMN@BPBSLaw.com
SCD@BPBSlaw.com

***/s/ David J. Betras***
David J. Betras (0030575)
6630 Seville Drive
Canfield, Ohio 44406
Telephone: (330) 746-8484
Facsimile: (330) 702-8280
Email: dbetras@bkmlaws.com

Attorneys for Plaintiff

## TABLE OF CONTENTS

**MEMORANDUM IN SUPPORT OF MOTIONS**..........................................................1

**SUMMARY OF THE ARGUMENT.**...............................................................................1

**ISSUED PRESENTED FOR DECISION.**.....................................................................1

**BACKGROUND FACTS**...............................................................................................2

    A. Defendants dislike Frenchko and her viewpoints....................................................2
    B. Defendants' meetings are the like the Wild West....................................................3
    C. Defendant Fuda held up pictures of Frenchko's used tampons to cause disruptions during meetings...........................................................................................................4
    D. Frenchko criticized the sheriff's department...........................................................5
    E. Fuda disrupted the meeting to read the Sheriff's letter...........................................5
    F. Fuda caused Frenchko to get out of her seat to record the clerk.............................7
    G. Defendants retaliated against Frenchko for criticizing government officials and refusing to apologize.....................................................................................................8
    H. Defendants used R.C. § 2917.12 to punish Frenchko's viewpoints........................10
    I. Sheriff Monroe punished Frenchko because of her viewpoints.............................11
    J. Defendant Ross admitted that he never determined Frenchko had the purpose to disrupt the meeting.....................................................................................................12
    K. Defendants treated Frenchko differently than everyone else because of her viewpoints....................................................................................................................13
        1. Commissioners always argued and interrupted each other during their meetings............................................................................................................14
        2. Chaos and emotional abuse are commonplace in the commissioners' meetings............................................................................................................16
        3. Defendants never arrested other people they removed from meetings......17
    L. Defendants destroyed public records and evidence...............................................18
    M. Defendants received plenty of notice to preserve text messages...........................19
    N. The deleted text messages related to this Action...................................................21
    O. Defendants' spoliation damaged Frenchko............................................................23

**LAW AND ARGUMENT**..............................................................................................24

    A. Defendants violated the First Amendment of the United States Constitution.....24
        1. R.C. § 2917.12 facially violates the First Amendment.................................26
        2. Defendants retaliated against Frenchko's viewpoints................................34
    B. Defendants violated the Fourth Amendment of the United States Constitution..36
        1. There was no probable cause to arrest Frenchko.......................................38
        2. Defendants retaliated against Frenchko for insulting government officials.........................................................................................................38
    C. Defendants destroyed evidence and public records...............................................39
        1. Defendants unlawfully destroyed public records.......................................39
        2. Defendants willfully destroyed relevant evidence......................................41

**CONCLUSION**.................................................................................................................46

ii

# TABLE OF AUTHORITIES

## Cases

*2023 Ohio Sunshine Law Manual*......................................................................................7

*McVey v. Carthage Twp. Trustees,* 4th Distr. Athens No. 04CA44, 2005-Ohio-2869......7

*Kline v. Davis,* 4th Distr. Lawrence Nos. 00CA32, 01CA13, 2001-Ohio-2625...................7

*Texas v. Johnson,* 491 U.S. 397, 414, 109 S. Ct. 2533 (1989)...........................................24

*Cohen v. California*, 403 U.S. 15, 91 S. Ct. 1780 (1971).....................................................24

*Citizens for Cmty. Values, Inc. v. Upper Arlington Pub. Library Bd. Of Trs.,* No. C-2-08-223, 2008 U.S. Distr. LEXIS 85439 (S.D. Ohio Aug. 14, 2008)..........................24, 25

*Pouillon v. City of Owosso*, 206 F. 3d 711, 715 (6th Cir. 2000).........................................25

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)....................25

*Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015).............................25, 26, 27, 28, 29

*Good News Club . Milford Central School*, 121 S. Ct. 2093, 533 U.S. 98, 106-7 (2001)............................................................................................................................25, 35

*Teufel v. Princeton City Sch. Dist. Bd. Of Educ.*, No. 1:12-cv-355, 2013 U.S. Distr. LEXIS 4923, 29031 (S.D. Ohio Jan. 11, 2013)...................................................................25

*Billboard Co. V. City of Toledo*, 690 F.Supp2d 651, 666 (N.D. Ohio 2010).....................25

*Pagan v. Fruchey*, 492 F.3d 766, 771 (6th Circ. 2007).......................................................25

*Matal v. Tam*, 137 S. Ct. 1744, 1763 (2018)..............................................26, 27, 28, 29, 30

*Rosenberger v. Rectors and Visitors of University of Virginia*, 515 U.S. 819, 829-30 (1995)...................................................................................................................................26

*Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96 (1972)..............................................26

*Turn Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641-3 (1994)..............................26

*McCullen v. Coakley*, 573 U.S. 464, 478 (2014)...............................................................27

*Zapach v. Dismute*, 134 F. Supp. 2d 682, 692 (E.D. Pa. 2001)..........................................27

*Burnham v. Ianni*, 119 F. 3d 668, 676 (8th Cir. 1997) (en banc)........................................27

*Iancu v. Brunetti*, 139 S. Ct. 2294, 2294 (2019)................................................27, 28, 29, 30

*Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653 (2011)...............................................................27

*Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)....................................28

*AFDI v. Sub. Mobility Auth. For Regional Transp.*, 978 F. 3d 481, 498-504 (6th Cir. 2020)........................................................................................................................29, 30

*Minnesota Voters Alliance v. Mansky*, 138 S.Ct. 1876, 1888 (2018)..............................29

*Ison v. Madison Local School Dist.*, 3 F.4th 887 (6th Circ. 2021).........................30, 31, 32

*Houston v. Hill*, 482 U.S. 451, 107 S. Ct. 2502 (1987).........................................32, 33, 34

*Gooding v. Wilson*, 405 U.S. 518, 92 S. Ct. 1103 (1972)..............................................33, 34

*Terminiello v. Chicago*, 337 U.S. 1, 4-5, 69 S. Ct. 894 (1949)....................................33, 34

*Barrett v. Harrington*, 130 F.3d 246, 263 (6th Cir. 1997).................................................34

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019)..........................................................................35

*Wood v. Eubanks*, 25 F.4th 414 (6th Cir. 2022)...........................................................36, 37

*Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018)...................................................37

*Kish v. City of Akron*, 2006-Ohio-1244, 109 Ohio St. 3d 162, 848 N.E.2d 811 (Ohio 2006)..................................................................................................................39, 41

*State ex rel Gannett Satellite Information Network, Inc. v. Petro* (1997), 80 Ohio St. 3d 261, 264, 1997 Ohio 319, 685 N.E.2d 1223.......................................................................39

*State ex rel Strothers v. Wertheim* (1997(, 80 Ohio St.3d 155, 157, 1997 Ohio 349, 684 N.E.2d 1239.........................................................................................................................39

*Beaven v. United States DOJ*, 622 F.3d 540, 553-554 (6th Cir. 2010)........................41, 42

*Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004)................................41

*Kronisch v. United States*, 150 F.4d 112, 126 (2d Cir. 1998)...........................................42

## Statutes

O.R.C. § 2917.12..............................................6, 10, 11, 12, 13, 25, 26, 31, 32, 38

O.R.C § 149.351......................................................................................................6, 40

iv

<u>**MEMORANDUM IN SUPPORT OF MOTIONS**</u>

## I.     SUMMARY OF THE ARGUMENT

This is a case about a government which abused its police powers to retaliate against an elected official for making critical statements about the Sheriff and his political allies.  Plaintiff Niki Frenchko ("Frenchko") was arrested during her own meeting for responding to Defendant Sheriff Paul Monroe's ("Monroe") chastising letter that accused her of dishonesty and demanded a public apology.  Because Frenchko refused to apologize to the Sheriff, and she criticized the "chief law enforcement official in Trumbull County," the Defendants Trumbull County ("County"), Trumbull County Sheriff's Department ("Department"), Sheriff Paul Monroe ("Monroe"), Sgt. Robert Ross ("Ross"), Sgt. Harold Wix ("Wix"), Frank Fuda ("Fuda"), and Mauro Cantalamessa ("Cantalamessa") (collectively "Defendants") utilized a facially unconstitutional statute and maliciously prosecuted Frenchko in violation of the First and Fourth Amendment of the United States Constitution.  The Defendants then unlawfully purged every single text message from their cellphones to destroy evidence of their conspiracy and intent to retaliate against Commissioner Frenchko's viewpoints.

This Court should grant Plaintiff Frenchko's Partial Motion for Summary Judgment for her claims under the First and Fourth Amendment, as well as the destruction of public records under Count I, Count II, Count III, Count IV and Count X. This Court should further sanction Defendants for spoliation of evidence.

## II.    ISSUES PRESENTED FOR DECISION

Frenchko's Motion for Summary Judgment addresses the following issues for this Court's determination:

1. Whether R.C. § 2917.12 is facially unconstitutional under the First Amendment because it criminalizes viewpoints that offend government listeners.

2. Whether Defendants violated the First Amendment because they retaliated against Frenchko for her critical viewpoints.

3. Whether Defendants violated the Fourth Amendment and arrested Frenchko without probable cause to retaliate against her viewpoints.

4. Whether Defendants destroyed public records under R.C. § 149.351.

5. Whether Defendants unlawfully destroyed evidence relevant to this Action.

### III.    BACKGROUND FACTS

#### A. Defendants dislike Frenchko and her viewpoints.

Fuda and Cantalamessa were both County Commissioners during July of 2022. The Defendant County Commissioners and Defendant Sheriff Monroe are Democrats. Frenchko ran for office as a Republican, and she promised the Trumbull County voters to challenge the status quo.  She won her election, so the Trumbull County voters seemingly desired these challenges to Defendants' leadership.  Frenchko fiercely challenges Defendants' past and current practices, and she is the first woman on the Board. Frenchko does not represent that she is always kind to Defendants' officials.

