# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **NIKI FRENCHKO** | : | **Case Number:** 4:23-cv-00781 |
| | : | |
| Plaintiff, | : | **Judge:** J. Phillip Calabrese |
| -vs- | : | |
| | : | |
| **PAUL MONROE, et al** | : | <u>**ORAL ARGUMENT REQUEST**</u> |
| | : | |
| Defendants. | : | |

---

## PLAINTIFF NIKI FRENCHKO'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Niki Frenchko submits this Response to Defendants' Motion for Summary Judgment.

Respectfully Submitted,

<u>**/s/ Matt Miller-Novak**</u>
Matthew Miller-Novak (0091402)
Steven C. Davis, Esq. (0065838)
Barron, Peck, Bennie & Schlemmer
3074 Madison Road
Cincinnati, Ohio 45209
(513) 721-1350
MMN@BPBSLaw.com
SCD@BPBSlaw.com

<u>**/s/ David J. Betras**</u>
David J. Betras (0030575)
6630 Seville Drive
Canfield, Ohio 44406
Telephone: (330) 746-8484
Facsimile: (330) 702-8280
Email: dbetras@bkmlaws.com

Attorneys for Plaintiff

## TABLE OF CONTENTS

INTRODUCTION............................................................................................................1

    A. Defendants' meetings were like the Wild West.......................................................3
    B. Defendant Fuda interrupted employees during meetings........................................4
    C. Defendant Fuda caused the disruptions on July 7, 2022........................................5
    D. Defendants Fuda and Cantalamessa accused Frenchko of disrupting the meeting
        to cause her arrest.............................................................................................6
    E. Defendant Monroe admitted he approved prosecuting Frenchko because she
        insulted a public official...................................................................................7
    F. Defendant Monroe made offensive contact with Frenchko's person on March 9,
        2023 without justification................................................................................9
    G. Defendants destroyed public records and evidence after Frenchko requested
        those records.................................................................................................10

LAW AND ARGUMENT................................................................................................10

    A. R.C. § 2917.12 is facially unconstitutional because it is overbroad.......................10
    B. Defendants unlawfully retaliated against protect speech in violation of the First
        and Fourteenth Amendments..........................................................................14
        1. Defendants' arrest was retaliatory because they never previously arrested a
            person for disrupting their meeting..........................................................17
        2. Defendants' top policymakers had a plan and conspiracy to arrest
            Frenchko and then willfully destroyed the evidence of that plan...............18
        3. Defendants Fuda and Cantalamessa applied Roberts' Rules unequally to
            punish Frenchko's viewpoints...................................................................20
    C. Defendants lacked probable cause to arrest Frenchko.........................................20
    D. Defendants are liable for malicious prosecution and false arrest...........................22
    E. Defendant Monroe unlawfully seized Frenchko's phone and person in violation of
        the First and Fourteenth Amendments..............................................................22
    F. Defendants Trumbull County, Trumbull County Sheriff's Department, and
        Trumbull County Commissioners are liable.......................................................24
    G. The Individual Defendants are not entitled to qualified immunity for Frenchko's
        Constitutional Claims.....................................................................................25
    H. Defendants unlawfully destroyed public records.................................................26
        1. This Court may issue an injunction, damages, and attorney fees under R.C.
            § 149.351.............................................................................................27
        2. Frenchko's claim under R.C. § 149.351 succeeds as a matter of law..........30
    I. Defendants are not entitled to immunity for any state claim under R.C. §
        2744.03(A)(6)(b)............................................................................................33
    J. Defendants Monroe, Ross, and Wix battered Frenchko.......................................34
    K. Defendant Monroe assaulted Frenchko.............................................................36
    L. Monroe is liable for trespass to chattel..............................................................37
    M. Defendants are liable under R.C. § 2307.60.......................................................37
        1. Defendants are liable under R. C. § 2921.12 (A)(1)...................................38

i

2. There is evidence of malicious conduct to support punitive damages against the Individual Defendants.

**CONCLUSION**................................................................................................................42

## TABLE OF AUTHORITIES

### <u>Cases</u>

*Ashcroft v. Free Speech Coal.,* 535 U.S. 234, 122 S. Ct. 1389 (2002)................................11

*Houston v. Hill,* 482 U.S. 451, 107 S. Ct. 2502 (1987)....................................................11, 13

*Gooding v. Wilson,* 405 U.S. 518, 92 S. Ct. 1103 (1972).................................................11, 13

*State v. Hensel*, 901 N.W.2d 166, 171 (Minn. 2017)............................................................11

*United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010)..12

*United States v. Williams*, 553 U.S. 285, 292, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008).....................................................................................................................................12

*Terminiello v. Chicago*, 337 U.S. 1, 4-5, 69 S. Ct. 894 (1949).....................................12, 13

*Texas v. Johnson*, 491 U.S. 397, 399, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989).............12

*Matal v. Tam*, 137 S. Ct. 1744, 1763 (2018).................................................................13, 25

*Ison v. Madison Local School Dist.,* 3 F.4th 887 (6th Cir. 2021)....................13, 20, 22, 25

*Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96 (1972)..............................................14

*Rosenberger v. Rectors and Visitors of University of Virginia,* 515 U.S. 819, 828 (1995)......................................................................................................................................14

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641-3 (1994).........................14

*Burnham v. Ianni,* 119 F.3d 668, 676 (8th Cir. 1997) (en banc).......................................14

*Angeline v. Mahoning Cty. Agr. Soc.*, 993 F. Supp. 627, 633 (N.D. Ohio 1998)..................................................................................................................15, 20, 26

*Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018)....................................15, 17, 26

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019).....................................................................16, 17

*Wood v. Eubanks*, 25 F.4th 414, 419-421 (6th Cir. 2022).................................20, 21, 22, 25

*Crawford v. Geiger,* 656 F. App'x 190, 202 (6th Cir. 2016)..................................22, 23, 26

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-484, 106 S. Ct. 1292 (1986)..............24

*Mallin v. City of Eastlake*, 755 F.Supp.2d 819, 832 (N.D. Ohio 2010)...........................24

*Grawey v. Drury*, 567 F3d 302, 310 (6th Cir. 2009)........................................................25

*Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005)........................................................25

*Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005)........................................25

*Kish v. City of Akron*, 2006-Ohio-1244, 109 Ohio St. 3d 162, 846 N.E.2d 811 (Ohio

2006)......................................................................................................................27, 29

*Kish v. City of Akron*, 200 F. App'x 390 (6th Cir. 2006)..................................................27

*Bd. Of Trs. Of Pierce Twp. V. Hartman,* No. 1:08-CV-37, 2008 U.S. Dist. LEXIS 137553,

**18-20 (S.D. Ohio June 17, 2008)...........................................................................28, 29

 *Aarti Hosp., LLC v. City of Grove City*, No. 2:06-cv-886, 2007 U.S. Dist. LEXIS 20931

(S.D. Ohio Mar. 23, 2007)........................................................................................28, 29

*Patriot Water Treatment, LLC v. Ohio Dep't of Nat. Res.,* 2013-Ohio-5398 (10th Dist.

2013).............................................................................................................................28

*McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733 (N.D. Ohio 2010)..................................29

*Wellin v. City of Hamilton, Ct. of Cl.* No. 2021-00748PQ, 2022-Ohio-2661...................31

*Stillwagon v. City of Del.*, 274 F. Supp. 3d 714, 777 (S.D. Ohio 2017)......................33, 38

*Cook. City of Cincinnati*, 103 Ohio App. 3d 80, 658 N.E.2d 814, 821 (Ohio Ct. App.

1995)..............................................................................................................................33

*Chavalia v. City of Cleveland*, 2017-Ohio-1048, 87 N.E.3d 705 (8th Dist. 2017).............33

*Liechtman v. WLW Jacor Commc'ns*, 92 Ohio App. 3d 232, 236, 634 N.E.2d 697

(1994)......................................................................................................................34, 35

*Lacey v. Laird*, (1956), 166 Ohio St. 12, 1 O.O 2d 158, 139 N.E.2d 25.............................35

*Perkins v. Lavin,* 98 Ohio App. 3d 378, 382, 648 N.E.2d 839 (1994)..............................35

*Love v. City of Port Clinton*, 37 Ohio St. 3d 98, 99, 54 N.E.2d 166 (1988)......................35

*Krewina v. United Specialty Ins. Co.*, 2021-Ohio-4425 (1st Dist. 2021)..........................36

*Schweller v. Schweller*, 1st Dist. Hamilton No. C-970183, 1997 Ohio App. LEXIS 5784,

1997 WL 793106, *4 (Dec. 26 1997)...............................................................36

*Mercer v. Halmbacher*, 2015-Ohio-4167, 44 N.E.3d 1011 (Ct. App.)...............................37

*Sollenberger v. Sollenberger*, 173 F. Supp. 3d 608, 632-633 (S.D. Ohio 2016)........37, 38

## **Statutes**

O.R.C. § 2917.12.......................................................................11, 13, 14, 17, 18, 37, 38, 39

Minn. Stat. § 609.72...............................................................................................12

O.R.C § 149.351.........................................................................26, 27, 28, 29, 30, 32

O.R.C. § 1345.19.....................................................................................................29

O.R.C. § 149.43.......................................................................................................31

O.R.C. § 2744.03.............................................................................................33, 34, 38

O.R.C. § 3314.07.....................................................................................................33

O.R.C. § 3746.24.....................................................................................................33

O.R.C. § 2307.60.....................................................................................................37

O.R.C. § 2921.45.....................................................................................................40

O.R.C. § 2901.22.....................................................................................................40

## I.    INTRODUCTION

It is not just the retaliation—it is the cover up. Defendants Trumbull County, Trumbull County Commissioners, Trumbull County Sheriff's Department, Paul Monroe, Mauro Cantalamessa, Frank Fuda, Harold Wix, and Robert Ross have failed to establish they are entitled to summary judgment on any of Plaintiff Niki Frenchko's claims before this Court. Frenchko is the only woman on the Trumbull County Board of Commissioners, and she is the first Republican elected for that Board for a significant period of time. Frenchko defeated the Democratic County Chairman in her election, she advocated to hold Defendants accountable, and Defendants were not happy about it.

