# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| NIKI FRENCHKO, | ) | Case No. 4:23-cv-781 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge Thomas M. Parker |
| | ) | |
| PAUL MONROE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Here in America, we do not arrest our political opponents.  This case tests that longstanding norm as well as our Constitution's robust protections for free speech that allow us to criticize our representatives and public officials.  Plaintiff Niki Frenchko won election to the three-member Board of County Commissioners of Trumbull County, Ohio.  She was an outsider, and the only member of County government from her political party.  As a public official, she used her position to needle the incumbents and, in her view, hold them accountable for their decisions.  For their part, they viewed her as ignorant of the basic workings of county government and a nuisance, to put it mildly.  As her colleagues became more and more frustrated and impatient with her, their personal and political disagreements grew increasingly heated.

After Commissioner Frenchko criticized the performance of Sheriff Paul Monroe, a Defendant in this action, two of his deputies arrested her during a public meeting of the Trumbull County Commission as she spoke on a matter of public

concern and criticized the Sheriff.  Based on this and other incidents, Plaintiff brought this lawsuit seeking to vindicate her federal constitutional rights.  She sued several public officials, as well as Trumbull County itself, the County Sheriff's Department, and the Trumbull County Board of Commissioners.  Both Plaintiff and all Defendants seek a summary judgment in their favor.

For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** each motion.  On some claims, Commissioner Frenchko is entitled to summary judgment; on others, Defendants are entitled to summary judgment; a jury must decide some; and still others are best addressed in State court.

## STATEMENT OF FACTS

Plaintiff and Defendants filed cross-motions for summary judgment.  In this procedural posture, the Court construes the facts in Defendants' favor in ruling on Plaintiff's motion for summary judgment, and in Plaintiff's favor in ruling on Defendants' motion for summary judgment.  Because videos capture many of the key events at issue, there is not much room to dispute what they show.  But where the record presents material disputes or competing versions of the facts, the Court so notes.

### A.    The Trumbull County Board of Commissioners

By way of background, a three-member commission governs Trumbull County, Ohio, which has a population of approximately 200,000 in Northeast Ohio outside of Youngstown.  The Board possesses "all the powers and duties vested by law in boards of county commissioners":  it "is the policy-determining body of the county."  Ohio Rev. Code § 302.12.  Under Ohio law, the Board must "conduct at least fifty regular

sessions each year." *Id.* § 305.06(A).  Such meetings "shall be public" and held "in conformity with the rules of parliamentary law." *Id.* § 305.09; *see id.* § 121.22.

Plaintiff Niki Frenchko won election to the Trumbull County Board of Commissioners in 2020 and took office in 2021.  (ECF No. 49, PageID #1039–40.)  She ran on a platform of disrupting the entrenched practices of county leadership.  (*Id.*, PageID #1081.)  She challenged an incumbent who had held office since 2004 and who also served as the chairman of the county Democratic party.  Before the election, Ms. Frenchko faced a board of elections inquiry into her qualifications.  *State ex rel. Frenchko v. Trumbull Cnty. Bd. of Elections*, 161 Ohio St. 3d 174, 2020-Ohio-4253, 161 N.E.3d 616, ¶ 3.  After her election, her opponent and a number of voters protested the result, charging that Ms. Frenchko was ineligible to serve as a commissioner, claiming that she did not reside in Trumbull County.  *Polivka v. Frenchko*, Trumbull Cnty. Ct. Com. Pl. No. 2020CV01327, slip op. at 3–4 (Feb. 2, 2021).  The State trial court rejected this effort to overturn the election.  *Id.* Commissioner Frenchko assumed office in January 2021, making her "the first Republican and first woman to serve as Trumbull County commissioner in at least three decades."  Guy Vogrin, *Victory is hers again*, The Vindicator (Dec. 21, 2020).

At the relevant times, two other commissioners served with Ms. Frenchko: Mauro Cantalamessa and Frank Fuda, who served as the chair.  (ECF No. 43-1, PageID #424.)  Commissioner Cantalamessa served on the board since 2013, and Commissioner Fuda served since 2007.  (*Id.*; ECF No. 42-1, PageID #301.)  By all accounts, Commissioner Frenchko brought a dissenting and often unwelcome voice

to the Trumbull County Board of Commissioners. In her own words, Commissioner Frenchko has "been critical" of her colleagues and "embarrassed [them] by . . . exposing how they've been doing business . . . over their terms in a very inept and corrupted way." (ECF No. 49, PageID #1053.)

At meetings of the Trumbull County Commission, Commissioner Frenchko and her two colleagues often sparred. (ECF No. 43, PageID #485.) Even disagreements over policy often devolved into arguments during which the commissioners interrupted one another. (*Id.*, PageID #485–88.) Often, the meetings descended into personal insults. For example, at public meetings Commissioner Fuda referred to Commissioner Frenchko as "this lady." (June 10 meeting video at 3:00 & 3:40.) During one public meeting, he held up photographs to Commissioner Frenchko of the trash can in the women's restroom containing used tampons. (ECF No. 42-1, PageID #378.)

Commissioner Frenchko developed a practice of live streaming meetings to her Facebook page. (ECF No. 50, PageID #1119–20.) Under Ohio law, that practice is lawful. *See, e.g.*, *Foulk v. City of Upper Arlington*, Ct. of Cl. No. 2017-00132-PQ, 2017-Ohio-4249, ¶ 15 (citing *McVey v. Carthage Twp. Trs.*, 4th Dist. Athens No. 04CA44, 2005-Ohio-2869, ¶ 14-15; *Kline v. Davis*, 4th Dist. Lawrence Nos. 00CA32, 01CA13, 2001-Ohio-2625, 2001 Ohio App. LEXIS 5598, at *8–9; 1998 Ohio Att'y Gen. No. 087, at 2-415).

## B.    Dispute Involving the Trumbull County Jail

At the Commission's meeting on June 1, 2022, though not on the agenda, Commissioner Frenchko read into the record the concerns of the mother of an inmate

at the Trumbull County jail.  (ECF No. 49, PageID #1056–57; ECF No. 51-1, PageID #1300.)  The mother's email asserted that her son contracted meningitis and received inadequate medical assistance.  (ECF No. 51-1, PageID #1300.)  Commissioner Frenchko reported that she learned that the inmate "did survive but has lost hearing in one ear, and has to go to rehabilitation for physical reasons."  (*Id.*)  In her view, "this was unacceptable."  (*Id.*)  Also, she reported that the Sheriff, Defendant Paul Monroe, an independently elected public official, failed to respond to her requests for information about relevant policies.  (*Id.*)  Commissioner Frenchko said that she raised the issue "to bring this to people's attention" and accused the two other commissioners of having "half a heart when it comes to inmate care."  (*Id.*)

On July 5, 2022, the Sheriff responded to the Commissioner's reading of the letter "claiming to be written by the mother of a previously incarcerated adult inmate in the Trumbull County Jail."  (ECF No. 51-2, PageID #1303.)  Sheriff Monroe chastised Commissioner Frenchko for "read[ing] [the letter] publically [*sic*]" "without any investigation or corroboration to verify whether the letter was factually based or simply unfounded allegations."  (*Id.*)  He wrote:  "Such a public presentation prior to initiating an appropriate, [*sic*] investigation through well-established, existing investigatory protocol is contrary to sound government and procedural justice safeguards."  (*Id.*)  Sheriff Monroe characterized Commissioner Frenchko's reading of the letter as "reckless behavior" that "should not be tolerated by Trumbull County citizens nor other elected officials."  (*Id.*, PageID #1304.)  After undertaking his own investigation, Sheriff Monroe declared that the "complaint had no basis in fact" and

that inmates receive "quality, professional healthcare." (*Id.*)  Sheriff Monroe concluded by stating that he expected "a public apology from Commissioner Frenchko . . . be delivered in the same public forum as was the publication of the false accusations." (*Id.*)

Notwithstanding this request in his response, Sheriff Monroe testified that his intent was not to read the letter at the next meeting of the commissioners.  (ECF No. 44-1, PageID #575–76.)  Further, he testified that reading the letter into the record was Commissioner Fuda's idea and that he (Sheriff Monroe) did not know Commissioner Fuda would do so.  (*Id.*, PageID #576.)  But Commissioner Fuda testified that Sheriff Monroe did not object to having someone else read the letter at the next meeting.  (ECF No. 42-1, PageID #385.)

### C.    Commission Meeting—July 7, 2022

The Commission held its next meeting on July 7, 2022.  The events of that meeting give rise to this litigation, so the Court discusses them in some detail.  Unless otherwise noted, the Court takes the following facts from video and audio recordings of the meeting and made a part of the record.  (ECF No. 52, PageID #1390, Item 1.)  Where helpful, the Court points to specific points in the recordings for these facts.

### C.1.    Commissioner Frenchko's Disruption

Approximately 36 minutes into the meeting, shortly before 11:10 a.m., without objection, Commissioner Fuda directed the clerk to read aloud Sheriff Monroe's letter.  While recording from her cellphone, Commissioner Frenchko relocated from the dais where the commissioners sit to the front row of the audience, near the clerk.  Toward the end of the reading, Commissioner Frenchko began to speak over the clerk.

6

Commissioner Frenchko objected that reading the letter was not part of the meeting agenda, and she repeatedly disputed its accuracy. (ECF No. 49, PageID #1046.) Demanding that Commissioner Frenchko stop interrupting, Commissioner Fuda banged his gavel and raised his voice. Commissioner Frenchko continued to interrupt the clerk, mocking the clerk and bringing her to tears. As she continued interrupting, people in the audience urged Commissioner Frenchko to stop upsetting the clerk. At one point, Commissioner Frenchko left her seat to record the clerk from a better angle because Commissioner Fuda held up a piece of paper to obstruct her from recording the clerk.

Two Sheriff's deputies, Sergeants Harold Wix and Robert Ross, were assigned to provide security at the meeting and did so in uniform. (ECF No. 51-11, ¶ 11, PageID #1344; ECF No. 51-12, ¶ 11, PageID #1361.) Sergeant Wix had not done so before (ECF No. 45-1, PageID #683; ECF No. 51-12, ¶ 10, PageID #1361), but Sergeant Ross had (ECF No. 46-1, PageID #800). Sitting in opposite corners at the back of the meeting room, both Sergeants appeared to send intermittent text messages. (*See, e.g.*, ECF No. 51-14, PageID #1379 (surveillance video at 4:25).) As Commissioner Frenchko interrupted the clerk with increasing frequency and as Chairman Fuda ordered the clerk to continue reading, the two Sergeants stood, converged, and moved forward in the room. (*Id.* (surveillance video at 4:35); ECF No. 51-11, ¶ 24, PageID #1345.) Video from the meeting shows members of the audience videotaping Commissioner Frenchko as the clerk read Sheriff's Monroe's letter.

After the clerk finished reading, Commissioner Frenchko returned to her seat on the dais and responded to the Sheriff's letter.  She spoke for just under two minutes, from 11:17 a.m. to 11:19 a.m.  (ECF No. 51-14, PageID #1379 (surveillance video at 6:44 to 8:38).)  In her remarks, Commissioner Frenchko referenced an inmate in the jail who died days after being taken off his medication.  At about that same time, Commissioner Cantalamessa received a text message from the head of a county department who advised him, "You can have her removed for being disruptive in a public meeting."  (ECF No. 47-110, PageID #1022.)  At that point in Commissioner Frenchko's remarks about the jail, Commissioner Cantalamessa interjected that "this is getting disruptive. . . . You are talking about the chief law enforcement officer in Trumbull County; it's unacceptable."  (ECF No. 51-13, PageID #1379 (Frenchko cell phone video at 46:05 to 46:16).)  Objecting to being interrupted, Commissioner Frenchko rhetorically asked whether her response to the Sheriff's letter really was disrupting the meeting.

At this point, Commissioner Fuda, the presiding officer, interrupted, "Ms. Frenchko you've interrupted everybody the entire time.  We're tired of it, Ms. Frenchko."  (ECF No. 51-15, PageID #1381 (audio recording at 49:05 at 49:12).)  Then, Commissioner Fuda called out for Sergeant Wix, who was in the back of the room. He shouted, "Wix." (*Id.* (audio recording at 49:14).)  Commissioner Fuda talked over Commissioner Frenchko:  "You got a choice, you wanna apologize to the Sheriff, fine, if you don't, we're going to move on.  We're going to move on."  (*Id.* (audio recording at 49:16 to 49:22).)  Instead of apologizing, Commissioner Frenchko

continued to state her point; Chairman Fuda pounded his gavel and ordered the clerk to "move on" as Commissioner Frenchko continued to speak.  (*Id.*)

Commissioner Frenchko turned to "another thing for County business" relating to jobs and family services, which was also not on the agenda.  (*Id.* (audio recording at 49:36).)  At that point, Sergeant Ross gave a "thumbs up" signal to the front of the room, in the direction of Commissioner Cantalamessa.  Immediately after the signal, the Sergeants approached Commissioner Frenchko, and Sergeant Wix ordered her to "stand up."  She asked why.  Sergeant Wix stated, "We're not going to deal with this; you are being very disruptive; you're disrupting the meeting."  (*Id.* (Frenchko cell phone video at 47:00 to 47:12).)  Commissioner Cantalamessa added, "You can be removed for disrupting a meeting."  Commissioner Frenchko seemed confused and calmly said:  "I'm not being disruptive."

Then, Sergeant Wix gently pulled her rolling chair back and directed Commissioner Frenchko to exit the meeting room.  "You are removed," he stated, as the audience applauded.  (*Id.*)  Thirty seconds elapsed between Commissioner Fuda calling "Wix" and Sergeant Wix removing Commissioner Frenchko from the meeting.

With Commissioner Frenchko outside the meeting room, the clerk attempted to follow her instruction to move the meeting to the next order of business.  (ECF No. 51-15, PageID #1381 (audio recording at 50:38).)  But Commissioner Cantalamessa interjected, "before that, if I could, Mr. President, I'd like to discuss a few things that are quite pressing and urgent in county business."  (*Id.* (audio recording at 50:39 to 50:50).)  Commenting on Commissioner Frenchko *in absentia*,

9

Commissioner Cantalamessa first stated, "this lunacy has to stop." (*Id*.) Then, he proceeded to address three matters of county business without interruption. He spoke for more than two minutes uninterrupted—about a minute longer than Commissioner Frenchko took on the jail issue. Next, Commissioner Fuda opened the meeting for public comment. (*Id*.) Finally, in Commissioner Frenchko's absence, her colleagues adjourned to executive session, which was closed to the public.

### C.2.  Arrest of Commissioner Frenchko

Meanwhile, at 11:20 a.m., outside the hearing room, Sergeants Wix and Ross placed Commissioner Frenchko under arrest "for disrupting a public meeting." (*Id*. (Frenchko cell phone video at 48:33).) The Sergeants ordered Commissioner Frenchko to set her phone down (still recording) and placed her in handcuffs. She complained that the cuffs aggravated a pre-existing injury, so the officers double cuffed Commissioner Frenchko, allowing her arms to rest at her side instead of behind her back.

