**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NIKI FRENCHKO,<br><br>Plaintiff,<br><br>v.<br><br>PAUL MONROE, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:23-cv-781<br><br>Judge J. Philip Calabrese |

**OPINION AND ORDER**

Plaintiff Niki Frenchko, a former Trumbull County Commissioner, sued Defendants Paul Monroe, the former Trumbull County Sheriff; former County Commissioners Mauro Cantalamessa and Frank Fuda, and Sheriff's deputies Sergeants Harold Wix and Robert Ross for violations of her civil rights. She alleges that when Defendants arrested her for disrupting a public meeting of the Trumbull County Commission, they did so in retaliation for her vocal opposition to the political leadership in Trumbull County, in violation of her constitutional rights.

The parties cross-filed motions for summary judgment, which the Court granted in part and denied in part. Most significantly for the present purpose, the Court dismissed several of Ms. Frenchko's claims but granted summary judgment to her on her First and Fourth Amendment claims for retaliatory and unlawful arrest. In doing so, the Court found that probable cause did not support her arrest. Also, the Court found that several of her claims under State law should proceed to a jury. On appeal, the Sixth Circuit affirmed in part, reversed in part, and vacated the order

granting partial summary judgment in favor of Ms. Frenchko. It affirmed the Court's findings regarding statutory immunity but determined that probable cause supported Ms. Frenchko's arrest.

On remand, the Sixth Circuit left it to the Court to decide whether Ms. Frenchko's remaining claims survive the finding of probable cause. Her remaining claims are for First Amendment retaliation (Count III), Fourth Amendment unlawful seizure (Count IV), false arrest (Count V), civil conspiracy (Count VII), and battery (Count VIII). For the reasons outlined below, the Court determines that the Sixth Circuit's ruling has the consequence of bringing these claims to an end as a matter of law. Therefore, they do not survive the Sixth Circuit's ruling. Accordingly, the Court **GRANTS** summary judgment to Defendants on Plaintiff's remaining claims.

## STATEMENT OF FACTS

### A. The Trumbull County Board of Commissioners

Plaintiff Niki Frenchko won election to the Trumbull County Board of Commissioners in 2020 and took office in 2021. (ECF No. 49, PageID #1039–40.) She ran on a platform of disrupting the entrenched practices of county leadership. (*Id.*, PageID #1081.) Once elected, she joined a three-member commission which governed Trumbull County and held regular public sessions. Ohio Rev. Code §§ 302.12, 305.06, 305.09.

At the relevant times, two other commissioners served with Ms. Frenchko: Mauro Cantalamessa and Frank Fuda, who served as the chair. (ECF No. 43-1, PageID #424.) Commissioner Cantalamessa served on the board since 2013, and

Commissioner Fuda served since 2007. (*Id.*; ECF No. 42-1, PageID #301.) By all accounts, Commissioner Frenchko brought a dissenting and often unwelcome voice to the Trumbull County Board of Commissioners. In her own words, Commissioner Frenchko has "been critical" of her colleagues and "embarrassed [them] by . . . exposing how they've been doing business . . . over their terms in a very inept and corrupted way." (ECF No. 49, PageID #1053.)

At meetings of the Trumbull County Commission, Commissioner Frenchko and her two colleagues often sparred. (ECF No. 43, PageID #485.) Even disagreements over policy often devolved into arguments during which the commissioners interrupted one another. (*Id.*, PageID #485–88.) Often, the meetings descended into personal insults. For example, at public meetings Commissioner Fuda referred to Commissioner Frenchko as "this lady." (June 10 meeting video at 3:00 & 3:40.) During one public meeting, he held up photographs to Commissioner Frenchko of the trash can in the women's restroom containing used tampons. (ECF No. 42-1, PageID #378.)

Commissioner Frenchko developed a practice of live streaming meetings to her Facebook page. (ECF No. 50, PageID #1119–20.) Under Ohio law, that practice is lawful. *See, e.g.*, *Foulk v. City of Upper Arlington*, Ct. of Cl. No. 2017-00132-PQ, 2017-Ohio-4249, ¶ 15 (citing *McVey v. Carthage Twp. Trs.*, 4th Dist. Athens No. 04CA44, 2005-Ohio-2869, ¶ 14-15; *Kline v. Davis*, 4th Dist. Lawrence Nos. 00CA32, 01CA13, 2001-Ohio-2625, 2001 Ohio App. LEXIS 5598, at *8–9; 1998 Ohio Att'y Gen. No. 087, at 2-415).

### B. Dispute Involving the Trumbull County Jail

At the Commission's meeting on June 1, 2022, though not on the agenda, Commissioner Frenchko read into the record the concerns of the mother of an inmate at the Trumbull County jail. (ECF No. 49, PageID #1056–57; ECF No. 51-1, PageID #1300.) The mother's email asserted that her son contracted meningitis and received inadequate medical assistance. (ECF No. 51-1, PageID #1300.) Commissioner Frenchko reported that she learned that the inmate "did survive but has lost hearing in one ear, and has to go to rehabilitation for physical reasons." (*Id.*) In her view, "this was unacceptable." (*Id.*) Also, she reported that the Sheriff, Defendant Paul Monroe, an independently elected public official, failed to respond to her requests for information about relevant policies. (*Id.*) Commissioner Frenchko said that she raised the issue "to bring this to people's attention" and accused the two other commissioners of having "half a heart when it comes to inmate care." (*Id.*)