When Frenchko believes that the County's employees and officials are failing to perform for the taxpayers, she lets them know.  Defendants do not appreciate her criticisms, and they accuse her of lying in plenty of public meetings.  As explained below, Defendants have no problem publicly criticizing Frenchko and arguing with her in meetings.  However, only Frenchko was ever arrested.

### B. Defendants' meetings are like the Wild West.

Defendant Fuda claimed he moderated Defendants' meetings with Robert's Rules of Order.  (PAGEID# 42, Fuda Depo at 17).  He did not.  For example, the Commissioners never asked the Chair for permission to speak, so the Commissioners always interrupted one another.  (Id. at 54:8-13).  Even though Robert's Rules required Fuda to relinquish the Chair when he engaged in debate, Fuda never did. (Id. at 28:13-17; Exhibit 1 at 2).[1] Fuda would instead start debates, then he would moderate his own debates in violation of Robert's Rules.   In fact, Fuda was known to throw plenty of stones while sitting in the Chair.  For example, on May 18, 2022, video footage of the meetings exemplifies Fuda's aggressiveness as acting Chair, as he slams his gavel and attacks Commissioner Frenchko's character.  (See Exhibit 11 (manually filed) at "(12) May 18, 2022, Gavel"). There is also footage of Defendants Cantalamessa and Fuda engaged in fierce debate at the end of that same meeting.  Defendants Fuda and Cantalamessa abruptly ended that meeting, they continued to argue with Frenchko, and they even argued with the audience. (Id. at "(13) May 18, 2022, Debate").

Defendants will surely blame Plaintiff Frenchko for all their disorder because they despise her critical viewpoints of them, and they are in love with their criticisms of her. However, Defendants Fuda and Cantalamessa engaged in their share of interrupting and arguing.  As a normal course of business, Defendants' meetings were chaotic, and all the commissioners regularly and repeatedly interrupted each other and said unkind things to one another.   (PAGEID #43, Cantalamessa Depo at 76-82). Simply stated, all

---

[1] Under the relevant section of the 12th Edition of Robert's Rules of Order Section 4329, the Rules require that the president relinquish his Chair when engaging in debate.

commissioners were engaged in chaotic meetings and arguing.  Until Frenchko criticized

Sheriff Monroe, the deputies never lifted a single finger, let alone arrested anyone.

### C. Defendant Fuda held up pictures of Frenchko's used tampons to cause disruptions during meetings.

Even though Defendants want to blame Frenchko for all the chaos, they cannot.

Defendant Fuda engaged in disgusting conduct during meetings.  For instance, Fuda had

staff take pictures of Frenchko's used bloody tampons from the feminine waste receptacle

in her restroom. (PAGEID#42, Fuda Depo at 86-88).  On multiple occasions, Fuda would

then hold up pictures of Frenchko's own used tampons in her face. (Id.)  See the following

testimony:

Q.  And you were holding up pictures of the women's trash can that
contained tampons?

A.  No.  That was given to me by the cleaning people.

Q.  And you were holding up pictures during meetings to Ms. Frenchko?

A.  I did.

Q.  Do you think that that's not disruptive as a Chair?

A.  No.

(Id. at 10-19).

***

Q.  So your testimony today under oath that as a Chair of a board meeting
to hold up pictures to a female board member showing used tampons during
a meeting is not disruptive?

A.  That was part of her bullying to the cleaning people, as far as I'm
concerned.

***

Q.  Okay.  You decided to do that, correct?

A.  That's correct.

Q.  And you're the chair of the meeting, correct?

A.  Correct.

(Id. at 86-87).

4

Fuda did not maintain order.  He instead invited, instigated, and created disorder with disgusting behavior.  Defendant Fuda nonetheless disingenuously tried to blame Frenchko for his own decision to waive around pictures of her used tampons.  (Id.)

### D. Frenchko criticized the Sheriff's Department.

On June 1, 2022, Frenchko read a letter from the mother of an inmate that accused both the Sheriff's Department of poor performance and medical standards.  Sheriff Monroe was clearly furious, he wrote a scathing letter to the Commissioners, he accused Frenchko of recklessness, and he demanded a public apology during a meeting.  (PAGEID #44, Monroe Depo at 33; 39:15-17).  The letter was not kind. (Exhibit 2).  The letter was authoritarian and disparaged Frenchko's character.  (Id.)  Defendant Fuda called Monroe after receiving the letter, and Fuda decided he would publicly read Monroe's letter during the July 7, 2023, commissioners meeting.  (PAGEID #44, Monroe Depo 46-47).  Thus, Defendant Fuda decided to initiate a debate with Commissioner Frenchko on the matter and demand a public apology from her during a meeting.

### E. Fuda disrupted the meeting to read the Sheriff's letter.

Fuda violated Robert's Rules and caused the disruption during the meeting on July 7, 2022.  The meeting agenda mentioned nothing about reading the Sheriff's letter on July 7, 2022.  Fuda understood that Robert's Rules demand that the presiding officer follow the agenda, but Fuda ignored the agenda regardless. (PAGEID #42, Fuda Depo at 22:4-22; 78-79; 40:14-16 (Fuda admitted it was his *primary duty* to follow the agenda under Robert's Rules)).  Robert's Rules require that the board votes on amendments to the agenda, but Fuda ignored these rules. (Id.)  Instead of following Robert's Rules, Fuda ordered the clerk to read the Sheriff's letter, accuse Frenchko of lying about the Sheriff, and to demand that Frenchko publicly apologize to Sheriff Monroe. (Id. at 79).  In

5

addition, even though Robert's Rules expressly demand that the presiding officer forfeits the chair when he engages in debate, Fuda chaired his own debate.  (Id. at 93:15-21, see also, Exhibit 1, Robert's Rules Section 4329 (demanding that "the impartiality required of the Chair in an assembly precludes his exercising [his rights to debate] while he is presiding")).  Thus, Fuda violated Robert's Rules on July 7, 2022, in numerous ways.

While the clerk was reading the letter, Commissioner Frenchko objected to the deviation from the agenda. (Exhibit 11, C. "(2) July 7 Meeting Audio at 42:38).[2]  Under Robert's Rules, this objection was essentially an "order of the day" objection.  (See Exhibit 1 at 3).   The presiding officer is then *required* to submit the deviation to a vote or otherwise return to the agenda.  (Id.)  In fact, Fuda acknowledged that he was required to call a vote when Commissioner Frenchko objected to deviating from the agenda.  See the following excerpts.

> Q. All right.  Well, are you aware that when someone makes a motion or brings up that the agenda's being deviated from that they're making an order of the day motion?
>
> A. Oh, yes, I understand that sure.
>
> ***
>
> Q. Okay. So what your testimony is right now is if the agenda is being deviated from and a member brings that up that you're supposed to call a vote at that time?
>
> A. Correct.
>
> (PAGEID #42,  Fuda Depo at 24-36).

Therefore, Fuda was violating the rules because he deviated from the agenda, did not submit the deviation for a vote, and he chaired his own debate.   Indeed, when Commissioner Frenchko objected to the deviation, Fuda shouted at her for violating Robert's Rules while he was the first person to violate Robert's Rules because he deviated

---

[2] This is the Defendants' official audio recording of the July 7, 2022, meeting where Frenchko was arrested.

from the agenda without a vote and continued to Chair his own debate.  (Exhibit 11 at "(2) July 7, 2022_Meeting Audio" at 43:42).    At that moment, Fuda was simply more interested in the political theater than his own adherence to the Rules. If the Chair himself is violating the rules of order for his own theater, he is to blame for the resulting disruptions.

### F. Fuda caused Frenchko to get out of her seat to record the clerk.

Defendants' Police Report complains that Frenchko got out of her seat to film the clerk. (Exhibit 3 at 6-11).    However, Fuda caused this to occur.  Instead of permitting Frenchko to livestream the meeting as required under Ohio law, Fuda purposely held up a paper to obstruct Frenchko's line of sight to stop her from recording the clerk.[3]

> A. . . . I remember her getting out of her seat and going up in front of Ms. Klotz and –
>
> Q. Well, because she was videotaping Ms. Klotz, right?
>
> A. She videotaped everything.
>
> Q. Do you recall holding up a piece of paper at the time so she couldn't – she couldn't view Ms. Klotz from her seat?
>
> A. I used to have to put a piece of paper in front of her many times.
>
> ***
>
> Q. Her cell phone.  You were obstructing her video then, correct?
>
> A. I just had a piece of paper there.
>
> (Id. at 83:5-18).

Thus, Fuda's disruptive behavior was the reason that Frenchko got out of her seat to record the clerk.  Once again, when the Chair is violating the rules and instigating disruption, it is a sham for him to blame the resulting disruptions on others.

---

[3] See 2023 Ohio Sunshine Law Manual at 113; see also, *McVey v. Carthage Twp. Trustees*, 4th Dist. Athens No. 04CA44, 2005-Ohio-2869, ¶ 14-15; *Kline v. Davis*, 4th Dist. Lawrence Nos. 00CA32, 01CA13, 2001-Ohio-2625.

7

## G. Defendants retaliated against Frenchko for criticizing government officials and refusing to apologize.

Defendants never threatened Frenchko when the clerk was reading the letter. However, when *Frenchko had the floor*, she discussed another complaint about the jail she had received. (Exhibit 11 at "(2) July 7, 2022_Meeting Audio" at 48:30). Frenchko explained that one complaint included allegations that an inmate was taken off his medicine and ended up dying. (Id. at 48:40). This comment led to her persecution.

Defendants immediately interrupted Frenchko at this point to stop her critical viewpoints about the jail. (Id. at 48:47). Because of this viewpoint, Defendant Cantalamessa claimed that "this is getting disruptive." (Id. at 48:52) Frenchko replied, "is it really"? (Id.) Defendant Cantalamessa replied it was because "you're talking about the chief law enforcement officer in Trumbull County, and it's unacceptable." (Id. at 48:56). Defendant Cantalamessa admitted in deposition that he did accuse Frenchko of disrupting the meeting because he disagreed with her viewpoints.