Defendants utilized an overbroad statute to retaliate against Frenchko for her critical viewpoints about Sheriff Monroe and the County Jail.  R.C. § 2917.12 is facially unconstitutional because its language empowers government actors to punish a substantial amount of protected speech when it outrages the sensibilities of the group. The United States Supreme Court has invalidated similar statutes under the overbreadth doctrine, and the Minnesota Supreme Court has recently invalidated its own state's disrupting-a-public-meeting statute for the same reasons that Frenchko advances here.

Defendants' justifications for punishing Frenchko are pretext and a ruse designed to distract from the viewpoint animus they wear on their sleeves.  Defendants' meetings were full of constant interruptions, chaos, fierce debates, accusations, insults, salsa-dancing, and pictures of used tampons held in front of Frenchko's face.  Interruptions and boorish behavior were the norm—not the exception—in Defendants' meetings. Defendants let anyone disrupt their meetings without consequence until Frenchko criticized the Sheriff and refused to apologize.  In fact, Defendant Fuda even explained to

the media recently that it is surprising the Sheriff arrested Commissioner Frenchko because "others have acted inappropriately at those meetings and were never arrested."[1]

After receiving multiple public records requests, a preservation order and spoliation notices, Defendants willfully deleted every single text message they sent to one another for a period of three months. Every text message Defendant Monroe sent is gone. Every text message that Defendant Ross sent is gone. Every text message that Defendant Wix sent is gone. Defendant Cantalamessa deleted all his text messages.[2] More than nine County agents deleted approximately ninety days' worth of public records and evidence to cover-up Defendants' conspiracy to punish Frenchko. Now, while simultaneously arguing that Frenchko has not suffered any harm resulting from Defendants' willful destruction of these records, Defendants are brazenly attempting to convince this Court to grant them immunity because Frenchko does not have the evidence Defendants willfully destroyed. This Court should not tolerate Defendants attempts to benefit from their flagrant destruction of evidence, or every police force in the Northern District of Ohio will learn destroying evidence and public records is worth the risk when they abuse their police power.

Defendants' animus is evident. Their retaliation was swift. And their cover-up is exposed. Defendants maliciously prosecuted Commissioner Frenchko for her viewpoints in violation of the First and Fourth Amendments, and they unlawfully destroyed evidence to cover up their assault against both Frenchko and the United States Constitution.

---

[1] https://www.tribtoday.com/news/local-news/2023/10/frenchko-files-for-summary-judgment/
[2] Only a few of Cantalamessa's text messages were restored **after** deletion. And those deleted messages exhibit plenty of celebration about Frecnhko's arrest and discussions to remove her during the meeting. However, Cantalamessa's messages in days leading up to the meeting remain conveniently deleted.

## A. Defendants' meetings were like the Wild West.

You cannot disrupt inherent disorder. Defendants' meetings historically have permitted plenty of emotional abuse, interruptions, salsa dancing, and a president of the board who even waived around pictures of her own used feminine products in Frenchko's face. As President of the Board, Defendant Fuda never followed Robert's Rules when he chaired Defendants' meetings unless Frenchko was making a critical statement. Defendants now want to debate which version of Robert's Rules they were supposed to follow. Defendants miss the point. If Defendants cannot even articulate what Robert's Rules they are supposed to follow during their meetings, then they probably should not arrest people for *allegedly* violating those rules which they do not know. More importantly, if Defendants argue that they do not even know which rules they were enforcing, then Defendant Fuda was seemingly making the rules up as he went along based on viewpoints.

Defendants permitted the public to come into the meetings, roam around the room, and cause chaos. For example, a county employee's spouse came into a public meeting, he approached the dais, salsa danced around the room to disparage Frenchko's Hispanic ethnicity, displayed his two middle fingers at her, and continued to speak and "flip her off" when it was no longer his time to speak. (See Frenchko's Motion for Summary Judgment, Exhibit 11, "(16) Salsa Dancing Video"). Because this disruptive conduct was at Frenchko's expense, the Sheriff's department and Defendants did not even flinch. (Id.).

In fact, Defendant Cantalamessa admitted under oath that interruptions and insults were commonplace at the commissioners' meetings, and he participated in those interruptions and insults. (PAGEID #43, Cantalamessa Depo at 76-82). Defendant

3

Cantalamessa could not even articulate what was different about the July 7, 2022, meeting, other than the fact that Commissioner Frenchko criticized the Sheriff in a manner that he did not appreciate.  (Id. at 77-78).

Additionally, Defendant Fuda engaged in disruptive behavior while chairing meetings.  For example, Fuda would periodically hold up pictures of Commissioner Frenchko's used tampons in the middle of the commissioners' meetings.  (PAGEID#42, Fuda Depo at 86-88).

Defendants removed one person from meetings several times, but they never arrested that person because he was not criticizing the Sheriff. (PAGEID #44, Monroe Depo at 51-52).  Defendant Fuda recently summarized Defendants' disparate treatment of conduct to the media when he admitted that "others have acted inappropriately at those meetings and were never arrested."[3]

### B. Defendant Fuda interrupted employees during meetings.

Defendants further attempt to argue that they arrested Commissioner Frenchko because she interrupted an employee who was speaking reading a demand for an apology not on the meeting agenda.  However, Defendant Fuda would engage in that very same conduct during meetings.  For example, only one month before Defendants arrested Commissioner Frenchko for *allegedly* interrupting an employee during a meeting, Defendant Fuda barraged an employee with interruptions while that employee was speaking during the meeting. (See Exhibit 1 attached to this Brief, Frenchko manually filed a video of Fuda interrupting an employee on June 10, 2022).

---

[3] https://www.tribtoday.com/news/local-news/2023/10/frenchko-files-for-summary-judgment/

On June 10, 2022, the Trumbull County highway superintendent came to the commissioners' meeting to state his grievances with Defendant Fuda.  (Id.).  Since this employee was criticizing Defendant Fuda—and not Frenchko—Defendant Fuda immediately interrupted him.  (Id.).  In fact, Fuda was interrupting him so much in the first minute of his discussion, the employee had to immediately ask Fuda to stop interrupting his comments, so the employee could state his grievances.  (Id. at 0:00:57).  Seconds later, when the employee told Fuda that he spoke mistruths about the highway department, Fuda immediately interrupted him to disagree.  (Id. 0:01:03)  Frenchko then asked Fuda to permit the employee to speak, but Fuda continued to interrupt the employee time and time again.  (Id., generally).

Even though Defendants want to claim that they arrested Frenchko for interrupting the clerk while she was reading a letter, this video clearly exhibits that Defendants often interrupted speakers and debated with them while they spoke during public meetings.  The Sheriff's Department never threatened to arrest any other commissioner who interrupted an employee during a meeting.  The only person that the Sheriff's Department ever arrested for "interrupting" another speaker was Commissioner Frenchko because she was criticizing the Sheriff's Department and refused Defendants' demands to publicly apologize.

### C.  Defendant Fuda caused the disruptions on July 7, 2022.

Defendants seem to seek refuge because they were clueless about which version of Robert's Rules they applied to meetings.  That is their problem—not Frenchko's.  Regardless, Defendant Fuda admitted he had some awareness of every rule he violated on July 7, 2022.

5

Defendant Fuda knew reading the Sheriff's letter was not on the agenda, but he did not care about the agenda. Specifically, Defendant Fuda knew he was required to follow the agenda, but he deviated from the agenda to begin the debate-at-issue. (PAGEID #42, Fuda Depo at 22:4-22; 78-79; 40:14-16 (Fuda admitted it was his *primary duty* to follow the agenda under Robert's Rules)). Defendant Fuda knew he should not chair his own debate, but he did so anyway. (Id. at 93:15-21). Defendant Fuda knew that he was supposed to keep order, but then inappropriately held up paper in front of Frenchko to purposely interfere with her recording the meeting. (Id. at 83:5-18). Fuda knew that the commissioners needed to vote on deviations from the agenda, but he ignored Frenchko's order of the day objection. (Id. at 24-36).

When Frenchko had the floor, Defendant Fuda had no problems when Defendant Cantalamessa interrupted Frenchko to claim that she was not permitted to talk about the "chief law enforcement" official in the County. The entire debate that led to Frenchko's arrest was the chaotic result of Defendant Fuda violating multiple of Robert's Rules to accuse Frenchko of lying and demand her apology. Defendant Fuda also permitted Defendant Cantalamessa to interrupt Frenchko to object to her viewpoints. The Defendants transparently only want to apply Robert's Rules to Frenchko in order to retaliate against her, but then hypocritically want to excuse their own habitual violations of those very same rules.