The arrest report indicates that Sergeants Wix and Ross charged Commissioner Frenchko for the offense of "disturbing a lawful meeting" under Section 2917.12 of the Ohio Revised Code. (ECF No. 51-4, PageID #1314 (capitalization altered).) Sergeant Ross reported that Commissioner Frenchko "continuously interrupted [the clerk] by speaking and making utterances" while "Commissioner Fuda told Commissioner Frenchko . . . to stop interrupting her." (*Id*., PageID #1317.) Sergeant Ross reported that the clerk became "visibly upset" and "uncomfortable with [Commissioner Frenchko] recording her." (*Id*.) The Sergeant reported that they arrested Commissioner Frenchko because she "continued to speak

10

over [Commissioner Fuda]." (*Id.*)  Sergeant Wix's report noted that "Frenchko was given ample opportunity to stop her disruptive behavior, even more opportunity than the general public who attends would be afforded." (*Id.*, PageID #1319.)

In a declaration filed in connection with summary judgment, Sergeant Ross stated that he and Sergeant Wix arrested Commissioner Frenchko because her repeated interruptions were "disrupting the meeting." (ECF No. 51-11, ¶¶ 29–30, PageID #1346.)  According to Sergeant Ross, "Ms. Frenchko was arrested for her interruptive and disruptive conduct, not the content of her interruptions.  I did not even hear or pay attention to most of what she was saying." (*Id.*, ¶ 47, PageID #1347.) Sergeant Wix executed a materially identical declaration. (ECF No. 51-12, ¶¶ 29–30 & 46, PageID #1362 & #1364.)

After her arrest, the Sergeants led Commissioner Frenchko to the Trumbull County Jail (in the same building), where she was processed and released that day. (ECF No. 50, PageID #1138.)  The next morning, Sergeant Ross filed a criminal complaint at the local municipal court and that court's deputy clerk apparently made a finding of probable cause for the charge. (ECF No. 51-17; ECF No. 51-18.)  More than three months later, on the State's motion, the court dismissed the charge without prejudice. (ECF No. 51-19, PageID #1387.)

### C.3.  Public Statements About the Arrest

Commissioner Frenchko was arrested at 11:24 a.m. (ECF No. 51-4, PageID #1312.)  Less than 30 minutes later, at 11:52 a.m., a reporter from WKBN First News in Warren, Ohio published a story on the arrest. (ECF No. 47-4, PageID #995; *see also* Grimley, Nadine, *Trumbull County Commissioner Niki Frenchko arrested at*

11

*meeting*, WKBN (July 7, 2022), https://www.wkbn.com/news/local-news/ commissioner-niki-frenchko-arrested-at-meeting/ (noting that the story initially posted at 11:52 a.m. on July 7, 2022).) That story shows the full text of the letter Sheriff Monroe sent the commissioners as well as the email to Commissioner Frenchko from the inmate's concerned mother. (*Id.*) The story quoted Sheriff Monroe, who did not attend the meeting, saying: "Our deputies gave her more latitude than a normal person from the public in a meeting, . . . . What she did violated the law, and she forced our deputies to take official action." (*Id.*) All of this content appeared in the first version of the story posted within 30 minutes of Commissioner Frenchko's arrest. (ECF No. 44-1, PageID #610.)

At deposition, Sheriff Monroe admitted that he texted the WKBN reporter at 11:16 a.m. on July 7, 2022—less than 10 minutes before the arrest of Commissioner Frenchko. (ECF No. 44-1, PageID #602.) Also, before the story first ran, he texted with the reporter after learning of Commissioner Frenchko's arrest. (*Id.*)

### C.4. Statements in Texts About the Arrest

Although the contents of the text messages the Sergeants sent while sitting at the back of the meeting room before Commissioner's Frenchko's arrest are unknown, phone records for both Sergeants show that they were not texting with the Commissioners at that time. (ECF No. 56-2; ECF No. 56-3.) These records confirm that the Sergeants were texting at the time, but do not establish with whom. On the parties' cross-motions for summary judgment, the Court construes the fact that the officers were texting with someone during the meeting in Plaintiff's favor in ruling on Defendants' motions for summary judgment, and the fact that the Sergeants were

12

not texting with the commissioners in Defendants' favor in ruling on Plaintiff's motion for summary judgment.

Within minutes of Commissioner Frenchko's removal from the hearing room, the county auditor texted Commissioner Cantalamessa, "What the hell happened to the bitch," to which he responded, "Handcuffed and removed." (ECF No. 47-10, PageID #1022.) Over the course of the day, Commissioner Cantalamessa texted memes—profane, insulting, and vile—to his contacts. (*Id.*, PageID #1025–26.) To one, he called Commissioner Frenchko a "[s]hitbag." (*Id.*, PageID #1024.) To another, he commented, "Terrible person to boot." (*Id.*, PageID #1026.) In answering one text asking whether Commissioner Frenchko was arrested during the commissioners' meeting, he replied, "Yup" and laughed at the ensuing response, "Wow! That might be a first." (*Id.*)

Almost a month later, on August 2, 2022, Commissioner Cantalamessa sent two texts to Sheriff Monroe. (*Id.*, PageID #1028.) In the first, he told the Sheriff, "This bs about the jail is going to[o] far." (*Id.*) In the second, less than a minute later, he added, "I'm sorry but she is running the narrative with lies and half truths and people are believing her. It's sad." (*Id.*)

In a declaration, Commissioner Cantalamessa denies texting any Defendant *during* the July 7, 2022 meeting. (ECF No. 51-1, PageID #1341.) Sergeants Ross and Wix denied ever texting any commissioner and deny being told to preserve their text messages. (ECF No. 51-11, ¶¶ 8 & 49, PageID #1344 & #1348; ECF No. 51-12, ¶¶ 9 & 48, PageID #1360 & #1364.)

13

### D.    Other Commission Meetings

At least during the relevant times, the record demonstrates that interruptions, lack of decorum, and aggressive gaveling have been regular occurrences at meetings of the Trumbull County Board of Commissioners.    Indeed, Commissioner Cantalamessa testified that arguments and interruptions are commonplace at their meetings, but arrests are not.  (*See* ECF No. 43-1, PageID #485–88.)

### D.1.    May 18, 2022

On May 18, 2022, at a public meeting, Commissioner Frenchko suggested an investigation of county staff for "consistent failure to do things properly."  (ECF No. 52, PageID #1391 (May 18, 2022 meeting video ("May 18_Gavel") at 0:06).) Offended at the suggestion, Commissioner Fuda slammed his gavel hard enough to break it and shouted, "Stop making up stories. . . . You know who needs to be investigated?  You."  (*Id.* at 0:16–0:34).)    Another video in the record shows the conclusion of that meeting.  With Commissioner Frenchko speaking on a matter of public concern, Commissioner Cantalamessa interrupted with a motion to adjourn, which Commissioner Fuda seconded.  (ECF No. 52, PageID #1391 (May 18 meeting video ("May 18_End Debate")).)    Commissioner Frenchko questioned whether the Commission would forego public comments; at the same time, her colleagues voted to adjourn.  (*Id.* at 0:09).)  As the chair of the meeting, Commissioner Fuda stated that there was no time for public participation.  (*Id.*)

After the meeting formally adjourned, Commissioner Cantalamessa accused his colleague of "childishness," and Chairman Fuda mocked her for "do[ing] this thing with her hair" as he imitated flipping hair behind his ear.  (*Id.* at 0:21 & 0:31).)  As

14

the commissioners left, a member of the public complained that "the taxpayers don't get to speak." (*Id.* at 1:01).)  Commissioner Fuda chided Commissioner Frenchko by responding, "[that's] because of you Ms. Frenchko." (*Id.* at 1:05.)  After the meeting, Commissioner Fuda approached a member of the press and criticized him because his news organization called the board of commissioners "dysfunctional." (*Id.* at 1:39.)  When the journalist (who had a camera) began to respond, Commissioner Fuda said, "I don't want to hear you" and walked away.  (*Id.* at 2:01).)  (Later, Commissioner Fuda apologized.)

Then, the journalist and Commissioner Frenchko exchanged pleasantries.  She stayed after the meeting adjourned to address constituent questions.  Her two colleagues returned to the meeting room to talk over her.  Commissioner Cantalamessa said:  "You don't even know that we have a stabilization fund.  You don't even know what that is." (*Id.* at 4:10 to 4:15.)  Then Commissioner Fuda spoke: "Ms. Frenchko, you are not here to do the commissioner's job; I am, every day." (*Id.* at 4:15 to 4:20).)  Commissioner Frenchko reminded her colleagues not to talk about county business after the meeting had concluded; Commissioner Cantalamessa thought it permissible because the press was present, but a member of the public corrected him and he demurred.  (*Id.* at 5:45–6:37.)

### D.2.   June 10, 2022

On June 10, 2022, less than a month before Commissioner Frenchko's arrest, the Trumbull County Highway Superintendent took the podium to respond to a list of complaints Commissioner Fuda made at a prior meeting.  (ECF No. 55, PageID #1460 (June 10 meeting video).)   Less than 30 seconds into his remarks,

Commissioner Fuda began to interrupt, to which the superintendent responded: "Sir, I am speaking; You're banging your gavel, telling everyone to be quiet so you can speak. Let me speak." (*Id*. at 0:25–0:31).) For the next ten minutes, the superintendent criticized Commissioner Fuda, who continuously interrupted with his side of the story. Occasionally, Commissioner Frenchko attempted to ask a clarifying question. (*Id*. at 3:00 & 3:40).) When she did, Commissioner Fuda raised his voice and pounded his gavel at Commissioner Frenchko—to whom he referred to as "this lady." (*Id*.)

Commissioner Fuda explained that his interruptions were necessary to correct the falsehoods the superintendent asserted. (ECF No. 42-1, PageID #358.) "I just set him straight," Commissioner Fuda testified, "I wasn't stopping him from speaking." (*Id*., PageID #355.) "I was answering what he was saying. That's all." (*Id*., PageID #365.)

### D.3. Cellphone Incident (March 9, 2023)

During a public meeting on March 9, 2023, Commissioner Frenchko and Sheriff Monroe had a run-in, captured on Commissioner Frenchko's cellphone. (ECF No. 55, PageID #1460 (March 9 meeting video).) The video in the record picks up midstream with Commissioner Frenchko making a point about avoiding layoffs at the jail. (*Id*.) Commissioner Cantalamessa invited Sheriff Monroe to address the issue. As the Sheriff began speaking, Commissioner Frenchko rotated her the camera of her phone and oriented the stand on which it rested to face the Sheriff. (*Id*. at 0:20.)

As he left his seat, Sheriff Monroe approached the commissioners' dais and knocked the phone off its stand. (*Id*. at 0:24.) As he did so, the Sheriff said, "First of all, I'm not . . . [inaudible]." Commissioner Frenchko told Sheriff Monroe that he had committed a battery. (*Id*.) As the Sheriff stood within arm's length of her seat, he twice told Commissioner Frenchko to "please stand back." (*Id*. at 0:34.) Sheriff Monroe went on answering the question posed to him while Commissioner Frenchko uttered insults, like "disgusting," and accused him of giving preferential treatment to friends. (*Id*. at 0:46.)

### D.4. Salsa Dancing Incident

During a public meeting held on an unknown date, one public commenter (apparently the husband of a county employee) got up from his seat and approached Commissioner Frenchko to display his documentation of vaccination against Covid-19. (ECF No. 47-11, PageID #1030.) In an aggressive manner, he asks: "Did you take a test when you left Mexico?" before he imitated salsa dancing for a moment. (*Id*. at 0:15.) When the commenter concluded his presentation, he held up his middle finger to Commissioner Frenchko and pointed at her saying, "you, you, you." (*Id*. at 0:32.) Commissioner Frenchko laughed off the commenter light heartedly and muttered, "you're a racist." (*Id*. at 0:41.)

Commissioner Fuda spoke next, though the commenter interrupted him. Even after the commenter quieted down, he sat with both middle fingers directed at Commissioner Frenchko. (*Id*. at 1:04 to 1:21).) A Sheriff's deputy stood about five feet away during this episode. (*Id*.)

17

## STATEMENT OF THE CASE

On April 17, 2023, Plaintiff filed suit against fellow Trumbull County Commissioners Mauro Cantalamessa and Frank Fuda, Trumbull County Sheriff Paul Monroe, Deputy Sheriffs Sergeant Harold Wix and Sergeant Robert Ross, as well as Trumbull County itself, the County Sheriff's Department, and the County Board of Commissioners, seeking declaratory and injunctive relief and damages.  (ECF No. 1, PageID #3–4 & #26.)  Based on the events at the meetings of the Trumbull County Commissioners on July 7, 2022 and March 9, 2023, Plaintiff claims violations of her constitutional rights under the First, Fourth, and Fourteenth Amendments as well as several torts under State law.

Under Section 1983, Plaintiff claims that the statute supporting her arrest violates the Free Speech Clause of the First Amendment (Count I) and the Due Process Clause of the Fourteenth Amendment (Count II), and that her arrest was unconstitutional retaliation for her protected speech (Count III), unlawful seizure of her person (Count IV), and a malicious arrest (Count IV).  (*Id.*, PageID #14–18.)  Also, she claims that Sheriff Monroe unconstitutionally seized her cellphone (Count XIII).  (*Id.*, PageID #25.)

Under State law, Plaintiff brings claims for false arrest (Count V), malicious prosecution (Count VI), civil conspiracy (Count VII), battery (Count VIII), assault (Count IX), destruction of public records (Count X), civil liability for criminal acts (Counts XI and XII), and conversion (Count XIV).  (*Id.*, PageID #18–26.)

18

### A.  Procedural History

When she filed her complaint, Plaintiff moved for a temporary restraining order to prevent Defendants from destroying material evidence, such as text messages.  (ECF No. 2.)  The next day, the Court held a hearing on the motion.  (ECF No. 6.)  Although Defendants had actual notice of the hearing, they failed to appear.  (*Id.*, PageID #81.)  The Court denied Plaintiff's motion because Defendants had an existing obligation to preserve text messages and other evidence, both as public officials and litigants.  (*Id.*)

After the Ohio Attorney General elected not to participate in this litigation (ECF No. 9), the Court held a case management conference and set a schedule for discovery and dispositive motions.  (Minutes, July 10, 2023.)   As the parties progressed through discovery and depositions, Plaintiff raised concern that Defendants had spoliated text messages.  The parties presented arguments about spoliation on the record, and the Court instructed them to brief the issue under Rule 37(e).  (Minutes, Sept. 22, 2023.)