On July 5, 2022, the Sheriff responded to the Commissioner's reading of the letter "claiming to be written by the mother of a previously incarcerated adult inmate in the Trumbull County Jail." (ECF No. 51-2, PageID #1303.) Sheriff Monroe chastised Commissioner Frenchko for "read[ing] [the letter] publically [*sic*]" "without any investigation or corroboration to verify whether the letter was factually based or simply unfounded allegations." (*Id.*) He wrote: "Such a public presentation prior to initiating an appropriate, [*sic*] investigation through well-established, existing investigatory protocol is contrary to sound government and procedural justice safeguards." (*Id.*) Sheriff Monroe characterized Commissioner Frenchko's reading of the letter as "reckless behavior" that "should not be tolerated by Trumbull County

citizens nor other elected officials." (*Id.*, PageID #1304.) After undertaking his own investigation, Sheriff Monroe declared that the "complaint had no basis in fact" and that inmates receive "quality, professional healthcare." (*Id.*) Sheriff Monroe concluded by stating that he expected "a public apology from Commissioner Frenchko . . . be delivered in the same public forum as was the publication of the false accusations." (*Id.*)

Notwithstanding this request in his response, Sheriff Monroe testified that his intent was not to read the letter at the next meeting of the commissioners. (ECF No. 44-1, PageID #575–76.) Further, he testified that reading the letter into the record was Commissioner Fuda's idea and that he (Sheriff Monroe) did not know Commissioner Fuda would do so. (*Id.*, PageID #576.) But Commissioner Fuda testified that Sheriff Monroe did not object to having someone else read the letter at the next meeting. (ECF No. 42-1, PageID #385.)

### C. Commission Meeting—July 7, 2022

The Commission held its next meeting on July 7, 2022. The events of that meeting give rise to this litigation, so the Court discusses them in some detail. Unless otherwise noted, the Court takes the following facts from video and audio recordings of the meeting and made a part of the record. (ECF No. 52, PageID #1390, Item 1.) Where helpful, the Court points to specific points in the recordings for these facts.

#### C.1. Commissioner Frenchko's Disruption

Approximately 36 minutes into the meeting, shortly before 11:10 a.m., without objection, Commissioner Fuda directed the clerk to read aloud Sheriff Monroe's letter. While recording from her cellphone, Commissioner Frenchko relocated from the dais

where the commissioners sit to the front row of the audience, near the clerk. Toward the end of the reading, Commissioner Frenchko began to speak over the clerk. Commissioner Frenchko objected that reading the letter was not part of the meeting agenda, and she repeatedly disputed its accuracy. (ECF No. 49, PageID #1046.) Demanding that Commissioner Frenchko stop interrupting, Commissioner Fuda banged his gavel and raised his voice. Commissioner Frenchko continued to interrupt the clerk, mocking the clerk and bringing her to tears. As she continued interrupting, people in the audience urged Commissioner Frenchko to stop upsetting the clerk. At one point, Commissioner Frenchko left her seat to record the clerk from a better angle because Commissioner Fuda held up a piece of paper to obstruct her from recording the clerk.

Two Sheriff's deputies, Sergeants Harold Wix and Robert Ross, were assigned to provide security at the meeting and did so in uniform. (ECF No. 51-11, ¶ 11, PageID #1344; ECF No. 51-12, ¶ 11, PageID #1361.) Sergeant Wix had not done so before (ECF No. 45-1, PageID #683; ECF No. 51-12, ¶ 10, PageID #1361), but Sergeant Ross had done so regularly (ECF No. 46-1, PageID #800 & #814-15). Sitting in opposite corners at the back of the meeting room, both sergeants appeared to send intermittent text messages. (*See, e.g.*, ECF No. 51-14, PageID #1379 (surveillance video at 4:25).) As Commissioner Frenchko interrupted the clerk with increasing frequency and as Chairman Fuda ordered the clerk to continue reading, the two Sergeants stood, converged, and moved forward in the room. (*Id.* (surveillance video at 4:35); ECF No. 51-11, ¶ 24, PageID #1345.) Video from the meeting shows

members of the audience videotaping Commissioner Frenchko as the clerk read Sheriff's Monroe's letter.

After the clerk finished reading, Commissioner Frenchko returned to her seat on the dais and responded to the Sheriff's letter. She spoke for just under two minutes, from 11:17 a.m. to 11:19 a.m. (ECF No. 51-14, PageID #1379 (surveillance video at 6:44 to 8:38).) In her remarks, Commissioner Frenchko referenced an inmate in the jail who died days after being taken off his medication. At about that same time, Commissioner Cantalamessa received a text message from the head of a county department who advised him, "You can have her removed for being disruptive in a public meeting." (ECF No. 47-110, PageID #1022.) At that point in Commissioner Frenchko's remarks about the jail, Commissioner Cantalamessa interjected that "this is getting disruptive. . . . You are talking about the chief law enforcement officer in Trumbull County; it's unacceptable." (ECF No. 51-13, PageID #1379 (Frenchko cell phone video at 46:05 to 46:16).) Objecting to being interrupted, Commissioner Frenchko rhetorically asked whether her response to the Sheriff's letter really was disrupting the meeting.

At this point, Commissioner Fuda, the presiding officer, interrupted, "Ms. Frenchko you've interrupted everybody the entire time. We're tired of it, Ms. Frenchko." (ECF No. 51-15, PageID #1381 (audio recording at 49:05 at 49:12).) Then, Commissioner Fuda called out for Sergeant Wix, who was in the back of the room. He shouted, "Wix." (*Id.* (audio recording at 49:14).) Commissioner Fuda talked over Commissioner Frenchko: "You got a choice, you wanna apologize to the Sheriff,

fine, if you don't, we're going to move on. We're going to move on." (*Id.* (audio recording at 49:16 to 49:22).) Instead of apologizing, Commissioner Frenchko continued to state her point; Chairman Fuda pounded his gavel and ordered the clerk to "move on" as Commissioner Frenchko continued to speak. (*Id.*)

Commissioner Frenchko turned to "another thing for County business" relating to jobs and family services, which was also not on the agenda. (*Id.* (audio recording at 49:36).) At that point, Sergeant Ross gave a "thumbs up" signal to the front of the room, in the direction of Commissioner Cantalamessa. Immediately after the signal, the Sergeants approached Commissioner Frenchko, and Sergeant Wix ordered her to "stand up." She asked why. Sergeant Wix stated, "We're not going to deal with this; you are being very disruptive; you're disrupting the meeting." (*Id.* (Frenchko cell phone video at 47:00 to 47:12).) Commissioner Cantalamessa added, "You can be removed for disrupting a meeting." Commissioner Frenchko seemed confused and calmly said: "I'm not being disruptive."