> Q. Okay. And when she was responding, at some point you say that [you're] being disruptive. You're talking about the top law enforcement official in the county, correct?
>
> A. I do say that, yes.
>
> Q. Why did you say that?
>
> A. Because he is, because I think the allegations there were made from Commissioner Frenchko were not substantiated to begin with . . . And then when she goes off and attacks him once again, I just don't think that makes for very good government . . .
>
> (PAGEID #43, Cantalamessa Depo at 50-51).

As shown in his testimony, he stated that Commissioner Frenchko was disruptive because she "attack[ed]" the Sheriff with "allegations." Then, Defendant Cantalamessa told

8

Frenchko that she could be removed for disrupting the meeting an instant before her arrest. (Id. at 81).

At the same time, Fuda continued to violate Robert's Rules, to deprive Frenchko the opportunity to respond. But he knew he should have permitted Frenchko to respond to the Sheriff's criticisms.

> Q. Okay. And after she [the clerk] was finished reading the letter, Ms. Frenchko sat down, correct?
>
> A. I believe that is what happened.
>
> Q. Okay. And Ms. Frenchko – do you believe she should have an opportunity to respond to this?
>
> A. I wouldn't have stopped her from responding to this.
>
> (PAGEID #42, Fuda Depo at 94:7-16).

Thus, Fuda unwittingly admitted that he *should* have permitted Frenchko to respond to the Sheriff's criticisms in the meeting. However, he did not.

In fact, at this point, **Fuda called out Defendant Wix's name**. (Exhibit 11 at "(2) July 7, 2022_Meeting Audio" at 49:12). After calling out for Wix, Fuda is heard in the recording stating "you got a choice...do you want to apologize for the sheriff"? (Id. at 49:16). "If you don't, we're going to move on." (Id.) Because she refused to apologize and attempted to continue her critical statements, Defendant Wix then approached Frenchko, he battered her, and he arrested her.

Wix admitted in his deposition that he determined Frenchko was disrupting the meeting because Defendant Fuda said she was.

> Q. So is it fair to say that a large point of your determination that Commissioner Frenchko was being disruptive had to do with the fact that Commissioner Fuda was saying she was being disruptive?
>
> A. Yes.
>
> (PAGEID # 45, Wix Depo at 58: 7-12).

9

Defendants did not arrest Frenchko because she interrupted the clerk.  Defendants instead interrupted Frenchko and accused her of disrupting the meeting the moment she mentioned another complaint about the jail.  Defendants then immediately told her she was not permitted to talk about the chief law enforcement officer in the County, they demanded an apology, and they arrested her when she refused to apologize.

### H. Defendants used R.C. § 2917.12 to punish Frenchko's viewpoints.

The Defendants arrested Commissioner Frenchko under R.C. § 2917.12 ("Statute"). This Statute state that "no person, with purpose to prevent or disrupt a lawful meeting, procession, or gathering, shall do either of the following:"

> (1)  Do any act which obstructs or interferes with the due conduct of such meeting, procession, or gathering;
>
> (2) Make any utterance, gesture, or display which **outrages the sensibilities of the group**. (R.C. § 2917.12) (emphasis added).

Thus, the Statute expressly criminalizes statements that hurt the government's feelings. Defendant Wix allegedly did not even know the language of the Statue before he arrested Commissioner Frenchko, so he had no clue which subsection under which he arrested her.

> Q. And you weren't entirely sure what subsection you arrested her under because you weren't even sure of the code number, correct?
>
> A. Correct.
>
> Q. And you couldn't cite the context of the code before arresting her, so you didn't even know what the code said before you arrested her?
>
> A. Correct.
>
> (PAGEID #45, Wix Depo at 53: 7-10; 62:20-23)

However, Wix did testify that he felt that offensive comments were disruptive to a meeting.  When asked whether the Statute dictated that offensive conduct was disruptive, Wix replied: **"Obviously, offensive behavior**."  (Id. at 30:7-9) (emphasis added).

10

### I. Sheriff Monroe punished Frenchko because of her viewpoints.

Defendant Monroe used this overly broad and viewpoint-based statute (R.C. §
2917.12) to punish his political rival.  Defendant Monroe was directly involved in the
malicious prosecution of Frenchko, even if he wanted to pretend otherwise.  Defendant
Monroe was furious that Frenchko criticized his jail.  (PAGEID #44, Monroe Depo at
39:15-17). Defendant Monroe text messaged and called a news reporter both right before
and after Frenchko's arrest. (Id. at 76-77).  That same reporter, Nadine Grimley, was the
first person to publish the arrest, and her story was online within thirty minutes of the
arrest.  (Exhibit 4).  That story already included a quote from Monroe. (Id.)   Defendant
Monroe also called both the arresting deputies before and after they arrested Frenchko.
(PAGEID # 44, Monroe Depo at 60:18-20). Sheriff Monroe called the Trumbull County
prosecutor after Frenchko's arrest.   (Id. at  78-79).   Monroe also called Warren's
prosecutor after Frenchko's arrest, who is Cantalamessa's brother.   (Id. at  63:4-6).
Monroe also reviewed all the information and approved prosecuting Frenchko **before**
the charges were filed against her in the Warren Municipal Court. (Id. at 61).

When asked why he approved the prosecution of Frenchko, Monroe expressed
clear animosity towards Frenchko's viewpoints, and he determined that Frenchko
violated R.C. § 2917.12 because her comments outraged his sensibilities.

> Q.  Okay.  You looked at the statute.  What conduct do you think justifies a
> criminal charge?
>
> [omitted objections]
>
> A. Well, the fact that Michele Frenchko put another employee in emotional
> distress to the point where she couldn't face the public and is visibly crying.
> What she did to that employee publicly and disrupting the meeting -- if you
> show me the revised code here, let's look at it.
>
> Q. Well, we'll -- we can look at it.
>
> ***

11

A.  I just -- I look to you.  If that was your mother that was being emotionally crushed and put in emotional distress, what do you do?  Just watch your mom get beat up?

Q. What's that?

A.  Just watch your mom get verbally abused?

(Id. at 55-56)

Monroe could have comforted the clerk if he was that concerned about her feelings.

He instead abused his police power to punish his critic the day she refused to seek his

forgiveness.

### J.  Defendant Ross admitted that he never determined Frenchko had the purpose to disrupt the meeting.

Defendant Ross understands the difference between purposeful crimes and

negligent crimes.  (PAGEID #46, Ross Depo at 14-15).  The Statue he arrested Frenchko

under expressly requires that a person act with the "purpose" to disrupt a meeting.  R.C.

§ 2917.12.  Defendant Ross reviewed video of the meeting, and he admitted that he did

not determine it was Frenchko's actual "purpose" to disrupt the meeting.  Instead, it was

apparent to him that it was Frenchko's purpose to respond to the Sheriff's letter.

Q. So earlier you said your impression was that she [Frenchko] was upset and she was trying to respond to the letter.

A. I'd say that's fair.

\*\*\*

**Q. Before filing charges, did you make a determination what her intentions were while she was [allegedly] disrupting the meeting?**

**A. No.**

\*\*\*

Q. Okay.  Have you ever read the statute you arrested her under?

A. I have.

Q. Would you agree it says no purpose -- no person with purpose to prevent or disrupt the meeting disrupt a lawful meeting, procession or gathering shall either of the following.  Do you understand that?

A. Uh-huh, yes.

12

Q. So it says the words with the purpose.

A. Okay.

Q. Do you understand that as meaning you inten[d] to disrupt the meeting?

[objection omitted]

A. Yes.

Q. Okay. Which is opposed to different than an accidental or negligent disruption, correct?

A. Correct.

(Id. at 67-68) (emphasis added).

Thus, even though R.C. § 2917.12 requires that a person have the "purpose" to disrupt the meeting, Defendant Ross unreasonably did not even consider whether Frenchko exhibited such purpose before prosecuting her. There was no probable cause to arrest or prosecute Frenchko for having the "purpose" to disrupt the meeting.

In fact, the special prosecutor voluntarily dismissed the case for lack of sufficient evidence even though the entire event was captured on video.

## K. Defendants treated Frenchko differently than everyone else because of her viewpoints.

Defendants knew that they had a duty to not apply the law unequally based on a person's viewpoints. They did precisely that. Ross admitted the following.

Q. So before you arrest somebody, you should have a good idea whether or not you're enforcing the law equally, correct?

A. Correct.

(Id. at 62:8-11).

\*\*\*

Q. So you did no background research to find out whether or not the rules of decorum were applied evenly before filing charges?

A. Correct.

(Id. at 17-20).

13

Ross did nothing to ensure the rules of decorum were applied equally regardless of viewpoints.  Likewise, Defendant Wix also admitted that he investigated nothing before prosecuting Commissioner Frenchko.

> Q   Sure.  If there was a rule of decorum, would you agree that those rules needed to be applied to everybody equally regardless of viewpoint?
>
> A   Yes
>
> ***
>
> Q   Oh, okay.  So then you agree that if Commissioner Frenchko is going to be punished for violating the rules, so should Mauro Cantalamessa, correct?
>
> A. Yes.
>
> ***
>
> Q   You're not aware that there's times that Mauro Cantalamessa interrupts people while they're speaking?
>
> A   No, I'm not aware.
>
> Q   Are you aware that in previous meetings Frank Fuda has interrupted speakers in the public?
>
> A   No.
>
> (PAGEID#45, Wix Depo at 34-37).

Had Defendants conducted a modicum of investigation before prosecuting a commissioner for debating in her own meeting, they would have easily discovered that the July 7, 2022, argument was no different than arguments in previous meetings, and that the commissioners frequently interrupted each other.  But Defendants could not rush to the court fast enough to punish their critic for her viewpoints.