## D. Defendants Fuda and Cantalamessa accused Frenchko of disrupting the meeting to cause her arrest.

Defendants want to argue that Defendants Fuda and Cantalamessa had nothing to do with Frenchko's arrest, but this argument directly conflicts with testimony and the recording. Defendant Wix expressly testified that he determined that Frenchko was

6

"disrupting" the meeting because Defendants Fuda and Cantalamessa said she was. (PAGEID # 45, Wix Depo at 58: 7-12). And Defendant Fuda called out for Wix right before Wix arrested Commissioner Frenchko. (Frenchko's Motion for Summary Judgment, Exhibit 11 at "(2) July 7, 2022_Meeting Audio" at 49:12). And Defendants do not claim that either deputy was trained on the Statute or Robert's Rules.

Defendant Cantalamessa also admitted unwittingly that he accused Frenchko of disrupting the meeting because of her viewpoints. In fact, when Frenchko had the floor, Defendant Cantalamessa explained that he accused Frenchko of "disrupting" the meeting because Frenchko was talking about the "chief law enforcement" official in the County, and Frenchko "can't do that." (PAGEID #43, Cantalamessa Depo at 50-51). Defendant Fuda, right before Wix arrested her, also stated that Frenchko either had to apologize to the Sheriff, or they were "moving on." (Frenchko's Motion for Summary Judgment, Exhibit 11 at "(2) July 7, 2022_Meeting Audio" at 49:16). Thus, Fuda attacked her disruption as a refusal to use the floor to apologize to Sheriff Monroe. These viewpoint-based accusations ultimately led to Frenchko's arrest. She was arrested right after refusing to apologize, minutes after the *alleged* interruption.

### E. Defendant Monroe admitted he approved prosecuting Frenchko because she insulted a public official.

Although Defendant Monroe destroyed evidence to cover up his direct involvement in Frenchko's arrest, Monroe testified that he reviewed all the information, he called prosecutors, and he called reporters *before* Defendants arrested Frenchko. (PAGEID #44, Monroe Depo at 39:15-17; 60:18-20; 61; 63:4-6; 76-77; 78-79). According to his

7

own testimony, Monroe approved prosecuting Frenchko because he believed Frenchko

emotionally abused the clerk.

> Q. Okay. You looked at the statute. What conduct do you think justifies a criminal charge?
>
> [omitted objections]
>
> A. Well, the fact that Michele Frenchko put another employee in emotional distress to the point where she couldn't face the public and is visibly crying. What she did to that employee publicly and disrupting the meeting -- if you show me the revised code here, let's look at it.
>
> Q. Well, we'll -- we can look at it.
>
> ***
>
> A. I just -- I look to you. If that was your mother that was being emotionally crushed and put in emotional distress, what do you do? Just watch your mom get beat up?
>
> Q. What's that?
>
> A. Just watch your mom get verbally abused?
>
> (Id. at 55-56)

As an initial matter, the *alleged "*emotional abuse" supposedly occurred because

Frenchko told the clerk that if she did not want recorded, the clerk should not serve in

public office. Frenchko was correct. Anyone has a right to film a public meeting, including

even a guest in the audience. Considering that Defendants typically waived around

photos of used tampons in meetings, Defendants should not consider this statement

abusive. Objectively, a commissioner displaying used tampon images is more abusive

than disagreements about who is subject to recording during public meetings.

In addition to this gross disparity regarding viewpoints, Defendant Monroe

unwittingly explained that it was the **viewpoints** of Frenchko's speech, and an official's

offense to that speech, that caused him to approve of arresting Frenchko under the

Statute. This also just so happened to occur the same day Frenchko also criticized the

Sheriff and refused to apologize.

8

**F. Defendant Monroe made offensive contact with Frenchko's person on March 9, 2023, without justification.**

On March 9, 2023, Sheriff Monroe attended a budget meeting. This meeting was public, so Frenchko had every right to record the meeting. Not long after Frenchko criticized the Sheriff's lack of budgetary constraint during that meeting, Sheriff Monroe got out of his chair. (Manual filing, Exhibit 2, Phone Seizure Video, short clip). As he was approaching Frenchko, Sheriff Monroe verbally objected to being recorded during a public meeting even though his "consent" was not necessary. (Id.). The video then shows that Frenchko peacefully turned her phone around. (Id.). Sheriff Monroe then violently attacked the phone. (Id.).

Typical of Defendants' hypocrisy, the Defendants then claim that Frenchko was acting rude for interrupting Monroe *after* he just finished battering her. (Id.). According to Defendants, it is "rude" to live stream during a meeting, but there is nothing wrong with the County Sheriff battering an elected official during that live stream. (Id.).

Right after the arrest, WFMJ Channel 21 even observed that the "video shows Monroe's hand moving towards the camera lens followed by the phone falling." (Exhibit 3). The article also pointed out that "Monroe appears to be trying to reach for the phone in the video." (Id.). In his response to the media addressing the evidence of his assault of a commissioner, Monroe asserted that "he felt Frenchko recording him to be an invasion of his privacy and that he had 'every right' to move the phone." (Id.). Monroe went on to tell the media that "he doesn't want to participate in '[Frenchko's] social media fiasco she puts on every week.'" (Id.).

9

This battery was another instance of Defendants engaging in a pattern and practice of using their police power and battery to interfere with Frenchko's live streaming and online criticisms of Defendants.

## G. Defendants destroyed public records and evidence after Frenchko requested those records.

Defendants do not actually argue that their text messages were not public records because they were. Defendants do not argue that they did not delete about three months of their text messages that were public records. They did. Defendants instead attempt to argue that Commissioner Frenchko did not request these public records they destroyed. Defendants are wrong.

Frenchko issued two separate public records requests for Defendants' text messages relating to her arrests. First, Frenchko sent her own email on August 8, 2022, requesting all of Defendants' text messages between each other only from June 25, 2022, until August 8, 2022. (See P's MSJ at Exhibit 6). In addition, on March 2, 2023, Frenchko sent an additional records request through Counsel that requested numerous text messages that Defendants have destroyed.

On March 2, 2023, Frenchko's Counsel, Matt Miller-Novak, sent an email to Trumbull County Prosecutor William Danso requesting communications between Defendants that mentioned Frenchko on July 7, 2022. (Attached here as Exhibit 4). That public records request was extremely narrow. But Respondents never responded with a record because they destroyed those records to conceal their plans to retaliate against Frenchko's speech.

## II. LAW AND ARGUMENT

### A. R.C. § 2917.12 is facially unconstitutional because it is overbroad.

10

The entire point of an overbreadth challenge under the First Amendment is that a statute is so broad that it criminalizes a substantial amount of protected speech even if it has some legitimate applications. *See generally*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 122 S. Ct. 1389 (2002). Under this theory, the United States Supreme Court has invalidated multiple statutes that punish interfering with official conduct for overbreadth. See *Houston v. Hill*, 482 U.S. 451, 107 S. Ct. 2502 (1987) (where the Supreme Court held that a statute that criminalized "willfully" "interrupting" police conduct was facially overbroad because it punished protected objections to official conduct); s*ee also*, *Gooding v. Wilson*, 405 U.S. 518, 92 S. Ct. 1103 (1972) (striking down a law for overbreadth that restrained "abusive" language, tending to cause a breach of the peace).

In addition, the Minnesota Supreme Court recently struck down its state law that criminalized disrupting a public meeting because that statue was overly broad. *State v. Hensel*, 901 N.W.2d 166, 171 (Minn. 2017). In that case, the citizen was arrested for disrupting a public meeting because of conduct during two separate meetings. The citizen came to the first meeting, sat in the first row, and held up signs of dead children. *Id.* at 169. Because the citizen was blocking everyone's view, the council had to permit people to move around the gallery, and it eventually had to end the meeting. *Id.* The Council then had to rearrange the seating in its gallery. *Id.* Because there was no longer seating between the gallery and the dais, the citizen grabbed a folding chair to sit in front of the gallery and obstruct the gallery's view. *Id.* The Council asked her to move, and she refused. *Id.* She was charged with Minnesota's disturbance-of-a-meeting-or-assembly statute, and she challenged it under the overbreadth doctrine. *Id.* at 170. The citizen argued that even though the statute had legitimate applications, the statute could apply to criminalize numerous protected activities. *Id.*

11

Like R.C. § 2917.12, the Minnesota statute prohibited "any conduct or speech that 'disturbs an assembly or meeting,' whether expressive or not." *Id.* at 171.  The Minnesota Supreme Court held that a statute is unconstitutional when it criminalizes a substantial amount of protected speech.  *Id.* at 170, *citing*, *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008)).  "The rationale for allowing an overbreadth challenge, even when a statute is constitutional as applied in a particular circumstance, is that enforcement of an overbroad law chills protected speech, which 'inhibit[s] the free exchange of ideas.'" *Id.*, *quoting*, *United States v. Williams*, 553 U.S. 285, 292, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008).

The Minnesota Supreme Court held that even though the statute conceivably punished fighting words and other unprotected comments and actions, its broad scope also invalidated many protected expressions.  *Id.*  For example, the Minnesota Court recognized that the prohibition of "any" conduct that disrupts a meeting could include "wearing an offensive t-shirt, using harsh words in addressing another person, or even raising one's voice in a speech."  *Id.*

The Minnesota Court concluded the statute was unconstitutional because it criminalized any conduct a person would know would offend her listeners.  *Id.* at 172. "This statute presents us with a criminal prohibition of alarming breadth." *Id.*

> It criminalizes a public speech that "criticize[s] various political and racial groups . . . as inimical to the nation's welfare." *Terminiello v. City of Chicago*, 337 U.S. 1, 3, 69 S. Ct. 894, 93 L. Ed. 1131 (1949). It prohibits an individual from wearing a jacket containing an offensive inscription to a meeting. See *Cohen v. California*, 403 U.S. 15, 16, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971). And certainly, it would forbid someone from burning the American flag on a public street. See *Texas v. Johnson*, 491 U.S. 397, 399, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989). In addition to being disruptive of

gatherings of all kinds, all of these actions share a common quality: they are protected under the First Amendment. [*173] Due to the countless ways in which Minn. Stat. § 609.72, subd. 1(2), can prohibit and chill protected expression, we conclude that the statute facially violates the First Amendment's overbreadth doctrine.