### B.  Summary Judgment

Plaintiff and Defendants filed cross-motions for summary judgment.  (ECF No. 47; ECF No. 51.)  On summary judgment, the record largely consists of the depositions of the six individual parties.  (ECF No. 42; ECF No. 43; ECF No. 44; ECF No. 45; ECF No. 46; ECF No. 49; ECF No. 50.)  Also, the parties manually filed several videos recordings of two commission meetings and other events central to this case.  (ECF No. 51-13; ECF No. 51-14; ECF No. 51-15; ECF No. 51-20; ECF No. 52; ECF No. 54-1; ECF No. 54-2; ECF No. 55.)

Plaintiff seeks a partial summary judgment, on five of her claims. She argues that (1) the law under which she was arrested, Ohio Rev. Code § 2917.12, violates the First Amendment on its face, (2) her arrest constituted retaliation under the First Amendment, (3) her arrest lacked probable cause and constituted malicious prosecution under the Fourth Amendment, and (4) Defendants unlawfully destroyed public records and evidence. (ECF No. 47, PageID #932–33.) For this alleged spoliation, Plaintiff requests sanctions under Rule 37(e). (*Id.*) Defendants seek summary judgment on all claims asserted against them. (ECF No. 51.)

## ORAL ARGUMENT

Plaintiff requests oral argument. (ECF No. 53.) Section 19 of the Court's Civil Standing Order affords parties oral argument as of right if they certify that a less experienced lawyer will handle the argument. No party has so certified. Therefore, whether to hold oral argument on a fully briefed dispositive motion rests within the discretion of the district court. *Mann v. Conlin*, 22 F.3d 100, 103 (6th Cir. 1994); Fed. R. Civ. P. 78(b); Local Rule 7.2(b).

After review of the summary-judgment record, the Court exercises its discretion not to hold oral argument. During pretrial management of this case, the Court held enough status conferences and hearings on the record to gain familiarity with the parties' respective claims and defenses. Further, the summary judgment briefing thoroughly frames the issues for review. Additionally, a primary election for various elected positions in Trumbull County will be held in March 2024, and Commissioners Cantalamessa and Frenchko and Sheriff Monroe will be on the ballot.

20

The Court is wary of giving any party the opportunity to use oral argument to his or her political advantage.  And oral argument would delay resolution of the parties' motions, pushing it closer to the date of the primary election and the beginning of early voting.

On this record, the Court finds that ruling without oral argument better serves the interest of judicial economy by preserving the resources of the Court and the parties.  Accordingly, the Court **DENIES** Plaintiff's motion for oral argument.

## GOVERNING LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  On a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  The non-moving party must then "set forth specific facts showing there is a genuine issue for trial." *Id.* (citing *Anderson*, 477 U.S. at 250).  To determine whether a genuine dispute about material facts exists, it is not the Court's duty to search the record. *See Betkerur v. Aultman*

*Hospital Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). Instead, the parties must bring those facts to the Court's attention. *Id.*

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court, instead, determines "whether the evidence presents a sufficient disagreement to require submission to a jury" or whether the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. In doing so, the Court must view the evidence in the light most favorable to the non-moving party. *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).

If a genuine dispute exists, meaning "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgement is not appropriate. *Tokmenko*, 488 F. Supp 3d at 576 (citing *Anderson*, 477 U.S. at 250). If the evidence, however, "is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Id.* The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48).

"Just as a plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (cleaned

up).  "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment."  *Id.* (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009)).

"[W]here, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).  Therefore, cross-motions for summary judgment do not warrant granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.  *Langston v. Charter Twp. of Redford*, 623 F. App'x 749, 755 (6th Cir. 2015).  To the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed "in the light depicted by the videotape."  *Scott*, 550 U.S. at 380–81.

## ANALYSIS

Section 1983 provides a federal cause of action to a person whose rights "secured by the Constitution" are violated by an official acting "under color of [State law]."  42 U.S.C. § 1983.  In this way, Section 1983 "creates a species of tort liability" where State actors violate federal constitutional rights.  *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (citation omitted).  "The first inquiry in any § 1983 suit is to isolate the precise constitutional violation" alleged.  *Graham v. Connor*, 490 U.S. 386, 394 (1989) (internal quotation marks and citation omitted).  "After pinpointing" the

constitutional right at issue, "courts still must determine the elements of, and rules associated with, an action seeking damages for its violation." *Manuel v. City of Joliet*, 580 U.S. 357, 370 (2017).  Under Section 1983, "the general 'common law of torts'" bridges the gap between a constitutional right and the elements of a cause of action. *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160 (6th Cir. 2021) (citation omitted).

## I.     First Amendment Challenge to Arrest (Section 2917.12)

Commissioner Frenchko was arrested and charged with disturbing a lawful meeting under Section 2917.12 of the Ohio Revised Code.  That statute makes it a misdemeanor for any person, "with purpose to prevent or disrupt a lawful meeting," to engage in conduct that "obstructs or interferes" with the meeting or to engage in any speech that "outrages the sensibilities of the group."  Ohio Rev. Code § 2917.12(A).  In its entirety, the statute provides:

> (A)    No person, with purpose to prevent or disrupt a lawful meeting, procession, or gathering, shall do either of the following:
>
>> (1)    Do any act which obstructs or interferes with the due conduct of such meeting, procession, or gathering;
>>
>> (2)    Make any utterance, gesture, or display which outrages the sensibilities of the group.

*Id.*  Plaintiff challenges the constitutionality of Section 2917.12(A) under the First Amendment, maintaining that it is a content-based restriction on speech, overbroad, and vague.  (ECF No. 1, ¶¶ 108 & 119, PageID #14–15; ECF No. 47, PageID #957–66.)

Plaintiff begins by arguing that Section 2917.12(A) facially violates the First Amendment.  The First Amendment, applicable to the States through the Fourteenth, prevents the government from "abridging the freedom of speech."  U.S. Const.

amend I.  A facially unconstitutional law is "incapable of any valid application." *Steffel v. Thompson*, 415 U.S. 452, 474 (1974).  A facial attack is an effort "to invalidate the law in each of its applications" and, in effect, to "take the law off the books completely." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc).  A facial challenge is "the most difficult challenge to mount successfully," because a plaintiff must carry a "heavy burden" to "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

### I.A.    Standing

Before undertaking the constitutional analysis required, the Court begins by identifying the particular offense at issue to determine whether Plaintiff has standing to maintain her challenge to the statute.  Merely because independent provisions of a statute are codified under the same heading, an injury under one provision does not create standing to challenge others. *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 351 (6th Cir. 2007).  Instead, a plaintiff must claim "an injury arising from the specific rule being challenged, rather than an entirely separate rule that happens to appear in the same section of the" statute. *Id.*  Section 2917.12(A) prohibits two discrete offenses.  Each bars different conduct and requires separate analysis.

The police reports do not specify whether Sergeants Wix and Ross arrested Commissioner Frenchko under the first or second subsection of Section 2917.12(A). (ECF No. 51-11, PageID #1354 & #1356.)  But the record as a whole makes clear, and the Court finds no genuine dispute of material fact, that the Sheriff's deputies arrested Commissioner Frenchko for acts that "obstruct[ed] or interfere[d] with the

due conduct of" the meeting held on July 7, 2022, in violation of Section 2917.12(A)(1).
The stated reason for the arrest was Commissioner Frenchko's refusal to stop
speaking over the clerk and Commissioner Fuda as he presided at the meeting. (*Id.*)
The recordings of the meeting show that the Sergeants intervened when
Commissioner Frenchko refused to yield the floor to Commissioner Fuda, who
insisted on moving to the next item of business. (ECF No. 51-13 (video); ECF No. 51-
14 (audio).)

In their declarations, both Sergeants attest that "Ms. Frenchko was disrupting
the meeting. She repeatedly interrupted the clerk while the clerk was attempting to
read a document into the record and then, when the presiding commissioner wanted
to move on with the meeting, she just ignored him and kept talking." (ECF No. 51-11,
¶¶ 29–30, PageID #1346; ECF No. 51-12, ¶¶ 29–30, PageID #1363.)  In other words,
the Sergeants determined that Commissioner Frenchko violated the first subsection
of the statute by obstructing or interfering with the meeting.  Ohio Rev. Code
§ 2917.12(A)(1).  Neither the recordings nor the declarations refer to outraging the
sensibilities of the group, which falls under the second subsection of the statute.  And
no reasonable juror properly instructed on the law could find otherwise based on
recordings of the meeting. *Cf. Scott*, 550 U.S. at 380.  This is so because, whatever
people colloquially might find outrageous, the legal standard for what outrages the
sensibilities of the group is high. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)
(per curiam); *cf. Silvers v. Clay Twp. Police Dep't*, 2018-Ohio-2970, 117 N.E.3d 954
(Ohio Ct. App. 2018) (recognizing the high standard under Ohio law for a claim for

26

intentional infliction of emotional distress, which requires that speech go beyond "all possible bounds of decency" to what is "utterly intolerable in a civilized society").

Section 2917.12(A)(2)'s prohibition of speech ("any utterance, gesture, or display") that outrages others sounds obvious free speech alarms. But Plaintiff must "establish injury in fact as to each provision challenged, even under the overbreadth doctrine," *Prime Media*, 485 F.3d at 349, 350, and on this record Commissioner Frenchko's asserted injury is not "fairly traceable" to Section 2917.12(A)(2). Because the record does not permit a finding that the Sheriff's deputies arrested Commissioner Frenchko under Section 2917.12(A)(2), the Court need not address the facial constitutionality of the prohibition on speech that outrages others. Plaintiff directs many of her arguments to this second provision of the statute, in Section 2917.12(A)(2), but she also asserts the facial unconstitutionality of the first subsection. So, the Court limits its analysis to Section 2917.12(A)(1) and proceeds accordingly.

### I.B. Content Neutrality

Content-based restrictions on speech must survive strict scrutiny. "Content-based laws . . . target speech based on its communicative content" or "'on its face' draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The first offense that the statute prohibits does not draw distinctions based on a speaker's message: "No person, with purpose to prevent or disrupt a lawful meeting, . . . shall . . . [d]o any act which obstructs or interferes with the due conduct of such meeting." Ohio Rev. Code § 2917.12(A)(1).

On its face, Section 2917.12(A)(1) is content neutral.  According to its plain text, the statute regulates acts—not words—that impede lawful meetings.  It targets conduct, not speech, but in application might reach the act of speaking or forms of expressive conduct.  *See United States v. O'Brien*, 391 U.S. 367, 376 (1968).  But on its face, the law distinguishes only between acts (speech or otherwise) that "obstruct[] or interfere[] with" a meeting and acts that do not.  Ohio Rev. Code § 2917.12(A)(1).

In this respect, the law has no regard for the message any disruptive act might communicate.  Instead, the statute seeks to combat obstruction and interference of meetings—a prohibition indifferent to message that targets the *effect* of the act at issue.  Section 2917.12(A)(1) "do[es] not single out any topic or subject matter for differential treatment."  *City of Austin v. Reagan Nat'l Advert. of Austin*, 142 S. Ct. 1464, 1472 (2022).  Rather, the "substantive message itself is irrelevant to the application of the provisions; there are no content-discriminatory classifications."  *Id.*

Moreover, an act violates the statute only where it has the "purpose to prevent or disrupt."  Ohio Rev. Code § 2917.12(A).  That purpose does not implicate the expressive content, if any, of a disruption; the cause of the disruption is irrelevant under the law.  In this respect, culpability under the statute turns on the purpose of the act causing a disruption, not its content.  By targeting acts of any kind (not just speech) that obstruct or interfere with a lawful meeting, the law is facially neutral as to content.

But even facially neutral speech restrictions, if adopted with the "purpose" to censor a particular "message," might be content-based in effect.  *Ward v. Rock Against*

*Racism*, 491 U.S. 781, 791 (1989).  Section 2917.12(A)(1) does not mask a purpose to discriminate based on content in content-neutral language.  Its purpose is not to suppress any message but to ensure the orderly conduct of lawful public meetings.  The "purpose and justification for the law" is neutral to the content of any speech it might restrict.  *Reed*, 576 U.S. at 166.

Plaintiff directs her argument that the statute regulates the content of speech to Section 2917.12(A)(2)'s ban on utterances that outrage the group.  To her point, a speech restriction on "hostile" or even "abusive" speech is "viewpoint based and thus unconstitutional."  *Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893–94 (6th Cir. 2021).  But this case does not implicate the constitutionally suspect restriction on utterances that outrage the sensibilities of a group.  The section of the statute at issue is neutral.

### I.C.  Overbreadth

In the First Amendment context, a facial challenge might succeed where it otherwise would not.  *Virginia v. Hicks*, 539 U.S. 113, 118 (2003).  A law that punishes a substantial amount of protected speech, "judged in relation to the statute's plainly legitimate sweep," invalidates all enforcement of that law.  *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).  "Overbroad laws 'may deter or "chill" constitutionally protected speech'" and cause "would-be speakers [to] remain silent."  *United States v. Hansen*, 599 U.S. 762, 769–770 (2023) (quoting *Hicks*, 539 U.S. at 119).

To prevail, Plaintiff must show that a "substantial number of instances exist in which the law cannot be applied constitutionally."  *Glenn v. Holder*, 690 F.3d 417, 422 (6th Cir. 2012) (quoting *Richland Bookmart, Inc. v. Knox Cnty*, 557 F.3d 321,

338–39 (6th Cir. 2009)).  A showing of substantial overbreadth requires that the statute prohibit "a substantial amount of protected speech both in an absolute sense and relative to the statute's plainly legitimate sweep." *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013) (cleaned up).  Overbreadth examines whether the challenged law "prohibits a substantial amount of protected speech," *Williams*, 553 U.S. 285, 292 (2008), compares protected speech that the law restricts with all protected speech, and measures protected speech that the law restricts against all acts other than protected speech that the law restricts to determine whether the law reaches a *substantial* proportion of protected speech.  "In facial First Amendment challenges, . . . if a statute is not narrowly tailored, it cannot be constitutionally applied to *anyone*, even if a more narrowly tailored statute might still capture a plaintiff's conduct." *Sisters For Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 407 (6th Cir. 2022).  Invalidation for overbreadth is "strong medicine," not to be "casually employed." *United States v. Williams*, 553 U.S. at 293 (quotations omitted).

Plaintiff argues that Section 2917.12(A)(1) is unconstitutional not just on the facts presented but substantially across all applications.  A law that prohibits the obstruction and interference with a meeting is capable of innumerable applications that "abridge[] the freedom of speech," including expressive conduct.  U.S. Const. amend I.  At the same time, the law's legitimate reach sweeps broadly.  Section 2917.12(A)(1) regulates "any act" capable of interfering with or disrupting a meeting. But it does not bar all speech, such as whispers or sitting silently with a black arm band in protest.