Then, Sergeant Wix gently pulled her rolling chair back and directed Commissioner Frenchko to exit the meeting room. "You are removed," he stated, as the audience applauded. (*Id.*) Thirty seconds elapsed between Commissioner Fuda calling "Wix" and Sergeant Wix removing Commissioner Frenchko from the meeting.

With Commissioner Frenchko outside the meeting room, the clerk attempted to follow her instruction to move the meeting to the next order of business. (ECF No. 51-15, PageID #1381 (audio recording at 50:38).) But Commissioner Cantalamessa interjected, "before that, if I could, Mr. President, I'd like to discuss a

few things that are quite pressing and urgent in county business." (*Id.* (audio recording at 50:39 to 50:50).) Commenting on Commissioner Frenchko *in absentia*, Commissioner Cantalamessa first stated, "this lunacy has to stop." (*Id.*) Then, he proceeded to address three matters of county business without interruption. He spoke for more than two minutes uninterrupted—about a minute longer than Commissioner Frenchko took on the jail issue. Next, Commissioner Fuda opened the meeting for public comment. (*Id.*) Finally, in Commissioner Frenchko's absence, her colleagues adjourned to executive session, which was closed to the public.

### C.2. Arrest of Commissioner Frenchko

Meanwhile, at 11:20 a.m., outside the hearing room, Sergeants Wix and Ross placed Commissioner Frenchko under arrest "for disrupting a public meeting." (*Id.* (Frenchko cell phone video at 48:33).) The Sergeants ordered Commissioner Frenchko to set her phone down (still recording) and placed her in handcuffs. She complained that the cuffs aggravated a pre-existing injury, so the officers double cuffed Commissioner Frenchko, allowing her arms to rest at her side instead of behind her back.

The arrest report indicates that Sergeants Wix and Ross charged Commissioner Frenchko for the offense of "disturbing a lawful meeting" under Section 2917.12 of the Ohio Revised Code. (ECF No. 51-4, PageID #1314 (capitalization altered).) Sergeant Ross reported that Commissioner Frenchko "continuously interrupted [the clerk] by speaking and making utterances" while "Commissioner Fuda told Commissioner Frenchko . . . to stop interrupting her." (*Id.*, PageID #1317.) Sergeant Ross reported that the clerk became "visibly upset" and

"uncomfortable with [Commissioner Frenchko] recording her." (*Id.*) The Sergeant reported that they arrested Commissioner Frenchko because she "continued to speak over [Commissioner Fuda]." (*Id.*) Sergeant Wix's report noted that "Frenchko was given ample opportunity to stop her disruptive behavior, even more opportunity than the general public who attends would be afforded." (*Id.*, PageID #1319.)

In a declaration filed in connection with summary judgment, Sergeant Ross stated that he and Sergeant Wix arrested Commissioner Frenchko because her repeated interruptions were "disrupting the meeting." (ECF No. 51-11, ¶¶ 29–30, PageID #1346.) According to Sergeant Ross, "Ms. Frenchko was arrested for her interruptive and disruptive conduct, not the content of her interruptions. I did not even hear or pay attention to most of what she was saying." (*Id.*, ¶ 47, PageID #1347.) Sergeant Wix executed a materially identical declaration. (ECF No. 51-12, ¶¶ 29–30 & 46, PageID #1362 & #1364.)

After her arrest, the Sergeants led Commissioner Frenchko to the Trumbull County Jail (in the same building), where she was processed and released that day. (ECF No. 50, PageID #1138.) The next morning, Sergeant Ross filed a criminal complaint at the local municipal court and that court's deputy clerk apparently made a finding of probable cause for the charge. (ECF No. 51-17; ECF No. 51-18.) More than three months later, on the State's motion, the court dismissed the charge without prejudice. (ECF No. 51-19, PageID #1387.)

### C.3. Public Statements About the Arrest

Commissioner Frenchko was arrested at 11:24 a.m. (ECF No. 51-4, PageID #1312.) Less than 30 minutes later, at 11:52 a.m., a reporter from WKBN First News

in Warren, Ohio published a story on the arrest. (ECF No. 47-4, PageID #995; *see also* Grimley, Nadine, *Trumbull County Commissioner Niki Frenchko arrested at meeting*, WKBN (July 7, 2022), https://www.wkbn.com/news/local-news/commissioner-niki-frenchko-arrested-at-meeting/ (noting that the story initially posted at 11:52 a.m. on July 7, 2022).) That story shows the full text of the letter Sheriff Monroe sent the commissioners as well as the email to Commissioner Frenchko from the inmate's concerned mother. (*Id.*) The story quoted Sheriff Monroe, who did not attend the meeting, saying: "Our deputies gave her more latitude than a normal person from the public in a meeting, . . . . What she did violated the law, and she forced our deputies to take official action." (*Id.*) All of this content appeared in the first version of the story posted within 30 minutes of Commissioner Frenchko's arrest. (ECF No. 44-1, PageID #610.)

At deposition, Sheriff Monroe admitted that he texted the WKBN reporter at 11:16 a.m. on July 7, 2022—less than 10 minutes before the arrest of Commissioner Frenchko. (ECF No. 44-1, PageID #602.) Also, before the story first ran, he texted with the reporter after learning of Commissioner Frenchko's arrest. (*Id.*)

### C.4. Statements in Texts About the Arrest

Although the contents of the text messages the Sergeants sent while sitting at the back of the meeting room before Commissioner's Frenchko's arrest are unknown, phone records for both Sergeants show that they were not texting with the Commissioners at that time. (ECF No. 56-2; ECF No. 56-3.) These records confirm that the Sergeants were texting at the time, but do not establish with whom. On the parties' cross-motions for summary judgment, the Court construes the fact that the

officers were texting with someone during the meeting in Plaintiff's favor in ruling on Defendants' motions for summary judgment, and the fact that the Sergeants were not texting with the commissioners in Defendants' favor in ruling on Plaintiff's motion for summary judgment.