     1.  <u>Commissioners always argued and interrupted each other during their meetings.</u>

Defendants claim that they arrested Frenchko because she interrupted a county employee while that employee was speaking.  This is untrue because all commissioners argued and interrupted people during most meetings.  Commissioner Cantalamessa

14

admitted that fighting and interruptions were commonplace in Defendants' meetings, and he could not even articulate anything different about the July 7, 2022, meeting.

> Q. So it seems like your feeling is that there [were] a lot of meetings prior to July 7th, 2022, that were very argumentative?
>
> A. Prior to two thousand and --
>
> Q. Prior to the meeting she was arrested at.
>
> A. I believe so, yeah.
>
> Q. Okay. And --
>
> A. Yes.
>
> Q. Something that was happening all the time, correct?
>
> A. For the most part.
>
> Q. So in a lot of meetings there [were] a lot of arguments and people interrupting each other, correct?
>
> A. Correct . . .
>
> ***
>
> Q. So in the past when these arguments are occurring and people are interrupting each other and it sometimes gets out of control, you would agree that has happened in the past?
>
> A. It has.
>
> Q. Okay. Was anybody ever arrested?
>
> A. No.
>
> Q. Was ever anybody threatened to be arrested?
>
> A. Well, except that incident.
>
> Q. Except for July 7th, 2022?
>
> A. Right.
>
> Q. Okay. What was different about her behavior on that day than any other meeting previous to that?
>
> A. I don't know.
>
> Q. Nothing. Would you agree?
>
> A. I don't know. I don't know what was different about her behavior.
>
> (PAGEID #43, Cantalamessa Depo at 77-78).

Simply stated, there was nothing even novel about the July 7, 2022, argument other than the fact that Frenchko was criticizing the Sheriff. In fact, Defendant Cantalamessa also interrupted speakers. In fact, Cantalamessa often interrupted Frenchko during her discussions to accuse her of lying. For example, on August 10, 2023, when Cantalamessa did not like Frenchko's statements, he interrupted her and instructed Fuda to make her stop talking. (Id. at 69; Exhibit 11, "(14) Video of August 10, 2022_Part #1"). During that same meeting, Commissioner Frenchko was attempting to discuss educating County staff regarding public records and the importance of not destroying text messages. (Exhibit 11, "(14) Video of August 10, 2022_Part #2"). As soon as Frenchko brought up some of the public records destruction that is at issue here, Defendant Cantalamessa repeatedly interrupted her while she was talking because he did not agree with her viewpoints. (Id.)

According to Cantalamessa, it was okay for him to interrupt Frenchko when he disagreed with her criticisms. (PAGEID #43, Cantalamessa Depo at 69). Thus, it is fine for Defendants to interrupt Frenchko during meetings when they want to accuse her of making false statements, but they arrested her for disagreeing with their criticisms.

  2. <u>Chaos and emotional abuse are commonplace in the commissioners' meetings.</u>

In addition to alleged interruptions, Defendant Monroe testified that he punished Frenchko because he thinks she emotionally abused the clerk. (PAGEID#44, Monroe Depo at 55). This reasoning is viewpoint-based on its face. Further, it exhibits Defendants' viewpoint bias. Indeed, Monroe and his allies are sure not worried about abusive conduct when it is directed at Commissioner Frenchko.

As stated above, Defendant Fuda's staff took pictures of the inside of the women's waste receptacle in the bathroom Commissioner Frenchko used. (See *Supra*, Part I.C.). Then, during open government meetings, Fuda would waive pictures of Commissioner Frenchko's own used tampons in her face. (Id.)  Fuda was not punished.

As another example, an employee's husband once acted extremely unhinged during a meeting.  (Exhibit 11, "(16) Salsa Dancing Video").  The employee's husband approached Frenchko's seat to yell at her.  (Id.)  The employee's husband then made racially charged statements about Frenchko's Hispanic background, salsa danced, and flipped Frenchko his middle finger.  (Id.) After his time to speak concluded, the husband continued to give Frenchko two middle fingers from his seat and said "you" while pointing at her from the audience.  (Id.)  When this disruptive conduct occurred, Defendants' deputy did not even seem to flinch in the video. (Id.)

Defendants' meetings were often a spectacle full of pictures of used tampons, shouting, and salsa dancing.  However, when Frenchko criticized the Sheriff, the Sheriff decided that mean words were suddenly a crime in Trumbull County.

3.  Defendants never arrested other people they removed from meetings.

Sheriff Monroe claimed in the media that Defendants gave Commissioner Frenchko much more latitude than he would have given a member of the public.  Sheriff Monroe's statement was false, and he knew it.  Monroe testified that Defendants have had to remove members of the public for disturbing commissioner meetings in the past. (PAGEID #44, Monroe Depo at 51:8-17). **However, Defendants never arrested or charged a single person they previously removed with a crime.** (Id.)  In fact, according to Sheriff Monroe, his deputies had to remove one individual from

17

commissioner meetings several times. (Id. at 51-52).  This repeat offender was never arrested.  (Id.)

In contrast, when Commissioner Frenchko criticized the Sheriff and refused to apologize, Defendant Monroe and the other Defendants couldn't have prosecuted her fast enough.  They immediately battered and cuffed Frenchko on the spot.  Defendants gave Frenchko *much less latitude* than members of the public in the past.  Apparently, Sheriff Monroe must have known the actual truth made Frenchko's arrest look precisely as retaliatory as it was, so he used a reporter to issue a false statement and mislead the public.

### L.  Defendants destroyed public records and evidence.

Defendants willfully deleted text messages they knew were public records.  In fact, Sheriff Monroe admitted certain text messages are public records.

> Q. . . .So earlier you testified that you use your personal cell phone and one's not provided to you, correct?
>
> A.  Yes.
>
> Q.  And that you sometimes send text messages to -- related to the activities of your office, correct?
>
> A. Yes.
>
> Q. Aren't those text messages public records then?
>
> A.  Yes.
>
> (PAGEID#44, Monroe Depo at 26:15-24).

Moreover, Sheriff Monroe also understands that criminal defendants may request public records, including text messages, to defend themselves in a criminal prosecution.

> Q.  Okay.  Well, in criminal prosecutions defendants are allowed to request records from a government, correct?
>
> A.  Yes.
>
> Q.  And some of those records that they can request would include text messages, correct?
>
> A.  Yes.

18

Q. So text messages can be relevant to a defendant's rights, correct?

A. If you can get them.

(Id. at 31: 12-21).

Thus, Monroe understands his deputies' text messages can have value for a criminal defendant "if [they] can get them." Here, Frenchko could not "get them" because Defendants destroyed them to make sure she could not "get them."

Sheriff Monroe admitted in his deposition that he deleted all the requested text messages. (Id. at 74:16-19). Defendant Ross also admitted that he regularly destroys public records.

Q. Okay. So you manually delete your text messages periodically?

A. Correct.

Q. Okay. And how frequently do you do that?

A. I don't know. Whenever I -- could be once a month. Whenever I just decide to go through it and do it.

Q. And you do it regardless of whether or not [they're] communications between deputies?

A. Correct.

Q. Related to work business?

A. Correct.

(PAGEID#46, Ross Depo at 92).

In addition, Mauro Cantalamessa also permitted settings on his phone to delete public records and evidence related to this Action. (PAGEID#43, Cantalamessa Depo at 98). It was not until Attorney Miller-Novak emailed this Court about spoliation (and after Cantalamessa's deposition) that Defendants conveniently provided *some* of Cantalamessa's deleted text messages that an e-discovery firm restored.

### M. Defendants received plenty of notice to preserve text messages.

On August 4, 2022, Judge Frost in the Warren Municipal Court expressly ordered Defendants to preserve every text message created between May 4, 2022, and August 4,

2022. (Exhibit 5 at 2).   Special prosecutor Raymond Srp ("Srp") then sent the Commissioners and the Sheriff's Department a letter on August 5, 2022, instructing them to take necessary steps to preserve these text messages. (Id.)

In addition, Commissioner Frenchko directly emailed a public records request to both Sheriff Monroe and the Commissioners for the same text messages on August 8, 2022.  (Exhibit 6).

Sheriff Monroe resisted all these instructions.  He immediately sent a letter to the County Prosecutor.  The County Prosecutor responded to Monroe on August 10th, 2022. (Exhibit 5).  The Prosecutor expressly instructed Sheriff Monroe in **bold font** that Sheriff Monroe and his staff must take necessary steps to preserve all their text messages.  (Id.) Apparently, Sheriff Monroe still wanted to destroy these text messages.

Special prosecutor Srp sent Frenchko's Counsel an email explaining that Sheriff Monroe was still absurdly arguing that neither he nor his staff had to cooperate with Judge Frost's preservation order regarding their cellphones. (Exhibit 7 at 2-3).  Attorney Betras replied to Prosecutor Srp and explained that Sheriff Monroe did have the duty to produce those records under law on August 24, 2022.  (Id. at 1-2)  On August 26, 2022, Prosecutor Srp voluntarily dismissed the charges (without prejudice) sighting insufficient evidence (even though the arrest was on video).[4]  Simply stated, Defendant Monroe consistently fought Judge Frost's order, and Defendants dismissed their own malicious prosecution when it became apparent Sheriff Monroe could not conceal his text messages in the criminal court.

---

[4] Because the dismissal was "without prejudice," the County could have refiled it at any time. Therefore, it is not credible that Defendants argue that "the case was over."  Moreover, Commissioner Frenchko still has an outstanding records request for those text messages.

Immediately after the dismissal, Commissioner Frenchko publicly announced her intent to file this constitutional action against the Defendants on August 26, 2022. (Exhibit 8).[5]  Multiple news outlets reported this announcement, so the entire County was on notice of this imminent action.  Moreover, Attorney Betras had already sent a spoliation letter to that effect on July 25, 2022.