*Id.*

Here, like *Hensel* and *Houston v. Hill*, 482 U.S. 451, 107 S. Ct. 2502 (1987), R.C. § 2917.12 criminalizes any conduct that disrupts a public meeting, regardless of whether that conduct is protected speech. In fact, R.C. § 2917.12(A)(2) expressly criminalizes any "utterance" that "outrages the sensibilities of the group." R.C. § 2917.12(A)(2) could criminalize even trivial statements merely because the "sensibilities of the group" are overly sensitive. For example, the Statute here could punish a person for stating that "all democrats are terrible" if the group is "outraged" that someone would make this statement. Thus, R.C. § 2917.12(A)(2)'s scope is consequently as dependent on the subjective sensitivities of the group as it is the conduct of the speaker.

R.C. § 2917.12(A) is unconstitutional under the overbreadth doctrine. The Statute substantially criminalizes protected speech because it punishes any utterances that offend government listeners. As the Supreme Court recently held, "[g]iving offense is a viewpoint." *Matal v. Tam*, 137 S.Ct. 1744, 1763 (2018); *see also*, *Ison v. Madison Local School Dist.*, 3 F.4th 887 (6th Cir. 2021) (holding that regulations against offensive and abusive speech in public meetings is facially viewpoint based); *Gooding v. Wilson*, 405 U.S. 518, 92 S. Ct. 1103 (1972) (striking down a law for overbreadth that restrained "abusive" language, tending to cause a breach of the peace); *see also*, *Terminiello v. Chicago*, 337 U.S. 1, 4-5, 69 S. Ct. 894 (1949) (striking down a statute because it permitted the punishment of a person when his speech stirs anger in others).

13

The Defendants claim that the individuals Defendants are immune. However, the Defendants entities make no convincing argument that R.C. § 2917.12 is not overbroad, and the Entity Defendants make no convincing arguments the entities are immune here. This Court should grant summary judgment and invalidate R.C. § 2917.12 because it is unconstitutionally overbroad.

### B. Defendants unlawfully retaliated against protected speech in violation of the First and Fourth Amendments.

This case involves all the top policymakers in a County punishing their critic. Defendants' First and Fourth Amendment analysis is ham-fisted because Defendants erroneously attempt to treat this case as typical officers arresting a typical criminal defendant in a typical set of circumstances. This arrest is anything but typical. And Defendants' entire analysis ignores the Supreme Court standards that expressly permit a plaintiff to establish a retaliatory arrest against individual officers even when probable cause exists.

As an initial matter, it is well established that viewpoint discrimination violates the First Amendment. The government may not regulate speech based on its substantive content or the message it conveys. *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 96 (1972). Discrimination against speech because of its message is presumed to be unconstitutional. *Rosenberger v. Rectors and Visitors of University of Virginia,* 515 U.S. 819, 828 (1995) (citing *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 641–3 (1994)). Viewpoint discrimination is so offensive to the First Amendment that courts have held it unconstitutional even in non-public forums. *See, e.g., Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) (en banc) (holding that it is not "constitutionally valid" to curtail speech in a limited public forum simply because "other persons on the [] campus

14

object[] to [the speaker's] viewpoint").  Even when a speech regulation has a legitimate application, the government still has the burden to establish that its rule was applied legitimately. *Angeline v. Mahoning Cty. Agr. Soc.,* 993 F. Supp. 627, 633 (N.D. Ohio 1998).

Because retaliation against viewpoints is so egregious, the Supreme Court has held that a plaintiff can establish a retaliatory arrest even when probable cause exists.  First, in *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018), the Court determined that a government could be held liable for speech retaliation even when probable cause exists if top policymakers are involved in that arrest.  Like this case, *Lozman* involved an arrest for disruption of a public government meeting.  *Id.* at 1949-50.  The speaker there had previously sued the council for violations of open meetings law, and he was a frequent critic during meetings. *Id.*  During one meeting, the speaker began talking during public participation about arrests of officials in other jurisdictions.  *Id.*  The council told him to stop making the statements, but the speaker continued.  *Id.*  The council had him removed from the meeting, and he was charged for disrupting that public meeting.  *Id.* The criminal charges were later dismissed.  *Id.*  The speaker then sued under theories of retaliatory arrest.  The lower court entered a jury instruction that required the speaker to prove no probable cause, and he lost at trial.  *Id.*  The speaker appealed, arguing that the lower court's jury instruction was an error, but the Eleventh Circuit affirmed.  The Eleventh Circuit determined any error in the instruction was harmless because the jury determined probable cause existed.  The Supreme Court reversed.  *Id.*, *generally*.

The Court reasoned that a different standard should apply to the speaker's claim because it was not a typical arrest.  *Id.* at 1954.  The Court applied a different standard because the speaker alleged that the government in *Lozman* "formed a premeditated plan

15

to intimidate him in retaliation for his criticisms of city officials and his open-meetings lawsuit," which is like this case here. *Id.* The Court noted that this was a "unique" class of claims involving a plan by top policymakers, so it would not apply to typical retaliatory arrest claims. *Id.* The Court held that the speaker did not need to establish the absence of probable cause, and it remanded the case back to the appellate court to consider arguments relating to the policymakers' plans to retaliate and retaliatory motive for the arrest. *Id.*

The next year, the Supreme Court opened another door to bringing a retaliation claim (even where probable cause exists) when a critical speaker is treated differently than similarly situated people who were not arrested for the same offense. *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019). *Nieves* dealt with an arrest at a winter festival. *Id.* at 1721. The speaker there was drinking, and he got into a verbal altercation with the police. *Id.* The officer there ultimately arrested the speaker for disorderly conduct, but the prosecutor dismissed the charges. *Id.* The speaker sued alleging that the officers retaliated against him for his speech in violation of the First Amendment. *Id.*

The Court rejected the speaker's arguments for a purely subjective test regarding retaliatory animus. *Id.* at 1725. The Court stated that retaliatory arrest claims still generally require that no probable cause existed. *Id.* at 1727. However, the Court expressly created *another* qualification where a plaintiff may bring a successful retaliatory arrest claim even where probable cause exists. *Id.* The Court articulated that "a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* (emphasis added). The Court reasoned that under those circumstances, an official may abuse its police power as a "means of suppressing speech." *Id.* The Court explained that historically most states

16

only permitted warrantless arrests of misdemeanor offenses in limited circumstances, but the states have evolved to permit warrantless arrests for even very minor offenses. *Id.*

The Court used the example of jaywalking because it often occurs without arrest. *Id.* "If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest." *Id.*

The Court concluded that "**the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been**." *Id.* (emphasis). Here, the existence of probable cause is not a determining issue because both qualifications under *Nieves* and *Lozman* apply.

1. Defendants' arrest was retaliatory because they never previously arrested a person for disrupting their meetings.

As an initial matter, disturbing a public meeting under R.C. § 2917.12 is a minor crime that often does not result in arrest.   More importantly, Defendants here **never** enforced this law against a single person other than Commissioner Frenchko.

There is evidence in the record that an employee's husband came into a meeting, approached the dais, salsa danced around the room, and continuously flipped off and interrupted the meeting when he finished speaking.  The deputies in the video never lifted a finger.  In addition, there is video footage of Defendant Fuda constantly interrupting an employee while he/she was speaking, and he was not arrested.  Defendant Cantalamessa

17

admitted that all the Defendants' meetings included interruptions, chaos, insults, and he participated in that chaos. He was never arrested.

Defendants also admit that they removed one person from multiple meetings because he disrupted **several** meetings. Even though this man was a member of the public—not a commissioner—Defendants never charged him with disrupting the commissioners' meetings under R.C. § 2917.12. Thus, Defendants let everyone disrupt their meetings time and time again, and they have **never** arrested or charged a single person until Commissioner Frenchko insulted the Sheriff's Department and refused Defendants' demands to publicly apologize.

Defendant Fuda may have summed it up the best in the media when he made his own observation that "others have acted inappropriately at those meetings and were never arrested."[4] Therefore, Defendants, even according to their own statements, should not have had Commission Frenchko arrested as they have never previously arrested a single person for disrupting their meetings, including one person who was removed multiple times. No Defendant should enjoy immunity or summary judgment here. There is plenty of objective evidence that Defendants treated Commissioner Frenchko differently than any other person because she was a political rival engaged in criticisms against the Sheriff's Department.

   2.   Defendants' top policymakers had a plan and conspiracy to arrest
        Frenchko and then willfully destroyed the evidence of that plan.

Defendants came to this Court for an informal conference concerning their spoliation, and they claimed their spoliation did not harm Frenchko's claims. Defendants now want to argue for immunity claiming there is no evidence of a plan, conspiracy, or

---

[4] https://www.tribtoday.com/news/local-news/2023/10/frenchko-files-for-summary-judgment/

policy to attempt to enjoy immunity because they destroyed that evidence.  At this point, it is obvious that Defendants destroyed every single text message in the days leading up to Frenchko's arrest, so they could make precisely this very argument.  Unfortunately for Defendants, the destruction of that evidence is evidence of a conspiracy.

In fact, the small sample of Defendant Cantalamessa's deleted messages that were recovered, show insight into Defendants' animus, celebration, and plans to deal with Frenchko's criticisms about the jail.