30

Nor does the First Amendment "guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981). "The strength of the First Amendment protection, and the level of justification required for a speech restriction, varies depending on the forum where the speech occurs." *Ison*, 3 F.4th at 893. Even for speech that disrupts a meeting, the First Amendment will protect speech in a traditional public forum but might not protect the same speech if delivered in a nonpublic forum. The Ohio statute reaches all fora—it applies to any "lawful meeting, procession, or gathering," which could occur anywhere, not just in a limited public forum of the sort where Commissioner Frenchko spoke. Ohio Rev. Code § 2917.12(A)(1). Because Section 2917.12(A)(1) applies in every forum, the overbreadth analysis must account for each one.

*Traditional Public Forum*. In a traditional public forum, the familiar First Amendment rules apply: "any restriction based on the content of . . . speech must satisfy strict scrutiny." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). The "quintessential public for[a]" are places like street, parks, and the town square. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 38 (1983). In a public forum, almost all speech restrictions offend the First Amendment. For example, the First Amendment shielded the members of the Westboro Baptist Church from liability for the emotional distress inflicted on the family of a fallen soldier when parishioners picketed his funeral. *Snyder v. Phelps*, 562 U.S. 443, 458 (2011). Certainly, that offensive conduct interfered with a lawful gathering within the

31

meaning of Section 2917.12(A)(1), but the First Amendment protects that speech. In a traditional public forum, Section 2917.12(A)(1) is most suspect. Even there, where speech protection is at its height, Section 2917.12(A)(1) does not necessarily restrict a "substantial amount" of protected speech—it limits only speech with a purpose to obstruct or interfere with a lawful gathering. A substantial amount of speech is not disruptive. A substantial number of disruptions are not purposeful. And a substantial number of intended disruptions do not take the form of protected speech.

*Limited Public Forum.* The First Amendment protects less speech in a limited public forum—a forum the government creates "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009). School board meetings and those of a county commission occur in limited public fora. *Ison*, 3 F.4th at 893. Speech restrictions in such a forum must be "reasonable and viewpoint-neutral." *Pleasant Grove* City, 555 U.S. at 470. In a limited public forum, Section 2917.12(A)(1) might outlaw protected speech that interferes with a meeting. But Plaintiff fails to show that disruptive speech represents a substantial amount of protected speech or is substantial relative to all disruptive acts.

*Nonpublic Forum.* In a nonpublic forum, "First Amendment rights of everyone . . . are at their constitutional nadir." *Mezibov v. Allen*, 411 F.3d 712, 718 (6th Cir. 2005). A nonpublic forum "is not by tradition or designation a forum for public communication" and, absent viewpoint discrimination, may be reserved "for its intended purposes, communicative or otherwise." *Perry Educ. Ass'n*, 460 U.S. at 46.

32

A classic nonpublic forum is a courtroom, *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1071 (1991), where arrest is often the appropriate remedy for deliberate disruption, in the form of speech or otherwise.  A content-neutral ban on disruptive speech in a nonpublic forum is not overbroad so long as the statute's language does not also encompass "behavior that is in no way disruptive."  *Bynum v. U.S. Capitol Police Board*, 93 F. Supp. 2d 50, 56 (D.D.C. 2000).  Here, the statute at issue includes language properly limiting the ban to only acts that "obstruct[] or interfere[] with the due conduct of such meeting . . . ."

In short, as the forum receives less protection under the First Amendment, the amount of protected speech declines in proportion to the plainly legitimate sweep of Section 2917.12(A)(1).  Review of the statute demonstrates that "[s]peakers are subject to restriction only when their speech 'disrupts . . . .'"  *White v. Norwalk*, 900 F.2d 1421, 1426 (9th Cir. 1990) (rejecting overbreadth challenge).  On its face, the Ohio statute covers "any act" that "obstructs or interferes with" a meeting held in any forum.  Ohio Rev. Code § 2917.12(A)(1).  The amount of protected speech that falls into that definition pales in comparison to all the non-speech acts and unprotected speech that make up the law's "plainly legitimate sweep."  *Williams*, 553 U.S. at 292.  Accordingly, Plaintiff has not carried her burden to establish that the unconstitutional reach of the law represents "a substantial amount of protected speech . . . not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."  *Id.*

33

Therefore, any unconstitutional applications must "be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Broadrick v. Oklahoma*, 413 U.S. 601, 615–16 (1973).  But Plaintiff does not challenge the constitutionality of the statute as applied to her.  So, the Court has no occasion to consider its constitutionality under the First Amendment further.

### I.D.    Vagueness

Plaintiff also attacks Section 2917.12(A)(1) as unconstitutionally vague.  (ECF No. 1, ¶ 119, PageID #15.)  Plaintiff does not seek summary judgment on this claim, but Defendants do.  (ECF No. 51, PageID #1267.)  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Additionally, vague laws upset the Constitution's division of powers.  *United States v. Davis*, 139 S. Ct. 2319, 2325 (2020).

A law is "impermissibly vague under the Due Process Clause" if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 288, 304; *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *United States v. Coss*, 677 F.3d 278, 289 (6th Cir. 2012).  A provision is vague where "no standard of conduct is specified at all." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971).  "[W]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Paull*, 551 F.3d 516, 525 (6th Cir. 2009) (citing *Williams,* 553 U.S. at 306).

34

Section 2917.12(A)(1) is not unconstitutionally vague.  Again, on its face, the statute provides that no person, "with purpose to prevent or disrupt a lawful meeting," may "[d]o any act which obstructs or interferes with the due conduct of such meeting, procession, or gathering."  Ohio Rev. Code § 2917.12(A)(1).  The intent requirement—"with purpose"—is well defined in Ohio law.  *See id.* § 2901.22(A) (defining when a person acts "purposely").  The other operative terms of the statute— "prevent," "disrupt," "obstructs," and "interferes"—are everyday words with "pedestrian and clear" meanings.  *United States v. Lopez*, 929 F.3d 783, 785 (6th Cir. 2019); Oxford English Dictionary 763, 1463, 1968 & 2294 (20th Ed. 1981).

The only potential ambiguity in Section 2917.12(A) is what constitutes a "lawful meeting, procession, or gathering."  Ohio Rev. Code § 2917.12(A).  The outer bounds of what this definition might cover are not an issue in this case.  Obviously, the meeting of a board of county commissioners falls within the statute such that no vagueness arises.  Indeed, Ohio courts have rejected vagueness (and overbreadth) challenges in analogous settings.  *City of Columbus v. Doyle*, 149 Ohio App. 3d 164, 2002-Ohio-4490, ¶ 15 (Ohio Ct. App. 2002) (board of education meeting); *State v. Brand*, 2 Ohio App. 3d 460, 461 (Ohio Ct. App. 1981) (charity gathering on a public square).  For these reasons, Section 2917.12(A)(1) is not unconstitutionally vague.

Although the neighboring offense in Section 2917.12(A)(2) might well offend due process, *see Hinners v. O'Shea*, No. 1:19-cv-2868, 2022 WL 1778409, at *22 (N.D. Ohio June 1, 2022) (analyzing a local ordinance materially indistinguishable from Section 2917.12(A)(2)), the record (again) does not implicate that provision.

35

\*     \*     \*

On its face, Ohio's restriction of "acts which obstruct[] or interfere[] with the due conduct of" a meeting is content neutral and neither overbroad nor vague.  Ohio Rev. Code § 2917.12(A)(1).  For all these reasons, Plaintiff's facial challenges raise questions of law on which Defendants are entitled to summary judgment.

## II.     Constitutionality of the Arrest

Apart from the facial challenges to the statute, Plaintiff claims that her arrest and prosecution violated the First and Fourth Amendments.  (ECF No. 1, ¶¶ 125 & 138, PageID #16 & #17.)  Under the First Amendment, Plaintiff claims the arrest came in retaliation against her for questioning the Sheriff's administration of the jail.  Under the Fourth Amendment, Plaintiff claims that the arrest was an unreasonable seizure.  Both parties move for summary judgment on these claims.  (ECF No. 47, PageID #965 & #967; ECF No. 51, PageID #1268 & #1271.)  Additionally, Defendants assert qualified immunity on all the constitutional claims.

"Qualified immunity protects state officers against section 1983 claims unless (1) 'they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time' of the offense."  *Novak v. City of Parma*, 33 F.4th 296, 303 (6th Cir. 2022) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)).  For a right to be clearly established, it "must be sufficiently clear [such] that every reasonable official would have understood that what he is doing violates that right."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quotations omitted) (cleaned up).  In other words, "existing precedent must have placed the

36

statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Rather than defining a clearly established right at a high level of generality, "clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). The Court may address the two inquiries in either order, and Plaintiff bears the burden on each. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

### II.A.  First Amendment Retaliation

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U. S. 250, 256 (2006)). To establish a claim of retaliatory arrest under the First Amendment, Plaintiff must show that "(1) [she] engaged in protected conduct; (2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) . . . [her] protected conduct" caused the adverse action. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc); *see also Wood v. Eubanks*, 25 F.4th 414, 428 (6th Cir. 2022).

Arrest and detention "would undoubtedly deter an average law-abiding citizen from similarly" repeating her conduct. *Center for Bio-Ethical Reform, Inc. v. City of*

*Springboro*, 477 F.3d 807, 822 (2007).  Both are "easy to identify" as "adverse actions." *Wilson*, 595 U.S. at 477 (citing *Nieves*, 139 S. Ct. at 1722; *Hartman*, 547 U. S. at 256). Therefore, in analyzing the parties' cross-motions for summary judgment, the Court focuses on whether Commissioner Frenchko engaged in protected speech and whether that speech caused her arrest.

### II.A.1. Protected Speech

To establish retaliation, Plaintiff must plead and prove that the First Amendment guaranteed her right to engage in the conduct that caused her arrest. Here, the facts are straightforward and captured on video.  At a board of commissioners meeting open to the public, Commissioner Frenchko began to speak over the clerk because she disagreed with the content of the letter from Sheriff Monroe that Commissioner Fuda instructed the clerk to read aloud.  Commissioner Frenchko contested the Sheriff's response to concerns she previously raised at the prior commission meeting about the treatment of detainees and conditions at the Trumbull County jail, which the Sheriff oversees.  Eventually, after numerous interruptions, the clerk finished reading the letter, and Commissioner Frenchko responded.

Commissioner Frenchko spoke for under two minutes, delivering comments highly critical of jail management, including Sheriff Monroe.  Her colleagues interjected that her statements "about the chief law enforcement officer in Trumbull County" were "unacceptable" and "getting disruptive."  (ECF No. 51-13, PageID #1379 (Frenchko cell phone video at 46:05 to 46:16).)  Commissioner Fuda added, "Ms. Frenchko you've interrupted everybody the entire time.  We're tired of it,

Ms. Frenchko."  (ECF No. 51-15, PageID #1381 (audio recording at 49:05 to 49:12).)  Commissioner Fuda pounded his gavel and demanded that the clerk call the next order of business.  Rather than yield the floor, Commissioner Frenchko raised "another thing for County business" about jobs and family services and continued to speak over Commissioner Fuda.  When she would not yield, Commissioner Fuda called for Sergeant Wix, and within moments Sergeants Wix and Ross removed Commissioner Frenchko from the meeting then arrested her.

It is a matter of "common sense that a government body should be allowed to remove people who are disrupting a public meeting." *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 523 (6th Cir. 2019).  Here, the Sergeants' stated reason for the removal and arrest of Commissioner Frenchko was her repeated disruptions.  Disruptions come in many forms and often present difficult question about the freedom of speech.  But this case does not.

Without question, the disruption that led to Commissioner Frenchko's removal and arrest was her speech itself.  And not just any speech.  The speech of an elected official, delivered at a public meeting, addressing a matter of public concern.  Speech that communicated a message disfavored by those in power.  Speech highly critical of another elected official.  Contrary to Defendants' argument, this record does not permit disentangling Commissioner Frenchko's speech from the disruption she caused.  Here, they are one and the same.  At minimum, the Constitution protects Commissioner Frenchko against an unreasonable or viewpoint-based intervention on

39

her speech.  *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).

"The freedom of individuals verbally to oppose or challenge [official] action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Houston v. Hill*, 482 U.S. 451, 462–63 (1987).  The First Amendment protects "the freedom to express disagreement with state action, without fear of reprisal based on the expression . . . ." *McCurdy v. Montgomery Cnty.*, 240 F.3d 512, 520 (6th Cir. 2001).

"Not all speech is of equal First Amendment importance"; rather, a "hierarchy of First Amendment values" inform the protection of free speech.  *Snyder*, 562 U.S. at 452 (citation omitted) (cleaned up).  Atop that hierarchy—at its "highest rung"— and, therefore, "entitled to special protection" lies "speech on public issues." *Connick v. Myers*, 461 U.S. 138, 145 (1983).  Commissioner Frenchko's speech addressed a matter on this highest rung—management of the county jail.  *See Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021).  "Correct operation of [a prison] is a matter of public concern." *Mosholder v. Barnhardt*, 679 F.3d 443, 450 (6th Cir. 2012).  So too is the operation of a jail.

Her identity as an elected official "makes it all the more imperative that [she] be allowed freely to express [herself] on matters of current public importance." *Wood v. Georgia*, 370 U.S. 375, 395 (1962).  As an elected public official, Commissioner Frenchko is a person for whom the government created the limited public forum—the commissioner's meeting—in the first place.  "The First Amendment surely promises

an elected representative like [Commissioner Frenchko] the right to speak freely on questions of government policy." *Wilson*, 595 U.S. at 478.  That Commissioner Frenchko brings a dissenting voice to the County Board sharpens the interest in protecting her speech.  In short, Commissioner Frenchko engaged in protected speech on a matter of public concern.  Audio and video recordings of the meeting leave no room for a reasonable jury to find otherwise.

Finally, the forum of the message plays a pivotal role. *Ison*, 3 F.4th at 893.  A board of county commissioners meeting is a limited public forum, in which the government may limit speech to "certain groups or . . . the discussion of certain subjects." *Id.* (quoting *Summum*, 555 U.S. at 470).  Even within those confines, restrictions on speech must be "reasonable in light of the purpose served by the forum and [must be] viewpoint neutral." *Cornelius*, 473 U.S. at 806.  Whatever reasonable time, place, and manner restrictions the First Amendment might tolerate, an issue Defendants do not press, Commissioner Frenchko's speech falls comfortably within those allowances.  As the presiding officer, Commissioner Fuda had ample tools available, such as adjourning, taking a break, or even a formal reprimand—all short of arrest—to protect the government's interests in running an orderly meeting. Indeed, "elected bodies in this country have long exercised the power to censure their members" unimpeded by the Constitution's speech protections. *Wilson*, 595 U.S. at 475.  Of all the tools available, Defendants used one that would chill any ordinary person or public official from continuing to question the Sheriff's performance of his duties—an arrest.