Within minutes of Commissioner Frenchko's removal from the hearing room, the county auditor texted Commissioner Cantalamessa, "What the hell happened to the bitch," to which he responded, "Handcuffed and removed." (ECF No. 47-10, PageID #1022.) Over the course of the day, Commissioner Cantalamessa texted memes—profane, insulting, and vile—to his contacts. (*Id.*, PageID #1025–26.) To one, he called Commissioner Frenchko a "[s]hitbag." (*Id.*, PageID #1024.) To another, he commented, "Terrible person to boot." (*Id.*, PageID #1026.) In answering one text asking whether Commissioner Frenchko was arrested during the commissioners' meeting, he replied, "Yup" and laughed at the ensuing response, "Wow! That might be a first." (*Id.*)

Almost a month later, on August 2, 2022, Commissioner Cantalamessa sent two texts to Sheriff Monroe. (*Id.*, PageID #1028.) In the first, he told the Sheriff, "This bs about the jail is going to[o] far." (*Id.*) In the second, less than a minute later, he added, "I'm sorry but she is running the narrative with lies and half truths and people are believing her. It's sad." (*Id.*)

In a declaration, Commissioner Cantalamessa denies texting any Defendant *during* the July 7, 2022 meeting. (ECF No. 51-1, PageID #1341.) Sergeants Ross and Wix denied ever texting any commissioner and deny being told to preserve their text

messages. (ECF No. 51-11, ¶¶ 8 & 49, PageID #1344 & #1348; ECF No. 51-12, ¶¶ 9 & 48, PageID #1360 & #1364.)

### D. Other Commission Meetings

At least during the relevant times, the record demonstrates that interruptions, lack of decorum, and aggressive gaveling were regular occurrences at meetings of the Trumbull County Board of Commissioners. Indeed, Commissioner Cantalamessa testified that arguments and interruptions are commonplace at their meetings, but arrests are not. (*See* ECF No. 43-1, PageID #485–88.)

#### D.1. May 18, 2022

On May 18, 2022, at a public meeting, Commissioner Frenchko suggested an investigation of county staff for "consistent failure to do things properly." (ECF No. 52, PageID #1391 (May 18, 2022 meeting video ("May 18_Gavel") at 0:06).) Offended at the suggestion, Commissioner Fuda slammed his gavel hard enough to break it and shouted, "Stop making up stories. . . . You know who needs to be investigated? You." (*Id.* at 0:16–0:34).) Another video in the record shows the conclusion of that meeting. With Commissioner Frenchko speaking on a matter of public concern, Commissioner Cantalamessa interrupted with a motion to adjourn, which Commissioner Fuda seconded. (ECF No. 52, PageID #1391 (May 18 meeting video ("May 18_End Debate").) Commissioner Frenchko questioned whether the Commission would forego public comments; at the same time, her colleagues voted to adjourn. (*Id.* at 0:09).) As the chair of the meeting, Commissioner Fuda stated that there was no time for public participation. (*Id.*)

After the meeting formally adjourned, Commissioner Cantalamessa accused his colleague of "childishness," and Chairman Fuda mocked her for "do[ing] this thing with her hair" as he imitated flipping hair behind his ear. (*Id.* at 0:21 & 0:31).) As the commissioners left, a member of the public complained that "the taxpayers don't get to speak." (*Id.* at 1:01).) Commissioner Fuda chided Commissioner Frenchko by responding, "[that's] because of you Ms. Frenchko." (*Id.* at 1:05.) After the meeting, Commissioner Fuda approached a member of the press and criticized him because his news organization called the board of commissioners "dysfunctional." (*Id.* at 1:39.) When the journalist (who had a camera) began to respond, Commissioner Fuda said, "I don't want to hear you" and walked away. (*Id.* at 2:01).) (Later, Commissioner Fuda apologized.)

Then, the journalist and Commissioner Frenchko exchanged pleasantries. She stayed after the meeting adjourned to address constituent questions. Her two colleagues returned to the meeting room to talk over her. Commissioner Cantalamessa said: "You don't even know that we have a stabilization fund. You don't even know what that is." (*Id.* at 4:10 to 4:15.) Then Commissioner Fuda spoke: "Ms. Frenchko, you are not here to do the commissioner's job; I am, every day." (*Id.* at 4:15 to 4:20).) Commissioner Frenchko reminded her colleagues not to talk about county business after the meeting had concluded; Commissioner Cantalamessa thought it permissible because the press was present, but a member of the public corrected him and he demurred. (*Id.* at 5:45–6:37.)

**D.2. June 10, 2022**

On June 10, 2022, less than a month before Commissioner Frenchko's arrest, the Trumbull County Highway Superintendent took the podium to respond to a list of complaints Commissioner Fuda made at a prior meeting. (ECF No. 55, PageID #1460 (June 10 meeting video).) Less than 30 seconds into his remarks, Commissioner Fuda began to interrupt, to which the superintendent responded: "Sir, I am speaking; You're banging your gavel, telling everyone to be quiet so you can speak. Let me speak." (*Id.* at 0:25–0:31).) For the next ten minutes, the superintendent criticized Commissioner Fuda, who continuously interrupted with his side of the story. Occasionally, Commissioner Frenchko attempted to ask a clarifying question. (*Id.* at 3:00 & 3:40).) When she did, Commissioner Fuda raised his voice and pounded his gavel at Commissioner Frenchko—to whom he referred to as "this lady." (*Id.*)

Commissioner Fuda explained that his interruptions were necessary to correct the falsehoods the superintendent asserted. (ECF No. 42-1, PageID #358.) ""I just set him straight," Commissioner Fuda testified, "I wasn't stopping him from speaking." (*Id.*, PageID #355.) He also indicated that their interaction emulated a style that was standard at Commission meetings.