On March 9, 2023, Commissioner Frenchko sent an additional spoliation email to the Trumbull County Prosecutor.  (See Exhibit 9, where Attorney Miller-Novak directly emailed a spoliation instruction to three County prosecutors instructing Defendants to preserve these deleted text messages).   Any argument that Defendants had no notice to preserve text messages is divorced from reality.

### N. The deleted text messages related to this Action.

Currently, Defendants have only restored some of the text messages that Defendant Cantalamessa destroyed, but none of the text messages the Sheriff and his staff destroyed.  In fact, there is no evidence that Defendants have taken any step to attempt to restore the messages the Sheriff's staff purposely destroyed.

Sheriff Monroe deleted text messages he exchanged between the Channel 27 reporter only four minutes before Frenchko's arrest.  Monroe communicated with that same reporter only several minutes after Frenchko's arrest.  Thus, he deleted text messages he was sending the press while these events unfolded.  See the following.

Q.  Judge Frost's order said to preserve them, correct?

A.  I'd have to go back and reread it.

Q.  That's fine.

---

[5] Numerous media outlets reported on Frenchko's intent to file suit.

A. Preserve is your interpretation.  By leaving them on my phone, they're preserved.

Q. If they're not here, they're not preserved?

A. No longer are they preserved.

Q. Okay.  They're no longer preserved?

A. No longer preserved.

(PAGEID#44, Monroe Depo at 119:12-22).

In addition, Defendant Ross manually deleted numerous text messages he sent to current and former deputies both right before and after arresting Commissioner Frenchko. (PAGEID#46, Ross Depo at 92-93).  Additionally, every single other deputy Ross texted on July 7, 2022, conveniently deleted those text messages.

Defendants deleted all their text messages in the days leading up to the arrest, as well as the days after the arrest.  They wiped out entire weeks of their conversations and public records.

The few messages that Defendants have bothered to restore are relevant. Cantalamessa's restored messages exhibit that Cantalamessa was texting a county department head about removing Frenchko mere minutes before Frenchko was arrested. (Exhibit 10 at 1). In fact, that County department head texted Cantalamessa and informed him that he could remove Frenchko from the meeting. (Id.)  Minutes later during the meeting, Cantalamessa announced that Frenchko could be removed for disrupting the meeting.  She was then arrested.

Almost immediately after Cantalamessa contributed to Frenchko's arrest, he was immediately bragging in text messages to his political allies. (Id. at 2-5).  He sent snarky memes to numerous people (including County officials), he laughed, and called Frenchko a "shitbag." (Id.)  After learning of the news, one of his allies noted responded: "Wow.

That might be a first." (Id.). In response, Defendant Cantalamessa "laughed" at that text message because he knew that arresting her for critical statements was indeed "a first." (Id.) Cantalamessa also messaged one of his allies that "she [Frenchko] should have thought of that before she [led] the sheriff department to conduct an investigation that resulted in unfounded inuendo." (Id.) Thus, Cantalamessa acknowledged there are consequences for crossing the Sheriff.

In addition, Cantalamessa and Sheriff Monroe were texting to combat public perception of their malicious arrest. On August 2, 2022, Sheriff Monroe text messaged Cantalamessa and stated "this bs about the jail is going to [sic]." (Id. at 7). The two planned to meet to discuss the matter. (Id.) Cantalamessa then text messaged "I am sorry but she is controlling the narrative with lies and half truths and people are believing her." (Id.)

Sheriff Monroe and Cantalamessa received Judge Frost's preservation order only three days later on August 5, 2022. As shown above, Defendant Monroe immediately began taking active steps to argue against preserving cellphone records and resisting that order. All Defendants deleted every single text message to conceal their intent, plans, celebrations, and collaborations concerning the events related to Commissioner Frenchko's arrest.

Defendants' complete and total destruction of evidence is entirely too systematic to appear innocent or harmless. No local government is that efficient by accident.

### O. Defendants' spoliation damaged Frenchko.

Frenchko has incurred substantial additional attorney fees to subpoena phone records, create spreadsheets, trace numbers, and depose Defendants to discover who they

communicated with during the relevant time period. None of this would have been necessary if not for Defendants' willful destruction of evidence.

This destruction also affects Commissioner Frenchko's ability to dispute the Defendants' claims relating to intent, immunity, certain torts, and certain damages. The Circumstances surrounding these deleted text messages suggest that they contained crucial information about Sheriff Monroe's knowledge, the Defendants' plans to punish Frenchko for criticizing the Sheriff, and the Sheriff's direct involvement. These deleted text messages likely exhibited malice and other information that could lead to punitive damages.

## II. LAW AND ARGUMENT

### A. Defendants violated the First Amendment of the United States Constitution.

The Defendants retaliated against Frenchko because her viewpoints offended their sensibilities. However, "if there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." – Justice Brennan, *Texas v. Johnson*, 491 U.S. 397, 414, 109 S. Ct. 2533 (1989). "That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength." *Cohen v. California*, 403 U.S. 15, 91 S. Ct. 1780 (1971).

There are three types of public forums: traditional public forums, limited public forums, and non-public forums. See, *Citizens for Cmty. Values, Inc. v. Upper Arlington Pub. Library Bd. of Trs*., No. C-2-08-223, 2008 U.S. Dist. LEXIS 85439 (S.D. Ohio Aug. 14, 2008). The Sixth Circuit has described the limited public forum as a forum that the government has designated for the people to engage in expressive activities for a limited

24

time, such as a board meeting.  *Id*., at 12-13, *citing*, *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000).

In a limited public forum, a government entity may impose time, place, and manner restrictions of expression which are content-neutral, "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983).  However, regardless of forum type, the government may not discriminate against speech based on its content. *Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2227 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."); *see also*, *Good News Club v. Milford Central School*, 121 S.Ct. 2093, 533 U.S. 98, 106-7 (2001) (Stating that limited forum regulation must not discriminate against viewpoints, and they must be reasonable in the purpose served by the forum).

With respect to a content-neutral time, place, or manner restriction on speech, the government bears the burden to prove its rules comply with the First Amendment.  *Teufel v. Princeton City Sch. Dist. Bd. of Educ.*, No. 1:12-cv-355, 2013 U.S. Dist. LEXIS 4923, ¶¶29-31, (S.D. Ohio Jan. 11, 2013), *citing*, *Billboard Co. v. City of Toledo*, 690 F.Supp.2d 651, 666 (N.D. Ohio 2010).  The government must provide some evidence "beyond its own belief in the necessity for regulation, that the harms it seeks to remedy are concrete and that its regulatory regime advances the stated goals."  *Id*., *citing*, *Pagan v. Fruchey*, 492 F.3d 766, 771 (6th Cir. 2007).

A Commissioners' meeting, like most local government meetings, is a limited public forum.  R.C. § 2917.12 is unlawful because it provides governments with the

unfettered discretion to punish speakers who offend them.  In addition, the Defendants punished Frenchko's because of her viewpoints.

> 1.     R.C. § 2917.12 facially violates the First Amendment.

> a.  *R.C. § 2917.12 facially punishes viewpoints.*

As the Supreme Court recently held, "[g]iving offense is a viewpoint," *Matal v. Tam,* 137 S.Ct. 1744, 1763 (2018), and viewpoint-based regulations cannot be salvaged for constitutional purposes by a viewpoint-neutral justification.  *See Reed v. Town of Gilbert,* 576 U.S. 155, 165-66 (2015) (holding that "an innocuous justification cannot transform a facially content-based law into one that is content neutral").

Restrictions on speech within a limited public forum of the government's creation must satisfy two First Amendment standards to pass muster: (1) the restriction must be reasonable in light of the purpose for which the forum was created; and (2) the restriction must not discriminate based on viewpoint. *Rosenberger v. Rectors and Visitors of University of Virginia*, 515 U.S. 819, 829-30 (1995).  With respect to the latter standard, it is a bedrock principle of constitutional law that the government may not regulate speech based on its substantive content or the message it conveys. *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 96 (1972).  Discrimination against speech because of its message is presumed to be unconstitutional.  *Rosenberger v. Rectors and Visitors of University of Virginia,* 515 U.S. 819, 828 (1995) (citing *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 641–3 (1994)).

It is black-letter law that content-based and viewpoint-based restrictions on expression are analyzed under strict scrutiny, which places the burden on the government to justify its restriction.  *See, e.g., Reed*, 576 U.S. at 171.  Content-based restrictions are presumed unconstitutional and only upheld when the government establishes that the

rules impose the least restrictive means necessary to achieve a compelling government interest.  *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).  While the government does retain some interest in an orderly meeting, that interest is hardly compelling.  *See, e.g.*, *Zapach v. Dismute*, 134 F.Supp.2d 682, 692 (E.D. Pa. 2001) (cataloguing cases holding that government interest in orderly meetings is legitimate and substantial, but not compelling).  Viewpoint discrimination is so offensive to the First Amendment that courts have held it unconstitutional even in non-public forums.  *See, e.g.*, *Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) (en banc) (holding that it is not "constitutionally valid" to curtail speech in a limited public forum simply because "other persons on the [] campus object[] to [the speaker's] viewpoint").

The Supreme Court's three most recent pronouncements on content and viewpoint discrimination – *Reed*, 576 U.S. 155; *Matal*, 137 S.Ct. 1744; and *Iancu v. Brunetti,* 139 S.Ct. 2294, 2294 (2019) – further hamper the government's ability to censor speech based on its offensiveness or disparaging nature.  In *Reed*, the Supreme Court struck down a sign ordinance which included exceptions and variable standards depending on whether the sign was political, elections-oriented, or bore some other non-commercial message.  *Reed*, 576 U.S. at 159-63, 172.  The Court found that the ordinance was content-based and therefore subject to strict scrutiny.  *Id.* at 171 (citing *Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653 (2011)).