1. Defendant Cantalamessa was receiving text messages from a department head planning to remove Frenchko from the meeting right before she was arrested. (PAGEID#47, P's MSJ at Exhibit 10, pg. 1).

2. Immediately after Frenchko was arrested, Defendant Cantalamessa and county employees were sharing Frenchko's mugshot, calling her a "shitbag," trash, and celebrating her arrest. (Id. at 2-6).

3. After the public began criticizing the arrest, Defendant Cantalamessa and Defendant Monroe discussed how the public was believing Frenchko's narrative.  (Id. at 7).

Defendants sent text messages about their hatred of Frenchko's opinions and coordinated to deal with those criticisms after retaliating against her.  Conveniently, Defendants destroyed every single text message *leading up to the arrest*, and now claim those are not recoverable.  When such a small sample of restored text messages sent after the arrest shows clear animosity, planning, and celebration, it is inconceivable that the rest of Defendants' destroyed messages leading up to the arrest exhibited no similar expressions of animosity or planning.

19

The Defendants planned, conspired, and created a policy to punish Frenchko's criticisms.

    3.  <u>Defendants Fuda and Cantalamessa applied Robert's Rules unequally to punish Frenchko's viewpoints.</u>

As stated above, a government cannot apply legitimate rules unequally based upon viewpoints. *Angeline,* 993 F. Supp. at 633. Defendants did precisely this. Defendants have historically interrupted each other, insulted each other, and argued over one another. Defendants wanted to punish Frenchko for her criticisms, and they applied the rules differently to her because of her viewpoints.

### C.  Defendants lacked probable cause to arrest Frenchko.

Defendant Monroe testified that he approved filing charges against Frenchko because he determined that she was "emotionally abusive." However, the Sixth Circuit Court of Appeals has held that (1) "abusive speech" is protected speech, and (2) that "personally abusive" insults of public officials do not constitute probable cause to arrest a person because insults and abusive statements about government officials are protected viewpoints.

In *Ison v. Madison Local School Dist*., 3 F.4th 887, 893 (6th Cir. 2021), the Sixth Circuit Court of Appeals held that "antagonistic," "abusive," and "personally directed" speech during board meetings was protected. Therefore, the Sixth Circuit has expressly held that a government cannot regulate speech even when that speech is "personally directed," "insulting," "antagonistic," "**abusive**," "harsh," or "insulting." *Id*., generally (emphasis added).

In addition, the Sixth Circuit has also held you cannot prosecute a person for insults and emotionally abusive speech. In *Wood v. Eubanks*, 25 F.4th 414, 419-421 (6th

Cir. 2022), a citizen wore a T-shirt that said "F*** the Police" on it to a county fair in Clark County, Ohio, called the officers "f**king pigs," and "f**kin thugs with guns that don't uphold the United States Constitution," and "fat-ass." *Id.* The officers then arrested the citizen for disorderly conduct and obstructing official business. *Id.* at 421. The trial court dismissed the claims holding the officers were entitled to qualified immunity. The citizen appealed, and the Sixth Circuit reversed.

The Sixth Circuit held that the officers falsely arrested that plaintiff because they lacked probable cause. *Id.* at 423. Like Defendants here, the officers claimed the arrest was proper because the citizen's "language consisted of personally **abusive** epithets." *Id.* at 423 (emphasis added). The Sixth Circuit rejected this argument because rudeness and insult are not "grounds for a seizure." *Id.* at 424.

Defendant Monroe testified that he reviewed the facts, the reports, and the charges **before** Defendants filed those charges against her. According to him, he approved Frenchko's prosecution because he concluded that Frenchko's speech was emotionally "abusive." Thus, Defendant Monroe approved prosecuting his political rival for speech that the Sixth Circuit has held is a protected viewpoint in a board meeting, and the Sixth Circuit has held is not probable cause for a prosecution.

Moreover, Frenchko was not actually the cause of any disruptions. Defendants can point the finger at her all they like. However, Defendant Fuda's actions violated Robert's Rules long before Frenchko began criticizing the Sheriff. Defendant Fuda refused to follow the agenda, chaired his own debate, held up pictures in front of Frenchko to obstruct her view, and refused to submit the deviation from the agenda to a vote as required. The entire debate-at-issue was set in motion because Defendant Fuda only follows Robert's Rules when he wants to silence a viewpoint he does not like.

21

The fact that Defendants do not train their deputies, and those deputies are completely ignorant as to what Robert's Rules are, does not excuse their poor judgment in this Action. Defendants did not have probable cause to arrest Commissioner Frenchko for debating with the Defendants and insulting the Sheriff's Department or the clerk.

### D. Defendants are liable for malicious prosecution and false arrest.

For the same reasons stated above, Defendants' arrest of Frenchko was unlawful because Defendants unlawfully retaliated against Frenchko's speech and unlawfully arrested Frenchko because she insulted government officials. See *Ison*, 3 F.4th at 893 (where the Sixth Circuit Court of Appeals held that "antagonistic," "abusive," and "personally directed" speech during board meetings was protected speech); *see also*, *Eubanks*, 25 F.4th at 419-421 (where the Sixth Circuit held that officers unlawfully arrested a man for insulting officials).

### E. Defendant Monroe unlawfully seized Frenchko's phone and person in violation of the First and Fourth Amendment.

When an officer uses a show of force or authority to restrain a person, he has committed a seizure. *Crawford v. Geiger*, 656 F. App'x 190, 202 (6th Cir. 2016). A seizure is a seizure regardless of how briefly the interference lasts. *Id.* Thus, the length of time a seizure persists is not dispositive of the matter. *Id.* An officer cannot perform a seizure without a warrant unless he has a reasonable suspicion that a person has committed a crime. *Id.* Thus, even a brief push of a person can constitute a seizure without a reasonable suspicion of criminal activity. *Id.*

Notably here, Monroe and the Entity Defendants do not claim that Monroe had any reasonable suspicion that Frenchko was committing a crime. Seemingly, Defendants concede that Frenchko was doing nothing unlawful when Monroe battered her, seized her

22

person, and seized her phone.  Defendants instead seem to argue that Monroe did not violate the Fourth Amendment because he only battered Frenchko's person and property for a moment.  *Geiger* rejects this argument.  Defendants also appear to claim that Monroe gently nudged the phone.  The video footage speaks for itself.  His animus towards her speech was evident, and his aggression was clear.

Monroe's own stated reasons for seizing Frenchko and her phone emphasizes how meaningful his seizure was.  According to Monroe, he seized Frenchko's phone because he did not want to be a part of her online criticisms.  Thus, Monroe admits that he seized Frenchko and her phone, in a public meeting, to punish and chill her speech, which violates both the First and the Fourth Amendments.  Frenchko has stated a claim that Monroe unlawfully seized her phone because Monroe does not even claim he had a reasonable suspicion that Frenchko committed a crime or her phone contained evidence of a crime, and it does not matter that this retaliatory seizure was brief under Sixth Circuit precedent.

Defendants seem to also suggest that somehow it is significant that Monroe physically attacked Frenchko's phone stand instead of her phone.  This argument is tone deaf.  First, it is common sense that a "phone stand" holds a "phone."  Defendants do not suggest that Frenchko's phone was not on the stand when Monroe attacked the phone stand.  Most importantly, who cares what part of Frenchko's phone Monroe attacked?  Frenchko's "phone stand" is still "her property," it was connected to her hand, and Monroe had no right to physically attack and seize Frenchko's phone, phone stand, purse, keys, key chain, or paper weight to physically intimidate her.  Monroe's conduct was unbecoming of the "chief law enforcement official" of the County because he physically

23

attacked a woman's property to physically intimidate her speech, and this Court should hold him accountable for his actions.

Finally, Defendants ask why Frenchko named Trumbull County and the Sheriff's Department for the Sheriff's own conduct. The answer to this question is simple—because the Sheriff is the top decision-maker and policy creator for these entities regarding law enforcement. As Defendant Cantalamessa has stated, Defendant Monroe is the "chief law enforcement official in the County." Thus, his actions are the County's policy on law enforcement. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-484, 106 S. Ct. 1292 (1986).

### F. Defendants Trumbull County, Trumbull County Sheriff's Department, and Trumbull County Commissioners are liable.

A government entity is liable when a final decision maker directs or approves of the unconstitutional action because that policymaker's decision is a policy. *Pembaur*, 475 U.S. at 480-484. A government is liable even when the policymaker directs a particular course of action on only one occasion. *Id.* In *Pembaur*, the Supreme Court stated the following:

> If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, [***464] it surely represents an act of official government "policy" as that term is commonly understood. 9 More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.

In *Mallin v. City of Eastlake*, 755 F.Supp.2d 819, 832 (N.D. Ohio 2010), this Court also noted that a government entity is subject to liability because of the "decision of a person with final policy making authority." Here, Trumbull County, Trumbull County Sheriff's Department, and the Trumbull County Board of Commissioners are all liable

24

because Frenchko's retaliatory arrest was directed and approved by all the entities' top policy makers. In fact, Monroe reviewed and approved of Frenchko's prosecution before it was filed. Additionally (though not less importantly), Monroe personally battered Frenchko as the final decision maker of his department.

### G. The Individual Defendants are not entitled to qualified immunity for Frenchko's Constitutional claims.

The Sixth Circuit applies a two-step analysis to determine of government officials are entitled to qualified immunity. The first inquiry is whether a constitutional violation has occurred. *Grawey v. Drury*, 567 F.3d 302, 310 (6th Cir. 2009). The second question is whether "the alleged violations involved a constitutional right that was clearly established at the time of the alleged misconduct." *Id.* at 313.