41

"[T]he First Amendment in particular [exists] to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995). The Framers of the Constitution understood and feared an orthodox majority "united by a common interest," and so they took measures to secure the fundamental "rights of the minority." The Federalist No. 51 (1788) (J. Madison). Indeed, fear of "instigation of criminal charges against critical or disfavored legislators by the executive . . . is the predominate thrust of the Speech or Debate Clause." *United States v. Johnson*, 383 U.S. 169, 182 (1966). That Clause broadly immunizes federal legislators from criminal jeopardy. U.S. Const., Art. I, § 6, cl. 1; *cf. id.* amend. XIV, § 1 (incorporating against the States "the privileges or immunities of citizens of the United States").

In total, every aspect of Commissioner Frenchko's speech—its substance, speaker, and venue—points toward its protection as political speech on a matter of public concern at the very core of the First Amendment. "The First Amendment applies differently . . . to a claim that the government has criminally punished the party for [her] speech" than for lesser sanctions. *Lemaster v. Lawrence Cnty.*, 65 F.4th 302, 308 (6th Cir. 2022). On these facts, in the context of a sitting commissioner speaking on a matter of public concern in a public meeting convened for this purpose, the decision to arrest was not constitutionally reasonable.

### II.A.2. Causation

A retaliation claim under the First Amendment requires a government actor to take an "adverse action against the plaintiff [that] would not have been taken absent the retaliatory motive." *Id.* On causation, "action colored by some degree of

42

bad motive does not amount to a constitutional tort if that action would have been taken anyway"; forbidden motive must be a but-for cause of the adverse action. *Hartman*, 547 U.S. at 260.  That is, Plaintiff must show "that the government took an 'adverse action' in response to [her] speech that 'would not have been taken absent the retaliatory motive.'" *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) (quoting *Nieves*, 139 S. Ct. at 1722).

For Commissioner Frenchko to prevail, her protected speech must have *caused* the arrest.  On summary judgment, the record at a minimum would support a jury's finding that Commissioner Frenchko's speech caused her arrest.  Again, as Commissioner Frenchko criticized Sheriff Monroe at a meeting days after the Sheriff met with Commissioner Fuda to discuss his response to Commissioner Frenchko's criticisms, Sergeants Wix and Ross removed her then arrested her at the direction of Commissioner Fuda and after Sergeant Ross gave a thumbs-up to Commissioner Cantalamessa.  But Plaintiff also seeks a summary judgment in her favor on causation, which might ordinarily present a question for a jury.  Under longstanding summary-judgment practice, Defendants have the burden to come forward and point to some evidence in the record creating a genuine issue of material fact.  *See, e.g.*, *Matsushita Elec. Indus.*, 475 U.S. at 586.  They fail to do so.  Instead, Defendants assert various defenses, addressed below.  Strictly on the question of causation, however, Plaintiff is entitled to summary judgment.

### II.A.3. Defenses

Based on the record on summary judgment, even construed in favor of Defendants individually and collectively, Plaintiff has established her First

Amendment retaliation claim. Therefore, the inquiry shifts to whether one or more Defendants can establish a defense as a matter of law or show a genuine dispute of a material fact for a jury to resolve on a necessary element of a defense. Defendants advance several defenses that they argue entitle them to summary judgment and also defeat Plaintiff's motion. The court considers each in turn.

### II.A.3.a. Probable Cause

Recently, the Supreme Court held that showing probable cause to arrest generally serves as a defense against a retaliation claim. *Nieves*, 139 S. Ct. at 1724–25. Probable cause allows an officer to negate causation by establishing that unlawful conduct—not protected speech—motivated the arrest.

Defendants contend that "disrupting a lawful public meeting . . . is not a constitutionally protected activity." (ECF No. 51, PageID #1268.) Further, they maintain that probable cause supports the arrest of Commissioner Frenchko based on her "repeated disruptions when (1) the clerk was trying to read a letter into the record and (2) the presiding commissioner was trying to move on . . . ." (ECF No. 56, PageID #1497.) Neither argument has merit. First, Commissioner Fuda did not call out for Sergeant Wix at any point while Commission Frenchko interrupted the clerk's reading of Sheriff Monroe's letter. Nor was Commissioner Frenchko removed or arrested at that time. Second, it is true that Commissioner Frenchko continued to speak over Commissioner Fuda for approximately 70 seconds as he attempted to advance the meeting. But viewing that fact in isolation, and even taking it together with Commissioner Frenchko's interruption of the clerk, fails to provide probable

cause to believe that a public official speaking in a limited public forum on a matter of public concern committed a crime.

In any event, under the law of this Circuit, "protected speech cannot serve as the basis for a violation of any" State law. *Sandul v. Larion*, 119 F.3d 1250, 1256 (6th Cir. 1997); *Novak*, 932 F.3d 421, 430–31 (6th Cir. 2019). More specifically, it "cannot serve as the basis for probable cause." *Novak*, 33 F.4th at 304 (quoting *Leonard v. Robinson*, 477 F.3d 347, 358 (6th Cir. 2007); *Sandul*, 119 F.3d at 1256. Accordingly, construing the record in Defendants' favor, the First Amendment makes the defense of probable cause unavailable on the undisputed facts of this case, as reflected in video and audio recordings.

### II.A.3.b. Qualified Immunity

Defendants fail to develop an argument to support a claim of qualified immunity against Plaintiff's First Amendment retaliation claim. (*See* ECF No. 56, PageID #1492–94.) Nor could they. "It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592 (1969). Further, the law of this Circuit has long recognized that any reasonable official would know that the First Amendment does not countenance the arrest of a person for engaging in protected speech. *See Sandul*, 119 F.3d at 1256; *see also Wood*, 25 F.4th at 423 (citation omitted). Nor may an official plead ignorance of the law to escape liability for the violation of a person's fundamental constitutional rights. *Id.* (quoting *Long v. Norris*, 929 F.2d 1111, 1115 (6th Cir. 1991)).

These principles apply with particular force in the context of a public meeting: "no reasonable officer would . . . arrest a recognized speaker at a chaired public assembly based solely on the content of [her] speech (albeit vigorous or blasphemous) unless and until the speaker is determined to be out of order by the individual chairing the assembly."  *Leonard*, 477 F.3d at 361; *see also Burton v. City of Detroit*, No. 22-1222, 2022 U.S. App. LEXIS 32566, at *3 (6th Cir. Nov. 23, 2022) (rejecting First Amendment challenge to arrest that escalated to violence where public official was ruled out of order at a meeting).  But in this case, Commissioner Fuda, who chaired the meeting, did not rule Commissioner Frenchko out of order and admitted that he did not make that determination:  "If someone interrupts in a manner that the sheriff feels is a bad situation," it is "up to the sheriff to decide" to make an arrest—it is not "up to the commissioners."  (ECF No. 42-1, PageID #366.)  In other words, although he directed Sergeant Wix to intervene during the meeting, Commissioner Fuda later tried to wash his hands of his unconstitutional conduct and shift the blame to the Sheriff.

In the face of these clearly established and longstanding First Amendment principles and their particular application to analogous facts in the law of this Circuit, the record on summary judgment forecloses the defense of qualified immunity, which Defendants did not advance in any event.

### II.B.  Fourth Amendment Seizure

Plaintiff argues that her arrest violated the Fourth Amendment.  (ECF No. 1, ¶ 139, PageID #17.)  Both Plaintiff and Defendants seek a summary judgment on this claim.  (ECF No. 47, PageID #967; ECF No. 51, PageID #1272.)  Plaintiff's complaint

46

offers three theories of liability for a Fourth Amendment violation:  malicious arrest, malicious prosecution, and unlawful seizure.  (ECF No. 1, PageID #17.)

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.  When Sergeants Wix and Ross arrested Commissioner Frenchko, they "seized" her person within the meaning of the Fourth Amendment.  *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021).  Therefore, the Fourth Amendment requires that seizure to be reasonable.  An arrest is "unreasonable" where it is not "'based on probable cause' to believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 192 (2013) (quoting *Dunaway v. New York*, 442 U.S. 200, 213 (1979)).  "This probable-cause standard applies to all 'seizures' up to the jury trial." *Jones v. Clark Cnty.*, 959 F.3d 748, 770 (6th Cir. 2020) (Murphy, J., concurring in part and dissenting in part) (citing *Manuel*, 580 U.S. at 369 n.8).

An unreasonable seizure is not an actionable claim unto itself under Section 1983.  "To determine the elements of a constitutional claim under § 1983," courts "look to the elements of the most analogous tort as of 1871 when § 1983 was enacted." *Thompson v. Clark*, 596 U.S. 36, 43 (2022); *Heck*, 512 U.S. at 483.  The most analogous torts at common law to an unreasonable seizure of a person are false arrest and malicious prosecution.  *Heck*, 512 U.S. at 484.  At common law, false arrest (and false imprisonment) applied to detention without legal process.  Malicious prosecution is the common law tort for "confinement imposed pursuant to legal process," such as

47

pursuant to an arrest warrant or indictment.  *Id.*  These common-law torts are apt analogies because they represent "specific versions of a general unreasonable-seizure claim alleging the same *constitutional* theory:  that the officers seized . . . [Plaintiff] without probable cause."  *Dibrell*, 984 F.3d at 1161.

### II.B.1. Probable Cause

In the language of the Fourth Amendment, arrests without probable cause are "unreasonable."  Conversely, where probable cause supports an arrest, the seizure of a person is reasonable under the Constitution.  The absence of probable cause for an arrest is an element of claims at common law for both false arrest and malicious prosecution.  *Voyticky v. Village of Timberlake*, 412 F.3d 669, 675, 677 (6th Cir. 2005). For this reason, and because the parties treat it as the decisive question (ECF No. 47, PageID #969; ECF No. 51, PageID #1272), the Court begins the Fourth Amendment analysis with probable cause.

Probable cause to arrest is "not a high bar."  *Kaley v. United States*, 571 U.S. 320, 338 (2014).  It means "reasonable grounds for belief, supported by less than prima facie proof, but more than mere suspicion" of guilt.  *United States v. Lattner*, 385 F.3d 947, 951 (6th Cir. 2004) (cleaned up); *see also United States v. Padro*, 52 F.3d 120, 122–23 (6th Cir. 1995) (citing *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).  Ultimately, the determination of probable cause involves a practical, commonsense review of the totality of the available facts and circumstances.  *Padro*, 52 F.3d at 123 (citations omitted); *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  The standard is objective; "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."  *Whren v. United States*, 517 U.S. 806, 813 (1996).

To determine whether Sergeants Wix and Ross had probable cause to arrest Commissioner Frenchko, the Court returns to Section 2917.12(A)(1), the offense for which she was arrested. Under the law, the Sergeants needed objectively reasonable grounds to believe that Commissioner Frenchko obstructed or interfered with a meeting with the purpose to prevent or disrupt that meeting. Ohio Rev. Code § 2917.12(A)(1). At the time of her arrest, Commissioner Frenchko was speaking in her official capacity about matters of public concern. "'[P]rotected speech cannot serve as the basis' for probable cause." *Novak*, 33 F.4th at 304 (quoting *Leonard*, 477 F.3d at 358); *Sandul*, 119 F.3d at 1256. As already discussed, the undisputed record leaves no doubt that Commissioner Frenchko's speech was protected.

Because the First Amendment removes Commissioner Frenchko's speech as a basis for probable cause, the record leaves hardly any conduct to which Defendants might point to justify the arrest. Indeed, Sergeants Wix and Ross removed Commissioner Frenchko at the direction of Commissioner Fuda *because* of her speech while speaking over him. But there is no way to disentangle the speech from any other interfering or obstructive conduct—they are one and the same. Her speech is the alleged "act which obstruct[ed]" the meeting. Ohio Rev. Code § 2917.12(A)(1).

This is not a case where the Sergeants sought to "punish the effects of speech (interruptions), [instead of] the speech itself." *Novak*, 932 F.3d at 430. Indeed, the only conduct involved in this case is Commissioner Frenchko's speech. Beyond her speech, no other act provides any basis, let alone a reasonable basis, for determining

49

that Commissioner Frenchko disrupted a lawful public meeting.  Accordingly, there is not probable cause for Commissioner Frenchko's arrest.

### II.B.3. False Arrest

While "[a] false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff," probable cause does not end the matter.  *Voyticky*, 412 F.3d at 677.  To recover damages under Section 1983 for an unreasonable seizure under the Fourth Amendment, Plaintiff must also satisfy the common-law elements of false arrest or malicious prosecution.  "False imprisonment . . . consists in imposing, by force or threats, of an unlawful restraint upon a man's freedom of locomotion."  Cooley, *The Law of Torts* at 169.  A completed arrest "without process or with void process" constitutes false imprisonment.  *Id.* at 170.  Probable cause for an arrest establishes "true or legal imprisonment" as a defense.  *Id.* at 169–70.  But a warrantless arrest results in "false imprisonment, if it turns out that [she] was innocent."  *Id.* at 176 (citation omitted).

Under this common-law definition, the record leaves no doubt that Plaintiff satisfies the elements of false imprisonment.  Beyond the absence of probable cause, the process Commissioner Frenchko received was void.  Additionally, because of the First Amendment's well-established protections, it turns out that she is legally innocent.  For each of these reasons, as a matter of law, Plaintiff makes out a claim of false arrest, and the record entitles her to a summary judgment on the claim.

### II.B.4. Malicious Prosecution

Common-law malicious prosecution requires proving (1) a "suit or proceeding [that] was instituted without any probable cause," (2) "for a purpose other than

bringing the defendant to justice," and (3) was terminated without conviction. *Thompson*, 596 U.S. at 44 (quoting T. Cooley, Law of Torts 181 (1880)). The Fourth Amendment requires Plaintiff to "prove that the malicious prosecution resulted in a seizure," too. *Id.* at 43 n.2 (citing *Manuel*, 580 U.S. at 365–66). Also known as a claim for unreasonable seizure pursuant to legal process, *id.* at 42, this claim remedies the wrongful institution of legal process, *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Wallace v. Kato*, 549 U.S. 384, 390 (2007)). As an offense separate and distinct from false arrest, malicious prosecution focuses on the initiation and maintenance of a prosecution. *Sykes*, 625 F.3d at 308 (citations omitted).

Although this case might appear at first blush to satisfy each of these common-law elements, a malicious prosecution claim is separate and distinct from false arrest and fails for an independent reason. Plaintiff does not allege in her complaint or argue in her summary judgment briefs that she was seized *after* the initiation of legal process. Sergeant Ross initiated legal process the day after the arrest when he filed a criminal complaint at the local municipal court. (ECF No. 51-17.) By then, however, Commissioner Frenchko had been released from custody—she was released hours after her arrest and not detained again. (ECF No. 50, PageID #1138.) Because the only seizure involved in this case occurred before formal legal process, she did not suffer an "unreasonable seizure pursuant to legal process." *Thompson*, 596 U.S. at 42. Therefore, Defendants are entitled to a judgment as a matter of law on this claim.