Q: So would you agree, generally, that while that gentleman was speaking you were interjecting your thoughts and ideas?

A: I was trying to answer what he was saying. That's all.

Q: Okay.

A: We talked in this way for 16 years.

* * *

Q: Okay. But he was in middle of a sentence sometimes when you were talking?

A: That—if that was the case, that was the case.

(ECF No. 42-1, PageID #365-66.)

**D.3. Cellphone Incident (March 9, 2023)**

During a public meeting on March 9, 2023, Commissioner Frenchko and Sheriff Monroe had a run-in, captured on Commissioner Frenchko's cellphone. (ECF No. 55, PageID #1460 (March 9 meeting video).) The video in the record picks up midstream with Commissioner Frenchko making a point about avoiding layoffs at the jail. (*Id.*) Commissioner Cantalamessa invited Sheriff Monroe to address the issue. As the Sheriff began speaking, Commissioner Frenchko rotated her the camera of her phone and oriented the stand on which it rested to face the Sheriff. (*Id.* at 0:20.)

As he left his seat, Sheriff Monroe approached the commissioners' dais and knocked the phone off its stand. (*Id.* at 0:24.) As he did so, the Sheriff said, "First of all, I'm not . . . [inaudible]." Commissioner Frenchko told Sheriff Monroe that he had committed a battery. (*Id.*) As the Sheriff stood within arm's length of her seat, he twice told Commissioner Frenchko to "please stand back." (*Id.* at 0:34.) Sheriff Monroe went on answering the question posed to him while Commissioner Frenchko uttered insults, like "disgusting," and accused him of giving preferential treatment to friends. (*Id.* at 0:46.)

#### D.4. Salsa Dancing Incident

During a public meeting held on an unknown date, one public commenter (apparently the husband of a county employee) got up from his seat and approached Commissioner Frenchko to display his documentation of vaccination against Covid-19. (ECF No. 47-11, PageID #1030.) In an aggressive manner, he asks: "Did you take a test when you left Mexico?" before he imitated salsa dancing for a moment. (*Id.* at 0:15.) When the commenter concluded his presentation, he held up his middle finger to Commissioner Frenchko and pointed at her saying, "you, you, you." (*Id.* at 0:32.) Commissioner Frenchko laughed off the commenter light heartedly and muttered, "you're a racist." (*Id.* at 0:41.)

Commissioner Fuda spoke next, though the commenter interrupted him. Even after the commenter quieted down, he sat with both middle fingers directed at Commissioner Frenchko. (*Id.* at 1:04 to 1:21).) A Sheriff's deputy stood about five feet away during this episode. (*Id.*)

## STATEMENT OF THE CASE

On April 17, 2023, Plaintiff filed suit against fellow Trumbull County Commissioners Mauro Cantalamessa and Frank Fuda, Trumbull County Sheriff Paul Monroe, Deputy Sheriffs Sergeant Harold Wix and Sergeant Robert Ross, as well as Trumbull County itself, the County Sheriff's Department, and the County Board of Commissioners, seeking declaratory and injunctive relief and damages. (ECF No. 1, PageID #3–4 & #26.) Based on the events at the meetings of the Trumbull County Commissioners on July 7, 2022 and March 9, 2023, Plaintiff claims violations of her

constitutional rights under the First, Fourth, and Fourteenth Amendments as well as several torts under State law.

Under Section 1983, Plaintiff claimed that the statute supporting her arrest violates the Free Speech Clause of the First Amendment (Count I) and the Due Process Clause of the Fourteenth Amendment (Count II), and that her arrest was unconstitutional retaliation for her protected speech (Count III), unlawful seizure of her person (Count IV), and a malicious arrest (Count IV). (*Id.*, PageID #14–18.) Also, she claimed that Sheriff Monroe unconstitutionally seized her cellphone (Count XIII). (*Id.*, PageID #25.) Under State law, Plaintiff brought claims for false arrest (Count V), malicious prosecution (Count VI), civil conspiracy (Count VII), battery (Count VIII), assault (Count IX), destruction of public records (Count X), civil liability for criminal acts (Counts XI and XII), and conversion (Count XIV). (*Id.*, PageID #18–26.)

**A. Summary Judgment**

Plaintiff and Defendants filed cross-motions for summary judgment. (ECF No. 47; ECF No. 51.) In her motion, Plaintiff requested sanctions for Defendants' spoliation of evidence. (ECF No. 47, PageID #932–33.) Based on the largely undisputed facts, the Court granted in part and denied in part each party's motion. (ECF No. 61.) Specifically, the Court declined to address Plaintiff's challenge to the constitutionality of Section 2917(A)(2) of the Ohio Revised Code because she was not arrested under that statute and rejected her challenge to Section 2917(A)(1) because she brought only a facial challenge, not an as-applied one (Counts I & II). (ECF No. 61, PageID #1986–99.) Also, the Court granted summary judgment in favor of Defendants on Plaintiff's State-law claim for malicious prosecution (Count VI) and

her claim that Sheriff Monroe unconstitutionally seized her cellphone (Count XIII). (*Id.*, PageID #2017–21 & #2023.) The Court declined to exercise supplemental jurisdiction over the State law claims that arose out of the cellphone incident, dismissing Plaintiff's causes of action for assault (Count IX), civil liability for criminal act (Counts XI), and conversion (Count XIV) without prejudice. (*Id.*, PageID #2030–33.) Additionally, the Court declined to exercise supplemental jurisdiction over Plaintiff's claim for destruction of public records (Count X) and her remaining State-law claim in Count XII. (*Id.*, PageID #2032)

Regarding Plaintiff's remaining five claims (Counts III, IV, V, VII and VIII), the Court found that Plaintiff engaged in protected speech under the First Amendment and that her protected speech was the cause of her arrest. (*Id.*, PageID #2000–05.) Additionally, the Court determined that Plaintiff's protected speech could not serve as the basis for probable cause to arrest her and that this proposition was so clearly established in the law as to foreclose the protection of qualified immunity for Defendants. (*Id.*, PageID #2006–08.) The record contained disputes of fact over whether Defendants engaged in a conspiracy to violate Ms. Frenchko's rights and whether Defendants acted in bad faith, depriving them of statutory immunity. (*Id.*, PageID #2025–29.)