The government therefore cannot rely upon a content-neutral motivation or a justification unrelated to a speaker's message to save a content-based restriction on speech.  *Id.* at 165-68.  Because the inquiry into whether a law, on its face, imposes content-based regulations is separate from the question of the law's justification, "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's

27

benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165 (citing *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 429 (1993)).

But the Court did not stop at *Reed*. In two more recent opinions, the Court continued its mission to eradicate confusion in the lower courts. First, in *Matal*, 137 S.Ct. 1744, the Court invalidated a prohibition on the issuance of trademarks that disparage living or dead persons. *Id.* at 1751. As a starting point, the Court imposed broad restrictions on the regulation of viewpoints. *Id.* at 1763. And the disparagement restriction, it noted, discriminates based on viewpoint because causing offense is itself a viewpoint. *Id.*

Next, in *Iancu v. Brunetti*, 139 S.Ct. 2294 (2019), the Court prohibited viewpoint-based judgments that separate speech based on the message it conveys, even if no speech is silenced as a result. There, the Court invalidated the Lanham Act's prohibition against the registration of trademarks deemed "immoral or scandalous." *Id.* at 2297. Brunetti, a clothing artist, experienced difficulties when attempting to register the trademark "FUCT," because the expression was deemed offensive, misogynistic, depraved, and even violent on review. *Id.* at 2297-98. The Court held that the terms "immoral" and "scandalous" are viewpoint-based restrictions because the terms permit speech that complies with society's sense of morality while barring speech that defies society's sense of morality. *Id.* at 2299. In the Court's view, regulations of this sort that discriminate against speech based on the ideas it conveys are egregious and presumptively unconstitutional. *Id.* (citing *Rosenberger*, 515 U.S. at 829-30).

Taken together, *Reed*, *Matal*, and *Iancu* require a threshold, robust inquiry into the impact of a speech regulation on viewpoint. This inquiry must occur without regard

28

as to why a particular government agency may have adopted the regulation and must focus solely on whether the restriction treats speech differently based on its message. This must occur regardless of whether the government is restricting speech, as it was in *Reed*, or enabling speech, as it was in *Matal* and *Iancu*.

Following the Supreme Court's clear pronouncements in *Matal*, *Iancu*, and *Reed*, the Sixth Circuit Court of Appeals issued two significant decisions clarifying the hallmarks of viewpoint discrimination in speech restrictions in public forums. The first such case was *AFDI v. Sub. Mobility Auth. for Regional Transp.*, 978 F.3d 481, 498-504 (6th Cir. 2020). At issue in *AFDI* was the constitutionality of a restriction, applicable to public bus stops, on "political" advertisements and ads bringing "scorn or ridicule" to a particular group. *AFDI*, 978 F.3d at 485. In striking down both provisions, the Sixth Circuit made several key observations about viewpoint neutrality and reasonable regulation of nonpublic forums. First, the Sixth Circuit held the ban on "political" advertisements was unreasonable, given the lack of clarity on what ads are "political" and how the term was applied. *Id*. at 497. Restrictions on speech in nonpublic forums must offer a "sensible basis for distinguishing what may come in from what must stay out" and must be "capable of reasoned interpretation." *Id*. at 494 (citing *Minnesota Voters Alliance v. Mansky*, 138 S.Ct. 1876, 1888 (2018)). This is so because laws that vest unrestrained or unguided discretion in government officials open up the possibility of haphazard enforcement, subjective censorship, and abuse. *Id*. at 497.

Next, the Sixth Circuit held that the "scorn or ridicule" provision was impermissibly viewpoint-based. *Id*. at 500. This holding reversed the decision of a previous panel that the "scorn or ridicule" provision was constitutional. *Id*. at 485-6. In departing from its initial ruling, the Sixth Circuit acknowledged that more recent

decisions from the Supreme Court about viewpoint bias necessitated reconsideration of the case.  *Id*.  The court also noted that viewpoint bias raises "greater First Amendment red flags" than content discrimination because it creates the risk that an entire perspective will be eliminated from public discourse.  *Id*. at 498.  Because it is difficult to distinguish viewpoint bias from content discrimination, courts interpret viewpoint discrimination broadly and find a law is impermissibly viewpoint-based even when it targets general or imprecise viewpoints.  *Id*. at 499 (citing *Matal*, 137 S.Ct. at 1763 (Alito, J., opinion)).  The ban on advertisements creating "scorn or ridicule" was such a restriction.  *Id*. at 500.

Shortly after it decided *AFDI*, the Sixth Circuit issued *Ison v. Madison Local School Dist*., 3 F.4th 887 (6th Cir. 2021).[6]  In *Ison*, the court considered whether prohibitions on "antagonistic," "abusive," and "personally directed" speech at school board meetings were unconstitutionally viewpoint-based.  *Id*. at 893. Holding in the affirmative, the court credited the dictionary definitions and common meaning of the words in observing that they essentially prohibited speech that offended or was in opposition to the school board.  *Id*. at 894-5.  And it held that *Matal* and *Iancu* controlled the analysis with regard to First Amendment viewpoint discrimination.  *Id*.  See the following excerpt:

> The antagonistic restriction, by definition, prohibits speech opposing the Board. *See Antagonistic*, Merriam-Webster ("showing dislike or opposition"). And abusive prohibits "insulting" language, *see Abusive*, Merriam-Webster ("harsh and insulting"), with "personally directed," meaning simply abusive speech directed at one person, per the Board's

Therefore, the Sixth Circuit has expressly held that a government cannot regulate speech even when that speech is "personally directed," "insulting," "antagonistic," "abusive," "harsh," or "insulting."  Thus, a speaker should not be restrained because she

---

[6] Moore's Counsel, Matt Miller-Novak, was Counsel for Plaintiffs in *Ison*.

is insulting the government.  Likewise, a speaker is not "disruptive" because she is abusive, offensive, disparaging, or in this, outrageous the sensibilities of a clerk, sheriff, or a commissioner.

Here, R.C. § 2917.12 expressly states that the following expressions during a public meeting are subject to criminal punishment:

> (A) No person, with purpose to prevent or disrupt a lawful meeting, procession, or gathering, shall do either of the following:
>
> (1) Do any act which obstructs or interferes with the due conduct of such meeting, procession, or gathering;
> (2) Make any utterance, gesture, or display which **outrages the sensibilities of the group**.
>
> (B) Whoever violates this section is guilty of disturbing a lawful meeting, a misdemeanor of the fourth degree. (emphasis added).

The Statute restrains any utterance or display that "outrages the sensibilities of the group."  As the Sixth Circuit explained in *Ison*, this Court must evaluate the meaning of statue to determine viewpoint bias based on the plain meaning of its word.  The word "outrage" as a verb in this context is generally defined as "to anger or offend; make resentful . . ." https://www.dictionary.com/browse/outrage.  Synonyms for outrage include "offense" and "abuse."  (Id.)  Thus, R.C. § 2917.12 expressly criminalizes speech that "offends" its listeners, or speech the listeners find "abusive."

The Sixth Circuit has already held that restraints on "abusive" speech are facially viewpoint-based and violate the First Amendment.  *Ison,* 3 F.4th at 893.  And the Supreme Court expressly held in *Matal,* 137 S.Ct. at 1763 that "giving an offense is a viewpoint."

Therefore, R.C. § 2917.12 facially regulates and criminalizes utterances that both the Supreme Court and the Sixth Circuit have already held are protected viewpoints.  And Sheriff Monroe made it perfectly clear that he weaponized this Statute to retaliate against Frenchko because he determined Frenchko "disrupted" the meeting because he believed

31

that she emotionally "abused" the clerk.  (PAGEID#44, Monroe Depo at 55-56).  The Statute, as well as Sheriff Monroe's reasoning, violates *Ison's* determination that "abusive" speech is a protected viewpoint.  *Ison,* 3 F.4ᵗʰ at 893.

> *b.  R.C. § 2917.12 is overly broad.*

In *Houston v. Hill*, 482 U.S. 451, 107 S. Ct. 2502 (1987), the Supreme Court held that a statute that criminalized "willfully" "interrupting" police conduct was facially overbroad because it punished protected objections to official conduct.  Courts may invalidate statutes that are overly broad on their face.  *Id*. at 458-9.  Even when a statue has legitimate applications, courts can still invalidate them when they reach speech that is protected under the First Amendment.  *Id.*

In *Houston*, the plaintiff taunted officers while they were arresting his companion. *Id*. at 453-4.  The plaintiff even admitted that he willfully wanted to distract the officers while they were arresting his companion. *Id*. at 460-1.  Although the statute regulated some physical actions, such as assaulting an officer, other statutes existed to regulate that conduct.  Consequently, the statute-at-issue in *Houston* was used to punish *language* that interrupted official business.  *Id*.

In striking down the statute, the Court reasoned that the constitution does not permit regulating language merely because it interrupts an officer in "any manner."  *Id.* "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."  *Id*.

Most importantly here, the Supreme Court held that the statute in *Houston* was unlawful because it empowered the government with the unfettered discretion to arrest

individuals merely because a speaker's words offended their sensibilities. *Id.* at 465-6. The Court expressly wrote the following:

> Although we appreciate the difficulties of drafting precise laws, **we have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them**. As the Court observed over a century ago, "it would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. (Emphasis added).

Thus, the Court concluded that statute was overbroad because it gave the government the discretion to arrest someone merely because he offends the government actors during their official action. *See also*, *Gooding v. Wilson*, 405 U.S. 518, 92 S. Ct. 1103 (1972) (striking down a law for overbreadth that restrained "abusive" language, tending to cause a breach of the peace); *see also*, *Terminiello v. Chicago*, 337 U.S. 1, 4-5, 69 S. Ct. 894 (1949) (striking down a statute because it permitted the punishment of a person when his speech stirs anger in others).

In Ohio, R.C. § 2917.12 provides the government unfettered power to punish speakers in a meeting merely because their speech offends the government listeners or is abusive to their sensibilities. R.C. § 2917.12 expressly states that the government may arrest a person if she makes any "utterance" that "outrages the sensibilities of the group." Simply stated, if a speaker says something that the government thinks is too mean, or the government finds "abusive," the government can punish that speaker because her comments outraged their sensibilities.