A court can determine sufficient notice from "direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Id.* Courts may still find notice to an official "even without a body of relevant case law." *Id.*, *citing, Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005). A plaintiff need not cite "the exact same fact pattern "or even 'fundamentally similar' or 'materially similar' facts." *Id.*, *citing*, *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005). The question is whether there is fair warning to the official. *Id.* at 314. Thus, officials are on notice their conduct establishes established law "even in novel factual circumstances." *Id.* The "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

Defendants were on plenty of notice that abusive and insulting speech is protected from retaliation and viewpoint discrimination. *Eubanks*, 25 F.4th at 419-421; *Ison,* 3 F.4th

25

at 893; *Matal v. Tam*, 137 S.Ct. 1744, 1763 (2018). Defendants were on plenty of notice that you cannot apply legitimate rules differently to retaliate against viewpoints. *Angeline,* 993 F. Supp. at 633; *Nieves*, 139 S. Ct. 1715; *Lozman*, 138 S. Ct. 1945. Defendants were also on notice that seizure is unlawful without reasonable suspicion of a crime. *Geiger*, 656 F. App'x at 202.

Therefore, Defendants Cantalamessa and Fuda had notice that they could not apply their rules differently based upon viewpoints. Defendants Ross and Wix had notice that they could not arrest Frenchko for conduct they permit others to engage in merely because her viewpoints were critical of their department. Monroe had notice he cannot prosecute people for "abusive" speech about an employee or seize a person or her property without the reasonable suspicion of a crime. No Defendant is entitled to qualified immunity.

### H. Defendants unlawfully destroyed public records.

Defendants are not entitled to summary judgment on Frenchko's destruction of public records claim. Instead, Frenchko's claim succeeds as a matter of law. R.C. § 149.351 (B) states the following:

> (B) Any person who is aggrieved by the removal, destruction, mutilation, or transfer of, or by other damage to or disposition of a record in violation of division (A) of this section, or by threat of such removal, destruction, mutilation, transfer, or other damage to or disposition of such a record, may commence either or both of the following in the court of common pleas of the county in which division (A) of this section allegedly was violated or is threatened to be violated:
>
> > (1) A civil action for injunctive relief to compel compliance with division (A) of this section, and to obtain an award of the reasonable attorney's fees incurred by the person in the civil action;

As an initial matter, Defendants do not claim that their text message communications were not public records. They were. Defendants cannot argue that they

26

did not destroy ninety days' worth of public records. They most certainly did. Defendants instead attempt to argue that Frenchko's claim was not filed in the proper forum, they did not receive the requests, and Frenchko's requests were too broad. All Defendants' arguments fail a matter of law.

1. This Court may issue an injunction, damages, and attorney fees under R.C. § 149.351.

The Defendants erroneously claim that this Court may not exercise its supplemental jurisdiction over a claim under R.C. § 149.351. Defendants are wrong. In fact, this Court, the Sixth Circuit Court of Appeals, and the Southern District of Ohio have all already exercised jurisdiction over R.C. § 149.351.

In *Kish v. City of Akron*, 2006-Ohio-1244, ¶¶4-9, 109 Ohio St. 3d 162, 846 N.E.2d 811 (Ohio 2006), *citing*, *Kish v. City of Akron*, 200 F. App'x 390 (6th Cir. 2006), a union brought an action in federal court against the City of Akron for violations of the FLSA, and the suit included a claim for destruction of public records under R.C. § 149.351. The union won its claim under R.C. § 149.351 after trial, and Akron appealed to the Sixth Circuit Court of Appeals. *Id.* at ¶10. The Sixth Circuit then certified two questions to the Ohio Supreme Court. The first question asked for the definition of "record" under R.C. § 149.351, and the second asked for a definition of the word "violation." *Id.*

The Ohio Supreme Court held that "[u]nless otherwise exempted or excepted, almost all documents memorializing the activities of a public office can satisfy the definition of 'record.'" *Id.* at ¶20. Thus, it informed the Sixth Circuit that "record" would include both a compilation of records, as well as a single record within that larger compilation. *Id.* at ¶27.

Regarding the definition of the word "violation," the Ohio Supreme Court held that "[a]ny person who is aggrieved by the removal, destruction, mutilation, or transfer of, or by other damage to or disposition of a record . . . may commence" an action in the "court of common pleas of the county" where the destruction took place. *Id.* at ¶31.[5] Therefore, the Ohio Supreme Court assisted the Sixth Circuit Court of Appeals in exercising supplemental jurisdiction over R.C. § 149.351.

In addition, the Southern District of Ohio has also exercised jurisdiction over R.C. § 149.351 multiple times. *See, Bd. of Trs. of Pierce Twp. v. Hartman*, No. 1:08-CV-37, 2008 U.S. Dist. LEXIS 137553, **18-20 (S.D. Ohio June 17, 2008); *Aarti Hosp., LLC v. City of Grove City*, No. 2:06-cv-886, 2007 U.S. Dist. LEXIS 20931 (S.D. Ohio Mar. 23, 2007).

Defendants present an overly broad interpretation of another opinion addressing different jurisdictional issues that may arise but are not present here.  In *Patriot Water Treatment, LLC v. Ohio Dep't of Nat. Res.*, 2013-Ohio-5398, ¶¶35-6 (10th Dist. 2013), the court only addressed whether the court of claims, which is a *special* court in Ohio that has *limited* jurisdiction for money damages against the State of Ohio, was the proper Ohio court for an action under R.C. § 149.351. That opinion concluded that the court of common pleas was the proper forum because the statute designated the court of claims jurisdiction over that matter.  This holding has no impact on a federal court's supplemental jurisdiction.

Defendant has provided no case holding that federal courts may not exercise ancillary/supplemental jurisdiction over this claim simply because the statute designates

---

[5] If a federal court had no power under R.C. § 149.351, it is inconceivable that the Northern District, Sixth Circuit, or Ohio Supreme Court would not have made this determination while all providing insight into the entire framework of the Statute.

the court of common pleas as the forum.  But it is common for a federal court to exercise jurisdiction over an Ohio statute even when that statute directs plaintiffs to file their actions in the court of common pleas.

Like R.C. § 149.351, the Ohio Open Meetings Act also calls for a plaintiff to seek an injunction from a court of common pleas.  See R.C. § 121.22(I)(1)-(2).  However, federal courts exercise their supplemental jurisdiction over claims under the Open Meetings Act under R.C. § 121.22(I).  For example, in *Aarti Hosp., LLC v. City of Grove City*, No. 2:06-cv-886, 2007 U.S. Dist. LEXIS 20931 (S.D. Ohio Mar. 23, 2007), the Southern District of Ohio exercised its supplemental jurisdiction over the Open Meetings Act, as well as R.C. § 149.351 to address claims under both the Open Meetings Act and the destruction of public records.  Federal courts also exercise supplemental jurisdiction over commercial statutes that designate Ohio courts of general jurisdiction.  The Consumer Sales Practices Act ("CSPA") under R.C. § 1345.19 expressly designates jurisdiction to the "courts of common pleas, and municipal or county courts."  See R.C. § 1345.19.  However, this Court has exercised supplemental jurisdiction over CSPA claims despite this language.  *See generally*, *McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733 (N.D. Ohio 2010).

Federal courts frequently exercise supplemental jurisdiction over a variety of state laws designating jurisdiction in the court of common pleas in Ohio, whether those claims involve destruction of public records under R.C. § 149.351, violations of the Open Meetings Act under R.C. § 121.22, or even violations of the CSPA.  Concerning the statute-at-issue, the Northern District, Southern District, Southern District of Ohio, and Sixth Circuit Court of Appeals have all exercised jurisdiction over R.C. § 149.351 in the past.  *See Kish v. City of Akron*, 2006-Ohio-1244, ¶¶4-9, 109 Ohio St. 3d 162, 846 N.E.2d 811 (Ohio 2006); *Kish v. City of Akron*, 200 F. App'x 390 (6th Cir. 2006); *Bd. of Trs. of Pierce Twp.*

*v. Hartman*, No. 1:08-CV-37, 2008 U.S. Dist. LEXIS 137553, **18-20 (S.D. Ohio June 17, 2008); *Aarti Hosp., LLC v. City of Grove City*, No. 2:06-cv-886, 2007 U.S. Dist. LEXIS 20931 (S.D. Ohio Mar. 23, 2007).

Defendants' jurisdictional objections are meritless.  This Court may enjoin Defendants' malicious destruction of public records and award all remedies available under the Statute.

2.   <u>Frenchko's claim under R.C. § 149.351 succeeds as a matter of law.</u>

Defendants waste much ink claiming unconvincingly that they did not receive plenty of notice to preserve evidence and public records requests.   They did.

Special Prosecutor Srp sent Judge Frost's preservation order to both the Sheriff and Commissioners. (PAGEID#47, P's MSJ at Exhibit 7). The Trumbull County Prosecutor had notice of the Preservation Order and sent a letter to Monroe about the Order, so the County and its agents were imputed with that notice.  (Id.)  On August 8, 2022, Frenchko personally sent an email directly to both the Sheriff and Commissioners requesting public records.  (Id. at Exhibit 6).  On March 2, 2023, Frenchko sent more public records requests directly to Trumbull County Prosecutor William Danso through Counsel Miller-Novak that covered these destroyed documents.  (See Exhibit 4 attached to this Brief).  Only several days later, on March 9, 2023, Frenchko sent a spoliation demand to Prosecutor Danso through attorney Miller-Novak.  (PAGEID#47, P's MSJ at Exhibit 9).