### II.B.5. Qualified Immunity

"It is clearly established that arrest without probable cause violates the Fourth Amendment." *Leonard*, 477 F.3d at 355 (alterations omitted) (quoting *Klein v. Long*,

275 F.3d 544, 550 (2001)).  It is also clearly established that "'protected speech cannot serve as the basis' for probable cause."  *Novak*, 33 F.4th at 304 (alterations omitted); *Sandul*, 119 F.3d at 1256.  Finally, as explained above, it is clearly established that Plaintiff's arrest violated the First Amendment because "the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."  *Street v. New York*, 394 U.S. 576, 592 (1969).  Nothing other than Commissioner Frenchko's protected speech provides probable cause for her arrest.

### II.B.5.a. Post-Arrest Determination of Probable Cause

Defendants' argument that there was probable cause relies in part on a post-arrest determination of probable cause that a deputy clerk of the local municipal court made.  (ECF No. 51, PageID #1275; ECF No. 51-18, PageID #1386.)  Factually, it is not clear that the deputy clerk made a probable cause determination.  The document on which Defendants rely for this argument did *not* check the box or provide an answer to the question what made the arresting officer think the defendant committed the offense charged.  (ECF No. 51-18, PageID #1386.)  However, because Commissioner Frenchko was charged criminally with violating Section 2917.12, it is reasonable to assume someone determined that probable cause existed for the arrest.  Even so, that determination does not provide qualified immunity here for the simple reason that the First Amendment provides a clearly established defense and has the legal effect of voiding Commissioner Frenchko's arrest.

### II.B.5.b. Arguable Probable Cause

Alternatively, Defendants maintain that there was *arguable probable cause*—"even if there were no actual probable cause"—because some case law from the Sixth Circuit and Ohio courts allowed the Sergeants to determine that probable cause supported Commissioner Frenchko's arrest.  (ECF No. 56, PageID #1499–1500 (capitalization altered).)    "Even assuming that the officers lacked actual probable cause to arrest . . . , they are entitled to qualified immunity [when], given 'the circumstances with which [they] w[ere] confronted,' they 'reasonably but mistakenly conclude[d] that probable cause [wa]s present.'" *Wesby*, 583 U.S. at 49.  As a threshold matter, the law of this Circuit "requires that—for the purposes of examining a claim of qualified immunity from a § 1983 cause of action—[the Court] turn only to federal court precedent for evaluating whether police officers have probable cause to effectuate an arrest."  *Wood*, 25 F.4th at 425 (quoting *Kennedy v. City of Villa Hills*, 635 F.3d 210, 215 (6th Cir. 2011)).  Nonetheless, even the State-court decisions on which Defendants rely fail to provide probable cause for Commissioner Frenchko's arrest.

First, Defendants point to *Columbus v. Doyle*, 149 Ohio App. 3d, 2002-Ohio-4490, 776 N.E.2d 537.  There, the defendant (1) continued speaking past his allotted time at a public meeting; (2) "[a]fter being asked several times to stop commenting, . . . continued to refuse to leave the podium"; (3) during the subsequently called recess, "continued to speak, addressing the same topic" and "stated that the meeting was going to continue to be interrupted until such time as the meeting was given back to the people;" (4) "refused to leave" when police officers were asked to remove him from

53

the meeting; and (5) resisted arrest.  *Id.* at ¶ 6–8.  Here, Commissioner Frenchko's failure to yield the floor falls far short of the conduct giving rise to the arrest in *Doyle*. No reasonable officer could think her conduct supported probable cause based on the facts in *Doyle*.

Second, Defendants argue that the Sergeants could think they had arguable probable cause based on *State v. Brand*, 2 Ohio App. 3d 460, 442 N.E.2d 805 (1981). In this case, the defendant, "[d]uring the course of [the First Lady]'s brief address, . . . shouted statements supporting the Iranian revolution and condemning the Carter administration's policies toward Iran."  *Id.* at 461.  "[D]espite three separate requests by a police officer to be quiet," the protester continued, leading to his arrest and conviction for disturbing a lawful meeting.  *Id.*  No reasonable officer could think that a protester's disruption of the First Lady's speech—criticizing the speaker in a clear attempt to disrupt the scheduled speech—provides support for finding probable cause to arrest a public official speaking on a matter of public concern in the forum to which the people elected her.

Third, in *Burton*, 2022 U.S. App. LEXIS 32566, at *3, the Sixth Circuit affirmed a ruling that probable cause supported the arrest of a public official for disturbing a meeting by resisting arrest.  Defendants' reliance on this case is misplaced.  Sergeants Ross and Wix could not have relied on this case to think they had probable cause to arrest Commissioner Frenchko because the Sixth Circuit decided it *after* the arrest at issue in this case.  Moreover, Commissioner Frenchko did not resist arrest and cooperated when Sergeant Wix removed her from the

meeting. Unlike *Burton*, where conduct in addition to speech itself supported probable cause for an arrest, the facts here involve only speech.

These cases fail to provide any *arguable probable cause* to arrest Commissioner Frenchko. Even if they might, any such argument fails on the facts presented for an additional reason. The Sergeants received no training on Section 2917.12. (ECF No. 45-1, PageID #680, #682 & #697.) For these reasons, the record on summary judgment establishes that Plaintiff is entitled to a judgment as a matter of law on her claim for false arrest under Section 1983 and that Defendants are not entitled to qualified immunity on the false arrest claim. Further, it shows that Defendants are entitled to judgment on Plaintiff's claim for malicious prosecution.

### II.C. Proper Defendants

Defendants participated in varying ways in the arrest of Commissioner Frenchko. Defendants argue that Sergeants Wix and Ross performed the arrest alone, so only those two Defendants could be exposed to liability. (ECF No. 51, PageID #1268–69.) But Plaintiff maintains that all individual Defendants acted together. (ECF No. 1, ¶¶ 125 & 161, PageID #16 & #20.) The Court discusses the proper Defendants in connection with Plaintiff's civil conspiracy claim below.

### III. Constitutionality of the Cellphone Incident

During the Board of Commissioners meeting on March 9, 2023, Sheriff Monroe made contact with Commissioner Frenchko's cellphone as she recorded the meeting. Plaintiff claims that Sheriff Monroe seized her phone in violation of the Fourth Amendment. (ECF No. 1, ¶ 202, PageID #25.) Defendants move for summary judgment on this claim. (ECF No. 51, PageID #1293.) The basic facts are undisputed.

As Sheriff Monroe began to speak at that meeting, Commissioner Frenchko oriented her phone to record him. The phone rested on a stand. Sheriff Monroe left his seat and intentionally knocked the phone from its stand. On summary judgment, the question is whether the Sheriff's brief contact with the phone, without possessing it, constituted an unreasonable seizure under the Fourth Amendment. (*See* ECF No. 1, PageID #25 (Count XIII))

### III.A. Elements of the Claim

At common law in 1871, the most closely analogous tort is trespass to personalty, also known as trespass to chattel. T. Cooley, Law of Torts 436 (1880). "A trespass to [personal] property," writes Cooley, "consists in the unlawful disturbance by force of another's possession." *Id*. "[O]ne who disturbs [property] without right in himself . . . occupies the position of an intermeddler." *Id*. at 437. Cooley notes "two principal differences between the actions of trespass and trover" (or conversion). *Id*. at 442. "[D]isturbance by force" or "intermeddl[ing]" marks the reference; the latter requires the tortfeasor to "appropriate[]" or to come "by the possession of the goods." *Id*. at 336–37 & 442. Therefore, "trespass lies for any wrongful force, but the wrongful force is no conversion where it is employed . . . with no purpose to deprive him of his right, temporarily or permanently." *Id*. at 442. Conversion is better understood as a compliment to replevin. Both involve appropriated property. Damages provide the remedy for conversion, while replevin results in a return of property.

Plaintiff's claim sounds more in trespass to personalty than conversion. The Sheriff's application of force caused Commissioner Frenchko to lose control over her phone momentarily, but the Sheriff did not take possession of it. And the video makes

clear that Sheriff Monroe forcibly contacted Commissioner Frenchko's phone. That contact disturbed the Commissioner's possession of it. Because constructive possession suffices, it does not matter that she was not physically holding the phone at the time. Cooley, *Law of Torts* at 437. Cooley used the example of one person unhitching another's horse and "remov[ing] him to another post." *Id.* at 439. According to Cooley, "trespass lies for any wrongful force." Cooley, *Law of Torts* at 442. At minimum, Commissioner Frenchko constructively possessed her phone as she exercised her right to record with it.

### III.B. Unreasonable Seizure

In addition to the common-law elements of trespass to personalty, because Plaintiff's claim is "housed in the Fourth Amendment, [she] also has to prove that the [trespass] resulted in a seizure." *Thompson*, 596 U.S. at 43 n.2. "From the time of the founding to the present, the word 'seizure' has meant a 'taking possession.'" *California v. Hodari D.*, 499 U.S. 621, 624 (1991) (quoting 2 N. Webster, An American Dictionary of the English Language 67 (1828)). "For most purposes at common law," a completed seizure required "actually bringing [the object] within physical control." *Id.* (citing cases). But in the context of arrests (seizures of the person), "[a] seizure did not necessarily result in actual control or detention." *Torres*, 592 U.S. at 312. "The slightest application of force" to a person, "even if the officer d[id] not secure control over the arrestee," constitutes a seizure under the Fourth Amendment. *Id.* at 313; *Hodari D*, 499 U.S. at 624 ("[A]pplication of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient.").

As to personal property—referenced in the Fourth Amendment as "effects"—a seizure "occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  To fashion that definition of "seizure," the Supreme Court relied on its "oft-repeated definition of the 'seizure' of a person within the meaning of the Fourth Amendment."  *Id*. at 113 n.5.   And seizures have no temporal component; "interference, however brief," satisfies the definition.  *Id*.; *Torres*, 592 U.S. at 318 ("[O]fficers seized Torres for the instant that the bullets struck her.").

Whether Sheriff Monroe's actions, which Cooley would have described as intermeddling, amounted to a seizure presents a close question.  Sheriff Monroe caused Commissioner Frenchko to lose control of her phone for a second, or two at the most.  For his part, the Sheriff did not actually or constructively control the phone in that brief moment.  In *Hodari D*, the Supreme Court recognized that a seizure traditionally "meant a 'taking possession.'"  499 U.S. at 624 (quoting 2 Webster at 67).  More recently, however, in the context of seizing a person, the Court said that a "seizure did not necessarily result in actual control or detention."  *Torres*, 592 U.S. at 312; *see id*. at 325 (Gorsuch, J., dissenting) ("Until today, a Fourth Amendment 'seizure' has required taking possession of someone or something.").  Moreover, the Court's majority qualified the possession-based definition from *Hodari D* as applicable "when speaking of property."  *Id*. at 312.  Accordingly, the Supreme Court appears to require possession of property to establish that a seizure occurred within the meaning of the Fourth Amendment.

58

On the other hand, the Supreme Court's leading precedent on seizures of effects requires "some meaningful interference with an individual's possessory interests . . . ." *Jacobsen*, 466 U.S. at 113. Perhaps "meaningful interference" implies possession. But the Court's definition of a seizure of property "follow[ed] from [its] definition of the 'seizure' of a person." *Id.* at 113 n.5. And the Supreme Court no longer treats possession as essential to the seizure of a person. *Torres*, 592 U.S. at 312.

At bottom, what counts as a Fourth Amendment seizure appears to be subject to debate. Whatever the case, the recording of the incident in this case shows that Commissioner Frenchko did not lose her ability to record the Sheriff. While the phone left her possession momentarily, Commissioner Frenchko never lost use of the phone, which continued to record. Within a second or two, she recovered her phone and resumed her live stream. Although the Sheriff acted unreasonably, he did not meaningfully interfere with the Commissioner's possession of her phone. Accordingly, because he did not possession the phone, actually or constructively, even for a moment, the Sheriff did not seize the phone within the meaning of the Fourth Amendment. His outburst does not meet the definition of a seizure under the Fourth Amendment, entitling Defendants to judgment as a matter of law on this claim stemming from the cellphone incident.

## IV.  State-Law Claims

Plaintiff asserts several claims arising under State law. The Court has jurisdiction over these State-law claims pursuant to 28 U.S.C. § 1367. Under federal law, "the district courts shall have supplemental jurisdiction over all other claims

59

that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III."  28 U.S.C. § 1367(a).  This grant of jurisdiction brings all claims arising from a common nucleus of operative fact before the Court.  *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 588 (6th Cir. 2016).

Even then, a court "may decline to exercise supplemental jurisdiction" in certain circumstances. 28 U.S.C. § 1367(c).  Supplemental jurisdiction "is a doctrine of discretion."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  To determine whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity[.]"  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also James v. Hampton*, 592 F. App'x 449, 462–63 (6th Cir. 2015) (quoting *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1882 (6th Cir. 1993)).

### IV.A.  Claims Arising from the Arrest

For her arrest, Plaintiff brings claims for false arrest (Count V), malicious prosecution (Count VI), and battery (Count VIII).  In addition, in Count VII, she claims that all Defendants "conspired to falsely arrest and later maliciously prosecute [her]."  (ECF No. 1, ¶ 161, PageID #20.)  Only Defendants moved for summary judgment on these four State-law claims.  They arise from a common nucleus of operative fact relating to Plaintiff's claims under the First, Fourth, and Fourteenth Amendments.  Therefore, the Court will exercise supplemental jurisdiction over these claims in the interest of judicial economy and convenience to the parties.

Considerations of fairness, to prevent conflicting rulings or determinations of the parties' liabilities and obligations, also support exercising jurisdiction over these claims.

### IV.A.1. False Arrest and Malicious Prosecution

To establish a claim of false arrest under Ohio law, Plaintiff must plead and prove, "the intentional detention of the person" and "the unlawfulness of the detention." *McKee v. McCann*, 8th Dist. Cuyahoga No. 104956, 2017-Ohio-7181, ¶ 18 (Ohio Ct. App.); *Rogers v. Barbera*, 170 Ohio St. 241, 243, 164 N.E.2d 162 (1960). Probable cause for the arrest in question supplies a complete defense to a claim of false arrest.  *McKee*, 2017-Ohio-7181, at ¶ 18.  To establish a claim of malicious prosecution under Ohio law, Plaintiff must plead and prove, "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused." *Froehlich v. Ohio Dep't of Mental Health*, 114 Ohio St. 3d 286, 288, 2007-Ohio-4161, 871 N.E.2d 1159, ¶ 10 (2007) (citation omitted).