Based on its analysis, the Court granted summary judgment to Plaintiff on her claims for unconstitutional arrest in retaliation for her protected speech (Count III) and unlawful seizure of her person (Count IV). Additionally, the Court found that Plaintiff's State-law claims for false arrest (Count V), civil conspiracy (Count VII),

and battery as it relates to unlawful arrest (Count VIII), should proceed to a jury. In response to Plaintiff's request for sanctions, the Court found that Defendants failed to preserve evidence. (ECF No. 61, PageID #2039.) However, the Court's summary judgment ruling made it unnecessary to consider whether sanctions were necessary to cure any resulting prejudice. (*Id.*, PageID #2042–43.)

**B. Appeal to the Sixth Circuit**

On appeal, the Sixth Circuit reviewed the decision to grant summary judgment in favor of Plaintiff on her claims for unconstitutional arrest in retaliation for protected speech (Count III) and unlawful seizure of her person (Count IV). Additionally, the Sixth Circuit considered whether Defendants were entitled to qualified immunity on the federal claims or statutory immunity on the State claims. (*See generally* ECF No. 69.)

The Sixth Circuit determined that Plaintiff was arrested for the *manner* of her protected speech, not its content, providing probable cause for her arrest. (*Id.*, PageID #2117–18.) "Supported by probable cause, her arrest was lawful," and Defendants are entitled to qualified immunity on Plaintiff's federal claims related to her arrest. (*Id.*, PageID #2118.) Additionally, the Sixth Circuit concluded that Plaintiff could only proceed with personal-capacity federal claims against Sergeants Wix and Ross, the officers who arrested her, not against Sheriff Monroe or Commissioners Fuda and Cantalamessa. (*Id.*, PageID #2119–21.) Although Plaintiff brought a civil conspiracy claim and presented evidence that all Defendants participated in a conspiracy to cause her arrest, the Sixth Circuit held this argument forfeited "because neither party has raised issue of a § 1983 civil conspiracy claim on

appeal." (*Id.*, PageID #2121.) However, the Sixth Circuit allowed Plaintiff's official capacity claims to proceed against each Defendant. (*Id.,* PageID #2122.) Finally, the Sixth Circuit affirmed the determination that Defendants' statutory immunity against Plaintiff's State-law claims depends on disputed fact and was best left to a jury. (*Id.*, PageID #2124-28.)

On remand, the Sixth Circuit left it to the Court to decide whether Plaintiff's First Amendment retaliation claim (Count III) survives the finding of legitimate probable cause through a recognized exception and to proceed with the remaining claims in a manner consistent with the Sixth Circuit's opinion. (*Id.*, PageID #2122–24 & #2129.) The only other remaining federal claim is for unlawful seizure of Plaintiff's person under the Fourth Amendment (Count IV). Plaintiff's remaining State-law claims are for false arrest (Count V), civil conspiracy (Count VII), and battery as it relates to unlawful arrest (Count VIII). The Sixth Circuit did not opine on Plaintiff's request for sanctions.

## ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions

of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must then "set forth specific facts showing there is a genuine issue for trial." *Id.* (citing *Anderson*, 477 U.S. at 250). To determine whether a genuine dispute about material facts exists, it is not the Court's duty to search the record. *See Betkerur v. Aultman Hospital Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). Instead, the parties must bring those facts to the Court's attention. *Id.*

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court, instead, determines "whether the evidence presents a sufficient disagreement to require submission to a jury" or whether the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. In doing so, the Court must view the evidence in the light most favorable to the non-moving party. *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).

If a genuine dispute exists, meaning "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgement is not appropriate. *Tokmenko*, 488 F. Supp 3d at 576 (citing *Anderson*, 477 U.S. at 250). If the evidence, however, "is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Id.* The "mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48).

"Just as a plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (cleaned up). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009)).

"[W]here, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). Therefore, cross-motions for summary judgment do not warrant granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed. *Langston v. Charter Twp. of Redford*, 623 F. App'x 749, 755 (6th Cir. 2015). To the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed "in the light depicted by the videotape." *Scott*, 550 U.S. at 380–81.

## I. Section 1983

Section 1983 provides a federal cause of action to a person whose rights "secured by the Constitution" are violated by an official acting "under color of [State

law]." 42 U.S.C. § 1983. In this way, Section 1983 "creates a species of tort liability" where State actors violate federal constitutional rights. *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (citation omitted). "The first inquiry in any § 1983 suit is to isolate the precise constitutional violation" alleged. *Graham v. Connor*, 490 U.S. 386, 394 (1989) (internal quotation marks and citation omitted). "After pinpointing" the constitutional right at issue, "courts still must determine the elements of, and rules associated with, an action seeking damages for its violation." *Manuel v. City of Joliet*, 580 U.S. 357, 370 (2017). Under Section 1983, "the general 'common law of torts'" bridges the gap between a constitutional right and the elements of a cause of action. *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160 (6th Cir. 2021) (citation omitted).