Here, that is precisely what happened. Defendant Sheriff Monroe testified that he approved prosecuting Frenchko because he felt her speech to the clerk was emotionally "abusive."

33

**Q.  Okay.  You looked at the statute.  What conduct do you think justifies a criminal charge?**

MS. SUDHOFF:  Objection.

MR. YOSOWITZ:  Objection.

A. Well, the fact that Michele Frenchko put another employee in emotional distress to the point where she couldn't face the public and is visibly crying. What she did to that employee publicly and disrupting the meeting -- if you show me the revised code here, let's look at it.

**Q. Well, we'll -- we can look at it.**

***

A.  I just -- I look to you.  If that was your mother that was being emotionally crushed and put in emotional distress, what do you do?  Just watch your mom get beat up?

**Q. What's that?**

A.  Just watch your mom get verbally abused?

(Id. at 55-56)

Because the Statute grants the government the unfettered discretion to punish speech that offends the group, the Defendants arrested a commissioner for making critical statements in her own meeting.  This Statute is overly broad.  *Houston*, 482 U.S. 451; *Gooding*, 405 U.S. 518; *Terminiello v. Chicago*, 337 U.S. 1, 4-5, 69 S. Ct. 894 (1949).

    2.  <u>Defendants retaliated against Frenchko's viewpoints.</u>

Commissioner Frenchko has the right under the First Amendment to make statements that hurt others' feelings without arrest.  "Freedom to criticize public officials and expose their wrongdoing is at the core of First Amendment values, even if the conduct is motivated by personal pique or resentment." *Barrett v. Harrington*, 130 F.3d 246, 263 (6th Cir. 1997).  The First Amendment "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S. Ct. 894 (1949).  "Speech is often provocative and challenging." *Id*.  "That is why freedom of speech" needs

34

protection "against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.*

Even when a speech regulation has a legitimate application, the government still has the burden to establish that its rule was applied legitimately. *Angeline v. Mahoning Cty. Agr. Soc.,* 993 F. Supp. 627, 633 (N.D. Ohio 1998). Although a government may regulate speech to conduct an orderly meeting, it still cannot discriminate against a speaker's viewpoint. *Good News Club v. Milford Central School*, 121 S.Ct. 2093, 533 U.S. 98, 106-7 (2001).

A plaintiff can show that an arrest is retaliation under the First Amendment when she can establish that she was treated differently than similarly situated individuals because of her viewpoints. *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019). In other words, if a plaintiff shows she was punished for conduct others are permitted to engage in, she can establish she was arrested in violation of the First and Fourth Amendments. *Id.*

Defendants try to advance *unconvincingly* that they arrested Frenchko because she interrupted a clerk. Everyone knows that the Commissioners' meetings were always chaotic. The Commissioners always argued with each other, interrupted each other, and criticized one another. Commissioner Cantalamessa admitted that all meetings were chaotic and disruptive. (PAGEID #43, Cantalamessa Depo at 82:12). And he admitted that he participated in that chaos to defend himself. (Id. at 82: 22-23). Cantalamessa could not even articulate what was different about the July 7, 2022, meeting where Defendants arrested Frenchko. (Id. at 78: 17-22).

35

Q. So in the past when these arguments are occurring and people are interrupting each other and it sometimes gets out of control, you would agree that has happened in the past?

A. It has.

Q. Okay. Was anybody ever arrested?

A. No.

Q. Was ever anybody threatened to be arrested?

A. Well, except that incident.

Q. Except for July 7th, 2022?

A. Right.

Q. Okay. What was different about her behavior on that day than any other meeting previous to that?

A. I don't know.

(Id. at 78:6-19).

Defendants further testified that numerous people were removed for allegedly disrupting their meetings and never arrested. In fact, even though one person allegedly disrupted several meetings, the Sheriff admitted that he did not arrest that person. The only person who the Sheriff's Department has ever arrested for allegedly "disrupting" a commissioners meeting was Commissioner Frenchko, and it coincidently happened when she was criticizing the Sheriff and refusing to publicly apologize to him as he demanded.

## B. Defendants violated the Fourth Amendment of the United States Constitution.

Defendants unlawfully prosecuted Frenchko for insulting the clerk and the Sheriff. In *Wood v. Eubanks*, 25 F.4th 414 (6th Cir. 2022), a citizen wore a T-shirt that said "F*** the Police" on it to a county fair in Clark County, Ohio. The police received complaints about the shirt. *Id.* at 419. The police officers instructed the citizen to leave the fair and escorted him from the property. *Id.* While he was escorted from the fair, the citizen called the officers, "f**king pigs," and "f**kin thugs with guns that don't uphold the United States Constitution." *Id.* at 420. The citizen called the officers "rat bastards." *Id.* He

called one of the officers a "fat-ass."  *Id*.  The citizen accused the officers of committing

battery." *Id*.  The officers then arrested the citizen for disorderly conduct and obstructing

official business.  *Id*. at 421.  The citizen filed a complaint against all the officers alleging

numerous constitutional claims. The trial court dismissed the claims holding the officers

were entitled to qualified immunity.  The citizen appealed, and the Sixth Circuit reversed.

The Sixth Circuit held that an officer falsely arrests a person when the officer lacks

probable cause to arrest the plaintiff.  *Id*. at 423.  The officers attempted to argue that the

arrest was proper because the citizen's "language consisted of personally abusive epithets"

that "constitute fighting words. *Id*. at 423.  The Sixth Circuit rejected this argument citing

a previous holding where the Sixth Circuit determined a citizen had a right to refer to an

officer as both an "a\*\*hole" and "stupid."  *Id*.  **Rudeness and insult are not "grounds

for a seizure."**  *Id*. at 424.  And the citizen in *Wood*, even though he was profane, did

not create a situation where violence was likely, and none of the officers appeared to view

the citizens insults as an invitation to "fisticuffs."  *Id.* 425.  Consequently, the First

Amendment protected the citizen's speech, and the officers lacked probable cause to

arrest him for his profane insults under the ruse of "obstructing official business."  *Id.*

Further, an arrest may constitute retaliation and violate the first amendment when

policy makers use the arrest to punish speech occurring before the arrest.  *Lozman v. City

of Riviera Beach*, 138 S. Ct. 1945 (2018).  A plaintiff can further show that an arrest is

retaliation under the First Amendment because she was arrested "when otherwise

similarly situated individuals not engaged in the same sort of protected speech had not

been."  *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019).

1. <u>There was no probable cause to arrest Frenchko.</u>

R.C. § 2917.12 is supposed to only criminalize conduct that has the "purpose" to disrupt a meeting.  It does not criminalize having the purpose to respond to allegations that you are a liar. Anyone with eyes and ears can watch the meeting and see that Commissioner Frenchko clearly had the "purpose" to respond to Sheriff Monroe's chastising letter.  Even Defendant Ross admitted that he never actually determined that he considered it Commissioner Frenchko's "purpose" to disrupt the meeting.  Instead, he admitted that it appeared that she instead had the purpose to respond to his boss's angry missive.

> Q. So earlier you said your impression was that she [Frenchko] was upset and she was trying to respond to the letter.
>
> A. I'd say that's fair.
>
> ***
>
> **Q. Before filing charges, did you make a determination what her intentions were while she was [allegedly] disrupting the meeting?**
>
> **A. No.**

(PAGEID #46, Ross Depo at 67-68) (emphasis added).

Therefore, Defendant Ross arrested her for having the purpose to refute his boss's petulant letter.  There was no probable cause to arrest her under R.C. § 2917.12, and her arrest was unreasonable.

2. <u>Defendants retaliated against Frenchko for insulting government officials.</u>

Here, the top policymakers were directly involved in Frenchko's arrest. Commissioner Cantalamessa admitted he accused Frenchko of disrupting the meeting because she was criticizing the Sheriff.  Commissioner Fuda accused Frenchko of disrupting the meeting because Frenchko would not apologize to the Sheriff.  And Sheriff Monroe reviewed and approved Frenchko's prosecution because he believed she

38

"emotionally abused" the clerk.  Thus, Sheriff Monroe testified that he approved prosecuting a county commissioner for insulting a government employee.

Regarding disparate treatment, there are no issues of material fact here.  According to Defendants' own testimony, they removed multiple members of the public from meetings without arresting them.  Sheriff Monroe testified that one person was removed from several meetings he disrupted, and they did not arrest him.  Defendant Cantalamessa admitted that all meetings were chaotic, and the Commissioners frequently argued over one another.  However, the Sheriff did not arrest those disruptive people. There was chaos and insults galore in all the Commissioners meetings.

The Sheriff and his staff never lifted a single finger until the day that Commissioner Frenchko insulted him and refused to apologize.

### C.  Defendants destroyed evidence and public records.

There are no issues of material fact here.  Regarding their text messages, every Defendant received a court order, instructions from prosecutors, public records requests, and spoliation letters demanding they preserved their text messages.  Yet, every single one of Defendants' agents deleted every single text message they were expressly instructed to preserve.  Local government is rarely so efficient.

1.  <u>Defendants unlawfully destroyed public records.</u>

"Public records are one portal through which the people observe their government, ensuring its accountability, integrity, and equity while minimizing sovereign mischief and malfeasance."  *Kish v. City of Akron*, 2006-Ohio-1244, ¶16, 109 Ohio St. 3d 162, 846 N.E.2d 811 (Ohio 2006) (citing *State ex rel. Gannett Satellite Information Network, Inc. v. Petro* (1997), 80 Ohio St. 3d 261, 264, 1997 Ohio 319, 685 N.E.2d 1223; *State ex rel. Strothers v. Wertheim* (1997), 80 Ohio St.3d 155, 157, 1997 Ohio 349, 684 N.E.2d 1239).