As stated above, Frenchko sent her first public records request on August 8, 2022, and she sent her second public records request on March 2, 2023.[6]  In her second request,

---

[6] Defendants confuse the records by at times incorrectly describing spoliation demands as public records requests.  For example, Defendants often refer to Miller-Novak's March 9, 2023, spoliation demand as a

Frenchko expressly asked for the following as one of her demands (in addition to other relevant demands):

> *Any text messages sent between Mauro Cantalamessa, Frank Fuda, Sheriff Monroe, Harold Wix or Robert Ross on July 7, 2022, mentioning Niki and/or Frenchko.*

(See Exhibit 4) (emphasis added).

This request is not overly broad, and this request placed all Defendants on notice that they needed to preserve public records related to Frenchko's arrest.  Yet, Defendants erroneously argue that they may destroy public records simply because they believe **one** of Frenchko's requests was overly broad, while ignoring her other requests which were very narrow.  Even if Defendants believe that one of Frenchko's requests was overly broad, the law still **requires** that Defendants work with Frenchko to clarify her request **before** rejecting it. See *Wellin v. City of Hamilton, Ct. of Cl.* No. 2021-00748PQ, 2022-Ohio-2661, ¶ 17 (public office failed to inform requester how the office maintained and accessed its records when it merely offered to requester to "contact" the office "[i]f you would like to clarify or revise your request"). In fact, the Ohio Sunshine Law Manual expressly provides the following guidance when a public body believes that a request is overly broad:

> R.C. 149.43(B)(2) permits a public office to deny any part of a public records request that is ambiguous or overly broad, as defined above. **However**, the statute then **requires that the public office give the requester the opportunity to revise the denied request, by informing the requester how the office ordinarily maintains and accesses its records**. In this way, the Public Records Act expressly promotes cooperation to clarify and narrow requests that are ambiguous or overly broad . . .[7]

---

public records request.  It was not.  Miller-Novak sent public records requests in a separate email earlier on March 2, 2023.

[7] https://www.ohioattorneygeneral.gov/Files/Publications-Files/Publications-for-Legal/Sunshine-Laws-Publications/2023-Sunshine-Manual.aspx at pg. 14 (emphasis added).

Defendants may not purge public records simply because they *allege* Frenchko's requests were too broad. Frenchko requested public records on two separate occasions, her requests were not overly broad, Defendants did not try to negotiate with her to narrow her requests if they believed they were too broad, and Defendants willfully destroyed public records. Frenchko is entitled to judgment as a matter of law under R.C. § 149.351.

3.  <u>Defendants' destruction of records aggrieved Frenchko.</u>

Defendants' arguments that Frenchko was not aggrieved by their destruction of records are meritless. Defendants attempt to argue that Commissioner Frenchko's requests for their text messages were "contrived" to create a claim under R.C. § 149.351. This argument is nonsensical. Defendants arrested Frenchko. Frenchko is suing Defendants for arresting her. Frenchko certainly did not "contrive" her own arrest to bring a public records claim. Clearly, Frenchko was seeking communications related to her arrest because she sought evidence of Defendants' unlawful conduct and sought public accountability. If Defendants had not abused their police power to punish her, she would never have requested the records at all.

Defendants further argue that Frenchko was not harmed because she received "phone logs" from Defendants' phone carriers. This argument is an assault on common sense. Defendants have seen those logs, and they are aware none of those logs contain a single conversation because phone logs do not show the actual conversations. More importantly, because Defendants destroyed ninety days of messages, Frenchko incurred a significant amount of attorney fees to read volumes of logs to expose Defendants' willful destruction of those public records to expose their concealment of their plans to retaliate against Frenchko.

32

### I. Defendants are not entitled to immunity for any state claim under R.C. § 2744.03(A)(6)(b).

When employees of a political body act outside the scope of their employment, or

commit torts maliciously or in bad faith, they are not entitled to immunity against state

claims.

> (6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:
>
>> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>>
>> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner . . .

Under O.R.C. § 2744.03(A)(6)(b), an employee of a political subdivision is not

entitled to immunity in connection with the performance of governmental function if that

employee "acts or omissions" were conducted "with malicious purpose, in bad faith, or in

a wanton or reckless manner." *Stillwagon v. City of Del.*, 274 F. Supp. 3d 714, 777 (S.D.

Ohio 2017). A person acts with malice when he has acts with the "willful and intentional

design to do injury" through unlawful or unjustified conduct. *Id.*, *citing*, *Cook v. City of

Cincinnati*, 103 Ohio App. 3d 80, 658 N.E.2d 814, 821 (Ohio Ct. App. 1995). "Bad faith"

occurs when a person acts with "dishonest purpose" or "ill will." *Id.* And "reckless

conduct" involves the "conscious disregard of or indifference to a known or obvious risk

of harm to another that is unreasonable under the circumstances and is substantially

greater than negligent conduct." *Id.* Whether an employee acted in a wanton or reckless

manner is typically a question for a jury. *Id.*, *citing*, *Chavalia v. City of Cleveland*, 2017-

33

Ohio-1048, 87 N.E.3d 705, ¶ 33 (8th Dist. 2017) ("[W]hether the employee acted in a wanton or reckless manner . . . is typically a question of fact for the jury.").

Here, the malice is evident.  All Defendants had clear axes to grind with Frenchko. Fuda disliked Frenchko to an extent he engaged in the filthy campaign of showing pictures of her used tampons during meetings.  Defendants Cantalamessa exhibited his malice in his messages right after Frenchko's arrest where he and other employees were calling Frenchko trash and a "shitbag" to celebrate her arrest.  Defendant Ross was texting with other deputies in the minutes before and after the arrest and deleted those messages to conceal his retaliation.  And Defendant Monroe approved Frenchko's arrest and battered her to maliciously punish her for her critical speech about his department.

Even though R.C. § 2744.03(A)(7) may not abrogate immunity for certain state claims Frenchko has brought, Defendants are still not immune because they acted with actual malice and bad faith to punish a political rival with an abuse of police power. Therefore, Defendants are not immune from **any** state tort under R.C. § 2744.03(A)(6) because acting with malice and bad faith strips an official of his immunity.

### J. Defendants Monroe, Ross, and Wix battered Frenchko.

Defendants erroneously attempt to misconstrue Frenchko's battery claim as just an excessive force claim.  Defendants fail to realize that battery does not only involve physically harmful contact.  It also involves "offensive" contact.  A person batters another when he intends to make offensive contact with the person of another and offensive contact results.  *Leichtman v. WLW Jacor Commc'ns*, 92 Ohio App. 3d 232, 236, 634 N.E.2d 697 (1994).  A plaintiff may establish battery when contact is offensive to a reasonable person's sense of dignity. *Id.* at 235.  In *Leichtman*, an anti-smoking advocate appeared on a radio talk show.  One of the agents of the radio station intentionally blew

34

smoke in the advocate's face. The First District Court of Appeals determined that it was

an actionable battery case because any battery is actionable, even if the damages are only

a dollar. *Id.*

> As alleged in Leichtman's complaint, when Furman intentionally blew cigar
> smoke in Leichtman's face, under Ohio common law, he committed a
> battery. No matter how trivial the incident, a battery is actionable, even if
> damages are only one dollar. Lacey v. Laird (1956), 166 Ohio St. 12, 1 O.O.2d
> 158, 139 N.E.2d 25, paragraph two of the syllabus. The rationale is explained
> by Roscoe Pound in his essay "Liability": "[I]n civilized society men must be
> able to assume that others will do them no intentional injury -- that others
> will commit no intentioned aggressions upon them." Pound, An
> Introduction to the Philosophy of Law (1922) 169. *Id.*

Ohio law is clear that battery does not only protect against harmful physical

contact, but it also protects against "any offensive contact." *Perkins v. Lavin*, 98 Ohio

App. 3d 378, 382, 648 N.E.2d 839 (1994). Battery can include "innocent intentional

contact and even intentional contact meant to assist the complainant, if that contact is

unauthorized." *Id.*

> The defendant may be liable when intending only a joke, or even a
> compliment, as where an unappreciated kiss is bestowed without consent,
> or a misguided effort is made to render assistance." Prosser, Law of Torts (5
> Ed.1984) 42, Section 9.

**The Ohio Supreme Court has expressly held that the "acts of 'subduing' and
'handcuffing' are undoubtedly offensive to a reasonable sense of personal
dignity, and that the "contact involved is plainly intentional; one cannot
accidentally handcuff or subdue another."** *Love v. City of Port Clinton*, 37 Ohio

St. 3d 98, 99, 524 N.E.2d 166 (1988). Thus, when an officer inappropriately handcuffs a

person, he has committed a battery.

Moreover, Defendant Monroe intended to take Frenchko's phone while it was

attached to her person. Frenchko's phone was specifically on a phone stand that was

attached to her person the moment Monroe attacked the phone. Monroe's own statements exhibit that he intended to move her phone because he (1) proclaimed right before taking the phone he was seizing phone because he did not "consent" to Frenchko filming him in public, and (2) he also informed the media that he had the right to seize the phone because he did not want her filming him. A jury could easily determine that Monroe's contact with Frenchko was offensive and maliciously designed to intimidate and humiliate Frenchko in bad faith. A jury could also determine that when Wix and Ross battered Frenchko when they handcuffed her to humiliate her for engaging in critical speech about the Sheriff's Department.