Defendants argue that they are entitled to summary judgment on both claims because the Sergeants had probable cause to arrest Plaintiff at the meeting on July 7, 2022.  (ECF No. 51, PageID #1277.)  But as already discussed, Commissioner Frenchko's arrest lacked probable cause.  Defendants present no alternative basis or reason to grant summary judgment in their favor on Plaintiff's false arrest claim.  As for malicious prosecution, Plaintiff makes no separate argument why this State-law claim should come out differently than its federal counterpart.  Accordingly, Defendants are not entitled to summary judgment on the claim for false arrest, but they are on malicious prosecution.

### IV.A.2. Battery

Plaintiff claims that the Sergeants Wix and Ross committed battery when arresting her by moving the chair in which she sat and placing her in handcuffs when she was arrested.  (ECF No. 1, ¶¶ 166–167, PageID #20.)  Battery requires intentional "harmful or offensive contact" with another person.  *Love v. City of Port Clinton*, 37 Ohio St. 3d 98, 99, 524 N.E.2d 166 (Ohio 1988).  "The force an officer uses to subdue and handcuff a suspect, unless privileged, constitutes an assault or battery."  *Krantz v. City of Toledo Police Dep't*, 197 F. App'x 446, 451 (6th Cir. 2006) (citing *Love*, 37 Ohio St. 3d at 99).  Here, whether the Sergeants committed a battery turns on whether the arrest was lawful because "[o]fficers are privileged to commit battery when making a lawful arrest," unless they use excessive force.  *Morrison v. Horseshoe Casino*, 2020-Ohio-4131, 157 N.E.3d 406, ¶ 88 (Ohio Ct. App.).  The arrest was lawful if the Sergeants had probable cause to believe Plaintiff violated Ohio law.  *State v. Woodards*, 6 Ohio St. 2d 14, 20, 215 N.E.2d 568 (1966).  Defendants lacked probable cause to arrest of Commissioner Frenchko, and therefore, are not entitled to summary judgment on her claim for battery.

However, a jury need not decide whether Sergeant Wix committed a battery by pulling Plaintiff's chair back as she sat in it.  The video of the incident removes any possibility that Sergeant Wix made "harmful or offensive contact" with the chair and, by extension, Plaintiff.  *Love*, 37 Ohio St. 3d at 99.  The chair moved on wheels and Sergeant Wix pulled it back a matter of inches to encourage the Commissioner to stand up.  (ECF No. 51-14, PageID #1379 (video at 8:55).)  The video makes clear that Sergeant Wix intentionally moved the chair intending no harm or offense by taking

that action.  (*Id.*)  In fact, Commissioner Frenchko had no adverse reaction in the moment.  A reasonable juror could not conclude that Sergeant Wix moved the chair "intending to cause a harmful or offensive contact" or that his action resulted in "a harmful contact with" Commissioner Frenchko.  Restatement (Second) of Torts § 13 (1965); *cf. Love*, 37 Ohio St. 3d at 99 (relying on the Restatement).  Therefore, Defendants are entitled to summary judgment on this claim to the extent it is based on Sergeant Wix moving Commissioner Frenchko's chair.

### IV.A.3. Civil Conspiracy

Plaintiff claims that Defendants collectively "conspired to falsely arrest and later maliciously prosecute [her]."  (ECF No. 1, ¶ 161, PageID #20.)  Plaintiff proceeds on the theory that her arrest was premeditated and that all Defendants joined together to effectuate it.  (ECF No. 54, PageID #1419–20.)  Only Defendants seek summary judgment on this claim.

Under Ohio law, "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages" constitutes a civil conspiracy. *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St. 3d 415, 419, 650 N.E.2d 863 (Ohio 1995).  Civil conspiracy requires "an unlawful act independent from the conspiracy itself." *Woods v. Sharkin*, 2022-Ohio-1949, 192 N.E.3d 1174, ¶ 103 (Ohio Ct. App.).  Defendants argue that (1) there was no underlying unlawful act; (2) there was no plan to arrest Commissioner Frenchko; and (3) the intra-corporate conspiracy doctrine bars liability.  (ECF No. 51, PageID #1278–80.)

### IV.A.3.a. Underlying Unlawful Act

This case involves at least one underlying unlawful act, and potentially several others. As the Court determined, the facts leave no room for doubt that Commissioner Frenchko suffered a false arrest in violation of federal and State law. Certain Defendants might also have committed a battery under Ohio law.

### IV.A.3.b. Existence of a Plan

The existence of a plan to arrest Commissioner Frenchko at the meeting July 7, 2022 presents a question of material fact in genuine dispute. In their depositions and briefs, Defendants denied any concerted effort to remove the Commissioner from the meeting. (ECF No. 51, PageID #1280; *see, e.g.*, ECF No. 42-1, PageID #367.) On summary judgment, however, the Court must construe the record in favor of Plaintiff as the non-moving party. So construed, this record would allow a reasonable jury to find that some or all of the individual Defendants participated in a conspiracy to arrest Commissioner Frenchko.

After Sheriff Monroe sent his letter to Commissioner Fuda responding to Commissioner Frenchko's criticisms at the commissioners' meeting in June 2022, the two men met. (ECF No. 44-1, PageID #575–76; ECF No. 42-1, PageID #385.) They have somewhat differing accounts of that meeting, and a jury could find that the two hatched a plan to arrest Commissioner Frenchko, then enlisted the other individual Defendants. Text messages between Commissioner Cantalamessa and others, including other public officials, during the meeting lend support to this view and would allow a jury to find that a conspiracy existed and that Commissioner Cantalamessa participated in it. (ECF No. 47-10.) A jury could find that the Sheriff's

deputies did not routinely provide security at commission meetings (*see* ECF No. 44-1, PageID #620) and that Sergeant Wix, who never had previously provided security at one (ECF No. 45-1, PageID #683; ECF No. 51-12, ¶ 10, PageID #1361), did so as part of a plan to carry out the arrest. Further, the jury could find that, when Commissioner Fuda called, "Wix," he did so as part of a prearranged plan that Sergeants Wix and Ross carried out after Sergeant Ross flashed a thumbs-up sign to Commissioner Cantalamessa. (ECF No. 51-15, PageID #1381 (video at 49:14).) Finally, shortly before the arrest, Sheriff Monroe texted a reporter to whom he made statements about the arrest half an hour after it occurred, although he was not present. (ECF No. 47-4, PageID #995.) Again, a jury could find that this fact evidences his participation in a scheme. Of course, a jury might *not* find a conspiracy based on these facts. At this stage of the proceedings, however, the record would support such a finding, and a jury is entitled to decide the issue.

### IV.A.3.c. Intracorporate Conspiracy Doctrine

*Third*, Defendants raise the legal issue that "members of the same legal entity cannot conspire with one another as long as their alleged acts were within the scope of their employment." (ECF No. 51, PageID #1280 (quoting *Jackson v. City of Columbus*, 194 F.3d 737, 753 (6th Cir. 1999)).) This so-called "intracorporate conspiracy doctrine" holds that, "when all the alleged coconspirators are members of the same corporate entity, there are not two separate 'people' to form a conspiracy." *Hawes v. Downing Health Techs.*, 8th Dist. Cuyahoga No. 110920, 2022-Ohio-1677, ¶ 63 (Ohio Ct. App.). A few Ohio appellate courts recognize this doctrine, but it appears none have applied it to the public sector. One court rejected a police officer's

attempt to raise the defense because the alleged conspiratorial conduct fell outside "the scope of a Dayton police officer's duties." *Rachlow v. Dee*, 2d Dist. Montgomery No. 18927, 2002 WL 91288 at *4 (Ohio Ct. App. 2002). Accordingly, the Court determines that State law, as the Ohio Supreme Court would interpret it, does not bar a civil conspiracy claim against individuals who all work within the same county government.

In any event, even if the doctrine were available under Ohio law, the record shows that it does not apply. Several Defendants testified, emphasizing the separateness between the Sheriff's Department, the County Commission, and other parts of county government. (*See, e.g.*, ECF No. 42-1, PageID #345.) Therefore, the individual Defendants are capable of collectively entering into a civil conspiracy, and a jury may decide they did so based on this record. Potential liability on a conspiracy claim also defeats Defendants' argument that Sheriff Monroe, Commissioner Fuda, and Commissioner Cantalamessa did not participate in the arrest. (ECF No. 51, PageID #1278.)

### IV.A.3.d. Statutory Immunity

Defendants claim that Ohio law confers statutory immunity from liability for any tortious act related to the arrest of Commissioner Frenchko. Under Ohio law, a county "employee is immune from liability unless" (a) the alleged conduct is "manifestly outside the scope of the employee's employment or official responsibilities," (b) the conduct is taken "with malicious purpose, in bad faith, or in a wanton or reckless manner," or (c) Ohio law "expressly impose[s]" liability. Ohio Rev. Code § 2744.03(A)(6). The parties direct their focus to Section 2744.03(A)(6)(b),

which lifts immunity from liability for malicious, bad-faith, wanton, or reckless behavior. Whether county employees acted in such a way "is typically a question of fact for the jury." *Chavalia v. City of Cleveland*, 2017-Ohio-1048, 87 N.E.3d 705, ¶ 33 (Ohio Ct. App.).

So too here. Immunity from liability in this case rises and falls with the jury's findings. A jury may find that the Defendants orchestrated the Commissioner's arrest before the meeting, in which case their conduct was conspiratorial and in bad faith, or the jury could find that the Sergeants arrested Commissioner Frenchko on their own without a prior plan. Put more formally, a determination of statutory immunity involves a mixed question of law and fact and, on the record in this case, turns on disputed facts that a jury must decide.

Finally, a jury could find that the arrest was the result not of "an ad hoc, on-the-spot decision by an individual officer" but instead of "the government itself orchestrat[ing] the retaliation." *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018). In that case, the entity Defendants—Trumbull County, the Board of Commissioners, or the Sheriff's Department—could well be liable for the arrest under federal law.

### IV.A.3.e. Punitive Damages

Finally, Defendants seek summary judgment on the question of whether Plaintiff may recover punitive damages (on this or any other claim). They argue that Ohio law immunizes political subdivisions from punitive damages. (ECF No. 51, PageID #1297.) As relevant here, the applicable statute provides that, "in an action against a political subdivision to recover damages for injury, death, or loss to person

or property caused by an act or omission in connection with a governmental or proprietary function . . . [p]unitive or exemplary damages shall not be awarded." Ohio Rev. Code § 2744.05(A).  Plaintiff does not dispute that this statute immunizes the entity Defendants in this case.  (ECF No. 54, PageID #1442–43.)  For that reason, the Court **GRANTS IN PART** Defendants' motion for summary judgment.  As to the individual Defendants, however, a jury could find that they acted with malice, as Ohio law requires to award punitive damages.  Of course, a jury might not make that finding.  Still, it is the jury's prerogative to make that determination on the record presented.

*     *     *

For these reasons, Defendants are entitled to judgment as a matter of law in their favor on Plaintiff's claim for malicious prosecution (Count VI) and partially in their favor on the claim for battery (Count VIII), but not on the claims for false arrest (Count V) or civil conspiracy (Count VII).

### IV.B. Claims Stemming from the Phone Incident

For the incident involving her cell phone, Plaintiff claims that Sheriff Monroe committed a battery (Count VIII), assault (Count IX), and trespass to chattel and conversion (Count XIV).  Because the Court determined that this incident did not violate federal law, the Court declines to exercise supplemental jurisdiction over the remaining related State-law claims.

"[G]enerally '[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims.'"  *Packard v. Farmers Ins. Co. of Columbus*, 423 F. App'x 580, 585 (6th Cir. 2011) (quoting *Musson*

*Theatrical v. Federal Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996)).  Although the Court does not dismiss all federal claims, it is dismissing the federal claims arising out of the cell phone incidence on March 9, 2023, to which these State claims relate.  A court may decide one claim over which it has supplemental jurisdiction on the merits while declining to hear another.  *Southerland v. Hardaway Mgmt. Co.*, 41 F.3d 250, 256 (6th Cir. 1994).  When declining to exercise supplemental jurisdiction, a court should dismiss the claims without prejudice.  *Kowall v. Benson*, 18 F.4th 542, 549 (6th Cir. 2021).

Because the federal constitutional question might be more narrowly circumscribed than these causes of action under State law, the interests of comity favor leaving their decision to a State court, if Plaintiff chooses to litigate them there.  This consideration justifies a claim-by-claim decision on the exercise of supplemental jurisdiction in this case and justifies exercising the Court's discretion not to decide these particular claims on their merits.

### IV.C.  Remaining State-Law Claims

Ohio law provides a civil right of action to anyone "injured in person or property by a criminal act."  Ohio Rev. Code § 2307.60(A)(1).  Plaintiff claims injuries that Defendants caused by allegedly violating State criminal law.  (ECF No. 1, ¶ 198, PageID #24.)  Specifically, she asserts that Defendants violated her civil rights:  Ohio makes it "a misdemeanor of the first degree" for any "public servant, under color of the public servant's office, employment, or authority, [to] knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right."  Ohio Rev. Code § 2921.45.

69

For two reasons, the Court declines to exercise supplemental jurisdiction over this claim asserted in Count XII.  First, it is not clear that this claim is part of the same case or controversy under Section 1367(a).  Plaintiff alleges a pattern and practice of interfering with her civil rights.  (ECF No. 1, ¶ 197, PageID #24.)  But the federal constitutional claims over which the Court has original jurisdiction relate to only a single occurrence, not a pattern or practice.  To the extent this claim implicates other instances of allegedly unlawful actions, a court with jurisdiction to hear and decide all such matters is best positioned to address the claim.

Second, under Section 1367(c)(1), a court may decline to exercise supplemental jurisdiction over a claim raising novel or complex issues of State law.  Ohio's statute providing a civil right of action for criminal acts provides such a case here.  That statute is underdeveloped, particularly as it involves Section 2921.45 as a claimed underlying criminal act, making its development and application better suited for the State courts in a case such as this.  *See, e.g.*, *Buddenberg v. Weisdack*, 157 Ohio St. 3d 1487, 2019-Ohio-4621, 134 N.E.3d 212; *Harris v. Cunix*, 2022-Ohio-839, 187 N.E.3d 582 (Ohio Ct. App.).

For substantially the same reasons, the Court declines to exercise supplemental jurisdiction over Plaintiffs' State-law claims relating to record retention.  In Count X, she asserts that Defendants destroyed public records in violation of Section 149.351 of the Ohio Revised Code.  (ECF No. 1, ¶ 182, PageID #22.)  Additionally, in Count XI, Plaintiff claims that the destruction of evidence is a criminal act for which she seeks to hold Defendants civilly liable.  (*Id.*, ¶¶ 189–90,

PageID #23.) Each present a claim not clearly part of the same case or controversy under Section 1367(a). Again, Section 2907.60 remains underdeveloped and is best left to a State court. Moreover, Ohio's public records law has a comprehensive framework regularly litigated in the State courts. The complexity of the case law on this claim, combined with questions about whether the alleged destruction of public records is part of the same case or controversy as the federal constitutional claims before the Court, counsels in favor of declining to exercise supplemental jurisdiction.