### I.A. First Amendment Retaliation (Count III)

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U. S. 250, 256 (2006)). To establish a claim of retaliatory arrest under the First Amendment, Plaintiff must show that "(1) [she] engaged in protected conduct; (2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) . . . [her] protected conduct" caused the adverse action. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc); *see also Wood v. Eubanks*, 25 F.4th 414, 428 (6th Cir. 2022).

#### I.A.1. Causation

Previously, the Court determined that Plaintiff satisfied the first two elements of this test. (ECF No. 61, PageID #1999–2004.) Now, the Court revisits the third

element, causation, based on the Sixth Circuit's analysis and its determination that probable cause supports Plaintiff's arrest. (ECF No. 69, PagEID #2117–19 & #2122–24.) Notably, the Sixth Circuit determined that this claim may proceed against each Defendant in his official capacity but only against Sergeants Wix and Ross in their personal capacities. (*Id.*, PageID #2119-22.)

"[R]etaliation is subject to recovery as the but-for cause of official action offending the Constitution." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). But in the case of retaliatory arrest or retaliatory prosecution claims, it can be more difficult to determine whether the retaliatory animus was the determining factor that led to an official action. *Hartman*, 547 U.S. at 261 (explaining, in a retaliatory prosecution case, that "the difference is that the requisite causation between the defendant's retaliatory animus and the plaintiff's injury is usually more complex than it is in other retaliation cases"). "[R]etaliatory arrest cases also present a tenuous causal connection between the defendant's alleged animus and the plaintiff's injury." *Reichle v. Howards*, 566 U.S. 658, 668 (2012). For this reason, a plaintiff raising such a claim is generally required to prove that probable cause did not support the arrest or prosecution. *Nieves*, 587 U.S. at 400 (citing *Hartman*, 547 U.S. at 265).

However, in the context of a retaliatory arrest claim, the presence of probable cause does not end the inquiry. Under *Nieves*, 587 U.S. at 407, a plaintiff may still establish causation if he "presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." This circumstance may arise "where officers have probable

cause to make arrests but typically exercise their discretion not to do so," as with minor offenses like jaywalking. *Id.* at 406–07. To fall within the *Nieves* exception, a plaintiff need not present evidence involving "virtually identical and identifiable comparators" who were not arrested. *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024). Rather, "the only express limit . . . on the sort of evidence a plaintiff may present for [this] purpose is that it must be objective." *Id.* Under *Nieves*, the analysis must "hone in on the arrest-generating conduct" and determine whether that "*particular* type of behavior had been overlooked in others." *Grady v. Cratsenburg*, 170 F.4th 995, 1005 (6th Cir. 2026) (cleaned up) (original emphasis).

Plaintiff invokes *Nieves* because "all meetings were chaotic and disruptive" at the Trumbull County Board of Commissioners. (ECF No. 47, PageID #966.) In this context, it is necessary to determine whether her "arrest-generating conduct" was comparable to other disruptions generally overlooked in others. In their report of the arrest, Sergeants Wix and Ross explained that they arrested Plaintiff because she "continuously interrupted [the clerk] by speaking and making utterances" and continued to speak even after "Commissioner Fuda used his gavel several more times." (ECF No. 51-4, PageID #1317.) After "[b]oth Commissioner Cantalamessa and Commissioner Fuda told Commissioner Frenchko she was being disruptive," both Sergeants rose to remove and arrest her for disturbing a lawful meeting. *Id.*

The video evidence demonstrates that several prior commission meetings contained greater disruptions than those at issue here, not only through gaveling, rude gestures, and personal insults, but also in interruptions between Commissioners

and anyone who took the opportunity to speak. Defendants largely agree that this dynamic was the norm at the time at the Trumbull County Commission. As Commissioner Fuda explains, "We talked in this way for 16 years." (ECF No. 42-1, PageID #365.) Commissioner Cantalamessa testified that arguments and interruptions are commonplace at commission meetings, although such conduct never resulted in an arrest until July 7, 2022. (ECF No. 43-1, PageID #485–87.)

Defendants offer no explanation to distinguish Ms. Frenchko's disruptive conduct from the disruptions in previous meetings. Instead, they suggest that Sergeants Wix and Ross had too little experience to compare their arrest of Ms. Frenchko with other incidents in which disruptive individuals or commissioners were not arrested. (ECF No. 56, PageID #1493–94.) However, the record does not support this argument. While Sergeant Wix had not previously attended commission meetings, Sergeant Ross was accustomed to them as part of his regular detail. (ECF No. 45-1, PageID #705; ECF No. 46-1, PageID #814-18.) Therefore, Plaintiff presents objective evidence that she was arrested "when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407. A rational jury could find that retaliatory animus, sparked by Ms. Frenchko's protected speech, was the actual cause of her arrest. "[T]he question of causation is a factual issue to be resolved by the jury, and may be satisfied by circumstantial evidence." *Richards v. Perttu*, 96 F.4th 911, 918–19 (6th Cir. 2024). Therefore, this claim presents genuine disputes of material for trial.

### I.A.2. Qualified Immunity

Defendants assert that they are entitled to qualified immunity. (ECF No. 58, PageID #1880–83.) Qualified immunity protects public officials against lawsuits for civil damages where their conduct does not violate clearly established constitutional rights. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (quotation omitted). In evaluating a claim of qualified immunity, the Sixth Circuit directs a district court to undertake two inquiries, in either order. The Court must determine whether "the facts alleged make out a violation of a constitutional right." *Id.* Also, the Court asks if the right at issue was clearly established at the time "such that a reasonable officer would have known that his conduct violated it." *Id.* (citation omitted). The burden to show that qualified immunity does not exist rests on the plaintiff. *Chappell*, 585 F.3d at 907 (citation omitted). To meet this burden, he must satisfy both steps of the test. *Martin*, 712 F.3d at 957 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

For a right to be clearly established, it "must be sufficiently clear [such] that every reasonable official would have understood that what [s]he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quotations omitted) (cleaned up). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). To determine whether a right is clearly established to provide "fair warning" that the conduct at issue is unconstitutional, courts "look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within our circuit, and finally to

decisions of other circuits." *Guertin v. Michigan*, 912 F.3d 907, 932 (6th Cir. 2019). (quotations omitted). The "precise situation" need not have previously been held unlawful, but "existing precedent must have placed the . . . constitutional question beyond debate." *Id.* (quotation omitted). "Finally, 'an action's unlawfulness can be 'clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs.'" *Id.* (quoting *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015)).