R.C. § 149.351 "proscribes the destruction, mutilation, removal, transfer, or disposal of or damage to public records and imposes penalties for violation of the law." *Id*. at ¶18.

Unless otherwise exempted or excepted, most records that document the activities of a public office satisfy the definition of a "record." *Id*. at ¶20.  A government unlawfully destroys a public record in violation of R.C. § 149.351 when it engages in "any attempted or actual removal, mutilation, destruction, or transfer of or damage to a public record that is not permitted by law." *Id*. at ¶42.

Frenchko directly emailed Sheriff Monroe and the Commissioners a public records request for all the deleted text messages on August 8, 2022.  (Exhibit 6).  Defendant Sheriff Monroe admitted that he was aware that his text messages documenting his official activities are public records.  However, he deleted them without submitting them to the Records Commission for approval of their one-time deletion.

Defendants will likely claim that they are permitted to delete these text messages because they had no more administrative value.  This argument will fail for the following reasons.

First, Defendant Sheriff Monroe will not admit when Defendants destroyed these records, so he cannot claim that he made an actual decision they no longer contained administrative value.  He would have to be willing to testify how, when, and why his entire staff deleted those messages, and it is clear he has no interest in that.

Second, Defendants received a court order on August 4, 2022, to preserve those text messages.  Commissioner Frenchko sent a public records request to Sheriff Monroe and the Commissioners for those same text messages a few days later.  When there is an outstanding court order and a public records request for text messages that still exist, you cannot just destroy them *after the request* claiming they no longer had value.

40

Finally, Defendants were also aware that their arrest of Commissioner Frenchko was under constant constitutional scrutiny by the media and public, and the arrest still is. In fact, the Defendants have directly engaged in that public debate, so public records relating to that public scrutiny and debate still have value.  Sheriff Monroe started this public scrutiny because he was text messaging the media while his allies were arresting Frenchko.  As the Ohio Supreme Court reasoned in *Kish*, 2006-Ohio-1244 at ¶16, public records are the device the public may obtain to investigate its officials for mischief and malfeasance.  Defendants knew that the public was scrutinizing their callous punishment of a political opponent, so they destroyed all records of their conversations to deprive Frenchko and the public of the ability to scrutinize their conduct for mischief and malfeasance.

2.  <u>Defendants willfully destroyed relevant evidence.</u>

Under Federal Rule 37(d), a party may move to compel discovery when the other party fails to produce evidence or refuses to produce evidence.  A trial court may compel the production of this evidence, and it may award the movant her attorney fees.

A party may also move for sanctions for spoliation under Federal Rule 37(e) when evidence is destroyed.  A moving party may receive inferences and other sanctions for spoliation when the other party willfully destroys evidence knowing it had the duty to preserve that evidence. *Beaven v. United States DOJ*, 622 F.3d 540, 553-554 (6th Cir. 2010).  Thus, an adverse inference for evidence spoliation is appropriate when the destroyer knew evidence was relevant for trial and lost or destroyed the evidence. *Id.* (citing *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004)).  "An obligation to preserve may arise 'when a party should have known that the evidence may

be relevant to future litigation.'" *Id.* (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)).

Proper spoliation sanctions serve fairness, but they are also punitive.  *Id.*  Trial courts finding spoliation may award summary judgment for spoliation and grant the moving party inferences at trial.  *Id.*

Defendants text messages were public records.  The following timeline exhibits all the notice Defendants received to preserve and produce those text messages:

> July 7, 2022— When Defendants arrest Commissioner Frenchko, she and Counsel announce her punishment was political and unconstitutional;

> July 25, 2022—Attorney Betras sends a spoliation letter to Defendants.

> August 4, 2022—Judge Frost ordered the Defendants to preserve their text messages from May 4, 2022, until August 4, 2022;

> August 5, 2022—Special Prosecutor Srp sends instructions directly to Sheriff Monroe and the Commissioners to preserve these text messages;

> August 8, 2022—Frenchko directly emails Sheriff Monroe and makes a public records request for the text messages;

> August 8, 2022—Special Prosecutor Srp emails Attorney Betras and informs him that Sheriff Monroe is claiming (incorrectly) that Defendants are not responsible for official text messages on personal phones;

> August 10, 2022—Trumbull County Prosecutor again instructs Sheriff Monroe **in bold** of his duty to preserve the text messages;

> August 24, 2022—Attorney Betras informs Special Prosecutor Srp that Defendants most certainly have the duty to maintain text messages on their cellphones.

> August 26, 2022—Defendants voluntarily dismiss their charges for insufficient evidence without prejudice, which is capable of refiling.

> August 26, 2022—Channel 27 (and other outlets) report that Attorney Betras announced Frenchko's intent to file suit;

> <u>March 9, 2023</u>—Attorney Miller-Novak emails a spoliation demand to three prosecutors directing them to preserve all text messages;
>
> <u>April 17, 2023</u>—Frenchko files her Complaint and Motion for Preliminary Injunction placing Defendants on further notice their text messages were at issue.

Simply put, Defendants did not only receive a single spoliation letter.  Defendants received numerous spoliations letters, preservation orders, and a public records request for text messages and public records, but they deleted every message regardless.

These messages were relevant. These messages included the conversations of the Sheriff's Department before and after they arrested Frenchko.  These messages also included the Sheriff's text messages to the Channel 27 Reporter while the clerk was reading his letter, and Frenchko's arrest unfolded.  These text messages included Defendants' follow-up discussions and celebrations.

In fact, after Defendants have finally restored a small amount of Cantalamessa's deleted text messages, those messages exhibit that Defendants were discussing Frenchko, her criticisms about the jail, and they celebrated her arrest.  Defendants willfully ignored numerous orders, instructions, and demands to preserve these text messages to erase their malice and schemes from discovery.

Commissioner Frenchko requests the following sanctions to remedy these harms and appropriately punish Defendants for willfully destroying public records.

(1) Frenchko requests that all Defendants are sanctioned, and they are jointly and severally liable for Frenchko's attorney fees and costs that resulted from Defendants' spoliation and failure to produce text messages, which were properly requested under the Federal Rules of Civil Procedure;

43

(2) Frenchko requests that this Court denies any requests to dismiss this Action, so Defendants reap no benefit from their spoliation because Defendants willfully destroyed numerous text messages and evidence relevant to Frenchko's Tort claims;

(3) Frenchko requests that this Court denies Defendants' requests for immunity, so Defendants cannot benefit from documents they unlawfully destroyed; and

(4) Frenchko further requests that the following inferences are presented to the jury at trial:

    a. Defendants' deleted text messages exhibit that Sheriff Monroe was directly involved in deciding to arrest Commissioner Frenchko;

    b. Defendants' deleted text messages exhibit that Sheriff Monroe, and his staff knew that Commissioner Frenchko did not have the purpose to disrupt the meeting;

    c. Defendants' deleted text messages exhibit that Sheriff Monroe approved arresting and filing charges against Commissioner Frenchko;

    d. Defendants' deleted text messages included all Defendants' plans to retaliate against Commissioner Frenchko for reading comments that criticized the Sheriff's Department;

    e. Defendants' deleted text messages exhibit that Sheriff Monroe wanted to suppress Frenchko's critical speech;

    f. Defendants' deleted text messages exhibit that Monroe and the other Defendants wanted to punish Frenchko for her critical speech about the Sheriff's Department;

44

g.  Defendants' deleted text messages exhibited that Defendant Monroe wanted to politically damage and humiliate Frenchko by arresting her;

h.  Defendants' deleted text messages included Sheriff Monroe's plans to arrest Commissioner Frenchko if she continued to criticize the Sheriff's Department after Fuda read the Sheriff's letter during the July 7, 2022, meeting;

i.  Defendants' deleted text messages included Sheriff Monroe's plans to arrest Commissioner Frenchko if she would not apologize to the Sheriff after Fuda read the Sheriff's letter during the July 7, 2022, meeting;

j.  Defendants' deleted text messages included conversations where the Defendants celebrated arresting Frenchko for refusing to apologize to Sheriff Monroe;

k.  Defendants' deleted text messages included conversations where the Defendants celebrated arresting Frenchko for criticizing Sheriff Monroe;

l.  Defendants' deleted text messages included conversations where the Sheriff's Department admitted they were aware that Frenchko had no purpose to disrupt the meeting; and

m.  Defendant's deleted text messages included instructions from Sheriff Monroe to staff and officials to delete their text messages about the plan to arrest Frenchko and celebration.

Given the ample notice Defendants received to preserve these text messages, and the complete and total destruction of every single text message regardless of this notice, the above-requested sanctions are not unreasonable.

45

Defendants should suffer punishment for their actions to send a message in this District.  Otherwise, these Defendants will do it again.  Moreover, every other government in this District will learn from Defendants that it is worth the risk to purge evidence when they abuse their police powers.   Defendants' actions mock criminal court orders, public records law, this Court, and the principles of fundamental fairness that is supposed to serve as the foundation for America's justice system.

### III. CONCLUSION

Accordingly, Commissioner Frenchko respectfully requests that this Court grants her Partial Motion for Summary Judgment against all Defendants, and Motion for Sanctions.

Respectfully Submitted,

*/s/ Matt Miller-Novak*
Matthew Miller-Novak (0091402)
Steven C. Davis, Esq. (0065838)
Barron, Peck, Bennie & Schlemmer
3074 Madison Road
Cincinnati, Ohio 45209
(513) 721-1350
MMN@BPBSLaw.com
SCD@BPBSlaw.com

*/s/ David J. Betras*
David J. Betras (0030575)
6630 Seville Drive
Canfield, Ohio 44406
Telephone: (330) 746-8484
Facsimile: (330) 702-8280
Email: dbetras@bkmlaws.com

Attorneys for Plaintiff

### **CERTIFICATE OF SERVICE**

I certify that I served notice of this Motion on Defendants' Counsel via email on October 20, 2023.

***/s/  Matt Miller-Novak***