### N. Defendant Monroe assaulted Frenchko.

The tort of assault is "the willful threat or attempt to" touch another offensively, which threat or attempt reasonably places the other in fear of such contact. *Krewina v. United Specialty Ins. Co.,* 2021-Ohio-4425 (1st Dist. 2021); *citing, Schweller v. Schweller,* 1st Dist. Hamilton No. C-970183, 1997 Ohio App. LEXIS 5784, 1997 WL 793106, *4 (Dec. 26, 1997). Simply stated, an assault occurs when a person attempts a battery, but fails to make the intended offensive contact.

Defendants seem to take the position that when Monroe attacked Frenchko's phone to silence her online speech, his actions did not place Frenchko in apprehension of offensive contact. However, the recording specifically states otherwise. Frenchko is clearly heard protesting to Monroe's battery and telling him how offensive his assault and battery was. Moreover, Monroe's own statements were that Frenchko defended her property when he attacked it. (Exhibit 3). Monroe's abusive and intimidating assault on Frenchko was designed to place her in fear of recording him in meetings because he did not "consent" to be a subject of her recordings and online speech. He clearly intended to

36

intimidate and threaten Frenchko's speech through physical violence and offensive contact with an object attached to Frenchko's person.

### O. Monroe is liable for trespass to chattel.

"A trespass to chattel occurs when one intentionally dispossesses another of their personal property." *Mercer v. Halmbacher*, 2015-Ohio-4167, ¶20, 44 N.E.3d 1011 (Ct. App.) "[T]he total duration of that dispossession is irrelevant when determining whether one has been 'dispossessed' of their property under the Second Restatement. *Id.* at ¶23. In addition to the unlawful disposition of another's property, it is also trespass to chattel to take the "chattel into the custody of the law." *Id.*, *citing*, 1 Restatement of the Law 2d, Torts, Section 217 (1965). Even nominal damages can support a trespass to chattel claim. *Id.* at ¶24.

Regardless of whether Monroe wants to argue that he attacked Frenchko's cellphone or her cellphone stand, Monroe attacked her property. As stated above, it is very dubious to act like it is significant that Monroe attacked the phone stand instead of the phone because it is commonsense that the phone was on the phone stand. Monroe acted maliciously and in bad faith to punish Frenchko for live streaming his public comments and criticizing him online.

### P. Defendants are liable under R.C. § 2307.60.

Defendants cite case law holding that an "employee" is not liable under R.C. 2921.12(A)(1) because "person" does not mean "employee" under R.C. § 2744.03(A)(6)(b). (See Ds' MSJ at 42). However, Defendants' reliance on *Sollenberger v. Sollenberger,* 173 F. Supp. 3d 608, 632-633 (S.D. Ohio 2016) is an overly broad application of that case. *Sollenberger* did not pronounce that public employees can never be held liable under R.C. § 2307.60. Although *Sollenberger* held R.C. § 2307.60 did not

37

function to abrogate immunity under 2744.03(A)(6)(c), *Sollenberger* does not hold that 2744.03(A)(6)(b) could never strip an employee of immunity for malicious conduct or bad faith.  In *Sollenberger*, the plaintiff failed to even name officials in their "individual" capacities.  *Id*. at 630 (noting that the plaintiff did "not explicitly state that Sheriff Defendants were sued in their individual capacities.").  Thus, the court there found that the plaintiff did not properly pent facts to support malicious conduct.  *Id*. at 631.  Conversely, Frenchko has shown that Defendants recklessly and maliciously have destroyed evidence and violated her constitutional rights.  Employees are not immune from state torts under R.C. § 2744.03(A)(6)(b) when they act maliciously and in bad faith.  *Stillwagon*, 274 F. Supp. 3d at 777.

> 1.   Defendants are liable under R.C. § 2921.12(A)(1).

Defendants willfully destroyed records to impair its availability in Frenchko's case and the investigation.  The statute states the following:

> (A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
>
>> (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation . . . R.C. § 2921.12(A)(1).

Defendants argue that their absolute destruction of ninety days' worth of text messages is somehow excusable because the criminal case against Frenchko was "dismissed," so the preservation order was somehow obsolete. (Ds' MSJ at 43-4).  First, the Order to Preserve the evidence had no expiration date.  Moreover, Defendants skirt the fact that the special prosecutor dismissed the criminal claims "without" prejudice, so Defendants could refile the claims against Frenchko at any time they felt like abusing the system again.  Moreover, Defendants never announced that the investigation against Frenchko was closed.

Defendants also attempt unconvincingly to pretend that they did not receive plenty of notice to not destroy evidence.  They did.  As exhibited above, they received a preservation order, numerous public records requests, and spoliation demands.

Regardless, R.C. § 2921.12(A)(1) does not actually mention a preservation order. Defendants' arguments here about the preservation order are a red herring.  In fact, the plain language of the statute does not require that a defendant receive a preservation order, a public records request, or a spoliation demand.  On the contrary, R.C. § 2921.12(A)(1) only requires that a defendant knows that an "official proceeding or investigation is in progress or is about to be or likely to be instituted."  Defendants have not and could not possibly suggest that they were unaware that they were prosecuting Frenchko or that she alleged that Defendants' actions were unconstitutional.  Defendants Wix and Ross arrested Frenchko, so they knew about her arrest.  Defendant Monroe was bragging to the media while she was arrested, and he approved of her prosecution before charges were filed.  Defendant Cantalamessa was bragging to his friends in text messages immediately after Frenchko was arrested, so he knew that a proceeding was likely.

Defendants have never dismissed their claims with prejudice, and they have instead dangled a potential refiling of their malicious prosecution against Frenchko while simultaneously purging every bit of exculpatory evidence.  A jury could determine that Defendants knew that they were prosecuting Frenchko, or would need to defend against constitutional claims, and they destroyed ninety days' worth of text messages to impair their availability.

39

2. <u>Defendants are liable under R.C. § 2921.45 for violating Frenchko's civil rights.</u>

Under R.C. § 2921.45, "[n]o public servant, under color of the public servant's office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right." Under Ohio law, a person acts knowingly when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B).

This is another in a long line of circumstances where Defendants are all attempting to prevail through their complete and total destruction of ninety days' worth of text messages. Defendants came into this court for an informal conference about their spoliation pretending like their destruction of public records had no impact on this case, but they continually argue to escape liability on claim after claim arguing no evidence of certain matters exists because they destroyed that same evidence. This Court should not accept Defendants' premise that they should escape liability because they purged evidence. And this repeated opportunism of their spoliation should serve as a constant reminder why this Court should punish Defendants for their spoliation.

Regardless, there is evidence that Defendants knew they were depriving Frenchko of her constitutional rights still in the record. For example, the record is clear that Monroe knew and admitted in the media that he battered Frenchko and seized her phone because he did not want to appear in her videos and online speech. In addition, the few messages that Cantalamessa was able to preserve—which was only a small fraction of his destroyed text messages—show that he was celebrating Defendants' malicious prosecution of his rival with fellow County employees and elected officials.

40

## Q. There is evidence of malicious conduct to support punitive damages against the Individual Defendants.

First, whether Plaintiffs can establish punitive damages against the Individual Defendants for their individual conduct is a question about remedies—not liability. This question is more appropriately answered at trial.

Moreover, Defendants' Counsel attempted to argue in an informal conference that their spoliation did not harm Frenchko. One of the precise examples that Frenchko's Counsel provided in that conference regarding spoliation harms was Defendants' deliberate destruction of evidence of malice to support punitive damages. Simply stated, Frenchko's Counsel predicted that Defendants would seek to use their spoliation to frustrate Frenchko's claims for punitive damages, among other matters, and they are here doing precisely that very thing. They will surely attempt to sell a jury this same snake oil.

Nonetheless, there remain issues of material fact regarding malice. Sheriff Monroe was clear in his deposition about his malice regarding his perceptions of Frenchko and her criticisms. In his deposition, he claims that Frenchko's viewpoints did "nothing but damage the sheriff's office . . ." (PAGEID#44, Monroe Depo. at 38:13-16). Monroe also used harsh language to describe his rival as "mentally disturbed" in his deposition. (Id. at 117: 19). Furthermore, after Frenchko's arrest, even a small sampling of Cantalamessa's restored-destroyed records exhibits plenty of animosity and malice. For instance, Cantalamessa and other County employees celebrated Frenchko's retaliatory arrest by passing around her mug shot, joking, and calling Frenchko a "shitbag" and "trash." (PAGEID#47, P's MSJ at Exhibit 10).

In summation, Defendants did everything they could to purge evidence of their malice towards Frenchko, but there remain issues of material fact about that malice.

41

Regardless, punitive damages are a remedies matter for a trial.  Defendants make no legal arguments that punitive damages are not available against the Individual Defendants in their individual capacities because they are.

### III.    CONCLUSION

Accordingly, Frenchko respectfully requests that this Court denies Defendants' Motion for Summary Judgment.

Respectfully Submitted,

*/s/ Matt Miller-Novak*
Matthew Miller-Novak (0091402)
Steven C. Davis, Esq. (0065838)
Barron, Peck, Bennie & Schlemmer
3074 Madison Road
Cincinnati, Ohio 45209
(513) 721-1350
MMN@BPBSLaw.com
SCD@BPBSlaw.com

*/s/ David J. Betras*
David J. Betras (0030575)
6630 Seville Drive
Canfield, Ohio 44406
Telephone: (330) 746-8484
Facsimile: (330) 702-8280
Email: dbetras@bkmlaws.com

Attorneys for Plaintiff

### CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on Defendants' Counsel utilizing this Court's electronic filing and notification system, as well as electronic mail.

*/s/ Matt Miller-Novak*