## V.    Spoliation and Sanctions

Plaintiff requests sanctions under Rule 37(e) because Defendants failed to take reasonable steps to preserve discoverable text messages. (ECF No. 47, PageID #932–33.)

### V.A.   Relevant Facts

The record shows the following relevant facts, which bear on the parties' arguments about spoliation.

### V.A.1. Preservation Notice (July 25, 2022)

On July 25, 2022, 18 days after the arrest of Commissioner Frenchko, Plaintiff's counsel sent a preservation notice to the Trumbull County commissioners and the prosecutor's office. (ECF No. 51-5, PageID #1323.) Directing the letter to Commissioner Fuda, Commissioner Cantalamessa, and the prosecutor in his capacity as their counsel, Plaintiff gave notice to preserve "any and all documents and information pertaining to the Commissioner's Meeting held on July 7, 2022 when Niki Frenchko was arrested," including "[t]ext messages" and other private

correspondence.  (*Id.*)  Plaintiff made this request "[p]ursuant to Federal Rule of Civil Procedure."  (*Id.*)

### V.A.2. State Court Preservation Order (August 4, 2022)

On August 4, 2022, in connection with the criminal charges pressed against Commissioner Frenchko, the local municipal court ordered the County Commission and Sheriff's Office to preserve all surveillance videos, call logs, emails, text messages, and other correspondences "between and among commissioners' staff, commissioners, sheriff's staff, [and] the sheriff" from "May 4 to August 4, 2022."  (ECF No. 47-5, PageID #1006.)

A special prosecutor appointed to handle the case notified the affected parties of the municipal court's preservation order the next day.  (*Id.*)  Sheriff Monroe recalls receiving this notice (ECF No. 44-1, PageID #633), but Commissioners Fuda and Cantalamessa do not (ECF No. 43-1, PageID #500; ECF No. 42-1, PageID #390; ECF No. 51-1-, PageID #1342).  In an email dated August 8, 2022, the special prosecutor relayed a request from the Sheriff's Department for more information and clarification on the scope and extent of the preservation order.  (ECF No. 47-7, PageID #1009–10.)

On August 10, 2022, an assistant prosecutor in Trumbull County sent Sheriff Monroe a letter to stress the importance of him taking "any and all steps necessary to preserve the information and data described in that letter, and that [he] communicate this duty to your staff as applicable."  (*Id.*, PageID #1005.)  That same day, the Chief Deputy Sheriff notified all employees in the Sheriff's Department to preserve responsive information.  (ECF No. 51-9, PageID #1337.)

In an email dated August 24, 2022, Plaintiff's counsel responded to the special prosecutor's email of August 8, 2022 and raised concerns about the destruction of evidence. (ECF No. 47-7, PageID #1008–09.)  In particular, he flagged the auto-delete settings on Commissioner Cantalamessa's phone:  "[Commissioner] Mauro Cantalamessa has a setting on his cell phone to purge everything after 30 days." (*Id.*, PageID #1008.)  Previously, on August 10, 2022, Commissioner Frenchko raised that same issue at a public meeting of the board of commissioners, expressing a concern that using an auto-delete setting of 30 days did not comply with the Commission's record retention policy.  (ECF No. 52, PageID #1390 (August 10 video #2).)  She recommended sending a message to all county employees that any discussions of county business on any device creates public records and must be preserved.  (*Id.* at 0:24 to 1:05.)  Commissioner Frenchko expressed particular concern for the County's exposure to liability in litigation that deleted evidence might pose.  (*Id.* at 1:10 to 1:25.)  Commissioner Cantalamessa responded that he set his phone to delete text messages automatically after 30 days.  (*Id.* at 1:25 to 1:52.)

On August 26, 2022, the special prosecutor moved to dismiss the charges, and on August 29, 2022 the municipal court formally dismissed the criminal case against Commissioner Frenchko without prejudice.  (ECF No. 51-19, PageID 1387.)

### V.A.3. Public Records Request (August 8, 2022)

Before the time the municipal court dismissed the criminal case, on August 8, 2022, Commissioner Frenchko had submitted a public records request to the county commission and the Sheriff's Department under Section 149.43 of the Ohio Revised Code for many of the same records subject to the preservation order.  (ECF No. 47-6,

PageID #1007.) Specifically, she requested "all call logs between commissioners, Gedeon, Taylor, Blair Klotz & Monroe or staff & text messages for the same, from June 25–today." (*Id.*) On August 26, 2022, a press report on the dropped charges noted that Commissioner Frenchko "will now consider filing a federal civil rights lawsuit." (ECF No. 47-8, PageID #1012.)

### V.A.4. Preservation Notice (March 9, 2023)

Following the cellphone incident at the commission meeting held on March 9, 2023, Plaintiff's counsel sent notice by email to the county prosecutor's office regarding that incident and Commissioner Frenchko's previous arrest. (ECF No. 47-9.) Broadly, this notice seeks the preservation of records relating to these events from anyone and everyone who might have relevant information. (*Id.*, PageID #1020–21.)

During a separate lawsuit, Commissioner Cantalamessa's phone was imaged on August 3, 2022, and Defendants have provided what was recovered. (ECF No. 56, PageID #1485.)

### V.A.5. Loss of Electronically Stored Information

During discovery, Plaintiff learned that certain Defendants failed to preserve text messages sent and received on July 7, 2022 and in the days leading up to the arrest of Commissioner Frenchko; others intentionally deleted them. For example, Sheriff Monroe testified that he no longer had his text messages from the day of the arrest, though he could not recall if the messages were automatically or manually deleted. (ECF No. 44-1, PageID #603–04 & #648.) Commissioner Cantalamessa did not change the 30-day automatic delete setting on his phone. (ECF No. 43-1, PageID

#502.)    Forensic imaging of Commissioner Cantalamessa's phone in separate litigation recovered some information from his phone.   (ECF No. 47-10.)    The statement of facts above discusses the information able to be recovered from this effort.   Sergeant Ross manually deleted his text messages from the relevant time. (ECF No. 46-1, PageID #875–76.)  Defendants added to the record text logs from AT&T for Sergeants Ross and Wix and Sheriff Monroe.  (ECF No. 56-1; ECF No. 56-2; ECF No. 56-3.)

Further, Commissioner Cantalamessa denies texting any Defendant *during* the July 7, 2022 meeting.  (ECF No. 51-10, PageID #1341.)  Sergeants Ross and Wix denied ever texting any commissioner or being told to preserve their text messages. (ECF No. 51-11, ¶¶ 8 & 49, PageID #1344 & #1348 (Ross Decl.); ECF No. 51-12, ¶¶ 9 & 48, PageID #1360 & #1364 (Wix Decl.).)

### V.B.   Rule 37(e)

An amendment to Rule 37(e) in 2015 worked major changes to the availability of sanctions for a party's spoliation of or failure to preserve electronically stored information.   Accordingly, cases interpreting or applying previous versions of the Rule have little application outside of certain limited areas, such as when a party has a duty to preserve or what amounts to prejudice.  As the movants, Plaintiff bears the burden of establishing whether sanctions are warranted.  *Courser v. Michigan House of Representatives*, 831 F. App'x 161, 188 (6th Cir. 2020).

Titled "Failure to Preserve Electronically Stored Information," Rule 37 provides for sanctions where such information is lost, if it cannot be restored or replaced through additional discovery.  Fed. R. Civ. P. 37(e).  Specifically, the Rule

applies to "electronically stored information that should have been preserved in the anticipation or conduct of litigation." *Id.* And its unavailability must result "because a party failed to take reasonable steps to preserve it." *Id.* Therefore, "the routine, good-faith operation of an electronic information system" presents a relevant consideration in evaluating whether a party failed to take reasonable steps to preserve information. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Reasonable steps to preserve do not require perfection. *Id.*

Where the loss of information results from a failure to take reasonable steps to preserve it, "upon a finding of prejudice to another party from loss of the information," a court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Even then, "the initial focus should be on whether the lost information can be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Under subsection (e)(1), a finding of prejudice requires "an evaluation of the [lost] information's importance in the litigation." *Courser*, 831 F. App'x at 187–88 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). The more severe sanctions available under Rule 37(e)(2), including an adverse-inference jury instruction, may be imposed only on a finding of specific intent "to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2).

### V.B.1. Should Have Been Preserved

Rule 37(e) only applies where electronically stored information "should have been preserved in the anticipation or conduct of litigation." Where a party destroys or fails to preserve evidence in anticipation of litigation, a court may impose sanctions

76

for spoliation.  *Applebaum v. Target Corp.*, 831 F.3d 740, 744 (6th Cir. 2016) (citing *Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (en banc)).  Rule 37(e) does not create a duty to preserve evidence, instead it is based on the common-law duty to preserve.  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  "[I]t is beyond question that a party to civil litigation has a duty to preserve relevant information, including [electronically stored information], when that party 'has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'"  *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)).  Any number of events put a party on notice of a duty to preserve:  demand letters, hold notices, preservation requests, or litigation threats.  *Gomez v. Metropolitan Gov't of Nashville & Davidson Cnty.*, No. 3:19-cv-00026, 2021 U.S. Dist. LEXIS 145910, at *6 (M.D. Tenn. Aug. 4, 2021) (citation omitted).

    Defendants do not argue that they had no duty to preserve the text messages at issue.  (ECF No. 56, PageID #1508.)  The record confirms that they did.  After the arrest of Commissioner Frenchko on July 7, 2022, her counsel delivered a preservation notice to Commissioner Fuda, Commissioner Cantalamessa, and the county prosecutor 18 days later, on July 25, 2022.  (ECF No. 51-5, PageID #1323.)  In doing so, he expressly invoked the Federal Rules of Civil Procedure.  Perhaps he could have more directly threatened a lawsuit, but this notice suffices to give rise to a duty to preserve text messages and other information, particularly given the broader

litigious history between Commissioner Frenchko and at least some of these Defendants.

Instead, Defendants maintain that Sheriff Monroe and Sergeants Wix and Ross did not receive notice to preserve their text messages. (*Id.*, PageID #1483.) Whatever they declare now (ECF No. 51-11, ¶¶ 8 & 49, PageID #1344 & #1348; ECF No. 51-12, ¶¶ 9 & 48, PageID #1360 & #1364), the record shows that these Defendants had notice of their duty to preserve text messages before Commissioner Frenchko filed suit. On August 4, 2022, the local municipal court ordered the Sheriff's Office to preserve all relevant information (ECF No. 47-5, PageID #1006), and the next day the special prosecutor notified the Department of the order (ECF No. 44-1, PageID #633).

As of August 5, 2022, then, within 30 days of Commissioner Frenchko's arrest, all Defendants had a duty to preserve and were on notice of that duty. That duty triggers an obligation to act reasonably and diligently to preserve information, including intervening to suspend the routine operation of automatic delete settings. If any particular Defendant fails to recall receiving notice of his duty to preserve, that is a matter between him and the county prosecutor or other counsel, but it does not relieve him of his obligations.

### V.B.2. Reasonable Steps to Preserve

For a movant to obtain sanctions under Rule 37(e), the loss of electronically stored information must be "because a party failed to take reasonable steps to preserve it." Fed. R. Civ. P. 37(e). Therefore, "the routine, good-faith operation of an electronic information system" presents a relevant consideration in evaluating

whether a party failed to take reasonable steps to preserve information.  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  Reasonable steps to preserve do not require perfection.  *Id.*

On this record, the Court cannot say that Defendants took reasonable steps to preserve electronically stored text messages.  In fact, the record fails to identify any steps, let alone reasonable ones, Defendants undertook to discharge their obligations to preserve electronically stored information.  What little evidence of text messages the record contains comes from the imaging of Commissioner Cantalamessa's phone in other litigation or is indirect—text logs produced after the fact to try to mitigate the effects of failing to preserve the evidence that Plaintiff put Defendants on notice she would seek and a court ordered them to preserve.

### V.B.3. Restoration or Replacement of Information

Before considering sanctions, Rule 37(e) focuses on whether electronically stored information can be restored or replaced through additional discovery.  Here, the record begins to tilt in favor of Defendants.  Inherent in a claim for spoliation, as Plaintiff points out, is the fact that no one will ever know what the lost information might show.  Perhaps it supports Plaintiff's claims and arguments.  Perhaps it exonerates Defendants.

Beyond that, the record shows some imperfect efforts to restore or replace the information.  Limited restoration occurred through the imaging of Commissioner Cantalamessa's phone in other litigation.  And replacement in part came in the form of the text logs Defendants later made part of the record.  These efforts have limitations and do not resolve Plaintiff's Rule 37(e) request.  But they provide some

help to fill the gaps arising from Defendants' failures to preserve and matter under the Rule's analytical framework.

### V.B.4. Rule 37(e)(1) and (2)

A finding of prejudice is necessary under Rule 37 and requires "an evaluation of the [lost] information's importance in the litigation." *Courser*, 831 F. App'x at 187–88 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Beyond the general claim applicable in any case of spoliation that it is impossible know the contents of the lost information or its significance, Plaintiff fails to develop an argument that she was prejudiced.

Evaluating the importance of the text messages that Defendants failed to preserve, and in some cases intentionally destroyed, demonstrates that the messages do not have great importance in this litigation. This is so because, even without that information, if favorable to Plaintiff, the record establishes violations of Commissioner Frenchko's federal constitutional rights and presents sufficient facts from which a jury could find that Defendants conspired to commit these violations.

Even on a showing of prejudice, Rule 37(e)(1) directs courts to order as a remedy "measures no greater than necessary to cure the prejudice." Under Rule 37(e)(2), "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation" may a court impose more serious sanctions for the spoliation of electronically stored information, such as instructing the jury that the information lost was unfavorable to the spoliating party. To make such a finding in this case would require the Court to hold an evidentiary hearing. But such a step is not necessary. Even if some or all Defendants acted with the intent

to deprive Commissioner Frenchko of the information lost or destroyed, and the record strongly implies that some did, the more serious remedies available under Rule 37(e)(2) should not be used where lesser measures, including those available under Rule 37(e)(1), would suffice to redress the loss of the information at issue.  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  Accordingly, as already explained, disposition of the parties' cross-motions for summary judgment on the merits makes the imposition or further consideration of Rule 37(e) sanctions unnecessary.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion for partial summary judgment (ECF No. 47) and Defendants' motion for summary judgment (ECF No. 51) and **DENIES** Plaintiff's motion for oral argument (ECF No. 53).  Further, the Court declines to exercise supplemental jurisdiction over Counts VIII (in part), IX, X, XII, and XIV and dismisses those claims without prejudice.

**SO ORDERED.**

Dated:  January 16, 2023

_____
　　　J. Philip Calabrese
　　　United States District Judge
　　　Northern District of Ohio