Rather than defining a clearly established right at a high level of generality, clearly established law must be particularized to the facts of the case. *White v. Pauly*, 580 U.S. 73 (2017) (per curiam) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). In this way, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Pauly*, 580 U.S. at 79.

In 2012, the Supreme Court held that there existed no clearly established "right to be free from a retaliatory arrest that is otherwise supported by probable cause." *Reichle v. Howards,* 566 U.S. 658, 665 (2012). This holding preceded later decisions in which the Supreme Court created exceptions to permit a retaliatory arrest claim even where probable cause existed. *Nieves v. Bartlett*, 587 U.S. 391 (2019); *Lozman v. Rivera Beach*, 585 U.S. 87 (2018). Plaintiff pursues her claims under these exceptions.

But the Supreme Court has not yet returned to the question whether the right to be free from retaliatory arrest notwithstanding probable cause is clearly established now that these exceptions exist. And the Sixth Circuit continues to cite *Reichle* for the proposition that it is not. *See e.g.*, *Blackwell v. Nocerini,* 123 F.4th 479, 491 (6th Cir. 2024); *Novak v. City of Parma,* 33 F.4th 296, 304 (6th Cir. 2022). Further, the Sixth Circuit has construed *Nieves*'s conclusion that "probable cause should *generally* defeat a retaliatory arrest claim," as evidence that the Supreme Court has "disavowed" the right to be free from retaliatory arrest otherwise supported by probable cause. *Id.* (emphasis added).

Under of the law of this Circuit as construed in this way, it cannot be said that the right at issue here is clearly established. The present state of the law simply does not permit a claim that falls within the *Nieves* exception to overcome the protection of qualified immunity. For this reason, Defendants are entitled to qualified immunity against Plaintiff's First Amendment claim.

**I.B. Fourth Amendment Seizure (Count IV)**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. When Sergeants Wix and Ross arrested Commissioner Frenchko, they "seized" her person within the meaning of the Fourth Amendment. *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021). Therefore, the Fourth Amendment requires that seizure to be reasonable. An arrest is "unreasonable" where it is not "'based on probable cause' to believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 192 (2013) (quoting *Dunaway v. New*

*York*, 442 U.S. 200, 213 (1979)). "This probable-cause standard applies to all 'seizures' up to the jury trial." *Jones v. Clark Cnty.*, 959 F.3d 748, 770 (6th Cir. 2020) (Murphy, J., concurring in part and dissenting in part) (citing *Manuel*, 580 U.S. at 369 n.8).

In the language of the Fourth Amendment, arrests without probable cause are "unreasonable." Conversely, where probable cause supports an arrest, the seizure of a person is reasonable under the Constitution. The absence of probable cause for an arrest is an element of claims at common law for both false arrest and malicious prosecution. *Voyticky v. Village of Timberlake*, 412 F.3d 669, 675, 677 (6th Cir. 2005).

The Sixth Circuit determined that probable cause supported Ms. Frenchko's arrest. (ECF No. 69, PageID #2117–18.) The existence of probable cause absolutely bars a claim of false arrest under the Fourth Amendment. *See Muhammad v. Pearson,* 900 F.3d 898, 907 (7th Cir. 2018); *Atterbury v. City of Miami Police Dep't,* 322 F. App'x 724, 727 (11th Cir. 2009). For this reason, Defendants are entitled to summary judgment on Plaintiff's Fourth Amendment claim.

## II. Remaining State Law Claims

Plaintiff pursues three remaining claims under State law. For her arrest, Plaintiff brings claims for false arrest (Count V) and battery (Count VIII). Also she brings a claim for civil conspiracy (Count VII), alleging that all Defendants "conspired to falsely arrest and later maliciously prosecute [her]." (ECF No. 1, ¶ 161, PageID #20.)

Under federal law "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original

jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). This grant of jurisdiction brings all claims arising from a common nucleus of operative fact before the Court. *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 588 (6th Cir. 2016).

Even then, a court "may decline to exercise supplemental jurisdiction" in certain circumstances. 28 U.S.C. § 1367(c). Supplemental jurisdiction "is a doctrine of discretion." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966). To determine whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity[.]" *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also James v. Hampton*, 592 F. App'x 449, 462-63 (6th Cir. 2015) (quoting *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1882 (6th Cir. 1993)). Section 1367(c)(3) provides that a district court may decline to exercise supplemental jurisdiction where (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. When deciding whether to invoke supplemental jurisdiction, "a federal court should consider and weigh . . . the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *Gibbs*, 383 U.S. at 726–27).

After reviewing the record in this matter, the Court declines to exercise its discretion to retain supplemental jurisdiction over Plaintiff's remaining claims under State law. For these reasons stated above, the Court determines that Defendants are entitled to judgment as a matter of law in their favor on Plaintiff's claims under federal law. Further, the remaining claims involve State-law causes of action best suited to resolution in the State courts. Nor does the Court perceive any compelling interest in judicial economy or other compelling reasons that would trump these considerations or lead it to proceed to the merits of these claims.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's remaining federal claims and exercises its discretion to **DISMISS WITHOUT PREJUDICE** Plaintiff's remaining State-law claims for false arrest (Count V), battery (Count VIII), and civil conspiracy (Count VII).

**SO ORDERED.**

Dated: November 24, 2026

J. Philip Calabrese
United States District Judge
Northern District of Ohio